In the Matter Of:

US BANK NATIONAL ASSOCIATION vs SHAKOORI

17-cv-394 WES

---

# HOWARD R.  HANDVILLE

*April 07, 2022*

---

*30b6*



1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF RHODE ISLAND

3

4

5

US BANK NATIONAL ASSOCIATION
6  AS TRUSTEE FOR THE REGISTERED
HOLDERS OF THE STRUCTURED ASSET
7  SECURITIES CORPORATION, STRUCTURED
ASSET INVESTMENT LOAN TRUST MORTGAGE
8  PASS-THROUGH CERTIFICATES,
SERIES 2003-BC11

9

       VS.                      17-cv-394 WES
10

MASOUD SHAKOORI, ET AL.
11

12

13

14

15

16

17       WEBCONFERENCE 30(b)(6) DEPOSITION OF

18   U.S. BANK, by and through HOWARD R. HANDVILLE

19                  APRIL 7, 2022

20                   10:34 A.M.

21

22

23

24

25       Linda L. Guglielmo, RMR No. 27532



1                    APPEARANCES OF COUNSEL

2

   On Behalf of the Plaintiffs:
3
             SAMUEL C. BODURTHA, ESQ.
4            Hinshaw & Culbertson, LLP
             53 State Street
5            Boston, MA  02109
             617-213-7000
6            sbodurtha@hinshawlaw.com

7

   On Behalf of the Defendant:
8

9            JOHN B. ENNIS, ESQ.
             Law office of John Ennis
10           1200 Reservoir Avenu
             Cranston, RI  02920
11           401-943-9230
             jbelaw75@gmail.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    INDEX OF EXAMINATION

 2

 3    WITNESS: HOWARD HANDVILLE

 4    EXAMINATION                                     PAGE
      By Mr. Ennis                                     5
 5

 6

 7

 8                        EXHIBITS

 9    DEFENDANT'S      DESCRIPTION                    PAGE

10    Exhibit A  NOTICE OF DEPOSITION, 7 PGS.......8
      Exhibit B  U.S. BANK'S ANSWERS TO
11               INTERROGATORIES, 16 PGS..........64

12    PLAINTIFF'S
      Exhibit 1  TRUST AGREEMENT, 197 PGS........101
13

14

15

16

17

18

19       FOR INSTRUCTIONS TO WITNESS, SEE PAGE 37

20

21

22

23

24

25
```



```
1              30(b)(6) DEPOSITION OF U.S. BANK,

2            by and through HOWARD HANDVILLE

3                   April 7, 2022

4              (COMMENCED AT 10:34 A.M.)

5              THE REPORTER: Stipulation: It is

6    hereby stipulated and agreed by and between all

7    counsel present that under the Executive Order

8    by the Supreme Court of Rhode Island, 2020-09

9    regarding COVID-19 that this proceeding is

10   being conducted remotely by web-based

11   conferencing.

12             The witness shall be sworn after

13   providing a valid form of identification.

14             This remote proceeding will not be

15   recorded in any manner without prior consent of

16   all parties.

17             Exhibits may be marked by counsel and

18   presented to a witness.  Copies of exhibits

19   presented shall be emailed to or otherwise in

20   possession of all parties prior to any

21   questioning regarding the exhibit.  My notary

22   number is 7337.

23

24

25
```



```
 1                    HOWARD R. HANDVILLE
 2    having been duly sworn, testifies as follows:
 3                    THE REPORTER: State your name.
 4                    THE WITNESS: Howard R. Handville.
 5    EXAMINATION
 6    BY MR. ENNIS:
 7         Q.  Mr. Handville, what is your business
 8    address, please?
 9         A.  1661 Worthington Road, Suite 100, West
10    Palm Beach, Florida, 33409.
11         Q.  What business is at that address?
12         A.  That is the -- that is the PHH
13    servicing division.
14         Q.  And what floor is your office on?
15         A.  It's only one floor.
16         Q.  Okay.  And do you have -- what is your
17    title?
18         A.  Senior loan analyst.
19         Q.  And who are you the senior analyst
20    for?
21         A.  Ocwen Financial Corporation.
22         Q.  Where is Ocwen Financial Corporation's
23    office?
24         A.  It's also in West Palm Beach, same
25    address.
```



1       Q.   Same address?

2       A.   Yes.

3       Q.   Is there a separate office in that

4   building for Ocwen Financial Corporation?

5       A.   Well, there is a bunch of internal

6   offices and facilities, but it's not like a

7   different suite number or anything, it's all in

8   the same facility.

9       Q.   Okay.  Do you have your own office?

10      A.   I work remotely.

11      Q.   Excuse me?

12      A.   I work remotely.

13      Q.   So you do not have an office location

14  at that building; is that correct?

15      A.   No longer, no.

16      Q.   Did you ever?

17      A.   Yes.

18      Q.   When did you?

19      A.   From the time I started with Ocwen in

20  2010 until I'm going to say probably late 2019

21  or early 2020.

22      Q.   And prior to that, did you have an

23  extension phone number to be reached at that

24  time?

25      A.   I did.



1        Q.  Okay.  Now you no longer have an

2    extension; is that correct?

3        A.  I don't.

4        Q.  Have you ever been deposed before?

5        A.  Yes.

6        Q.  How many times?

7        A.  I don't keep track.  I could venture a

8    guess, north of 75 times, maybe.

9        Q.  Do you recall when the first time was

10   you've ever been deposed?

11       A.  No.

12       Q.  Do you recall when the last time you

13   were deposed?

14       A.  I don't really remember the date.  I

15   think it was earlier this year, but I can't

16   recall specifically.

17       Q.  Okay.  In what capacity were you

18   deposed in that case this year?

19       A.  In my capacity as the witness for

20   Ocwen Financial Corporation.

21       Q.  Are you familiar with what a

22   deposition is?

23       A.  I am.

24       Q.  What is your understanding of what a

25   deposition is?



1        A.  Part of the discovery process.

2        Q.  I'm going to respond based on your

3    personal knowledge.  I don't want you to guess

4    or assume any answers; all right?

5        A.  Understood.

6        Q.  And you understand that if you don't

7    understand the question, feel free to let me

8    know, and I can either have it read back or

9    rephrase it; is that okay?

10       A.  Okay.

11       Q.  Okay.  Now, have you received a copy

12   of the notice to take deposition -- beforehand,

13   can I ask that the notice to take deposition be

14   marked as Exhibit A.

15                EXHIBIT A (DEFENDANT'S EXHIBIT A

16                MARKED FOR IDENTIFICATION)

17       Q.  Have you seen the notice to take

18   deposition?

19       A.  I have.

20       Q.  When did you see that?

21       A.  I received it on April 4th.

22       Q.  Did you read -- did you take time to

23   read it?

24       A.  I did.

25       Q.  How long did it take you to read it?



```
1         A.   Ten minutes, maybe.

2         Q.   Okay.  Did you look at all the topics

3    that were requested where it says, Pursuant to

4    FRCP 30(b)(6) U.S. Bank shall designate an

5    individual with knowledge to testify on its

6    behalf regarding the following areas of

7    inquiry.  Did you see that?

8         A.   I did.

9         Q.   And have you ever been deposed on

10   behalf of -- been a witness on behalf of U.S.

11   Bank before?

12        A.   I don't know specifically.  I don't

13   recall.

14        Q.   Now what is -- after you received

15   that, did you take any action to determine

16   whether or not you were the person with

17   knowledge of the various areas of inquiry?

18        A.   No.

19        Q.   Are you the person with knowledge of

20   the boarding of the defendant's mortgage loan

21   as referenced in topic -- do you have a copy of

22   the notice of deposition in front of you?

23        A.   I do.

24        Q.   In regard to area of inquiry number 1,

25   you state you did not take any action to
```



```
 1   determine whether or not you were the person

 2   with the knowledge in that regard?

 3        A.  I have some knowledge.

 4        Q.  What document have you -- in

 5   preparation of this deposition, have you

 6   reviewed any documents?

 7        A.  Yes.

 8        Q.  Okay.  Where did you receive those

 9   documents from?

10        A.  I didn't receive -- well, I received a

11   lot of documents from our counsel.

12        Q.  Okay.  Who is that?

13        A.  Samuel Bodurtha.

14        Q.  When did you receive those documents?

15        A.  I think it was in February.  I'm not

16   really sure specifically when.

17        Q.  Okay.  What documents did you receive?

18        A.  We received an exhibit list with the

19   exhibits.  Let's see, what else, a trial

20   readiness memo, and there were filings,

21   petitions and pleadings that I read.  I think I

22   even read yours, your trial readiness

23   memorandums.  I can't recall, there was a lot

24   of documents.

25        Q.  And when did you read these
```



1  documents -- when was the last time you

2  reviewed any documents?

3      A.  Last night.

4      Q.  Okay.  And how long did you spend

5  reading those documents?

6      A.  From the time I received them until

7  now, maybe 15 hours, maybe more.  I didn't

8  really track the time.

9      Q.  How is it determined -- who made a

10 determination that you were the person with the

11 knowledge in area of inquiry number 1?

12              MR. BODURTHA: I'm going to object

13 to that, because it calls for attorney/client

14 communications and for information obtained in

15 preparing or in anticipation of litigation.

16 But beyond any work product information,

17 Mr. Handville can answer.

18     A.  I don't know that there was a decision

19 made as to who has the knowledge.

20     Q.  Well, are you the person with

21 knowledge of all the topics that were listed?

22     A.  I have knowledge of the topics.

23     Q.  Directing your attention to number 1,

24 what documents did you review in order to be

25 able to testify about area of inquiry number 1?



1      A.  I didn't receive any documents on

2  that.

3      Q.  What documents did you review in

4  regard to area of inquiry Number 2 to prepare

5  for your deposition?

6      A.  I didn't receive or review any

7  documents on that, either.

8      Q.  What documents did you receive which

9  you reviewed in order to prepare for your

10  deposition in regard to area of inquiry Number

11  3 on the notice of deposition?

12      A.  I didn't receive or review any

13  documents on that.

14      Q.  What documents did you receive and

15  review in regard to topic Number 4 in the

16  notice to take deposition to prepare for this

17  deposition?

18      A.  I reviewed the -- I believe it was the

19  trust agreement regarding who the custodian is.

20  I reviewed MSP, the servicing system that PHH

21  uses.  Those are the two items that I reviewed.

22      Q.  From whom did you receive the trust

23  agreement?

24      A.  The trust agreement I received from

25  Mr. Bodurtha.



1        Q.  When you say the MSP servicing system,
2    can you please explain what that is?
3        A.  Servicing system is the electronic
4    platform used to service the loan, implemented
5    by or handled by PHH Mortgage.
6        Q.  Is that a printed document, or is that
7    a computerized document?
8        A.  It's a system.
9        Q.  So, when did you access that system in
10   regard to topic Number 4?
11       A.  Oh, gosh, probably back in February.
12       Q.  Of 2022?
13       A.  Correct.
14       Q.  You did not review that yesterday
15   during your 15 hours of preparation?
16       A.  No.
17       Q.  Staying on Number 4, do you know who
18   the custodian of this loan was?
19       A.  Yes.
20       Q.  And who was that custodian?
21       A.  Wells Fargo.
22       Q.  Do you know if there's a custodial
23   agreement in regard to that -- is there a
24   custodian between Wells Fargo and any other
25   entity?



 1        A.  I haven't seen the custodial

 2   agreement, so I don't know.

 3        Q.  What's a custodian, if you know?

 4        A.  We refer to them as document

 5   custodians.  They handle the lateral documents,

 6   note, mortgage, origination documents, I think

 7   title policy, commitment and things like

 8   allonges, notes, things like that in the

 9   collateral file, they're maintained with the

10   document custodial with the trust.

11        Q.  Have you seen a custodial index by the

12   document custodian regarding this file?

13        A.  No.

14        Q.  What documents did you receive and

15   review in regard to topic Number 5 in the

16   notice to take deposition?

17        A.  Nothing on 5 or 6.

18        Q.  So, in other words, you did not review

19   any documents, receive or review any documents

20   in preparation for topic number 6; is that

21   correct?

22        A.  Correct.

23        Q.  What documents did you receive and

24   review in preparation for your deposition in

25   regard to topic Number 7?



1        A.  Well, I reviewed the documents that

2    are exhibits that counsel sent me, I think it's

3    Exhibits H, I, J, K, L, M, N -- no, sorry, M is

4    the last one.  So Exhibits G through M is what

5    I reviewed in that regard.

6        Q.  Have you ever seen the originals of

7    those documents?

8        A.  No.

9        Q.  Do you know where the originals of

10   Exhibits G, H, I, J, K, L and M are located?

11       A.  Not specifically.

12       Q.  Not specifically, or not at all?

13       A.  Well, they would be in the possession

14   of the trust.

15       Q.  How do you know that?

16       A.  They're the people that provide them

17   to the servicers.

18       Q.  How do you know that?

19       A.  Well, just my experience.

20       Q.  Well, I'm not speaking about your

21   experience.  In regard to this particular loan,

22   you're being deposed as a representative of

23   U.S. Bank as trustee; is that correct?

24       A.  Correct.

25       Q.  You are the person with the knowledge

1  that, you've been presented by U.S. Bank as the

2  person with knowledge of certain topics; is

3  that correct?

4       A.  Yes.

5       Q.  So, once again, I'm asking you, based

6  upon your knowledge, where are the originals of

7  these documents located?

8       A.  I don't know.

9       Q.  Have you made any inquiry as to where

10  they are located?

11       A.  No.

12       Q.  Are there any documents in your

13  possession that indicate where they're located?

14       A.  Not that I've seen.

15       Q.  Are there any records anywhere which

16  indicates where these original documents are

17  located?

18             MR. BODURTHA: Objection.  You can

19  answer.

20       A.  I don't know.

21       Q.  Do you even know if there are any

22  original documents?

23             MR. BODURTHA: Objection.  You can

24  answer.

25       A.  I haven't seen any, so I couldn't say



1    yes to that.

2        Q.  Who provided the copy of Exhibit G to

3    U.S. Bank?

4                    THE WITNESS: Bear with me.

5                    (PAUSE)

6        A.  I don't know, but it's signed by

7    Lehman Brothers Bank.

8        Q.  I'm not asking whether or not it's

9    signed, I'm asking who provided that to U.S.

10   Bank?

11       A.  I don't know.

12       Q.  Do you even know if there are any

13   original documents of G through M?

14       A.  No.

15       Q.  Directing your attention to Number 8,

16   did you receive and review any documents which

17   indicate that you used to prepare for your

18   deposition with regard to topic Number 8?

19                    THE WITNESS: What was the question

20   again?

21       Q.  Did you receive and review any

22   documents to prepare for your testimony

23   regarding topic Number 8?

24       A.  No.

25       Q.  Did you receive and review any



1   documents -- did you receive any documents in
2   regard to topic Number 9?
3                  MR. BODURTHA: Is that the
4   question?
5                  MR. ENNIS: Yes.
6                  THE WITNESS: Did I receive
7   documents, is that what your question was?
8                  MR. ENNIS: Yes.
9       A.  I received copies of pay histories
10  from Ocwen.  I reviewed pay histories of PHH,
11  and I reviewed some prior service or pay
12  histories.
13      Q.  What exact documents did you review in
14  preparation for Number 9?
15                 MR. BODURTHA: Objection.  If you
16  understand the question.
17      Q.  Which pay histories?
18      A.  PHH, Ocwen, and I believe it was HMSI
19  or Homewood.
20      Q.  What time frame were the HMSI,
21  Homewood residential records dated that you
22  reviewed?
23      A.  I think it started in 2007 up through
24  somewhere near the transfer date to Ocwen.
25      Q.  Do you know what electronic system of



 1  record AHI/Homewood used?

 2       A.  I believe they were using MSP.

 3       Q.  What system did Ocwen use when it

 4  servicing the loan?

 5       A.  Ocwen was using a platform that was

 6  called Real Servicing.

 7       Q.  What documents did you review to

 8  verify that the documents provided to Ocwen by

 9  American Home Mortgage Servicing, Inc., were

10  accurate?

11              MR. BODURTHA: Objection.  You can

12  answer.

13       A.  Nothing.

14       Q.  What documents did you review to

15  determine that any documents provided from

16  Ocwen to PHH when servicing changed were in

17  fact accurate?

18              MR. BODURTHA: Objection.  You can

19  answer.

20       A.  Nothing.

21       Q.  Does PHH have a protocol to

22  determine -- let me strike that.  Does PHH

23  currently have a protocol to confirm and verify

24  the accuracy of all prior servicer documents

25  when it loads the documents on its electronic



1  system of record?

2           MR. BODURTHA: Objection.

3  Foundation.  You can answer.

4       A.  Not to my knowledge.

5       Q.  Well you're the person -- I had asked

6  you in regard to Number 2 whether you were the

7  person with knowledge of the manner in which

8  PHH verified the accuracy of the principal

9  balance, interest due, escrow due, monthly

10  payment of principal interest, and any fees

11  loan when the loan boarded on PHH's electronic

12  system of record; is that correct?

13      A.  That's what Number 2 says, yes.

14      Q.  Are you the person that has that

15  knowledge?

16      A.  I have some knowledge.

17      Q.  Once again, I'm asking you what

18  knowledge do you have by the manner in which

19  PHH verified the accuracy of those documents?

20           MR. BODURTHA: Objection.  You can

21  answer.

22      A.  You're asking me about verifying

23  documents.

24      Q.  Excuse me, I'll correct that.  What

25  documents did PHH review in order to verify the



1   accuracy of the principal balance, interest

2   due, escrow due, monthly payment of principal

3   and interest, and any fees charged to the

4   mortgage loan account when the loan boarded on

5   PHH's electronic system of record?

6        A.   PHH's boarding of loans involves a

7   process to -- I'm not sure I can explain this

8   because I'm not a technical person.  The

9   language of the data that is going to be

10  transferred from one servicer to another, how

11  the information is going to be transferred,

12  let's say through an electronic secure file

13  transfer protocol.  The prior servicer provides

14  a master file ahead of the boarding which has

15  all the loan data that resides in their system

16  of record.

17        The servicing transaction management

18  team ensures that we get another report right

19  before the loan goes live, so if there are any

20  material changes to any of the figures in this

21  interim period between the first report and the

22  last report, right before the loan goes live,

23  to capture any payments that have been made or

24  disbursements that have been made or any

25  changes in the system regarding the borrower or



1   anything like that that would have changed in
2   that interim period.
3          Then the information is run,
4   transferred into the new system, new loan
5   numbers are often associated with this,
6   sometimes we retain the same number as the
7   prior servicer.  Once the information is in the
8   system, I believe they run some sort of test to
9   make sure there aren't any failures to capture
10  the information, and that's primarily the major
11  aspect of loan boarding, make sure the
12  information that was received was input and
13  captured in the new system correctly.
14         Q.  That goes -- number 19 had asked
15  whether or not that for U.S. Bank to provide
16  the person with the knowledge of the names,
17  business addresses, and job titles of all
18  persons who confirm the accuracy of Ocwen's
19  real servicing records regarding Defendant's
20  mortgage loan account when the Defendant's
21  mortgage loan was converted from real servicing
22  and boarded on PHH's electronic system of
23  record, and any protocols or manuals or
24  guidelines PHH for verifying this information.
25  Once again --



```
 1                 MR. BODURTHA: Is that a question?
 2         Q.  I haven't asked the question yet.  In
 3   regard to number 19, what documents did you
 4   review -- first of all, did you receive any
 5   documents in regard to number 19?
 6         A.  No.
 7         Q.  Do you have any knowledge of the names
 8   and business addresses of any persons who
 9   confirmed the accuracy of Ocwen's records when
10   the load was boarded on PHH's system?
11         A.  No, I do not.
12         Q.  Did you make any effort to find that
13   out?
14         A.  No.
15         Q.  Were you provided that information?
16         A.  No.
17         Q.  You mentioned something called a team,
18   what was the name of the team?
19         A.  The Servicing Transaction Management,
20   STM.
21         Q.  STM.  You mentioned a team, I think,
22   didn't you?
23         A.  That's the reference.  Service
24   Transaction Management team.
25         Q.  Where are they located?
```



1        A.  I don't know specifically where

2   they're located.

3        Q.  Are they located at the location where

4   you are?

5        A.  I don't think they are.  The last time

6   I checked, which was years ago, they had

7   operations in India, and they had operations in

8   New Jersey, but I don't know if they are still

9   at the same addresses, or locations at this

10  moment.

11       Q.  You have no knowledge about 19 at all;

12  is that correct?

13              MR. BODURTHA: Objection.  You can

14  answer.

15       A.  I don't have the specific information

16  of number 19, no.

17       Q.  Do you have any information in regard

18  to names and business addresses and job titles?

19       A.  Chris Kennedy used to run the STM

20  team.  That person is no longer with us.  The

21  last time I checked, there was a person named

22  Sue Carrion (phonetic) who I believe was --

23       Q.  Can you spell that?

24       A.  C-a-r-i-o-n, I think, maybe two Rs,

25  I'm not sure.



1       Q.  Does she have anything to do with the

2   boarding of this particular loan on PHH's

3   system of record?

4       A.  I don't know.

5       Q.  Now, going to Number 10, did you

6   receive any documents in regard to topic Number

7   10 in the notice to take deposition?

8           THE WITNESS:  Could you repeat

9   that question, I'm sorry?

10      Q.  Did you receive any documents

11  regarding topic Number 10 in the notice to take

12  deposition?

13      A.  I looked at the payment history that

14  our counsel provided and looked in the system,

15  servicing platform.

16      Q.  In regard to number 11, did you

17  receive any documents in regard to topic number

18  11?

19      A.  Same as Number 10, basically.  I

20  looked at the payment histories that counsel

21  sent.

22      Q.  In regard to Number 12, did you

23  receive any documents in regard to topic Number

24  12?

25      A.  I think we have some Bailee letters on



1  that, and I looked at system notes, those type

2  of business records.

3      Q.  From whom did you receive the Bailee

4  letters?

5      A.  We have some Bailee letters in our

6  imaging records.

7      Q.  In this case what Bailee records are

8  you referring to?

9      A.  The Bailee records are in reference to

10  the collateral documents.

11      Q.  How many Bailee letters are there?

12      A.  I didn't count them.  I don't know.

13      Q.  So, you have access right now, I'm

14  asking you right now what documents -- you said

15  you received Bailee letters; is that correct?

16      A.  Bear with me, let me see.

17          (WITNESS CHECKING FOR DOCUMENTS)

18      A.  No, I'll correct that.  I didn't

19  receive Bailee letters from my counsel.  Any

20  Bailee letters I would have looked at would

21  have been in our imaged records.

22      Q.  Did you look at any Bailee letters,

23  any Bailee letters?

24      A.  I believe I looked at a few.

25      Q.  Which ones did you look at; can you



1   identify them?

2       A.  No.

3       Q.  You don't have access to what you

4   looked at?

5       A.  Not right now as we sit here, no.

6       Q.  So did you take any notes when you

7   reviewed those?

8       A.  Not on that, no.

9       Q.  Okay.  So do you remember what you

10  looked at?

11      A.  Most of what I looked at were the

12  system comments indicating when PHH or Ocwen

13  received the documents, and when they sent them

14  to counsel.

15      Q.  Do you know who entered that data?

16      A.  Generally -- from memory, I can't say

17  specifically, but generally our records

18  services team is responsible for making the

19  requests for collateral documents, logging them

20  in when we receive them, and keeping track of

21  when they are sent either back to the trust or

22  back to or over to our counsel.

23      Q.  Where is the records servicing team?

24      A.  They're in Palm Beach, Florida.

25      Q.  Where are they located?

1        A.   5720 Premier Park Road, West Palm

2   Beach, Florida.

3        Q.   Is that a single building, or is that

4   a high-rise building?

5        A.   It's an industrial complex.

6        Q.   Who manages that record servicing

7   team?

8        A.   I don't recall.

9        Q.   Regarding topic number 13, did you

10  receive any documents in order to prepare for

11  topic number 13?

12       A.   No.

13       Q.   Do you recall signing Answers to

14  Interrogatories, I believe on January 31st,

15  2022?

16       A.   I do not.

17       Q.   You do not remember?

18       A.   I do not.

19       Q.   Did you sign Answer to Interrogatories

20  in this case dated January 31, 2022?

21       A.   I'd have to see the document to be

22  able to respond to that.

23       Q.   That document was not provided to you

24  before you signed it?

25            MR. BODURTHA: Objection.  John,



1    that question lacks any foundation at all.  You

2    need to rephrase that.

3         Q.  Do you remember being provided

4    interrogatories in this case from the

5    defendant?

6              MR. BODURTHA: Objection.  The

7    defendant didn't -- we're the plaintiff.

8              MR. ENNIS: From the defendant.

9              MR. BODURTHA: You can answer.

10        A.   I don't recall.

11        Q.  Regarding topic number 14, what

12   documents did you receive prior -- after April

13   4th, 2022 regarding topic number 14?

14             MR. BODURTHA: I'm going to object

15   to this topic, because it calls for

16   attorney/client communications and work

17   product, but to the extent we're beyond any

18   attorney/client communications or work product,

19   Mr. Handville can answer.

20             THE WITNESS: Could you repeat that

21   question, sir?

22             MR. ENNIS: Can you read it back.

23             (QUESTION READ)

24             MR. BODURTHA: Same objection as

25   before.  You can answer, Mr. Handville.



1       A.  Well, as far as documents, I would
2    have reviewed the complaint, that's about it.
3       Q.  In regard to topic number 15, what
4    documents did you review after April 4th, 2022
5    in order to prepare for your testimony
6    regarding topic number 15?
7       A.  I looked at the pay histories, the
8    comments and the petitions and pleadings and
9    complaint, and all the legal documents that
10   were filed that were available to me, and I
11   looked at imaged records.
12      Q.  Where are those imaged records
13   located?
14      A.  Imaged records that I received from
15   counsel that reside on my desktop and imaged
16   documents regarding loan records are maintained
17   in a database that we call iDesk, sort of an
18   image repository, if you will.
19      Q.  Was that at your computer where you're
20   sitting now?
21      A.  I would access it through my computer,
22   yes.
23      Q.  When you access on your computer this
24   iDesk imaging, how do you go about doing that?
25      A.  I just open up the program and put the



1  loan number, and it brings up all the records.

2       Q.  Are you aware of who -- are you aware

3  of how those records were placed in that iDesk,

4  in that program?

5       A.  We have an imaging team that's

6  responsible for taking care of that aspect.

7       Q.  And where is the imaging team located?

8       A.  I believe they're in the same facility

9  as records services.  I could be mistaken.

10  They used to be there.  I haven't checked

11  recently.

12       Q.  Now regarding number 16, what

13  documents did you review to prepare for topic

14  number 16?

15       A.  I didn't.

16       Q.  Regarding number 17, what documents

17  did you review in order to prepare for topic

18  number 17?

19       A.  I did not review anything.

20       Q.  In regard to topic number 18, what

21  documents did you review in order to prepare

22  for topic number 18?

23       A.  I didn't review anything on that,

24  either.

25       Q.  You said -- can you describe what a

 1   Bailee letter is?

 2       A.  It's -- my best analogy is it's like a

 3   library card.  Somebody has to document where

 4   they're sending, and who they're sending it to,

 5   or if they're sending it back to us.  So it

 6   basically shows what's being sent, or reference

 7   to what's being sent.

 8       Q.  So I understand there is an allonge in

 9   this case; are you aware of that?

10       A.  I am.

11       Q.  Do you know when that allonge was

12   signed?

13       A.  No.

14              MR. ENNIS: Can we take a

15   five-minute break, I have to get the

16   interrogatories.

17              (RECESS)

18       Q.  Mr. Handville, in regard to topic

19   Number 2, is it fair to say you don't have

20   knowledge of the manner in which PHH verified

21   the accuracy of the mortgage loan account when

22   it was boarded on PHH's electronic system of

23   regard?

24       A.  As I understand it, the impetus on

25   boarding prior servicer records is about making



 1   sure the information imports into the new

 2   system accurately.

 3        Q.  I'm asking you on this loan, do you

 4   have any knowledge of the manner in which PHH

 5   verified the accuracy of that information from

 6   the Ocwen system before it was boarded in the

 7   PHH system?

 8        A.  No.

 9        Q.  And you received this notice of

10   deposition on April 4th, correct?

11        A.  Correct.

12        Q.  Did you indicate to anybody that you

13   had no knowledge of that topic?

14             MR. BODURTHA: Objection.  He

15   didn't answer he had no knowledge of the topic,

16   John.  You can answer.

17        Q.  You're the person with knowledge of

18   the manner in which PHH verified the accuracy

19   of this mortgage loan account when the loan was

20   boarded.  So, my question to you is what

21   knowledge do you have of the manner in which

22   PHH verified the accuracy of that account when

23   it was boarded onto PHH's system of record?

24        A.  I don't have any knowledge as to that.

25        Q.  Did you tell anybody that you did not



1   have knowledge of that topic?

2        A.  No.

3        Q.  Now, regarding Number 3, do you have

4   any knowledge of any documents which were

5   reviewed when Ocwen confirmed and verified the

6   accuracy of the mortgage loan account when the

7   loan was service transferred to Ocwen and

8   boarded on the Ocwen electronic system of

9   record?

10       A.  The boarding process is focused on the

11  accurate input of the data into the servicing

12  platform.

13       Q.  Once again, I'm not asking you a

14  general question, I'm asking you do you have

15  any knowledge of the documents reviewed when

16  Ocwen confirmed and verified the accuracy of

17  the mortgage loan account when the loan was

18  service transferred to Ocwen and boarded on

19  Ocwen's electronic system of record?

20            MR. BODURTHA: Objection to form.

21  You can answer.

22       A.  No.

23       Q.  Did you tell anybody that you had no

24  knowledge of that information regarding Number

25  3?



1              MR. BODURTHA: Objection to form.

2    You can answer.

3         A.   No.

4         Q.   Now you stated that you -- that Wells

5    Fargo was the custodian of the collateral file

6    for this loan; is that correct?

7         A.   Yes.

8         Q.   Has Wells Fargo always been the

9    custodian for the collateral file of this loan?

10        A.   Yes.

11        Q.   How do you know that?

12        A.   They're named in the trust as one of

13   the custodians, and they're the ones we reached

14   out to and obtained the documents -- well,

15   Ocwen reached out and obtained the documents

16   from.

17        Q.   Is there a Bailee letter from Wells

18   Fargo to any servicer?

19        A.   I don't know.

20        Q.   Do you have any knowledge about the

21   contents of the collateral file from

22   origination to the present?

23        A.   General knowledge, not specific to

24   this loan.

25        Q.   Did you tell anybody you didn't have



```
 1   any specific knowledge regarding the contents
 2   of the collateral file from origination to the
 3   present?
 4        A.  No.
 5        Q.  What knowledge do you claim to have
 6   regarding the sale, each sale of the
 7   defendant's note from origination to the
 8   present --
 9               MR. BODURTHA: Objection.  You can
10   answer.
11        Q.  -- in regard to topic Number 5?
12               MR. BODURTHA: Objection.  You can
13   answer.
14        A.  There are references to a sale by
15   Option One, but I haven't seen the sale
16   documents.  The deal documents that I reviewed
17   were the ones that were.  We now have them as
18   exhibit labels, and I think they were part of
19   the supplemental production in the response to
20   Interrogatories.
21        Q.  You said there is a sales agreement
22   from Ocwen you've seen referred to, but you
23   haven't seen it.  Is there any sales agreement
24   from Option One to any entity regarding this
25   mortgage?
```



1        A.  I haven't seen it, I don't know.

2        Q.  Are you aware if there is any?

3        A.  I don't have personal knowledge, no.

4        Q.  I'm not asking if you have personal

5   knowledge, do you have any knowledge as a

6   corporate representative of U.S. Bank as

7   trustee?  Is there any such sales agreement or

8   purchase agreement by which Option One sold the

9   mortgage to any entity?

10       A.  I can't say.  I haven't seen any, so I

11  don't know.

12       Q.  Did you tell anybody that you did not

13  have that information?

14               MR. BODURTHA: Objection.  That

15  calls for attorney/client communications.  I'm

16  not going to let him answer that one.

17               (SO NOTED)

18       Q.  Did you communicate with any other

19  members of Ocwen Financial Corp. in regard to

20  this topic?

21               MR. BODURTHA: Objection to the

22  extent that involves attorney/client

23  communication, Mr. Handville is not going to

24  answer.  To the extent attorneys were not

25  involved, he can answer.



1      A.  Yes.

2      Q.  And who did you speak with?

3      A.  I spoke with a person named Jolene

4  Stratton.

5      Q.  Who is Jolene Stratton?

6      A.  Law department supervisor, she works

7  out of the West Palm Beach office.  I've known

8  her for years, she's been there since I came on

9  board, probably twice as long as that,

10  actually.  She's the person that handles all of

11  the deal documents, so to speak, and uploads

12  them into our database.

13      Q.  Do you know if she uploaded any

14  documents into this database for this loan?

15      A.  I don't know for sure.  Possibly.  But

16  I don't know for sure.

17      Q.  Now, do you have any knowledge of each

18  document by which any sale of this mortgage

19  loan was made?

20      A.  I have not seen the sale documents.  I

21  don't know.

22      Q.  Any sale documents?

23      A.  Not that I recall.

24      Q.  Did you, after receiving this notice

25  to take deposition with the topics, did you



```
 1   advise anybody that you did not know this
 2   information?
 3                MR. BODURTHA: Objection.  To the
 4   extent it's attorney/client communications,
 5   Mr. Handville is not going to answer, but
 6   beyond attorney/client, he can answer.
 7        A.  No.
 8        Q.  With regard to number 6, do you have
 9   any knowledge of each sale of the Defendant's
10   mortgage from origination to the present, and
11   each document by which each sale was made.
12        A.  No.
13        Q.  Did you advise anybody that you did
14   not have that information?
15                MR. BODURTHA: Objection.  Calls
16   for attorney/client.  You can answer.
17        A.  No.
18        Q.  Do you have any knowledge of any
19   securitization of this mortgage loan?
20        A.  Outside of the documents that have
21   been produced, no.
22        Q.  And what documents were given to you
23   by your attorney to review in response to what
24   you just said, Number 7?
25        A.  Bear with me one moment.
```



1           (PAUSE)

2      A.   The exhibits marked G, H, I, J, K, L,

3    M, and the complete mortgage loan schedule.

4      Q.   What exhibit number was that?

5           THE WITNESS: Bear with me, I'm

6    looking.

7      A.   I believe it's K.  Let me pull it up

8    real quick.

9                (PAUSE)

10     Q.   Yes, K is the redacted mortgage loan.

11   This is an extrapolation, or excerpt from the

12   mortgage loan schedule.  You received that from

13   Mr. Bodurtha; is that correct?

14     A.   I did.

15     Q.   Did you go to the electronic system of

16   record to verify that that was the same

17   document that is on the electronic system of

18   record?

19     A.   I've reviewed the unredacted mortgage

20   loan schedule in its entirety that we have in

21   our database.

22     Q.   What database is that?

23     A.   It's a SharePoint data point.

24     Q.   What is it called?

25     A.   SharePoint.



1         Q.  Do you know who entered that data on

2    to that SharePoint database?

3         A.  Not specifically, no.

4         Q.  When was that data entered -- when was

5    that entered on to the SharePoint database?

6         A.  I don't know.

7         Q.  Is the SharePoint database the same as

8    the MSP system?

9         A.  No.

10        Q.  What is the SharePoint database, what

11   exactly is that?

12        A.  It's a database for depositing records

13   into it so somebody could access them and look

14   at them.

15        Q.  And who deposited this information

16   into the SharePoint database?

17        A.  I don't know.

18        Q.  Do you know when it was deposited?

19        A.  No.

20        Q.  In regard to topic number -- also, let

21   me just look at that, bear with me.  In regard

22   to those various documents that you just

23   mentioned, Exhibits G through M, when you say

24   Exhibit G, what are you referring to?

25        A.  Exhibit G is labeled Assignment and



1   Assumption Agreement between Lehman Brothers

2   Bank, FSB as assigner and Lehman Brothers

3   holding, Inc. as assignee, dated 10-1-2003.

4        Q.  From whom did you receive that

5   document?

6        A.  Counsel.

7        Q.  Did you verify that that document was

8   identical to a document on the system of PHH?

9        A.  Yes.

10        Q.  When did you do that?

11        A.  When I got it.

12        Q.  When did you get it?

13        A.  Looks like February 21st.  Maybe

14   that's not the correct date.

15                  (PAUSE)

16        A.  January 31st, 2022.

17        Q.  And how did you access that document?

18        A.  It was included in the exhibits that

19   were produced --

20        Q.  I'm talking about --

21        A.  -- by counsel.

22        Q.  -- other than from counsel, how did

23   you obtain, review that document other than

24   what counsel sent to you?

25        A.  I looked in the SharePoint database.



HOWARD R. HANDVILLE  30b6                                    April 07, 2022
US BANK NATIONAL ASSOCIATION vs SHAKOORI                              43

1      Q.  Do you know who entered that document

2   on to the SharePoint database?

3      A.  No.

4      Q.  Is the SharePoint database document

5   created, a database created by PHH?

6      A.  It was created by Ocwen, and PHH and

7   Ocwen merged.  So it's now maintained by PHH,

8   but it's the same Ocwen staff.

9      Q.  Do you know where the original of that

10  document is located?

11     A.  No.

12     Q.  You had said earlier that you believe

13  the trust agreement was with U.S. Bank; is that

14  correct?

15     A.  I'm not sure I understand what you're

16  asking me.

17     Q.  You had stated earlier that you

18  thought that the original of the trust

19  agreement is with U.S. Bank?

20     A.  Yes.

21     Q.  Where is U.S. Bank located, U.S. Bank

22  as trustee located?

23     A.  I don't think I have their address

24  handy.

25     Q.  If you had to communicate with them,



1  how would you communicate with them, U.S. Bank

2  as trustee?

3      A.  I'm not really sure.  I've never had

4  to communicate with them.

5      Q.  Do you know where the original of the

6  Exhibit G is at the current time?

7      A.  I do not.

8      Q.  Is it fair to say that Exhibit G,

9  which was one of the documents you say

10  Mr. Bodurtha gave to you, does not contain a

11  loan schedule; is that correct?

12      A.  It does not.

13      Q.  And there's no reference to the Option

14  One, this Option One mortgage in that

15  agreement; is that correct?

16      A.  Correct.

17      Q.  Is it fair to say you have no idea how

18  the loan got from -- what happened to the loan

19  after Option One?

20          MR. BODURTHA: Objection.

21      Q.  Excuse me, let me rephrase that.  Do

22  you have any information which indicates how

23  the loan, if it did, went from Option One

24  Mortgage Corporation to Lehman Brothers Bank?

25          MR. BODURTHA: Objection.  You can



 1  answer.
 2      A.  I have not seen any sale agreement
 3  regarding how the loan was transferred,
 4  considerations paid for it.
 5      Q.  What knowledge do you have of any
 6  electronic or paper index to the
 7  collateral/custodial file of the trustee's
 8  custodian?
 9              MR. BODURTHA: Objection to form.
10  You can answer.
11      A.  None.
12      Q.  You were designated as the person with
13  the knowledge of that information; is that
14  correct?
15      A.  I was.
16              MR. BODURTHA: Objection.  You can
17  answer.
18      Q.  And you have no knowledge; is that
19  correct?
20              MR. BODURTHA: Objection.  You can
21  answer.
22      A.  I don't have access to Wells Fargo's
23  custodial record keeping or how unfamiliar on
24  how they go about maintaining those records.
25      Q.  Did you express your lack of knowledge



1   to anybody in regard to topic Number 8?

2                   MR. BODURTHA: Objection.  Calls

3   for attorney/client.  Beyond that, you can

4   answer.

5        A.  No.

6        Q.  You referenced Exhibit H.  What is

7   Exhibit H?

8        A.  Exhibit H is Lehman Brothers Holding,

9   Inc., as seller, Structured Assets Securities

10  Corporation, purchaser, mortgage loan sale and

11  assignment agreement dated October 1, 2003.

12       Q.  Did you receive a copy of that

13  document?

14       A.  Yes.

15       Q.  And from whom did you receive that

16  document?

17       A.  Mr. Bodurtha.

18       Q.  Other than Mr. Bodurtha, have you seen

19  that document in any other format?

20       A.  Yes.

21       Q.  Where did you see it?

22       A.  The SharePoint database.

23       Q.  And when did you look at that?

24       A.  I believe it was end of January,

25  January 31st, 2022.



1      Q.  And did you go through that document

2   to confirm that that was in fact the same

3   document as the copy that you received?

4      A.  I glanced at it.  I didn't compare

5   them side by side.

6      Q.  Did the SharePoint database have any

7   signatures on it?

8              MR. BODURTHA: Objection to form.

9   You can answer.

10     A.  I don't recall.

11     Q.  Excuse me.  Did the document you

12  reviewed -- that you reviewed electronically,

13  specifically Exhibit H, did that have any

14  signatures on it in that SharePoint database?

15     A.  I don't recall.

16     Q.  Okay.  Regarding Exhibit G, when you

17  reviewed that exhibit in the SharePoint

18  database, did you compare it to the document

19  that Mr. Bodurtha gave you?

20     A.  I glanced at it.

21     Q.  Did Exhibit G when you reviewed it in

22  the SharePoint database have any signatures on

23  it?

24     A.  I don't recall.

25     Q.  You reference Exhibit I.  What is



1   Exhibit I?

2       A.   Exhibit I is captioned -- Exhibit I is

3   a trust agreement dated 10-1-03, it's between

4   Structured Assets Securities Corporation as

5   depositor, Aurora Loan Services as master

6   servicer, Wells Fargo Bank as securities

7   administrator, Murray Hill Company as credit

8   risk manager, and LaSalle Bank National

9   Association as trustee.

10      Q.   How did you -- what document do you

11  have that allowed you to look at that?

12      A.   This is a document that I received

13  from Mr. Bodurtha.

14      Q.   Did you look at any document on any

15  system to confirm that that was the same

16  identical document as the one Mr. Bodurtha gave

17  you?

18      A.   I looked in our SharePoint database

19  and saw this document, but I didn't compare the

20  two.

21      Q.   Did the document that you looked at in

22  the SharePoint database referenced herein as

23  Exhibit 1, trust agreement, have any signatures

24  on it?

25      A.   I don't recall.



1       Q.  Do you know when that document was

2   entered into the database -- into the

3   SharePoint data system?

4       A.  No.

5       Q.  Do you know who entered that

6   information into the SharePoint data system?

7       A.  No.

8       Q.  Do you know who entered Exhibit H into

9   the SharePoint data system?

10      A.  No.

11              MR. BODURTHA: Objection to form.

12  You can answer.

13      A.  No.

14      Q.  Do you know where the original of

15  Exhibit H is currently?

16      A.  I do not.

17      Q.  Did you make any effort to find out

18  where the original of Exhibit H is?

19      A.  No.

20      Q.  Do you know where the original of

21  Exhibit I is at the current time?

22      A.  I do not.

23      Q.  Did you make any effort to find out

24  where the original of Exhibit I is?

25      A.  No.



```
 1        Q.  Now you referenced Exhibit J, what

 2   exhibit are you referring to?

 3        A.  Exhibit J is the servicing agreement

 4   dated 10-1-03, Option One Mortgage Corporation

 5   as servicer, Aurora Loan Services as master

 6   servicer, and Lehman Brothers Holding, Inc., as

 7   seller.

 8        Q.  And how did you -- from whom did you

 9   receive that document?

10        A.   Mr. Bodurtha.

11        Q.  And did you view it in any other

12   manner other than the document you received

13   from Mr. Bodurtha?

14        A.   In the SharePoint database I reviewed

15   it.

16        Q.  And when you looked at the SharePoint

17   database, did you look at that document to

18   confirm that it was identical to the document

19   that Mr. Bodurtha sent you?

20        A.  I didn't do that type of close

21   examination.  I just glanced at it to make sure

22   that I could source the document.

23        Q.  Did that Exhibit J that you just

24   referenced in the SharePoint database contain

25   any signatures?
```



1      A.  I don't recall.

2      Q.  You reference Exhibit K.  What is

3  that?

4      A.  Exhibit K is redaction.  It is a

5  mortgage loan schedule that the other 12,664

6  loans were redacted from, leaving the subject

7  mortgage which is on line 9771 on that

8  spreadsheet.

9      Q.  Did you look at the original of

10  that -- did you look at the document other

11  than -- strike that.  How did you receive that

12  redacted document?

13      A.  From Mr. Bodurtha.

14      Q.  And when did you receive that?

15      A.  January 31st, 2022.

16      Q.  And when did you -- did you review any

17  document on the SharePoint database regarding

18  that particular document?

19      A.  I reviewed the mortgage loan schedule

20  in its entirety.

21      Q.  And do you know what the date of that

22  mortgage loan schedule is?

23      A.  I don't recall.

24      Q.  Is there a date on the SharePoint

25  database for that mortgage loan schedule?



1        A.   The only date that might be there

2    would be the date it was -- I don't know, I'm

3    not even sure it has any dates on it.  I don't

4    think it's indexed that way, by date.

5        Q.   Was that document attached to the

6    trust agreement --

7        A.   The document.

8        Q.   -- in the SharePoint database?

9        A.   The document I looked at was a

10   stand-alone document.

11       Q.   Do you know when that document was

12   entered, imaged on the SharePoint database?

13       A.   No.

14       Q.   Do you know when the SharePoint

15   database began, or was created?

16                MR. BODURTHA: Objection.  You can

17   answer.

18       A.   I do not.

19       Q.   Do you know who entered that image

20   into the SharePoint database --

21       A.   No.

22       Q.   -- referencing Exhibit K?

23       A.   I do not.

24       Q.   Now directing your attention to the

25   trust agreement that I believe is Exhibit I; is



1    that correct?

2         A.  Yes.

3         Q.  Let me pull it up for a moment,

4    please.  If you can look on the -- do you have

5    the copy that was filed -- are you looking at

6    the document that was filed in the Bankruptcy

7    Court -- excuse me, in the Federal Court as

8    document number 26-4, is that at the top of

9    your screen?

10                MR. BODURTHA: Can you show us what

11   document you're looking at?

12                MR. ENNIS: I'm referring to

13   Exhibit I in your exhibits that were filed.

14                MR. BODURTHA: Okay.

15                THE WITNESS:  I have it.

16        Q.  I'm going to ask you to look at Page

17   33 of 139 that is in Exhibit I, where did says

18   it's in the definitions at the beginning, it

19   says mortgage loan schedule.  Do you see that

20   paragraph?

21        A.  Can you give me -- at the top right of

22   each one of there's a page ID number.  Can you

23   give me that page ID number.  It's easier for

24   me to scroll through that than the way you

25   described it.



1              MR. ENNIS: 578.

2              THE WITNESS: I have it.

3         Q.  And do you know where in any case the

4    schedule shall set forth the following

5    information.  I'm going to ask you where on the

6    Exhibit K, the mortgagor's name is located?

7         A.  It's not.

8         Q.  Excuse me?

9         A.  It's not.

10        Q.  Okay.  Can you tell me where the

11   street address of the mortgage property of the

12   defendant is located in that Exhibit K,

13   redacted Exhibit K?

14        A.  On the very first page it starts --

15   goes on to the second page -- it doesn't list

16   the address.

17        Q.  Now, can you tell me where on that

18   redacted Exhibit K it indicates the mortgage

19   pool in which the mortgage loan is included?

20              (PAUSE)

21        A.  It doesn't seem to have that

22   information on this schedule.

23        Q.  Can you show me on that exhibit,

24   redacted Exhibit K, where it indicates the

25   custodian with respect to the mortgage file,



1   related to this mortgage loan?

2        A.   It's on the last page.

3        Q.   Where on the last page?

4        A.   On the left -- I'm sorry, on the

5   right, Wells Fargo.  Column CJ.

6        Q.   Now directing your attention to

7   Exhibit K, at the top of the first page after

8   the K page, there are certain columns and

9   letters below which there are stated wording.

10  For example, it says A, there it says loan ID.

11  Do you know what loan ID means in regard to

12  this particular document?

13       A.   That's a reference to the loan number

14  that's exhibited on the mortgage.

15       Q.   Okay.  What is Exhibit B -- column B

16  says a loan ID, what is that?

17       A.   I believe that is the investor loan

18  ID.

19       Q.   And how do you know that?

20       A.   Well, it's sort of a process of

21  elimination.  I know that investors provide

22  their own loan ID numbers to these loans, and I

23  know that the other two loan numbers, the one

24  to the left of it, and the one to right of it

25  are referenced on the mortgage.  So by process



```
 1   of elimination, that's my determination it
 2   would be the investor number.
 3        Q.  So that's a guess on your part?
 4              MR. BODURTHA: Objection.  You can
 5   answer.
 6        Q.  On what basis can you say that is the
 7   so-called investor number?
 8              MR. BODURTHA: Objection.  He
 9   already answered the question.  You can answer.
10        A.  My basis is investors put their
11   numbers on loans that they are in trust of.
12        Q.  What do you mean investor?
13        A.  An investor, U.S. Bank, Wells Fargo,
14   HSBC, all these companies that service trusts,
15   Fannie Mae, Freddie Mac, they all have their
16   own specific way of identifying the number in
17   their systems.
18        Q.  It's been suggested that this is the
19   loan schedule for this particular trust; is
20   that correct, is that what the assertion is?
21        A.  That's correct.
22        Q.  Well, who is the investor in number --
23   in this it looks like number 109718189, what
24   does that mean?
25        A.  That would be the investor loan
```



1  number, U.S. Bank.

2     Q.  So, you're going to tell me -- on the

3  original document -- not the original, the

4  unredacted document that you have, does every

5  loan have that same number on it for investor

6  number?

7     A.  I have to go back and look at the

8  unredacted document.  I would think not.

9     Q.  Well, why is that, why would you think

10 not?

11    A.  Investor loan numbers would be based

12 on individual loans.

13    Q.  But isn't this supposed to be the loan

14 schedule for the trust BC 2003-BC-11, isn't

15 this supposed to be the loan schedule for this

16 trust only?

17            MR. BODURTHA: Objection.  John, I

18 think you're misunderstanding the point.

19            MR. ENNIS: I don't think I need to

20 be asked any questions.

21            MR. BODURTHA: Maybe he can clarify

22 for you what he said, what he meant if the

23 investor had a number on the loan.

24    Q.  Who is the investor in this number

25 109718189, who is that investor?



1        A.  Plaintiff.

2        Q.  How do you know that?

3        A.  How do I know who the plaintiff is?

4        Q.  No.  How do you know that is the

5    number, what that number is allocated to?

6        A.  As I said before, my general

7    experience is investors have individual

8    investor loan numbers for each individual loan

9    in their trust so they can identify it in their

10   system.

11       Q.  You're saying that this trust has

12   different investors?

13              MR. BODURTHA: Objection.  He's not

14   saying that, John.

15              MR. ENNIS: Why don't you just --

16   the fact is, objections are only based upon

17   privilege, not -- this is not trial.  So I'm

18   going to ask him again.  I'm going to ask him

19   again.

20       Q.  How many loans, according to this

21   record, are in this trust?

22       A.  Well, I believe that's the first time

23   you asked me, it's 12,660 something loans.

24              MR. BODURTHA: Would it be helpful

25   if I shared screen and showed you the entire



 1   Excel file?

 2            MR. ENNIS: You can let me look at

 3   it, yes.  He's telling me there is different

 4   investors.

 5            MR. BODURTHA: No.  What he's

 6   telling you is the investor assigns a loan

 7   number to each of these loans, that's what he's

 8   testified to.  You interpreted that to mean

 9   that they're all these different investors

10   here.  But that's not what he testified to.  He

11   testified to the fact that investors will

12   assign loan numbers to each of these loans.

13            MR. ENNIS: That's nice for you to

14   testify to that, but he didn't say that.

15            MR. BODURTHA: I'm not testifying

16   to it.  I'm saying what he said.  You've

17   misinterpreted it.  Do you want to see the loan

18   file?

19            MR. ENNIS: Not right now.

20            MR. BODURTHA: I understand what

21   appears to be the confusion here.  I think it

22   might clarify the confusion if you're able to

23   see the entirety of the mortgage loan schedule.

24            MR. ENNIS: What you say is the

25   mortgage loan schedule.



1      Q.  Do you know, sir, when the original of
2  Exhibit K was created?
3      A.  I do not.
4      Q.  Does PHH Mortgage Corporation have any
5  records in relation to this loan prior to
6  January of 2008?
7              THE WITNESS:  Could you repeat
8  that again?
9      Q.  Does PHH Mortgage have any records in
10  relation to this loan prior to January of 2008?
11      A.  Are you saying outside of these trust
12  agreements, these exhibits we've been
13  reviewing?
14              MR. ENNIS: I'm asking does PHH
15  Mortgage have any records relating to this
16  mortgage loan account prior to 2008.
17      A.  I think so.  I didn't look at it when
18  I was reviewing the documents, I didn't look at
19  it from that aspect of dates.  But there are
20  documents that go back -- I'm not sure.  I
21  think there are, but I can't say with
22  specificity.  I didn't look with that in mind.
23  Well, of course, we have the copies of the
24  collateral documents, the mortgage, and the
25  note, and some of the closing origination



```
 1   documents, monthly statements and some of those

 2   type of servicing records.

 3        Q.  What knowledge do you have regarding

 4   the location of the defendant's promissory note

 5   to Option One Mortgage Corporation from

 6   origination to the present as indicated in

 7   topic Number 12?

 8        A.  According to the information I

 9   reviewed, the collateral file with the original

10   note and mortgage and title policy and whatnot,

11   was placed into Wells Fargo, the document

12   custodian's care, on 7-25-03.

13        Q.  What documents did you review to make

14   that determination?

15        A.  I reviewed comments in the Ocwen loan

16   servicing platform.

17        Q.  What date were those comments?

18        A.  The particular entry I was referencing

19   was done on November 2017.  I think it was

20   near -- November 13, maybe, 17, something like

21   that.

22        Q.  And that was at least ten years after

23   the loan was executed; is that correct?

24        A.  14 years, close to it.

25        Q.  Did you review any Wells Fargo records
```



 1   at all?

 2                    MR.  BODURTHA: Objection.  You can

 3   answer.

 4        Q.  I'll change the question.  In regard

 5   to the location of the note which you said went

 6   to Wells Fargo on July 25th, 2003, did you

 7   review any other Wells Fargo records in regard

 8   to that assertion?

 9                    MR.  BODURTHA: Objection.  You can

10   answer.

11        A.  No.

12        Q.  How do you know that that is an

13   accurate assertion, if you haven't reviewed the

14   Wells Fargo records?

15                    MR.  BODURTHA: Objection.  You can

16   answer.

17        A.  Ocwen has a process where should

18   anybody ask, such as our foreclosure attorneys

19   or whatnot, they can ask for note possession

20   history as we refer to it.

21              Ocwen has a task code that they enter,

22   it goes over to the records services

23   department, and they contact these document

24   custodians and ask them, and then they respond

25   back, and then they update the information in



1    the comments and provide the information to

2    counsel as they request it.

3        Q.  Were there any such requests to Wells

4    Fargo in that regard, and if so, on what dates?

5               MR. BODURTHA: Objection.  Compound

6    question.  You can answer.

7        A.  I don't remember the specific date the

8    request is made, but the feedback was November

9    of 2017, 11-13, I believe.  So it would have

10   been a request before that for them to respond

11   back with that.

12              And I think another request was made

13   some time in 2020, December of 2020, and on

14   12-30-20 a different person in the records

15   service department came back and basically

16   confirmed the same date, 7-25-03.

17       Q.  Do you have possession of the

18   documents by which that information was

19   confirmed?

20              MR. BODURTHA: Objection.  You can

21   answer.

22       A.  I don't have it.

23              THE WITNESS: Can I ask a question

24   unrelated to the case.  Do we have plans for

25   lunch break for anything?



```
 1                 (OFF THE RECORD)
 2            (LUNCH RECESS 12:30 TO 1:31 P.M.)
 3                 MR. ENNIS: I'm going to be sending
 4     over the interrogatories, supplemental
 5     interrogatories as an exhibit, it will be
 6     Exhibit B, I'll send it to Sam, too.
 7                 EXHIBIT B (DEFENDANT'S EXHIBIT B
 8                 MARKED FOR IDENTIFICATION)
 9         Q.  Now, Mr. Handville, just to confirm,
10     we just took a break for an hour.  Did you have
11     occasion to speak with Mr. Bodurtha during the
12     break about your testimony?
13         A.  No.
14         Q.  Now, when did you get this assignment
15     to be a 30(b)(6) witness?
16                 MR. BODURTHA: Objection.  You can
17     answer.
18         A.  April 4th.
19         Q.  Who gave you the assignment?
20         A.  Mr. Bodurtha.
21         Q.  Who from U.S. Bank designated you as
22     the 30(b)(6) witness?
23                 MR. BODURTHA: Objection to form.
24     You can answer.
25         A.  Nobody.
```



1        Q.  Did you have communications with an

2    employee of PHH Mortgage in which you -- strike

3    that.  Who is your supervisor at your current

4    employer?

5        A.  John Ramer.

6        Q.  He gave you the assignment reviewing

7    any documents in regard to this case?

8        A.  I don't know.  These type of requests

9    come in when a matter becomes litigated and our

10   attorneys, our outside attorneys, such as

11   Mr. Bodurtha, confirm with Ocwen, PHH,

12   regarding the litigation, and they open up the

13   matter in a software application used by

14   internal and external counsels, and parties are

15   assigned at that point.  And then if and when

16   counsel needs us for something, such as a

17   document execution, or research, or an

18   appearance, they can check this application and

19   find out who is assigned to it, and then they

20   contact us directly.

21       Q.  When did that happen in this case,

22   when were you first notified by your employer

23   that you were going to be a witness in this

24   case?

25       A.  My employer didn't notify me,



1   Mr. Bodurtha notified me.

2        Q.  I believe we were on Number 12 topic.

3   You indicated that Wells Fargo was the

4   custodian of this loan, and that according to

5   something you read, that they got the note on

6   July 25th, 2003; is that correct?

7        A.  Yes.

8        Q.  And this trust in question did not

9   exist on July 25, 2003; is that correct?

10       A.  I believe that's correct.

11       Q.  Okay.  So was there a custodial

12  agreement in effect between Wells Fargo and

13  Option One on July 25th, 2003?

14       A.  I have not seen any custodial

15  agreements, so I can't speak to that.  However,

16  my thought is that if there is a custodial

17  agreement, it would not be between Option One

18  and Wells Fargo, it would be between Wells

19  Fargo and I guess the trust.

20       Q.  Well, the trust didn't exist on July

21  25, 2003, correct?

22       A.  To my knowledge, yes.

23       Q.  Okay.  So, who was -- we asked you in

24  Number 12, the person -- you were designated as

25  the person with knowledge of the location of



1  the promissory note to Option One from

2  origination to the present.  Is that agreed,

3  that was the topic?

4      A.  Yes.

5      Q.  And you stated that based upon some

6  notes that were prepared by somebody in 2014, I

7  think you said, or 2017, that it indicated that

8  Wells Fargo was the custodian; is that correct?

9      A.  Yes.

10     Q.  So my question is who were they the

11  custodian for in July 2003?

12             MR. BODURTHA: Objection.  You can

13  answer.

14     A.  I haven't seen a custodial agreement,

15  so I don't know for sure.

16     Q.  You don't even know for sure they were

17  the custodian, correct?

18     A.  They're designated in the trust

19  agreement, and they're the custodian, and

20  that's who we reach out to, that's all I can

21  tell you about.

22     Q.  I'm talking before the trust agreement

23  went into effect.

24     A.  Again, I haven't seen any

25  documentation on that, so I don't know.



1      Q.  Okay.  Now, in number 13 you were

2   asked -- you were designated as the person with

3   the knowledge of the date the allonge was

4   signed, time and date the allonge was affixed

5   to the promissory note, as well as the

6   allonge -- as well as the date the allonge was

7   affixed to the note by the defendant, and the

8   identity of the person who signed the allonge.

9   Do you have any knowledge of that?

10      A.  Other than the person's signature on

11   it, I think her name was Mary Conway, I do not.

12      Q.  Now, did you make -- did you contact

13   Wells Fargo in regard to determining when that

14   signature was affixed?

15            MR. BODURTHA: Objection.  You can

16   answer.

17      A.  No.

18      Q.  Why not?

19            MR. BODURTHA: Objection.  You can

20   answer.

21      A.  I don't think they would know when,

22   dates, times.  The person that did it might

23   have that information, but the document

24   custodian, I don't see how they would have any

25   record of that.



1        Q.  You didn't check to see any records of

2    Wells Fargo; isn't that correct?

3                MR. BODURTHA: Objection.  You can

4    answer.

5        A.  I didn't reach out to Wells Fargo, no.

6        Q.  Now, directing your attention to

7    Interrogatory Number 14 in your supplemental

8    answer:  Interrogatory Number 14 says, Please

9    state each date that the note signed by the

10   defendant was endorsed by any person or

11   persons, along with the name, employer, job

12   title, home and business address, and telephone

13   number of each endorser.

14           In your supplemental answer, which you

15   signed on January 31st, 2022 you stated, the

16   face of the note produced to defendant

17   indicates -- excuse me, identifies -- it

18   indicates all dates and information applicable

19   to the date the note was endorsed and who

20   endorsed the note.  Wasn't that your answer?

21       A.  Yes.

22       Q.  And what is the only date on the face

23   of the note?

24       A.  From memory, I think it's 7-16-03.

25       Q.  What was the only date on the allonge?



1       A.   I believe the same.

2       Q.   Which is?

3       A.   7-16-03.  I would have to look at it,

4   but from my recollection, I believe that's

5   correct.

6       Q.   Now we were going through the various

7   exhibits that you referenced which was G

8   through M; is that correct?

9       A.   Right.

10      Q.   I think we got to K.  What is exhibit

11  L that you referenced in your testimony?

12      A.   Bear with me while I find it.  Exhibit

13  L starts off with what appears to be a form 8K

14  in reference to United States Securities and

15  Exchange Commission current report.  It says

16  it's dated March 7, 2008.  H & R Block,

17  Incorporated is the registrant referenced in

18  the charter.

19      Q.   And where did you receive that

20  document from?

21      A.   Mr. Bodurtha.

22      Q.   Did you check to see if the records of

23  PHH or Ocwen or any records -- strike that.

24  Did you review any records that are on any

25  system of record which contain that document?



1        A.   I don't recall.

2        Q.   What is Exhibit M?

3        A.   Exhibit M is a document captioned

4   LaSalle Global Trust Services on the top, dated

5   July 3 of '09.  It's a notice of appointment

6   regarding this particular trust, and it

7   references the trust agreement dated 10-1-03

8   among Structured Assets Securities, Aurora Loan

9   Services, Wells Fargo, Murray Hill Company,

10  Bank of America, successor by merger to LaSalle

11  National Bank as trustee, and it's indicating

12  that Bank of America has resigned as trustee

13  and certificate registrar and depositor as

14  appointed US Bank National association to act

15  as successor trustee, and it shows their

16  address, one Federal Street, Boston,

17  Massachusetts, 02110 for US Bank National

18  association.  And it's executed by Bank of

19  America, Dionne Degnan (phonetic) is vice

20  president.

21       Q.   From whom did you receive that

22  document?

23       A.   Mr. Bodurtha.

24       Q.   And did you verify that that document

25  is on the electronic system of record, PHH?



1        A.  I don't recall.

2        Q.  You don't recall.

3        A.  There's more to this document.

4        Q.  I'm just asking you to identify the

5    document.  You said regarding previous

6    documents you actually looked at a system that

7    share -- what's it called?

8        A.  SharePoint.

9        Q.  SharePoint.  You actually looked at

10   SharePoint and found what you said was certain

11   documents, right?

12       A.  Yes.

13       Q.  Did you find this document on

14   SharePoint?

15       A.  I don't recall.

16       Q.  You don't recall, or you didn't do it?

17       A.  I don't recall doing it.  I don't

18   recall that being required.

19       Q.  Okay.  So when we look at the exhibits

20   that you discussed, Exhibit L states that it's

21   a purchase agreement, is that correct, when you

22   get down to a purchase agreement for services;

23   is that correct?

24           THE WITNESS:  Hang on, I'm trying

25   to find it again.



```
 1                   (PAUSE)

 2        A.  Yes.

 3        Q.  And looking at this exhibit, it does

 4   not appear to have any personal signatures; is

 5   that correct?

 6                MR. BODURTHA: Objection.  You can

 7   answer.  Can you direct him to a page, John?

 8                MR. ENNIS: Let me direct you to

 9   Pages 19 and 20 of that document.

10        A.  On mine the signatures begin on 18, 19

11   and 20.  These don't have hand signatures on

12   them.  It looks like they have electronic

13   signatures.

14        Q.  Okay.  And you did not confirm that

15   there is a similar document in the possession

16   of either the custodian, PHH, or U.S. Bank; is

17   that correct?

18                MR. BODURTHA: Objection.  You can

19   answer.

20        A.  I did not confirm with anybody such as

21   U.S. Bank or the other parties that you

22   mentioned.  I don't recall -- bear with me.  I

23   don't recall if I verified this one or not in

24   our database.

25        Q.  There's no loan schedules attached to
```



1   this, are there?

2        A.  No.

3        Q.  Do you know where the original of this

4   document is?

5        A.  No.

6        Q.  So this document is not part of your

7   business records; is that correct?

8              MR. BODURTHA: Objection.  You can

9   answer.

10        A.  It might be.

11        Q.  Well, where did you check your image

12   program you just described?

13        A.  I would have checked in January to see

14   if we had it, but if we didn't have it, I

15   wouldn't have been terribly concerned about it.

16        Q.  Well, the question is you're not sure

17   if you checked, correct?

18        A.  I don't recall, correct.

19        Q.  So is it fair to say this is an

20   Internet document?

21              MR. BODURTHA: Objection.  You're

22   not going to answer that question, John.  I

23   don't even know where the foundation is for

24   that question.

25              MR. ENNIS: Well, I don't have to



1   lay a foundation.  This is cross-examination.

2                MR. BODURTHA: So you're asking him

3   if it's an Internet document?

4                MR. ENNIS: You're not allowed to

5   object other than for privilege.

6                MR. BODURTHA: Okay.  Ask the

7   question again.

8        Q.  Forget it.  Now, going to Exhibit K.

9   You said you looked at the Exhibit K on the

10  image program that you reviewed; is that

11  correct?

12       A.  I looked at the unredacted version of

13  this document.

14       Q.  And how long did you look at that

15  document?

16       A.  Long enough to find the subject loan;

17  a couple minutes.

18       Q.  How long was that?

19       A.  A couple minutes.

20       Q.  Did you confirm that it was identical

21  to the redacted version?

22       A.  No.

23       Q.  Directing your attention to Exhibit J,

24  servicing agreement.  That does not contain a

25  loan schedule; is that correct?



1        A.  Correct.

2        Q.  And you received this, the copy that

3    you reviewed from Attorney Bodurtha, correct?

4        A.  Correct.

5        Q.  And you had testified that you looked

6    on the image record briefly, but did not review

7    it page-by-page; is that correct?

8        A.  I looked through the document.  I

9    didn't compare the two.  I looked at the

10   heading.

11       Q.  So, you cannot state with any degree

12   of certainty that this is the same document as

13   the redacted -- and the redacted version is the

14   same document that is in the so-called records,

15   in the imaging records of PHH; is that correct?

16             MR. BODURTHA: Objection to form.

17   You can answer.

18       A.  I don't understand the question.  What

19   redacted documents?

20       Q.  Excuse me, that the copy version --

21   you got a copy version from Mr. Bodurtha,

22   correct?

23       A.  Correct.

24       Q.  And you briefly skimmed through the

25   document on the system where the image is



1   preserved; is that correct?

2        A.  Yes.

3        Q.  And you did not go through that and

4   compare them paragraph by paragraph, did you?

5        A.  I did not.

6               THE WITNESS: Let me interrupt one

7   moment.

8               MR. ENNIS: Sir, you've answered

9   the question.

10              THE WITNESS: Go ahead.

11       Q.  In this document it has a place for

12  schedule of mortgage loans, does it not, in

13  Exhibit A; is that correct?

14              MR. BODURTHA: Objection to form.

15  You can answer.

16       A.  Yes.

17       Q.  I'll rephrase that.  So you see -- do

18  you see Schedule A, I think it's on Page 61?

19       A.  Yes.

20       Q.  Okay.  And there's no loans attached

21  to this document; is that correct?

22       A.  Yes.

23       Q.  Do you know when this document was

24  imaged on the database of PHH?

25              MR. BODURTHA: Objection.  Asked



1  and answered.

2       A.  No, I don't.

3       Q.  So it's fair to say you cannot state

4  that this document is identical to the document

5  on your record, on the database of imaged

6  documents.

7            MR. BODURTHA: Objection.  You can

8  answer.

9       A.  I can't.

10      Q.  On the trust agreement you indicated

11 that you did not -- now the other thing I'm

12 wondering here is on the trust agreement that

13 is listed as Exhibit I.  Sam, I think we don't

14 have the trust agreements.  I'm looking at only

15 19 pages on the trust agreement.

16            MR. ENNIS: Do you have another

17 one?

18            MR. BODURTHA: It's a pared down

19 version so that we could circulate the

20 documents.

21            MR. ENNIS: Is there a complete

22 Exhibit I?  Is the trust agreement offered as

23 an exhibit in any other form?

24            MR. BODURTHA: Have we offered it

25 in any other form?



1              MR. ENNIS: Have you provided it

2      any other form?

3              MR. BODURTHA: I can't remember if

4      we produced the entire agreement to you or this

5      shorter version.  But I can certainly check,

6      and if we hadn't, we can send you the whole

7      entire version.

8              MR. ENNIS: I wanted to ask him

9      that question because, obviously, I only got 19

10     pages in this exhibit.  So can you check that

11     right now and, perhaps, if it's around -- this

12     one doesn't have any signatures.  This is right

13     off the Internet.

14             MR. BODURTHA: I don't know what

15     you're saying, right off the Internet, but the

16     signatures are on the last pages.

17             MR. ENNIS: Maybe I'm looking at a

18     different Exhibit I.  I'm looking at the

19     Exhibit I that was contained in your --

20             MR. BODURTHA: On Page 587, at the

21     top there's signatures by Structured Asset,

22     LaSalle Bank and Aurora Loan Services, and on

23     588 there's Wells Fargo and Murray Hill

24     Company, and then there is a signature by

25     Lehman Brother Holdings solely for purposes of



```
 1   Section 11.15.
 2             MR. ENNIS: What I'm looking at, it
 3   has /S signatures, not the actual signatures.
 4             MR. BODURTHA: That's a signature.
 5             MR. ENNIS: Okay.
 6             MR. BODURTHA: Are you suggesting
 7   that you can't countersign anything, you can't
 8   electronically sign a document?
 9             MR. ENNIS: When you have a partial
10   document here, we don't have the complete
11   document.
12             MR. BODURTHA: Let me see if I can
13   get the complete document.
14             MR. ENNIS: Okay.
15      Q.  So when you looked at the document --
16             MR. BODURTHA: Do you want it right
17   now?
18             MR. ENNIS: Why don't we take a
19   break, and we'll do that.
20             MR. BODURTHA: Hang on.
21             (OFF THE RECORD)
22             THE WITNESS: What I was going to
23   say, I'm here in South Florida, sometimes we
24   get these wonderful rainstorms with lightning
25   and thunder.  I don't know if you can hear it.
```

1   If for some reason my Internet or something

2   goes down, that's the cause.  I'll immediately

3   contact Mr. Bodurtha if we get disconnected

4   somehow.

5                    MR. ENNIS: All right.  Thanks.

6                    MR. BODURTHA: John, I have the

7   full agreement which actually has signatures on

8   it, and we e-mailed it to you on December 13th,

9   2021 at 3:41.  Do you want me to forward this

10  to you?

11                   MR. ENNIS: Please.  Because that's

12  different from the exhibit list that you gave

13  to Nisshy.

14                   MR. BODURTHA: I think I've just

15  explained that to you.

16                   MR. ENNIS: I just want to make

17  sure.  You may send it to me, but it wasn't in

18  the documents that were part of the --

19                   MR. BODURTHA: I just sent it to

20  you.

21                   (RECESS)

22       Q.  I'll try to ask you a few questions in

23  the meanwhile.  Mr. Handville, so the only

24  document which Mr. Bodurtha sent you was a

25  19-page document, is that correct, that



1   particular exhibit so-called trust agreement,

2   Exhibit I; is that right?

3        A.  No.  I'm looking at the zip file.

4        Q.  That you were just sent?

5        A.  No.  I'm looking at the zip file of

6   the exhibits that Mr. Bodurtha sent to me

7   January 31st in support of the response to

8   interrogatories, and it's a lot more than 19

9   pages.

10       Q.  So it's a different Exhibit I than

11  what was filed correct -- you don't know that,

12  forget about that.  So is that the document you

13  reviewed?

14       A.  The one I initially reviewed -- there

15  are a lot of documents at the end of it.  The

16  one I reviewed has handwritten signatures

17  starting on -- the page numbers are at the

18  bottom in the center, like a footer, but

19  there's numbers off to the left as well.  I

20  don't know if they're Bates numbers or what

21  they are.  But I get up to page -- the last

22  numbered page is 152, and it has 000171 to the

23  bottom right, and the next page does not have a

24  page number, but it has 000172 on the bottom

25  right, and that's where the handwritten



1   signatures start, and it goes through several

2   pages to different parties.

3        Q.  Regarding that document that you're

4   looking at, which was Exhibit I as sent to you

5   entitled The Trust Agreement, did you in fact

6   go online and verify paragraph by paragraph

7   that that was the same document that

8   Mr. Bodurtha sent you?

9            MR. BODURTHA: Objection to form.

10  You can answer.

11       A.  I don't understand the question.  Are

12  you asking me is the document that I received

13  on 1-31-22, did I compare it to the exhibits he

14  sent me?

15       Q.  No.  On 1-31-22 where did you get

16  this -- what document did you receive on

17  1-31-22?

18       A.  I received the assignment and

19  assumption agreement between Lehman Brothers

20  Bank and Lehman Brothers Holdings, which is

21  only about 12, 13 pages.

22       Q.  Who did you receive that from?

23       A.  Mr. Bodurtha.

24       Q.  What else did you receive on January

25  31st?



1       A.  June 31st (sic) I received the trust

2   agreement, you're questioning me on.

3       Q.  And who did you receive that from?

4       A.  From Mr. Bodurtha.

5       Q.  And what else did you receive on that

6   date from Mr. Bodurtha?

7               MR. BODURTHA: Objection to the

8   extent that calls for divulgence of

9   attorney/client communications, do not testify.

10  Beyond those communications, you can testify.

11      A.  Those are the documents that he sent

12  me, approximately 448 pages.

13      Q.  When you received the trust, what's

14  referred to as the trust agreement, did you in

15  fact go to your electronic image program and

16  compare that paragraph by paragraph to what

17  Mr. Bodurtha sent you?

18              MR. BODURTHA: Objection.  You can

19  answer.

20      A.  No.

21      Q.  How much time did you spend reviewing

22  the document on the imaged record that you

23  mentioned you looked at?

24      A.  For this document, just a minute or

25  two.



1              MR. BODURTHA: Just so we're clear,

2      we actually produced this document to you on

3      multiple occasions.

4              MR. ENNIS: I was just pointing out

5      when you filed it as an exhibit, I only have 19

6      pages.

7              MR. BODURTHA: Are we clear as to

8      why I did that?

9          Q.  Now, did you also receive on January

10     31st from Mr. Bodurtha a mortgage loan and sale

11     of assignment agreement between Lehman Brothers

12     Holding and Structured Asset Security

13     Corporation?

14              THE WITNESS:  The assignment and

15     assumption agreement?

16              MR. ENNIS: Yes.

17          A.  I received the --

18              MR. ENNIS: No, not assignment,

19     purchase and sales agreement?

20              MR. BODURTHA: Objection.

21          Q.  Mortgage loan sale and assignment

22     agreement.

23              MR. BODURTHA: Objection.  You can

24     answer.

25          A.  No.



1      Q.  The exhibits you mentioned, I think it

2   was G through M, how many of those exhibits

3   sent to you by Mr. Bodurtha did you verify were

4   identical to any records on your electronic

5   image system?

6                MR. BODURTHA: Objection to form.

7   You can answer.

8      A.  I don't believe I verified them as

9   being the exact same item.

10     Q.  Okay.  Do you know what a custodial

11  certification is?

12     A.  Not off the top of my head.  I've seen

13  reference to it, but I can't say that I can

14  describe what it entails.

15               MR. ENNIS: Hold on just a moment.

16  My laptop has this little blue spinning thing,

17  it's freezing for a moment.  Hold on just a

18  moment while I try to get this set up.

19                  (OFF THE RECORD)

20                    (RECESS)

21     Q.  Mr. Handville, so if you look at the

22  exhibits on the trust agreement, specifically

23  Exhibit B-1 where it says form of initial

24  certification.

25               MR. BODURTHA: Are we back on the



1 | record?

2 |             MR. ENNIS: We thought you were

3 | here.  Sorry.  He hasn't answered anything yet.

4 |             MR. BODURTHA: It's okay.

5 |     Q.  So looking at the so-called trust

6 | agreement where it says Exhibit B-1 --

7 |             THE WITNESS:  The one that you

8 | guys just e-mailed me?

9 |             MR. ENNIS: Yes.  At the end.

10 |             THE WITNESS:  Let me pull it up,

11 | hold on.

12 |             (PAUSE)

13 |     A.  Structured Asset Securities, Aurora

14 | Loan Services, Wells Fargo, Murray Hill,

15 | LaSalle trust agreement.  I have it up.

16 |     Q.  Do you see Exhibit B-1?

17 |     A.  No.

18 |             MR. ENNIS: At the end of that.

19 |             MR. BODURTHA: I don't think

20 | there's an Exhibit B-1.

21 |             MR. ENNIS: There is not?

22 |             MR. BODURTHA: I'm not testifying.

23 | Can you give us a page number?

24 |             THE WITNESS: I found it.  It's

25 | labeled Exhibit B-1, form of initial



1  certification, is that the document you're

2  talking about?

3             MR. ENNIS: Yes.

4             THE WITNESS:  Okay.

5             MR. BODURTHA: I'm sorry, okay.

6      Q.  Now, the imaging program that you

7  have, that PHH has, can you give me the

8  official full name of that imaging program?

9      A.  SharePoint.

10     Q.  S-h-a-r-e --

11     A.  Yes.

12     Q.  -- p-o-i-n-t?

13     A.  Correct.

14     Q.  It's just called SharePoint?

15     A.  Correct.

16     Q.  And how do you access SharePoint?

17     A.  PHH has a link you can click on to

18  access it.

19     Q.  Are you able to click that link?

20     A.  Yes.

21     Q.  Did you in fact click that link any

22  time you tried to find documents in regard to

23  this case?

24     A.  Yes.  Every time I wanted to look at

25  what we had in our records, I would go to that.



1       Q.   Okay.  In referencing Exhibit B-1,

2  that is a form of initial certification; is

3  that correct?

4       A.   That's what it's captioned, yes.

5       Q.   Do you know what that is?

6       A.   It reads that subject to review the

7  contents thereof the undersigned (witness

8  reading document).

9            The first paragraph starts off in

10 reference to the trust agreement.  It says, The

11 undersigned as custodian hereby certifies it's

12 received the documents listed in a section of

13 the trust agreement for each mortgage file

14 pertaining to each mortgage loan listed on

15 Schedule A to the trust agreement, subject to

16 any exceptions noted on Schedule 1 hereto.

17      Q.   When you looked at the SharePoint

18 images, did you find any exceptions?

19      A.   No.

20      Q.   When you looked on SharePoint, did you

21 find a signed initial certification?

22      A.   No.

23      Q.   Looking at Exhibit B-2 which is

24 another form of a certification; is that

25 correct?



1        A.  Yes.

2        Q.  And that is a final certification --

3   no, that's an interim certification; is that

4   correct?

5        A.  That's what it's captioned, yes.

6        Q.  When you looked on the SharePoint

7   records, did you find an interim certification

8   that was signed?

9        A.  I don't recall.

10        Q.  Okay.  When you looked on -- after

11   that it's Exhibit B-3, and that is form of

12   final certification; isn't that correct?

13        A.  Yes.

14        Q.  And when you looked at that, did

15   you -- when you looked at the SharePoint

16   document, were you able to find a final -- form

17   of final certification that was signed?

18        A.  I don't recall.

19        Q.  Okay.  Now that certification

20   agreement references Section 2.01 in each of

21   those, the initial, the interim, and the final

22   references a section of the trust agreement

23   Section 2.01; isn't that correct?

24        A.  Yes.

25        Q.  Now, when you looked in the -- have



 1  you ever looked at the -- have you ever had

 2  possession of the actual collateral/custodial

 3  file?

 4                  MR. BODURTHA: Are you asking him

 5  personally, or on behalf of the company?

 6                  MR. ENNIS: Personally.

 7                  MR. BODURTHA: Thank you.

 8                  THE WITNESS: Thank you for

 9  clarifying that.

10      A.  No, I have not.

11      Q.  Have you ever looked at a copy of the

12  custodial/collateral file in regard to this

13  litigation?

14                  MR. BODURTHA: Objection.  You can

15  answer.

16      A.  No.

17      Q.  Do you know what was contained in the

18  custodial file that was in the -- in regard to

19  this matter?

20                  MR. BODURTHA: Objection.  You can

21  answer.

22      A.  No.

23      Q.  Now, am I correct in saying that one

24  of the topics for the deposition was in fact --

25  let me give it to you exactly --



```
 1                   (OFF THE RECORD)

 2              MR. ENNIS: Bad computer day.

 3      Q.  In Number 19 you indicate -- U.S. Bank

 4   was asked to provide a person with knowledge of

 5   each custodian of the defendant's collateral

 6   file, custodial agreements regarding the

 7   custody of the defendant's collateral file and

 8   promissory note, and the contents of the

 9   collateral file from origination to the

10   present.  Do you see that?

11      A.  That's not 19.  What number are you

12   referencing?

13              MR. ENNIS: 19.

14              THE WITNESS:  19 of the depo

15   notice?

16              MR. ENNIS: Yes.

17              THE WITNESS:  19 of what?

18              MR. ENNIS: Of the deposition

19   notice.

20      A.  19 on mine says, Person with the

21   knowledge of names, business addresses, job

22   titles, servicing records --

23              MR. ENNIS: Okay, never mind.  Let

24   me see what we got here.  Sorry about that.

25      Q.  Number 4, person with the knowledge --
```



1   you were designated as the person with

2   knowledge of each custodian of the defendant's

3   collateral file, custodial agreements regarding

4   the custody of the defendant's collateral file

5   and promissory note, and the contents of the

6   collateral file from origination to the

7   present.  Is it fair to say you don't have any

8   knowledge regarding the contents of the

9   collateral file?

10       A.  I have not viewed the collateral file,

11   so I can't speak to that with any specificity.

12   I've spoken with my counsel, he's indicated

13   what is in it, but I haven't reviewed any of

14   it.

15       Q.  So, you have not made any

16   determination of what is in it yourself?

17       A.  Correct.

18       Q.  You previously testified on the number

19   of these topics you had no information; is that

20   correct?

21             MR. BODURTHA: Objection.  That is

22   vague and overbroad.  You can answer.

23       Q.  Ever?

24       A.  I have.

25       Q.  Is it fair to say you have no



 1   knowledge of topic Number 2?

 2                MR. BODURTHA: Objection.  You can

 3   answer.

 4        A.  No, I don't have any specific

 5   knowledge regarding that.

 6        Q.  And you don't have any specific

 7   knowledge regarding topic Number 3; isn't that

 8   correct?

 9        A.  Correct.

10        Q.  You don't have any specific knowledge

11   of topic Number 4; is that correct?

12        A.  Well, there's multiple things in this

13   one, and I have testified that our records

14   indicate Wells Fargo is the document custodian.

15        Q.  When did you -- when you first found

16   that out, did you -- is there any particular

17   reason why you didn't go to Wells Fargo to

18   obtain that information?

19                MR. BODURTHA: Objection.  You can

20   answer.

21        A.  I didn't think I needed to.  They were

22   named as one of the custodians in the trust,

23   and our records indicate that we obtained the

24   documents from them.  There would be no reason

25   for me to verify it outside of that.

1      Q.  Where are any records indicating that

2   you received any documents from Wells Fargo?

3              MR. BODURTHA: Objection to form.

4   You can answer.

5      Q.  I'll rephrase it.  What documents

6   indicate that you received any documents from

7   Wells Fargo?

8      A.  I don't know.  I didn't look for a

9   Bailee letter.  We might have one, but I can't

10  say for sure.

11     Q.  Is it fair to say there is no Bailee

12  letter from Wells Fargo in any other documents

13  that have been produced in this case?

14             MR. BODURTHA: Objection.  You can

15  answer.

16     A.  I couldn't say.  I don't know.

17     Q.  So you don't know if there is a Bailee

18  letter, correct?

19             MR. BODURTHA: Objection.  Asked

20  and answered.  You can answer.

21             MR. ENNIS: Sam, you're not

22  allowed -- objections in a deposition are

23  limited to privilege.  You are objecting to

24  virtually every question.

25             MR. BODURTHA: That's not true.  We



```
 1   didn't agree to waive objections, and I'm
 2   entitled to object on any grounds that the
 3   evidence or testimony would be inadmissible.
 4              MR. ENNIS: That is absolutely not
 5   true.
 6        Q.  Let me ask you this, sir:  Can you
 7   name one particular document which indicates
 8   that any documents were transmitted to PHH by
 9   Wells Fargo Bank as custodian?
10              MR. BODURTHA: Objection.  You can
11   answer.
12        A.  I can't say off the top of my head.  I
13   don't recall.
14        Q.  Can you name one document which
15   indicates that Wells Fargo Bank transferred any
16   documents to Ocwen Loan Servicing regarding
17   this loan?
18              MR. BODURTHA: Objection.  You can
19   answer.
20        A.  I don't recall.  I have to look and
21   see if we have it.
22        Q.  You didn't check, did you?
23              MR. BODURTHA: Objection.  You can
24   answer.
25        A.  I didn't specifically look for them,
```



```
 1   no, I didn't have time.

 2        Q.  You did not have time.  So do you need

 3   more time?

 4        A.  More time would be great.

 5        Q.  Have you ever contacted Wells Fargo in

 6   regard to other depositions that you've had

 7   that you've been designated the witness for?

 8             MR. BODURTHA: Objection.

 9   Relevancy.  You can answer.

10        A.  No.

11             MR. ENNIS: At this time I'd like

12   to adjourn this deposition.  This witness has

13   not -- has indicated on multiple of these

14   topics he was either not prepared or didn't

15   bother looking for any records, and he's

16   indicated he needs more time.  I would ask that

17   this deposition be adjourned to another date.

18             MR. BODURTHA: I have some

19   questions before you adjourn.

20             MR. ENNIS: My direct examination

21   is not complete, I'm not resting.  I believe

22   this witness is not a proper 30(b)(6) witness.

23             MR. BODURTHA: I would like to ask

24   some questions.

25             MR. ENNIS: You get to ask the
```



 1   questions after I've completed.

 2            MR. BODURTHA: You're saying I

 3   can't ask any questions today?

 4            MR. ENNIS: No, because I am

 5   adjourning this deposition because you have not

 6   provided a 30(b)(6) witness who has either made

 7   any diligent effort to obtain information

 8   regarding the topics which were requested, nor

 9   has he made any attempt to obtain documents on

10   which he may be able to testify.

11            MR. BODURTHA: I think your

12   objection is noted, but I'm still allowed to

13   ask questions.

14            MR. ENNIS: No.  I'm adjourning the

15   deposition right now.  I'm asking the court

16   reporter to conclude this also.  I would also

17   note that this deposition has been the subject

18   of multitude, multitude objections, which like

19   my brother suggested, you can't object on

20   relevancy grounds in a deposition.  This is not

21   a trial.  This is a discovery deposition, and

22   as a result, deposition objections are limited

23   to privilege.  Objection to the form of a

24   question, I understand that.  But to suggest

25   relevancy, it has no basis in a deposition at



 1   all.  So I'm going to ask the court reporter to

 2   adjourn the deposition and give --

 3                MR. BODURTHA: Wait, wait. You're

 4   not letting me ask any questions?

 5                MR. ENNIS: I have not completed my

 6   examination and, therefore --

 7                MR. BODURTHA: I want to note for

 8   the record that the counsel taking the

 9   deposition has prevented the plaintiff from

10   asking any questions at this deposition.  I

11   want that on the record.

12                MR. ENNIS: The deposition has not

13   been concluded.  This witness has been woefully

14   prepared and has not made any effort to obtain

15   information about topics that were crucial.

16                MR. BODURTHA: I absolutely oppose

17   and object to what you're saying, and I think

18   it's categorically ridiculous that you won't

19   let me ask questions.

20                MR. ENNIS: Your testimony --

21   cross-examination of the witness occurs after

22   my deposition is concluded.  Therefore, we're

23   adjourning, Sam.  I am adjourning this

24   deposition because this witness, this is a bad

25   faith presentation of a 30(b)(6) witness who



 1  either wasn't prepared or didn't -- didn't want

 2  to be prepared, or didn't care about preparing

 3  on multiple of the topics as the testimony will

 4  indicate he just stated he knew nothing, and

 5  that is not the purpose of a 30(b)(6)

 6  deposition.  So I ask this be adjourned at this

 7  time.

 8              MR. BODURTHA: I still want to ask

 9  my questions.  May I ask my questions?

10              MR. ENNIS: I'm going to object to

11  that.  The deposition I scheduled, I ask the

12  court reporter to conclude the deposition right

13  now.

14              THE REPORTER:  Okay.  May I ask

15  who wants a copy of the transcript?

16              MR. ENNIS: I do.

17              MR. BODURTHA: Mini with an index,

18  electronic.

19              THE REPORTER: How about you, John.

20              MR. ENNIS: Electronic.

21              MR. BODURTHA: I'd like the

22  documents referred to be marked as an exhibit.

23              (OFF THE RECORD)

24              MR. BODURTHA: I want the execution

25  copy of the trust agreement that was reviewed



1   by Mr. Handville marked as an exhibit.  Do you

2   want it marked as your exhibit, or do you want

3   it marked as mine?

4                    THE REPORTER:  It wasn't marked, I

5   don't have it.  Do you want me to mark it now?

6                    MR. ENNIS: You can mark it as

7   yours.  You can put it in when you present

8   testimony.

9                    MR. BODURTHA: I want it marked

10  now, and I'll put it as Plaintiffs' Exhibit A

11  or 1, and I'll e-mail it to the court reporter.

12                   EXHIBIT 1 (PLAINTIFFS' EXHIBIT 1

13                   MARKED FOR IDENTIFICATION)

14             (DEPOSITION ADJOURNED AT 2:50 P.M.)

15

16

17

18

19

20

21

22

23

24

25



1              C-E-R-T-I-F-I-C-A-T-E

2         I, LINDA L. GUGLIELMO, a Notary Public in
   and for the State of Rhode Island, duly
3  commissioned and qualified to administer oaths,
   do hereby certify that the foregoing
4  webconference 30(b)(6) deposition of U.S. Bank,
   by and through Howard Handville, a Witness in
5  the above-entitled cause, was taken before me
   on behalf of the Defendant, on April 7, 2022 at
6  10:30 a.m., that previous to examination of
   said witness, who was of lawful age, he was
7  first sworn by me and duly cautioned and sworn
   to testify the truth, the whole truth, and
8  nothing but the truth, and that he thereupon
   testified as in the foregoing manner as set out
9  in the aforesaid transcript.

10        I further certify that the foregoing
   deposition was taken down by me in machine
11 shorthand and was later transcribed by computer
   and that the foregoing deposition is a true and
12 accurate record of the testimony of said
   witness.

13
          Pursuant to Rule 5 (d) and 30 (f) of the
14 Federal Rules of Civil Procedure, original
   transcripts shall not be filed in court;
15 therefore, the original is delivered and
   retained by Defendant's attorney, John Ennis.

16
          IN WITNESS WHEREOF, I have hereunto set my
17 hand this 14th day of April 2022.

18

19

20

21 _____
   LINDA L. GUGLIELMO, NOTARY PUBLIC/RPR-RMR
22   (MY COMMISSION EXPIRES AUGUST 13, 2025)
              RMR NO. 27532
23

24

25



**Exhibits**

8115816 How
ard.R.
 Handville
30b6 DEFEND
ANT.
EXHIBIT1
  3:12
  48:23
  101:12

8115816 How
ard.R.
 Handville
30b6 DEFEND
ANT.
EXHIBIT2

8115816 How
ard.R.
 Handville
30b6 PLAINT
IFF.
EXHIBITA
  3:10
  8:14,15
  77:13
  101:10

———————

**0**

000171
  82:22

000172
  82:24

02110
  71:17

09
  71:5

———————

**1**

1

9:24
11:11,23,
25 46:11
48:23
89:16
101:11

**1-31-22**
83:13,15,
17

**10**
  25:5,7,
11,19

**10-1-03**
  48:3 50:4
71:7

**10-1-2003**
  42:3

**100**
  5:9

**109718189**
  56:23
57:25

**11**
  25:16,18

**11-13**
  63:9

**11.15**
  80:1

**12**
  25:22,24
61:7
66:2,24
83:21

**12,660**
  58:23

**12,664**
  51:5

**12-30-20**
  63:14

**12:30**

64:2

**13**
  28:9,11
61:20
68:1
83:21

**139**
  53:17

**13th**
  81:8

**14**
  29:11,13
61:24
69:7,8

**15**
  11:7
13:15
30:3,6

**152**
  82:22

**16**
  31:12,14

**1661**
  5:9

**17**
  31:16,18
61:20

**18**
  31:20,22
73:10

**19**
  22:14
23:3,5
24:11,16
73:9,10
78:15
79:9 82:8
85:5
92:3,11,
13,14,17,
20

**19-page**
  81:25

**1:31**
  64:2

———————

**2**

———————

**2**
  12:4
20:6,13
32:19
94:1

**2.01**
  90:20,23

**20**
  73:9,11

**2003**
  46:11
62:6
66:6,9,
13,21
67:11

**2003-BC-11**
  57:14

**2007**
  18:23

**2008**
  60:6,10,
16 70:16

**2010**
  6:20

**2014**
  67:6

**2017**
  61:19
63:9 67:7

**2019**
  6:20

**2020**
  6:21

63:13

**2021**
  81:9

**2022**
  13:12
28:15,20
29:13
30:4
42:16
46:25
51:15
69:15

**21st**
  42:13

**25**
  66:9,21

**25th**
  62:6
66:6,13

**26-4**
  53:8

———————

**3**

———————

**3**
  12:11
34:3,25
71:5 94:7

**30(b)(6)**
  9:4
64:15,22
97:22
98:6
99:25
100:5

**31**
  28:20

**31st**
  28:14
42:16
46:25
51:15



69:15
82:7
83:25
84:1
85:10

**33**
53:17

**33409**
5:10

**3:41**
81:9

---
**4**
---

**4**
12:15
13:10,17
92:25
94:11

**448**
84:12

**4th**
8:21
29:13
30:4
33:10
64:18

---
**5**
---

**5**
14:15,17
36:11

**5720**
28:1

**578**
54:1

**587**
79:20

**588**
79:23

---
**6**
---

**6**
14:17,20
39:8

**61**
77:18

---
**7**
---

**7**
14:25
39:24
70:16

**7-16-03**
69:24
70:3

**7-25-03**
61:12
63:16

**75**
7:8

---
**8**
---

**8**
17:15,18,
23 46:1

**8K**
70:13

---
**9**
---

**9**
18:2,14

**9771**
51:7

---
**A**
---

**absolutely**
96:4
99:16

**access**
13:9
26:13
27:3
30:21,23
41:13
42:17
45:22
88:16,18

**account**
21:4
22:20
32:21
33:19,22
34:6,17
60:16

**accuracy**
19:24
20:8,19
21:1
22:18
23:9
32:21
33:5,18,
22 34:6,
16

**accurate**
19:10,17
34:11
62:13

**accurately**
33:2

**act**
71:14

**action**
9:15,25

**actual**
80:3 91:2

**address**
5:8,11,25
6:1 43:23
54:11,16
69:12
71:16

**addresses**
22:17
23:8
24:9,18
92:21

**adjourn**
97:12,19
99:2

**adjourned**
97:17
100:6

**adjourning**
98:5,14
99:23

**administrat
or**
48:7

**advise**
39:1,13

**affixed**
68:4,7,14

**agree**
96:1

**agreed**
67:2

**agreement**
12:19,23,
24 13:23
14:2
36:21,23
37:7,8
42:1
43:13,19
44:15

**45:2**
46:11
48:3,23
50:3
52:6,25
66:12,17
67:14,19,
22 71:7
72:21,22
75:24
78:10,12,
15,22
79:4 81:7
82:1
83:5,19
84:2,14
85:11,15,
19,22
86:22
87:6,15
89:10,13,
15 90:20,
22 100:25

**agreements**
60:12
66:15
78:14
92:6 93:3

**ahead**
21:14
77:10

**AHI/
HOMEWOOD**
19:1

**allocated**
58:5

**allonge**
32:8,11
68:3,4,6,
8 69:25

**allonges**
14:8

**allowed**
48:11



75:4
95:22
98:12

America
71:10,12,
19

American
19:9

analogy
32:2

analyst
5:18,19

answers
8:4 28:13

anticipation
11:15

appearance
65:18

appears
59:21
70:13

applicable
69:18

application
65:13,18

appointed
71:14

appointment
71:5

approximately
84:12

April
8:21
29:12
30:4
33:10
64:18

area

9:24
11:11,25
12:4,10

areas
9:6,17

aspect
22:11
31:6
60:19

assertion
56:20
62:8,13

Asset
79:21
85:12
87:13

Assets
46:9 48:4
71:8

assign
59:12

assigned
65:15,19

assignee
42:3

assigner
42:2

assignment
41:25
46:11
64:14,19
65:6
83:18
85:11,14,
18,21

assigns
59:6

association
48:9
71:14,18

assume

8:4

assumption
42:1
83:19
85:15

attached
52:5
73:25
77:20

attempt
98:9

attention
11:23
17:15
52:24
55:6 69:6
75:23

attorney
39:23
76:3

attorney/
client
11:13
29:16,18
37:15,22
39:4,6,16
46:3 84:9

attorneys
37:24
62:18
65:10

Aurora
48:5 50:5
71:8
79:22
87:13

aware
31:2 32:9
37:2

B

B-1
86:23
87:6,16,
20,25
89:1

B-2
89:23

B-3
90:11

back
8:8 13:11
27:21,22
29:22
32:5 57:7
60:20
62:25
63:11,15
86:25

bad
92:2
99:24

Bailee
25:25
26:3,5,7,
9,11,15,
19,20,22,
23 32:1
35:17
95:9,11,
17

balance
20:9 21:1

Bank
9:4,11
15:23
16:1
17:3,7,10
22:15
37:6 42:2
43:13,19,

21 44:1,
24 48:6,8
56:13
57:1
64:21
71:10,11,
12,14,17,
18 73:16,
21 79:22
83:20
92:3
96:9,15

Bankruptcy
53:6

based
8:2 16:5
57:11
58:16
67:5

basically
25:19
32:6
63:15

basis
56:6,10
98:25

Bates
82:20

BC
57:14

Beach
5:10,24
27:24
28:2 38:7

bear
17:4
26:16
39:25
40:5
41:21
70:12
73:22



began
  52:15

begin
  73:10

beginning
  53:18

behalf
  9:6,10
  91:5

Block
  70:16

blue
  86:16

board
  38:9

boarded
  20:11
  21:4
  22:22
  23:10
  32:22
  33:6,20,
  23 34:8,
  18

boarding
  9:20
  21:6,14
  22:11
  25:2
  32:25
  34:10

Bodurtha
  10:13
  11:12
  12:25
  16:18,23
  18:3,15
  19:11,18
  20:2,20
  23:1
  24:13
  28:25
  29:6,9,

14,24
33:14
34:20
35:1
36:9,12
37:14,21
39:3,15
40:13
44:10,20,
25 45:9,
16,20
46:2,17,
18 47:8,
19 48:13,
16 49:11
50:10,13,
19 51:13
52:16
53:10,14
56:4,8
57:17,21
58:13,24
59:5,15,
20 62:2,
9,15
63:5,20
64:11,16,
20,23
65:11
66:1
67:12
68:15,19
69:3
70:21
71:23
73:6,18
74:8,21
75:2,6
76:3,16,
21 77:14,
25 78:7,
18,24
79:3,14,
20 80:4,
6,12,16,
20 81:3,
6,14,19,

24 82:6
83:8,9,23
84:4,6,7,
17,18
85:1,7,
10,20,23
86:3,6,25
87:4,19,
22 88:5
91:4,7,
14,20
93:21
94:2,19
95:3,14,
19,25
96:10,18,
23 97:8,
18,23
98:2,11
99:3,7,16
100:8,17,
21,24
101:9

borrower
  21:25

Boston
  71:16

bother
  97:15

bottom
  82:18,23,
  24

break
  32:15
  63:25
  64:10,12
  80:19

briefly
  76:6,24

brings
  31:1

brother
  79:25

98:19

Brothers
  17:7
  42:1,2
  44:24
  46:8 50:6
  83:19,20
  85:11

building
  6:4,14
  28:3,4

bunch
  6:5

business
  5:7,11
  22:17
  23:8
  24:18
  26:2
  69:12
  74:7
  92:21

─────────

      C

─────────

C-A-R-I-O-N
  24:24

call
  30:17

called
  19:6
  23:17
  40:24
  72:7
  88:14

calls
  11:13
  29:15
  37:15
  39:15
  46:2 84:8

capacity

7:17,19

captioned
  48:2 71:3
  89:4 90:5

capture
  21:23
  22:9

captured
  22:13

card
  32:3

care
  31:6
  61:12
  100:2

Carrion
  24:22

case
  7:18 26:7
  28:20
  29:4 32:9
  54:3
  63:24
  65:7,21,
  24 88:23
  95:13

categorical
ly
  99:18

center
  82:18

certainty
  76:12

certificate
  71:13

certificati
on
  86:11,24
  88:1
  89:2,21,
  24 90:2,



3,7,12,
17,19

**certifies**
89:11

**change**
62:4

**changed**
19:16
22:1

**charged**
21:3

**charter**
70:18

**check**
65:18
69:1
70:22
74:11
79:5,10
96:22

**checked**
24:6,21
31:10
74:13,17

**CHECKING**
26:17

**Chris**
24:19

**circulate**
78:19

**CJ**
55:5

**claim**
36:5

**clarify**
57:21
59:22

**clarifying**
91:9

**clear**

85:1,7

**click**
88:17,19,
21

**close**
50:20
61:24

**closing**
60:25

**code**
62:21

**collateral**
14:9
26:10
27:19
35:5,9,21
36:2
60:24
61:9
92:5,7,9
93:3,4,6,
9,10

**collateral/
custodial**
45:7 91:2

**column**
55:5,15

**columns**
55:8

**comments**
27:12
30:8
61:15,17
63:1

**Commission**
70:15

**commitment**
14:7

**communicate**
37:18
43:25

44:1,4

**communicati
on**
37:23

**communicati
ons**
11:14
29:16,18
37:15
39:4 65:1
84:9,10

**companies**
56:14

**company**
48:7 71:9
79:24
91:5

**compare**
47:4,18
48:19
76:9 77:4
83:13
84:16

**complaint**
30:2,9

**complete**
40:3
78:21
80:10,13
97:21

**completed**
98:1 99:5

**complex**
28:5

**Compound**
63:5

**computer**
30:19,21,
23 92:2

**computerize
d**

13:7

**concerned**
74:15

**conclude**
98:16
100:12

**concluded**
99:13,22

**confirm**
19:23
22:18
47:2
48:15
50:18
64:9
65:11
73:14,20
75:20

**confirmed**
23:9
34:5,16
63:16,19

**confusion**
59:21,22

**considerati
ons**
45:4

**contact**
62:23
65:20
68:12
81:3

**contacted**
97:5

**contained**
79:19
91:17

**contents**
35:21
36:1 89:7
92:8
93:5,8

**converted**
22:21

**Conway**
68:11

**copies**
18:9
60:23

**copy**
8:11 9:21
17:2
46:12
47:3 53:5
76:2,20,
21 91:11
100:15,25

**Corp**
37:19

**corporate**
37:6

**Corporation**
5:21 6:4
7:20
44:24
46:10
48:4 50:4
60:4 61:5
85:13

**Corporation
's**
5:22

**correct**
6:14 7:2
13:13
14:21,22
15:23,24
16:3
20:12,24
24:12
26:15,18
33:10,11
35:6
40:13
42:14



43:14
44:11,15,
16 45:14,
19 53:1
56:20,21
61:23
66:6,9,
10,21
67:8,17
69:2
70:5,8
72:21,23
73:5,17
74:7,17,
18 75:11,
25 76:1,
3,4,7,15,
22,23
77:1,13,
21 81:25
82:11
88:13,15
89:3,25
90:4,12,
23 91:23
93:17,20
94:8,9,11
95:18

**correctly**
22:13

**counsel**
10:11
15:2
25:14,20
26:19
27:14,22
30:15
42:6,21,
22,24
63:2
65:16
93:12
99:8

**counsels**
65:14

**count**
26:12

**countersign**
80:7

**couple**
75:17,19

**court**
53:7
98:15
99:1
100:12
101:11

**created**
43:5,6
52:15
60:2

**credit**
48:7

**cross-
examination**
75:1
99:21

**crucial**
99:15

**current**
44:6
49:21
65:3
70:15

**custodial**
13:22
14:1,10,
11 45:23
66:11,14,
16 67:14
86:10
91:18
92:6 93:3

**custodial/
collateral**
91:12

**custodian**
12:19
13:18,20,
24 14:3,
12 35:5,9
45:8
54:25
66:4
67:8,11,
17,19
68:24
73:16
89:11
92:5 93:2
94:14
96:9

**custodian's**
61:12

**custodians**
14:5
35:13
62:24
94:22

**custody**
92:7 93:4

---

D

---

**data**
21:9,15
27:15
34:11
40:23
41:1,4
49:3,6,9

**database**
30:17
38:12,14
40:21,22
41:2,5,7,
10,12,16
42:25
43:2,4,5
46:22

**date**
47:6,14,
18,22
48:18,22
49:2
50:14,17,
24 51:17,
25 52:8,
12,15,20
73:24
77:24
78:5

**date**
7:14
18:24
42:14
51:21,24
52:1,2,4
61:17
63:7,16
68:3,4,6
69:9,19,
22,25
84:6
97:17

**dated**
18:21
28:20
42:3
46:11
48:3 50:4
70:16
71:4,7

**dates**
52:3
60:19
63:4
68:22
69:18

**day**
92:2

**deal**
36:16
38:11

**December**

63:13
81:8

**decision**
11:18

**defendant**
29:5,7,8
54:12
68:7
69:10,16

**defendant's**
8:15 9:20
22:19,20
36:7 39:9
61:4 64:7
92:5,7
93:2,4

**definitions**
53:18

**Degnan**
71:19

**degree**
76:11

**department**
38:6
62:23
63:15

**depo**
92:14

**deposed**
7:4,10,
13,18 9:9
15:22

**deposited**
41:15,18

**depositing**
41:12

**deposition**
7:22,25
8:12,13,
18 9:22
10:5



12:5,10,
11,16,17
14:16,24
17:18
25:7,12
33:10
38:25
91:24
92:18
95:22
97:12,17
98:5,15,
17,20,21,
22,25
99:2,9,
10,12,22,
24 100:6,
11,12

**depositions**
97:6

**depositor**
48:5
71:13

**describe**
31:25
86:14

**designate**
9:4

**designated**
45:12
64:21
66:24
67:18
68:2 93:1
97:7

**desktop**
30:15

**determination**
11:10
56:1
61:14
93:16

**determine**
9:15 10:1
19:15,22

**determined**
11:9

**determining**
68:13

**diligent**
98:7

**Dionne**
71:19

**direct**
73:7,8
97:20

**directing**
11:23
17:15
52:24
55:6 69:6
75:23

**directly**
65:20

**disbursements**
21:24

**disconnected**
81:3

**discovery**
8:1 98:21

**discussed**
72:20

**division**
5:13

**divulgence**
84:8

**document**
10:4
13:6,7
14:4,10,

12 28:21,
23 32:3
38:18
39:11
40:17
42:5,7,8,
17,23
43:1,4,10
46:13,16,
19 47:1,
3,11,18
48:10,12,
14,16,19,
21 49:1
50:9,12,
17,18,22
51:10,12,
17,18
52:5,7,9,
10,11
53:6,8,11
55:12
57:3,4,8
61:11
62:23
65:17
68:23
70:20,25
71:3,22,
24 72:3,
5,13
73:9,15
74:4,6,20
75:3,13,
15 76:8,
12,14,25
77:11,21,
23 78:4
80:8,10,
11,13,15
81:24,25
82:12
83:3,7,
12,16
84:22,24
85:2 88:1
89:8

90:16
94:14
96:7,14

**documentation**
67:25

**documents**
10:6,9,
11,14,17,
24 11:1,
2,5,24
12:1,3,7,
8,13,14
14:5,6,
14,19,23
15:1,7
16:7,12,
16,22
17:13,16,
22 18:1,
7,13
19:7,8,
14,15,24,
25 20:19,
23,25
23:3,5
25:6,10,
17,23
26:10,14,
17 27:13,
19 28:10
29:12
30:1,4,9,
16 31:13,
16,21
34:4,15
35:14,15
36:16
38:11,14,
20,22
39:20,22
41:22
44:9
60:18,20,
24 61:1,
13 63:18

65:7
72:6,11
76:19
78:6,20
81:18
82:15
84:11
88:22
89:12
94:24
95:2,5,6,
12 96:8,
16 98:9
100:22

**due**
20:9 21:2

_____

**E**

_____

**e-mail**
101:11

**e-mailed**
81:8 87:8

**earlier**
7:15
43:12,17

**early**
6:21

**easier**
53:23

**effect**
66:12
67:23

**effort**
23:12
49:17,23
98:7
99:14

**electronic**
13:3
18:25
19:25



20:11
21:5,12
22:22
32:22
34:8,19
40:15,17
45:6
71:25
73:12
84:15
86:4
100:18,20

**electronica
lly**
47:12
80:8

**elimination**
55:21
56:1

**employee**
65:2

**employer**
65:4,22,
25 69:11

**end**
46:24
82:15
87:9,18

**endorsed**
69:10,19,
20

**endorser**
69:13

**ENNIS**
5:6 18:5,
8 29:8,22
32:14
53:12
54:1
57:19
58:15
59:2,13,
19,24

60:14
64:3 73:8
74:25
75:4 77:8
78:16,21
79:1,8,17
80:2,5,9,
14,18
81:5,11,
16 85:4,
16,18
86:15
87:2,9,
18,21
88:3 91:6
92:2,13,
16,18,23
95:21
96:4
97:11,20,
25 98:4,
14 99:5,
12,20
100:10,
16,20
101:6

**ensures**
21:18

**entails**
86:14

**enter**
62:21

**entered**
27:15
41:1,4,5
43:1
49:2,5,8
52:12,19

**entire**
58:25
79:4,7

**entirety**
40:20
51:20

59:23

**entitled**
83:5 96:2

**entity**
13:25
36:24
37:9

**entry**
61:18

**escrow**
20:9 21:2

**evidence**
96:3

**exact**
18:13
86:9

**examination**
5:5 50:21
97:20
99:6

**Excel**
59:1

**exceptions**
89:16,18

**excerpt**
40:11

**Exchange**
70:15

**excuse**
6:11
20:24
44:21
47:11
53:7 54:8
69:17
76:20

**executed**
61:23
71:18

**execution**

65:17
100:24

**exhibit**
8:14,15
10:18
17:2
36:18
40:4
41:24,25
44:6,8
46:6,7,8
47:13,16,
17,21,25
48:1,2,23
49:8,15,
18,21,24
50:1,2,3,
23 51:2,4
52:22,25
53:13,17
54:6,12,
13,18,23,
24 55:7,
15 60:2
64:5,6,7
70:10,12
71:2,3
72:20
73:3
75:8,9,23
77:13
78:13,22,
23 79:10,
18,19
81:12
82:1,2,10
83:4 85:5
86:23
87:6,16,
20,25
89:1,23
90:11
100:22
101:1,2,
10

**exhibited**
55:14

**exhibits**
10:19
15:2,3,4,
10 40:2
41:23
42:18
53:13
60:12
70:7
72:19
82:6
83:13
86:1,2,22

**exist**
66:9,20

**experience**
15:19,21
58:7

**explain**
13:2 21:7

**explained**
81:15

**express**
45:25

**extension**
6:23 7:2

**extent**
29:17
37:22,24
39:4 84:8

**external**
65:14

**extrapolati
on**
40:11

_____

F

_____

**face**



69:16,22

**facilities**
  6:6

**facility**
  6:8 31:8

**fact**
  19:17
  47:2
  58:16
  59:11
  83:5
  84:15
  88:21
  91:24

**failures**
  22:9

**fair**
  32:19
  44:8,17
  74:19
  78:3
  93:7,25
  95:11

**faith**
  99:25

**familiar**
  7:21

**Fannie**
  56:15

**Fargo**
  13:21,24
  35:5,8,18
  48:6 55:5
  56:13
  61:11,25
  62:6,7,14
  63:4
  66:3,12,
  18,19
  67:8
  68:13
  69:2,5
  71:9

79:23
87:14
94:14,17
95:2,7,12
96:9,15
97:5

**Fargo's**
  45:22

**February**
  10:15
  13:11
  42:13

**Federal**
  53:7
  71:16

**feedback**
  63:8

**feel**
  8:7

**fees**
  20:10
  21:3

**figures**
  21:20

**file**
  14:9,12
  21:12,14
  35:5,9,21
  36:2 45:7
  54:25
  59:1,18
  61:9
  82:3,5
  89:13
  91:3,12,
  18 92:6,
  7,9 93:3,
  4,6,9,10

**filed**
  30:10
  53:5,6,13
  82:11
  85:5

**filings**
  10:20

**final**
  90:2,12,
  16,17,21

**Financial**
  5:21,22
  6:4 7:20
  37:19

**find**
  23:12
  49:17,23
  65:19
  70:12
  72:13,25
  75:16
  88:22
  89:18,21
  90:7,16

**five-minute**
  32:15

**floor**
  5:14,15

**Florida**
  5:10
  27:24
  28:2
  80:23

**focused**
  34:10

**footer**
  82:18

**foreclosure**
  62:18

**forget**
  75:8
  82:12

**form**
  34:20
  35:1 45:9
  47:8
  49:11

64:23
70:13
76:16
77:14
78:23,25
79:2 83:9
86:6,23
87:25
89:2,24
90:11,16
95:3
98:23

**format**
  46:19

**forward**
  81:9

**found**
  72:10
  87:24
  94:15

**foundation**
  20:3 29:1
  74:23
  75:1

**frame**
  18:20

**FRCP**
  9:4

**Freddie**
  56:15

**free**
  8:7

**freezing**
  86:17

**front**
  9:22

**FSB**
  42:2

**full**
  81:7 88:8

─────────

        **G**

**gave**
  44:10
  47:19
  48:16
  64:19
  65:6
  81:12

**general**
  34:14
  35:23
  58:6

**generally**
  27:16,17

**give**
  53:21,23
  87:23
  88:7
  91:25
  99:2

**glanced**
  47:4,20
  50:21

**Global**
  71:4

**gosh**
  13:11

**great**
  97:4

**grounds**
  96:2
  98:20

**guess**
  7:8 8:3
  56:3
  66:19

**guidelines**
  22:24

**guys**



87:8

_____

**H**
_____

**hand**
  73:11

**handle**
  14:5

**handled**
  13:5

**handles**
  38:10

**Handville**
  5:7 11:17
  29:19,25
  32:18
  37:23
  39:5 64:9
  81:23
  86:21
  101:1

**handwritten**
  82:16,25

**handy**
  43:24

**Hang**
  72:24
  80:20

**happen**
  65:21

**happened**
  44:18

**head**
  86:12
  96:12

**heading**
  76:10

**hear**
  80:25

**helpful**

58:24

**hereto**
  89:16

**high-rise**
  28:4

**Hill**
  48:7 71:9
  79:23
  87:14

**histories**
  18:9,10,
  12,17
  25:20
  30:7

**history**
  25:13
  62:20

**HMSI**
  18:18,20

**hold**
  86:15,17
  87:11

**holding**
  42:3 46:8
  50:6
  85:12

**Holdings**
  79:25
  83:20

**home**
  19:9
  69:12

**Homewood**
  18:19,21

**hour**
  64:10

**hours**
  11:7
  13:15

**HSBC**

56:14

_____

**I**
_____

**ID**
  53:22,23
  55:10,11,
  16,18,22

**idea**
  44:17

**identical**
  42:8
  48:16
  50:18
  75:20
  78:4 86:4

**IDENTIFICAT
ION**
  8:16 64:8

**identifies**
  69:17

**identify**
  27:1 58:9
  72:4

**identifying**
  56:16

**identity**
  68:8

**idesk**
  30:17,24
  31:3

**image**
  30:18
  52:19
  74:11
  75:10
  76:6,25
  84:15
  86:5

**imaged**
  26:21

30:11,12,
  14,15
  52:12
  77:24
  78:5
  84:22

**images**
  89:18

**imaging**
  26:6
  30:24
  31:5,7
  76:15
  88:6,8

**immediately**
  81:2

**impetus**
  32:24

**implemented**
  13:4

**imports**
  33:1

**inadmissibl
e**
  96:3

**included**
  42:18
  54:19

**Incorporate
d**
  70:17

**index**
  14:11
  45:6
  100:17

**indexed**
  52:4

**India**
  24:7

**indicating**
  27:12

71:11
  95:1

**individual**
  9:5 57:12
  58:7,8

**industrial**
  28:5

**information**
  11:14,16
  21:11
  22:3,7,
  10,12,24
  23:15
  24:15,17
  33:1,5
  34:24
  37:13
  39:2,14
  41:15
  44:22
  45:13
  49:6
  54:5,22
  61:8
  62:25
  63:1,18
  68:23
  69:18
  93:19
  94:18
  98:7
  99:15

**initial**
  86:23
  87:25
  89:2,21
  90:21

**initially**
  82:14

**input**
  22:12
  34:11

**inquiry**
  9:7,17,24



11:11,25
12:4,10
16:9

**interest**
20:9,10
21:1,3

**interim**
21:21
22:2
90:3,7,21

**internal**
6:5 65:14

**Internet**
74:20
75:3
79:13,15
81:1

**interpreted**
59:8

**interrogato ries**
28:14,19
29:4
32:16
36:20
64:4,5
82:8

**Interrogato ry**
69:7,8

**interrupt**
77:6

**investor**
55:17
56:2,7,
12,13,22,
25 57:5,
11,23,24,
25 58:8
59:6

**investors**
55:21

56:10
58:7,12
59:4,9,11

**involved**
37:25

**involves**
21:6
37:22

**item**
86:9

**items**
12:21

———————

**J**

———————

**January**
28:14,20
42:16
46:24,25
51:15
60:6,10
69:15
74:13
82:7
83:24
85:9

**Jersey**
24:8

**job**
22:17
24:18
69:11
92:21

**John**
28:25
33:16
57:17
58:14
65:5 73:7
74:22
81:6
100:19

**Jolene**
38:3,5

**July**
62:6
66:6,9,
13,20
67:11
71:5

**June**
84:1

———————

**K**

———————

**keeping**
27:20
45:23

**Kennedy**
24:19

**knew**
100:4

**knowledge**
8:3 9:5,
17,19
10:2,3
11:11,19,
21,22
15:25
16:2,6
20:4,7,
15,16,18
22:16
23:7
24:11
32:20
33:4,13,
15,17,21,
24 34:1,
4,15,24
35:20,23
36:1,5
37:3,5
38:17
39:9,18
45:5,13,

18,25
61:3
66:22,25
68:3,9
92:4,21,
25 93:2,8
94:1,5,7,
10

———————

**L**

———————

**labeled**
41:25
87:25

**labels**
36:18

**lack**
45:25

**lacks**
29:1

**language**
21:9

**laptop**
86:16

**Lasalle**
48:8
71:4,10
79:22
87:15

**late**
6:20

**lateral**
14:5

**Law**
38:6

**lay**
75:1

**leaving**
51:6

**left**

55:4,24
82:19

**legal**
30:9

**Lehman**
17:7
42:1,2
44:24
46:8 50:6
79:25
83:19,20
85:11

**letter**
32:1
35:17
95:9,12,
18

**letters**
25:25
26:4,5,
11,15,19,
20,22,23
55:9

**letting**
99:4

**library**
32:3

**lightning**
80:24

**limited**
95:23
98:22

**link**
88:17,19,
21

**list**
10:18
54:15
81:12

**listed**
11:21
78:13



89:12,14

litigated
  65:9

litigation
  11:15
  65:12
  91:13

live
  21:19,22

load
  23:10

loads
  19:25

loan
  5:18 9:20
  13:4,18
  15:21
  19:4
  20:11
  21:4,15,
  19,22
  22:4,11,
  20,21
  25:2
  30:16
  31:1
  32:21
  33:3,19
  34:6,7,17
  35:6,9,24
  38:14,19
  39:19
  40:3,10,
  12,20
  44:11,18,
  23 45:3
  46:10
  48:5 50:5
  51:5,19,
  22,25
  53:19
  54:19
  55:1,10,
  11,13,16,

17,22,23
56:19,25
57:5,11,
13,15,23
58:8
59:6,12,
17,23,25
60:5,10,
16 61:15,
23 66:4
71:8
73:25
75:16,25
79:22
85:10,21
87:14
89:14
96:16,17

loans
  21:6 51:6
  55:22
  56:11
  57:12
  58:20,23
  59:7,12
  77:12,20

located
  15:10
  16:7,10,
  13,17
  23:25
  24:2,3
  27:25
  30:13
  31:7
  43:10,21,
  22 54:6,
  12

location
  6:13 24:3
  61:4 62:5
  66:25

locations
  24:9

logging
  27:19

long
  8:25 11:4
  38:9
  75:14,16,
  18

longer
  6:15 7:1
  24:20

looked
  25:13,14,
  20 26:1,
  20,24
  27:4,10,
  11 30:7,
  11 42:25
  48:18,21
  50:16
  52:9
  72:6,9
  75:9,12
  76:5,8,9
  80:15
  84:23
  89:17,20
  90:6,10,
  14,15,25
  91:1,11

lot
  10:11,23
  82:8,15

lunch
  63:25
  64:2

———————————

M

———————————

Mac
  56:15

made
  11:9,19
  16:9

21:23,24
38:19
39:11
63:8,12
93:15
98:6,9
99:14

Mae
  56:15

maintained
  14:9
  30:16
  43:7

maintaining
  45:24

major
  22:10

make
  22:9,11
  23:12
  49:17,23
  50:21
  61:13
  68:12
  81:16

making
  27:18
  32:25

management
  21:17
  23:19,24

manager
  48:8

manages
  28:6

manner
  20:7,18
  32:20
  33:4,18,
  21 50:12

manuals
  22:23

March
  70:16

mark
  101:5,6

marked
  8:14,16
  40:2 64:8
  100:22
  101:1,2,
  3,4,9

Mary
  68:11

Massachusets
  71:17

master
  21:14
  48:5 50:5

material
  21:20

matter
  65:9,13
  91:19

means
  55:11

meant
  57:22

members
  37:19

memo
  10:20

memorandums
  10:23

memory
  27:16
  69:24

mentioned
  23:17,21
  41:23
  73:22



84:23
86:1

**merged**
43:7

**merger**
71:10

**mind**
60:22
92:23

**mine**
73:10
92:20
101:3

**Mini**
100:17

**minute**
84:24

**minutes**
9:1
75:17,19

**misinterpre
ted**
59:17

**mistaken**
31:9

**misunderstа
nding**
57:18

**moment**
24:10
39:25
53:3 77:7
86:15,17,
18

**monthly**
20:9 21:2
61:1

**mortgage**
9:20 13:5
14:6 19:9
21:4

22:20,21
32:21
33:19
34:6,17
36:25
37:9
38:18
39:10,19
40:3,10,
12,19
44:14,24
46:10
50:4
51:5,7,
19,22,25
53:19
54:11,18,
19,25
55:1,14,
25 59:23,
25 60:4,
9,15,16,
24 61:5,
10 65:2
77:12
85:10,21
89:13,14

**mortgagor's**
54:6

**MSP**
12:20
13:1 19:2
41:8

**multiple**
85:3
94:12
97:13
100:3

**multitude**
98:18

**Murray**
48:7 71:9
79:23
87:14

**N**

**named**
24:21
35:12
38:3
94:22

**names**
22:16
23:7
24:18
92:21

**National**
48:8
71:11,14,
17

**needed**
94:21

**nice**
59:13

**night**
11:3

**Nisshy**
81:13

**north**
7:8

**note**
14:6 36:7
60:25
61:4,10
62:5,19
66:5 67:1
68:5,7
69:9,16,
19,20,23
92:8 93:5
98:17
99:7

**noted**
37:17
89:16

98:12

**notes**
14:8 26:1
27:6 67:6

**notice**
8:12,13,
17 9:22
12:11,16
14:16
25:7,11
33:9
38:24
71:5
92:15,19

**notified**
65:22
66:1

**notify**
65:25

**November**
61:19,20
63:8

**number**
6:7,23
9:24
11:11,23,
25 12:4,
10,15
13:10,17
14:15,20,
25 17:15,
18,23
18:2,14
20:6,13
22:6,14
23:3,5
24:16
25:5,6,
11,16,17,
19,22,23
28:9,11
29:11,13
30:3,6
31:1,12,

14,16,18,
20,22
32:19
34:3,24
36:11
39:8,24
40:4
41:20
46:1
53:8,22,
23 55:13
56:2,7,
16,22,23
57:1,5,6,
23,24
58:5 59:7
61:7
66:2,24
68:1
69:7,8,13
82:24
87:23
92:3,11,
25 93:18
94:1,7,11

**numbered**
82:22

**numbers**
22:5
55:22,23
56:11
57:11
58:8
59:12
82:17,19,
20

**O**

**object**
11:12
29:14
75:5 96:2
98:19
99:17



100:10

**objecting**
95:23

**objection**
16:18,23
18:15
19:11,18
20:2,20
24:13
28:25
29:6,24
33:14
34:20
35:1
36:9,12
37:14,21
39:3,15
44:20,25
45:9,16,
20 46:2
47:8
49:11
52:16
56:4,8
57:17
58:13
62:2,9,15
63:5,20
64:16,23
67:12
68:15,19
69:3
73:6,18
74:8,21
76:16
77:14,25
78:7 83:9
84:7,18
85:20,23
86:6
91:14,20
93:21
94:2,19
95:3,14,
19 96:10,
18,23

97:8
98:12,23

**objections**
58:16
95:22
96:1
98:18,22

**obtain**
42:23
94:18
98:7,9
99:14

**obtained**
11:14
35:14,15
94:23

**occasion**
64:11

**occasions**
85:3

**occurs**
99:21

**October**
46:11

**Ocwen**
5:21,22
6:4,19
7:20
18:10,18,
24 19:3,
5,8,16
27:12
33:6
34:5,7,8,
16,18
35:15
36:22
37:19
43:6,7,8
61:15
62:17,21
65:11
70:23

96:16

**Ocwen's**
22:18
23:9
34:19

**offered**
78:22,24

**office**
5:14,23
6:3,9,13
38:7

**offices**
6:6

**official**
88:8

**online**
83:6

**open**
30:25
65:12

**operations**
24:7

**oppose**
99:16

**Option**
36:15,24
37:8
44:13,14,
19,23
50:4 61:5
66:13,17
67:1

**order**
11:24
12:9
20:25
28:10
30:5
31:17,21

**original**
16:16,22

17:13
43:9,18
44:5
49:14,18,
20,24
51:9 57:3
60:1 61:9
74:3

**originals**
15:6,9
16:6

**origination**
14:6
35:22
36:2,7
39:10
60:25
61:6 67:2
92:9 93:6

**overbroad**
93:22

────────

    P

────────

**p-o-i-n-t**
88:12

**P.M.**
64:2

**page-by-
page**
76:7

**pages**
73:9
78:15
79:10,16
82:9
83:2,21
84:12
85:6

**paid**
45:4

**Palm**

5:10,24
27:24
28:1 38:7

**paper**
45:6

**paragraph**
53:20
77:4 83:6
84:16
89:9

**pared**
78:18

**Park**
28:1

**part**
8:1 36:18
56:3 74:6
81:18

**partial**
80:9

**parties**
65:14
73:21
83:2

**PAUSE**
17:5
40:1,9
42:15
54:20
73:1
87:12

**pay**
18:9,10,
11,17
30:7

**payment**
20:10
21:2
25:13,20

**payments**
21:23



**people**
  15:16

**period**
  21:21
  22:2

**person**
  9:16,19
  10:1
  11:10,20
  15:25
  16:2
  20:5,7,14
  21:8
  22:16
  24:20,21
  33:17
  38:3,10
  45:12
  63:14
  66:24,25
  68:2,8,22
  69:10
  92:4,20,
  25 93:1

**person's**
  68:10

**personal**
  8:3 37:3,
  4 73:4

**personally**
  91:5,6

**persons**
  22:18
  23:8
  69:11

**pertaining**
  89:14

**petitions**
  10:21
  30:8

**PHH**
  5:12
  12:20

13:5
18:10,18
19:16,21,
22 20:8,
19,25
22:24
27:12
32:20
33:4,7,
18,22
42:8
43:5,6,7
60:4,9,14
65:2,11
70:23
71:25
73:16
76:15
77:24
88:7,17
96:8

**PHH's**
  20:11
  21:5,6
  22:22
  23:10
  25:2
  32:22
  33:23

**phone**
  6:23

**phonetic**
  24:22
  71:19

**place**
  77:11

**plaintiff**
  29:7
  58:1,3
  99:9

**Plaintiffs'**
  101:10

**plans**
  63:24

**platform**
  13:4 19:5
  25:15
  34:12
  61:16

**pleadings**
  10:21
  30:8

**point**
  40:23
  57:18
  65:15

**pointing**
  85:4

**policy**
  14:7
  61:10

**pool**
  54:19

**possession**
  15:13
  16:13
  62:19
  63:17
  73:15
  91:2

**Possibly**
  38:15

**Premier**
  28:1

**preparation**
  10:5
  13:15
  14:20,24
  18:14

**prepare**
  12:4,9,16
  17:17,22
  28:10
  30:5
  31:13,17,
  21

**prepared**
  67:6
  97:14
  99:14
  100:1,2

**preparing**
  11:15
  100:2

**present**
  35:22
  36:3,8
  39:10
  61:6 67:2
  92:10
  93:7
  101:7

**presentatio
n**
  99:25

**presented**
  16:1

**preserved**
  77:1

**president**
  71:20

**prevented**
  99:9

**previous**
  72:5

**previously**
  93:18

**primarily**
  22:10

**principal**
  20:8,10
  21:1,2

**printed**
  13:6

**prior**
  6:22
  18:11

19:24
21:13
22:7
29:12
32:25
60:5,10,
16

**privilege**
  58:17
  75:5
  95:23
  98:23

**process**
  8:1 21:7
  34:10
  55:20,25
  62:17

**produced**
  39:21
  42:19
  69:16
  79:4 85:2
  95:13

**product**
  11:16
  29:17,18

**production**
  36:19

**program**
  30:25
  31:4
  74:12
  75:10
  84:15
  88:6,8

**promissory**
  61:4 67:1
  68:5 92:8
  93:5

**proper**
  97:22

**property**
  54:11



protocol
  19:21,23
  21:13

protocols
  22:23

provide
  15:16
  22:15
  55:21
  63:1 92:4

provided
  17:2,9
  19:8,15
  23:15
  25:14
  28:23
  29:3 79:1
  98:6

pull
  40:7 53:3
  87:10

purchase
  37:8
  72:21,22
  85:19

purchaser
  46:10

purpose
  100:5

purposes
  79:25

Pursuant
  9:3

put
  30:25
  56:10
  101:7,10

_____

      Q
_____

question

8:7 17:19
18:4,7,16
23:1,2
25:9
29:1,21,
23 33:20
34:14
56:9 62:4
63:6,23
66:8
67:10
74:16,22,
24 75:7
76:18
77:9 79:9
83:11
95:24
98:24

questioning
  84:2

questions
  57:20
  81:22
  97:19,24
  98:1,3,13
  99:4,10,
  19 100:9

quick
  40:8

_____

      R
_____

rainstorms
  80:24

Ramer
  65:5

reach
  67:20
  69:5

reached
  6:23
  35:13,15

read
  8:8,22,
  23,25
  10:21,22,
  25 29:22,
  23 66:5

readiness
  10:20,22

reading
  11:5 89:8

reads
  89:6

real
  19:6
  22:19,21
  40:8

reason
  81:1
  94:17,24

recall
  7:9,12,16
  9:13
  10:23
  28:8,13
  29:10
  38:23
  47:10,15,
  24 48:25
  51:1,23
  71:1
  72:1,2,
  15,16,17,
  18 73:22,
  23 74:18
  90:9,18
  96:13,20

receive
  10:8,10,
  14,17
  12:1,6,8,
  12,14,22
  14:14,19,
  23 17:16,
  21,25

18:1,6
23:4
25:6,10,
17,23
26:3,19
27:20
28:10
29:12
42:4
46:12,15
50:9
51:11,14
70:19
71:21
83:16,22,
24 84:3,5
85:9

received
  8:11,21
  9:14
  10:10,18
  11:6
  12:24
  18:9
  22:12
  26:15
  27:13
  30:14
  33:9
  40:12
  47:3
  48:12
  50:12
  76:2
  83:12,18
  84:1,13
  85:17
  89:12
  95:2,6

receiving
  38:24

recently
  31:11

RECESS
  32:17

64:2
81:21
86:20

recollectio
n
  70:4

record
  19:1
  20:1,12
  21:5,16
  22:23
  25:3 28:6
  33:23
  34:9,19
  40:16,18
  45:23
  58:21
  64:1
  68:25
  70:25
  71:25
  76:6 78:5
  80:21
  84:22
  86:19
  87:1 92:1
  99:8,11
  100:23

records
  16:15
  18:21
  22:19
  23:9
  26:2,6,7,
  9,21
  27:17,23
  30:11,12,
  14,16
  31:1,3,9
  32:25
  41:12
  45:24
  60:5,9,15
  61:2,25
  62:7,14,



22 63:14
69:1
70:22,23,
24 74:7
76:14,15
86:4
88:25
90:7
92:22
94:13,23
95:1
97:15

**redacted**
40:10
51:6,12
54:13,18,
24 75:21
76:13,19

**redaction**
51:4

**refer**
14:4
62:20

**reference**
23:23
26:9 32:6
44:13
47:25
51:2
55:13
70:14
86:13
89:10

**referenced**
9:21 46:6
48:22
50:1,24
55:25
70:7,11,
17

**references**
36:14
71:7
90:20,22

**referencing**
52:22
61:18
89:1
92:12

**referred**
36:22
84:14
100:22

**referring**
26:8
41:24
50:2
53:12

**regard**
9:24 10:2
12:4,10,
15 13:10,
23 14:15,
25 15:5,
21 17:18
18:2 20:6
23:3,5
24:17
25:6,16,
17,22,23
30:3
31:20
32:18,23
36:11
37:19
39:8
41:20,21
46:1
55:11
62:4,7
63:4 65:7
68:13
88:22
91:12,18
97:6

**registrant**
70:17

**registrar**

71:13

**related**
55:1

**relating**
60:15

**relation**
60:5,10

**relevancy**
97:9
98:20,25

**remember**
7:14 27:9
28:17
29:3 63:7
79:3

**remotely**
6:10,12

**repeat**
25:8
29:20
60:7

**rephrase**
8:9 29:2
44:21
77:17
95:5

**report**
21:18,21,
22 70:15

**reporter**
98:16
99:1
100:12,
14,19
101:4,11

**repository**
30:18

**representat
ive**
15:22
37:6

**request**
63:2,8,
10,12

**requested**
9:3 98:8

**requests**
27:19
63:3 65:8

**required**
72:18

**research**
65:17

**reside**
30:15

**residential**
18:21

**resides**
21:15

**resigned**
71:12

**respect**
54:25

**respond**
8:2 28:22
62:24
63:10

**response**
36:19
39:23
82:7

**responsible**
27:18
31:6

**resting**
97:21

**result**
98:22

**retain**
22:6

**review**
11:24
12:3,6,
12,15
13:14
14:15,18,
19,24
17:16,21,
25 18:13
19:7,14
20:25
23:4 30:4
31:13,17,
19,21,23
39:23
42:23
51:16
61:13,25
62:7
70:24
76:6 89:6

**reviewed**
10:6 11:2
12:9,18,
20,21
15:1,5
18:10,11,
22 27:7
30:2
34:5,15
36:16
40:19
47:12,17,
21 50:14
51:19
61:9,15
62:13
75:10
76:3
82:13,14,
16 93:13
100:25

**reviewing**
60:13,18
65:6
84:21



**ridiculous**
99:18

**risk**
48:8

**Road**
5:9 28:1

**Rs**
24:24

**run**
22:3,8
24:19

———————————

**S**

———————————

**S-H-A-R-E**
88:10

**sale**
36:6,14,
15 38:18,
20,22
39:9,11
45:2
46:10
85:10,21

**sales**
36:21,23
37:7
85:19

**Sam**
64:6
78:13
95:21
99:23

**Samuel**
10:13

**schedule**
40:3,12,
20 44:11
51:5,19,
22,25
53:19
54:4,22

56:19
57:14,15
59:23,25
75:25
77:12,18
89:15,16

**scheduled**
100:11

**schedules**
73:25

**screen**
53:9
58:25

**scroll**
53:24

**section**
80:1
89:12
90:20,22,
23

**secure**
21:12

**securities**
46:9
48:4,6
70:14
71:8
87:13

**securitizat
ion**
39:19

**Security**
85:12

**seller**
46:9 50:7

**send**
64:6 79:6
81:17

**sending**
32:4,5
64:3

**senior**
5:18,19

**separate**
6:3

**service**
13:4
18:11
23:23
34:7,18
56:14
63:15

**servicer**
19:24
21:10,13
22:7
32:25
35:18
48:6
50:5,6

**servicers**
15:17

**services**
27:18
31:9 48:5
50:5
62:22
71:4,9
72:22
79:22
87:14

**servicing**
5:13
12:20
13:1,3
19:4,6,9,
16 21:17
22:19,21
23:19
25:15
27:23
28:6
34:11
50:3
61:2,16

75:24
92:22
96:16

**set**
54:4
86:18

**share**
72:7

**shared**
58:25

**Sharepoint**
40:23,25
41:2,5,7,
10,16
42:25
43:2,4
46:22
47:6,14,
17,22
48:18,22
49:3,6,9
50:14,16,
24 51:17,
24 52:8,
12,14,20
72:8,9,
10,14
88:9,14,
16 89:17,
20 90:6,
15

**shorter**
79:5

**show**
53:10
54:23

**showed**
58:25

**shows**
32:6
71:15

**sic**
84:1

**side**
47:5

**sign**
28:19
80:8

**signature**
68:10,14
79:24
80:4

**signatures**
47:7,14,
22 48:23
50:25
73:4,10,
11,13
79:12,16,
21 80:3
81:7
82:16
83:1

**signed**
17:6,9
28:24
32:12
68:4,8
69:9,15
89:21
90:8,17

**signing**
28:13

**similar**
73:15

**single**
28:3

**sir**
29:21
60:1 77:8
96:6

**sit**
27:5

**sitting**
30:20



skimmed
  76:24
so-called
  56:7
  76:14
  82:1 87:5
software
  65:13
sold
  37:8
solely
  79:25
sort
  22:8
  30:17
  55:20
source
  50:22
South
  80:23
speak
  38:2,11
  64:11
  66:15
  93:11
speaking
  15:20
specific
  24:15
  35:23
  36:1
  56:16
  63:7
  94:4,6,10
specifically
  7:16 9:12
  10:16
  15:11,12
  24:1
  27:17
  41:3

47:13
86:22
96:25
specificity
  60:22
  93:11
spell
  24:23
spend
  11:4
  84:21
spinning
  86:16
spoke
  38:3
spoken
  93:12
spreadsheet
  51:8
staff
  43:8
stand-alone
  52:10
start
  83:1
started
  6:19
  18:23
starting
  82:17
starts
  54:14
  70:13
  89:9
state
  9:25 69:9
  76:11
  78:3
stated
  35:4

43:17
55:9 67:5
69:15
100:4
statements
  61:1
states
  70:14
  72:20
Staying
  13:17
STM
  23:20,21
  24:19
Stratton
  38:4,5
street
  54:11
  71:16
strike
  19:22
  51:11
  65:2
  70:23
Structured
  46:9 48:4
  71:8
  79:21
  85:12
  87:13
subject
  51:6
  75:16
  89:6,15
  98:17
successor
  71:10,15
Sue
  24:22
suggest
  98:24

suggested
  56:18
  98:19
suggesting
  80:6
suite
  5:9 6:7
supervisor
  38:6 65:3
supplemental
  36:19
  64:4
  69:7,14
support
  82:7
supposed
  57:13,15
system
  12:20
  13:1,3,8,
  9 18:25
  19:3
  20:1,12
  21:5,15,
  25 22:4,
  8,13,22
  23:10
  25:3,14
  26:1
  27:12
  32:22
  33:2,6,7,
  23 34:8,
  19 40:15,
  17 41:8
  42:8
  48:15
  49:3,6,9
  58:10
  70:25
  71:25
  72:6
  76:25

86:5
systems
  56:17

_____

          T
_____

taking
  31:6 99:8
talking
  42:20
  67:22
  88:2
task
  62:21
team
  21:18
  23:17,18,
  21,24
  24:20
  27:18,23
  28:7
  31:5,7
technical
  21:8
telephone
  69:12
telling
  59:3,6
ten
  9:1 61:22
terribly
  74:15
test
  22:8
testified
  59:8,10,
  11 76:5
  93:18
  94:13
testify



9:5 11:25
59:14
84:9,10
98:10

**testifying**
59:15
87:22

**testimony**
17:22
30:5
64:12
70:11
96:3
99:20
100:3
101:8

**thereof**
89:7

**thing**
78:11
86:16

**things**
14:7,8
94:12

**thought**
43:18
66:16
87:2

**thunder**
80:25

**time**
6:19,24
7:9,12
8:22
11:1,6,8
18:20
24:5,21
44:6
49:21
58:22
63:13
68:4
84:21

88:22,24
97:1,2,3,
4,11,16
100:7

**times**
7:6,8
68:22

**title**
5:17 14:7
61:10
69:12

**titles**
22:17
24:18
92:22

**today**
98:3

**top**
53:8,21
55:7 71:4
79:21
86:12
96:12

**topic**
9:21
12:15
13:10
14:15,20,
25 17:18,
23 18:2
25:6,11,
17,23
28:9,11
29:11,13,
15 30:3,6
31:13,17,
20,22
32:18
33:13,15
34:1
36:11
37:20
41:20
46:1 61:7

66:2 67:3
94:1,7,11

**topics**
9:2
11:21,22
16:2
38:25
91:24
93:19
97:14
98:8
99:15
100:3

**track**
7:7 11:8
27:20

**transaction**
21:17
23:19,24

**transcript**
100:15

**transfer**
18:24
21:13

**transferred**
21:10,11
22:4
34:7,18
45:3
96:15

**transmitted**
96:8

**trial**
10:19,22
58:17
98:21

**true**
95:25
96:5

**trust**
12:19,22,
24 14:10

15:14
27:21
35:12
43:13,18
48:3,23
52:6,25
56:11,19
57:14,16
58:9,11,
21 60:11
66:8,19,
20 67:18,
22 71:4,
6,7
78:10,12,
14,15,22
82:1 83:5
84:1,13,
14 86:22
87:5,15
89:10,13,
15 90:22
94:22
100:25

**trustee**
15:23
37:7
43:22
44:2 48:9
71:11,12,
15

**trustee's**
45:7

**trusts**
56:14

**type**
26:1
50:20
61:2 65:8

_____

**U**

_____

**U.S.**
9:4,10

15:23
16:1
17:3,9
22:15
37:6
43:13,19,
21 44:1
56:13
57:1
64:21
73:16,21
92:3

**undersigned**
89:7,11

**understand**
8:6,7
18:16
32:8,24
43:15
59:20
76:18
83:11
98:24

**understandi
ng**
7:24

**Understood**
8:5

**unfamiliar**
45:23

**United**
70:14

**unredacted**
40:19
57:4,8
75:12

**unrelated**
63:24

**update**
62:25

**uploaded**
38:13



uploads
  38:11

—————————
         V
—————————

vague
  93:22

venture
  7:7

verified
  20:8,19
  32:20
  33:5,18,
  22 34:5,
  16 73:23
  86:8

verify
  19:8,23
  20:25
  40:16
  42:7
  71:24
  83:6 86:3
  94:25

verifying
  20:22
  22:24

version
  75:12,21
  76:13,20,
  21 78:19
  79:5,7

vice
  71:19

view
  50:11

viewed
  93:10

virtually
  95:24

—————————
         W
—————————

wait
  99:3

waive
  96:1

wanted
  79:8
  88:24

Wells
  13:21,24
  35:4,8,17
  45:22
  48:6 55:5
  56:13
  61:11,25
  62:6,7,14
  63:3
  66:3,12,
  18 67:8
  68:13
  69:2,5
  71:9
  79:23
  87:14
  94:14,17
  95:2,7,12
  96:9,15
  97:5

West
  5:9,24
  28:1 38:7

whatnot
  61:10
  62:19

woefully
  99:13

wonderful
  80:24

wondering
  78:12

wording
  55:9

words
  14:18

work
  6:10,12
  11:16
  29:16,18

works
  38:6

Worthington
  5:9

—————————
         Y
—————————

year
  7:15,18

years
  24:6 38:8
  61:22,24

yesterday
  13:14

—————————
         Z
—————————

zip
  82:3,5

