1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
- - - - - - - - - - - - - - -X
U.S. Bank N.A., as          :  17-cv-00394-WES
Trustee for the             :
Registered Holders of the   :
Structured Asset            :
Securities Corporation,     :
Structured Asset            :
Investment Loan Trust,      :
Mortgage Pass-Through       :
Certificates, Series        :  United States Courthouse
2003-BC11,                  :  Providence, Rhode Island
        Plaintiff,          :
                            :
                            :  Tuesday, April 5, 2022
                            :
    vs.                     :
                            :
                            :
                            :
                            :
                            :
MASOUD SHAKOORI-NAMINY,     :
et al.,                     :
        Defendants.         :
- - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CIVIL CAUSE FOR A BENCH TRIAL
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff:      SAMUEL C. BODURTHA, ESQ.
                        Hinshaw & Culbertson LLP
                        56 Exchange Terrace, 5th Floor
                        Providence, RI  02903

For the Defendants:     JOHN B. ENNIS, ESQ.
                        1200 Reservoir Avenue
                        Cranston, RI  02920

Court Reporter:  Lisa Schwam, CRR-RPR-RMR
                 One Exchange Terrace
                 Providence, RI  02903

```
 1    (In open court)

 2    05 APRIL 2022

 3         THE COURT:  All right.  Good morning, everyone.

 4    We're here in the matter of U.S. Bank, N.A., as Trustee

 5    vs. Masoud Shakoori-Naminy, et al.  We're here today to

 6    begin the bench trial in this matter.  So let's have

 7    counsel identify themselves for the record, please.

 8         MR. BODURTHA:  Good morning, your Honor.  Sam

 9    Bodurtha on behalf of U.S. Bank, N.A., as Trustee.

10         MR. ENNIS:  John Ennis on behalf of Mr.

11    Shakoori.

12         THE COURT:  Okay.  Thank you.

13         So as I've previously discussed with counsel,

14    we're going to begin the bench trial today.  I'm going

15    to hear testimony, as I understand it, from a single

16    witness.  I've received your pretrial filings, and I

17    think we're ready to go forward.  My understanding is

18    everyone has tested negative, so the protocol that

19    we're going to follow is that you'll be able to remove

20    your mask when you're speaking.  So that means if

21    you're examining the witness or you're on the witness

22    stand, you can take your mask off, but otherwise, we'll

23    keep our masks on unless we're speaking, okay.

24         So do you wish to give any opening statements?

25         MR. BODURTHA:  Yes, your Honor.
```

1          THE COURT:  Okay.

2          MR. BODURTHA:  Good morning again, your Honor.

3    My name is Sam Bodurtha.  I represent the plaintiff,

4    U.S. Bank, N.A., as Trustee.  The purpose of this

5    lawsuit is to obtain relief from this Court in the form

6    of an equitable assignment of mortgage so that U.S.

7    Bank, as Trustee can pursue foreclosure on a mortgage

8    loan in default since 2011.  Equitable relief rests

9    within the sound discretion of this Court, and this

10   Court's determination of whether U.S. Bank, as Trustee

11   is entitled to an equitable assignment of mortgage

12   should be guided by the principles of equity and

13   justice, should balance the equities, weighing the

14   hardships to either side, and relief should be granted

15   only in the absence of an adequate legal remedy.

16          The evidence of this case will demonstrate that

17   the defendant, Masoud Shakoori-Naminy, obtained a

18   mortgage loan from Option One Mortgage Corporation in

19   July of 2003; that Mr. Shakoori defaulted on that

20   mortgage loan by failing to make regular monthly

21   payments on numerous occasions; and that Mr. Shakoori

22   has remained in default on that loan since April of

23   2011.

24          The evidence in this case will also demonstrate

25   that the loan Mr. Shakoori originated with Option One

1    has since then been sold and deposited into a trust,

2    specifically the Structured Asset Investment Loan

3    Trust, Mortgage Pass-Through Certificates, Series

4    2003-BC11.  And the evidence will also demonstrate that

5    U.S. Bank is the current trustee of that trust.

6    Applying the evidence demonstrating that U.S. Bank, as

7    Trustee is the current holder of the mortgage loan to

8    Rhode Island law and the law of this circuit, U.S.

9    Bank, as Trustee is entitled to an equitable

10   assignment.

11        Now, our intention in this case is to run

12   through three separate layers of evidence in order to

13   prove up our claim.  It is anticipated today that Mr.

14   Shakoori will provide the following testimony:  That he

15   purchased property located at 1541 Ten Rod Road in

16   Exeter, Rhode Island, in late 2000, early 2001; that he

17   has continued to reside at that property to the present

18   day.

19        It is also anticipated that Mr. Shakoori will

20   confirm through his testimony that he obtained a loan

21   from Finance America in November of 2001 for $243,750

22   and that that loan was secured by a first mortgage on

23   the Ten Rod Road property.  It is also anticipated that

24   Mr. Shakoori will testify that he refinanced the

25   Finance America loan in July of 2003 with a new loan

1    from Option One Mortgage Corporation in the amount of

2    $315,400 and that that loan was secured by a first

3    mortgage on the property causing the Finance America

4    mortgage loan to be discharged.

5         It is also anticipated that Mr. Shakoori will

6    testify that he defaulted on the mortgage that he

7    obtained from Option One in 2008 and that in order to

8    resolve that default, he entered into a loan

9    modification agreement with American Home Mortgage

10   Servicing, Inc., a loan servicer and on behalf of the

11   noteholder.  It is also anticipated that Mr. Shakoori

12   will testify that through that 2008 loan modification,

13   he agreed to a new principal balance of $320,760.58;

14   that he agreed to make regular monthly mortgage

15   payments of $1,336.50 between January 1, 2009, and

16   December 1, 2013; that those payments were for interest

17   alone, interest only, and that he stopped making those

18   interest-only payments on the modified mortgage loan at

19   some point in 2011, specifically in April.

20        I want to make this clear.  There's going to be

21   no evidentiary dispute that Mr. Shakoori originated a

22   mortgage loan in July of 2003 with Option One; that he

23   defaulted on the mortgage loan and that he has not made

24   a mortgage loan payment in more than ten years.  It is

25   also anticipated that Mr. Shakoori will testify that he

1    filed two bankruptcy petitions following default on the

2    mortgage loan in 2011 in the United States Bankruptcy

3    Court for the District of Rhode Island.  Mr. Shakoori

4    signed each of these bankruptcy petitions under the

5    pains and penalties of perjury and represented to the

6    bankruptcy court that all schedules provided were true

7    and correct to the best of his knowledge and

8    information.

9         In reviewing those bankruptcy petitions, it is

10    anticipated that Mr. Shakoori's testimony will confirm

11    that in a 2012 bank petition he filed, he included a

12    Schedule D, Creditors Holding Secured Claims, which

13    identified the Option One mortgage under creditor

14    number one.  Under creditor number one, he listed the

15    creditor as American, and in parentheses, LaSalle Bank

16    N.A., close parentheses.  Under creditor number one, he

17    also described the creditor's claim as a first mortgage

18    that he opened on July 1, 2003, on his primary

19    residence located at 1541 Ten Rod Road, Exeter, Rhode

20    Island.  And under that creditor claim, he listed the

21    amount at $320,760, identical to the amount he listed

22    in the 2008 loan modification agreement.

23         The evidence in this case will also show that

24    Mr. Shakoori, through his counsel, entered into loss

25    mitigation negotiations in the 2012 bankruptcy petition

1    with his creditor identified as the mortgage holder

2    LaSalle Bank National Association, as Trustee for the

3    Structured Asset Securities Corporation, Structured

4    Asset Investment Loan Trust, Mortgage Pass-Through

5    Certificates, Series 2003-BC11.

6         The evidence in this case will further show that

7    Mr. Shakoori's counsel filed a subsequent Chapter 7

8    petition in the United States Bankruptcy Court in April

9    of 2015.  In that bankruptcy petition, Mr. Shakoori

10   again filed a Schedule D, Creditors Holding Secured

11   Claims, and once again, Mr. Shakoori identified the

12   Option One mortgage under creditor number one.

13        In the 2015 Schedule D, he listed as creditor

14   number one Ocwen Mortgage Co.  He described the claim,

15   similarly to 2012, as a first mortgage opened on July

16   1, 2003, on his primary residence located at 1541 Ten

17   Rod Road, Exeter, Rhode Island.  And he also included

18   the amount of the claim at $320,760, identical to the

19   2008 modification agreement, identical to the 2012

20   bankruptcy petition.

21        The evidence in this case will also show that in

22   that 2015 bankruptcy, Mr. Shakoori received an order of

23   discharge from the court on December 31, 2015.  That

24   discharge prohibited and prohibits any creditor from

25   attempting to collect a discharged debt against Mr.

1    Shakoori.  At the same time, that discharge order

2    allowed a creditor with a lien to enforce the claim

3    against Mr. Shakoori's property.

4        The evidence will show that Mr. Shakoori,

5    following the 2015 discharge, is relieved of all

6    personal liability on the mortgage loan he originated

7    with Option One.  At the same time, Mr. Shakoori still

8    has not made any mortgage loan payments since April of

9    2011 so that the creditor who holds his mortgage is

10   entitled to foreclose on the Ten Rod Road property.

11       What is the significance of Mr. Shakoori's

12   anticipated testimony and the associated exhibits?

13   Well, it is as follows:  The evidence will demonstrate

14   that Mr. Shakoori himself, over the course of nearly 15

15   years, has acknowledged and admitted by his own conduct

16   several dispositive facts.  Number one, that Structured

17   Asset Securities Corporation, Structured Asset

18   Investment Loan Trust, Mortgage Pass-Through

19   Certificates, Series 2003-BC11 is the holder of the

20   mortgage loan he originated with Option One in July of

21   2003; that American Home Mortgage Servicing was the

22   loan servicer for this mortgage between 2008 and 2012;

23   that Ocwen was the loan servicer for this mortgage loan

24   following American Home Mortgage Servicing; that the

25   mortgage loan has been in default for more than ten

1    years, and that despite not making any mortgage loan

2    payments in more than ten years, and while no longer

3    personally liable for the loan, Mr. Shakoori continues

4    to reside at the property subject to a valid and

5    enforceable mortgage lien and default.

6          There is a second layer of evidence that we will

7    present to this Court.  This consists of documentary

8    evidence that can and will fill any holes, to the

9    extent any exist, that resolve from Mr. Shakoori's

10   testimony.  Documents submitted to this Court as

11   evidence will demonstrate that U.S. Bank, as Trustee is

12   the current holder of the original promissory note that

13   Mr. Shakoori signed in connection with the 2003 Option

14   One mortgage loan; and moreover, that the promissory

15   note is indorsed in blank by an allonge permanently

16   affixed to the note.

17         Documentary evidence will also demonstrate that

18   U.S. Bank, as Trustee possesses the original mortgage

19   agreement that Mr. Shakoori signed in connection with

20   the 2003 mortgage loan, and that that mortgage

21   agreement was recorded in the property chain of title

22   and exists today as the priority first lien mortgage on

23   the Ten Rod Road property.  Documents submitted to this

24   Court will also demonstrate that the Shakoori loan was

25   sold, transferred and deposited into the trust that he

1    listed as a creditor in his bankruptcy filings and with

2    whom he attempted to negotiate a loan modification.

3    The documents that are submitted to this Court will

4    include a schedule of mortgage loans that is appended

5    to the trust agreement, and on that schedule is Mr.

6    Shakoori's loan identifiable by the loan number and the

7    servicing number that are included on both the

8    promissory note and the mortgage.  And finally,

9    documentary evidence will demonstrate that LaSalle

10   Bank, who Mr. Shakoori listed as the creditor on his

11   bankruptcy petitions, has resigned and that U.S. Bank

12   was subsequently appointed.

13        There is a third layer of evidence that we will

14   present in order to fill any holes that remain from the

15   documents in Mr. Shakoori's testimony.  And that is the

16   testimony of a representative of U.S. Bank, as

17   Trustee's current mortgage loan servicer, PHH Mortgage

18   Corporation.  It is anticipated that U.S. Bank's

19   representative will testify as to the manner through

20   which the Option One mortgage loan was transferred,

21   sold and deposited into trust.

22        The testimony will also show the manner through

23   which servicing of the Shakoori loan transferred from

24   Option One to American Home Mortgage Servicing.  The

25   testimony will also demonstrate that American Home

1   Mortgage Servicing, Inc., changed its name to Homeward

2   Residential, and then Homeward was sold to Ocwen

3   Financial Corporation.  Testimony will also inform the

4   Court of the merger between Ocwen Financial and PHH

5   Mortgage Corporation, the current mortgage loan

6   servicer for the Shakoori loan.

7          And lastly, the testimony of U.S. Bank, as

8   Trustee's representative will demonstrate the integrity

9   and reliability of all servicing records of the

10  Shakoori loan, including the transaction documents

11  memorializing the sale and deposit into trust, and that

12  this trust is rightfully pursuing equitable assignment

13  through this lawsuit.

14         Applying the facts of this case to the law.  In

15  this circuit, the purchase of a promissory note has an

16  equitable right to obtain the assignment of a mortgage

17  and may accomplish that right by filing an equitable

18  action in court.  That is precisely what is happening

19  in this lawsuit.  There are three separate legal

20  grounds through which U.S. Bank, as Trustee pursues

21  equitable assignment.

22         First, the trustee of a securitized trust can

23  establish that it holds the mortgage, or a pool of

24  mortgages, is assigned to a securitized trust, by

25  producing the executed agreement that assigns the pool

of mortgages with a schedule of the pool mortgage loans that clearly and specifically identifies the mortgage at issue as among those assigned.  The evidence of this case demonstrates that the Shakoori loan was deposited into the Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 on review of the trust schedule and on review of the loan schedule with the specific identifying numbers of the Shakoori loan.  If there is any doubt from a review of these agreements, and there isn't, Mr. Shakoori's own bankruptcy filings confirm that the 2003-BC11 trust is the holder of the mortgage.

Second, under Rhode Island law, a party who is the holder of an original signed promissory note is entitled to enforce the obligations under the note. Here, the evidence of this case will demonstrate that U.S. Bank, as Trustee is the present holder of the promissory note that Mr. Shakoori signed in 2003. Moreover, that note is indorsed in blank by allonge permanently affixed to the note such that U.S. Bank, as Trustee has achieved holder in due course status under Rhode Island law.  As the holder in due course status of the original promissory note, U.S. Bank, as Trustee is entitled to an assignment of the valid and

1    enforceable mortgage securing repayment of that note

2    with a lien on property located at 1541 Ten Rod Road in

3    Exeter, Rhode Island.

4         Third, Rhode Island law permits a split between

5    the holder of the promissory note and the owner of the

6    mortgage on record title.  Despite the fact that there

7    may be a split between the holder and record title, the

8    Rhode Island Supreme Court has concluded that these two

9    documents remain unified and that the mortgage has

10   followed the note.  Here, with the mortgage following

11   the note under Rhode Island law, equity demands that

12   this Court allow for an assignment of mortgage to U.S.

13   Bank, as Trustee on proof that U.S. Bank, as Trustee is

14   the holder in due course of the original promissory

15   note.

16        Just three final important considerations to

17   this equitable claim.  U.S. Bank, as Trustee does not

18   have a valid and enforceable claim at law due to Mr.

19   Shakoori's ongoing and persistent challenges to the

20   assignments of mortgage recorded in the property's

21   chain of title.  And in fact, U.S. Bank, as Trustee

22   will not be submitting or relying upon the assignments

23   of mortgage in order to prove up this case.

24        Second, there is no dispute at present that Mr.

25   Shakoori is not personally liable for the money he

1   borrowed from Option One in 2003.  That debt has been

2   discharged through a Chapter 7 bankruptcy petition, and

3   any pursuit of that debt would violate federal

4   bankruptcy law.

5       And third, there is no dispute that Mr. Shakoori

6   continues to reside at the property, remains on title,

7   refuses to vacate, but at the same time is not paying

8   any mortgage loan payments, no property taxes and no

9   insurance.  Mr. Shakoori has been living for free for

10  more than ten years despite the lack of any dispute

11  that he borrowed over $300,000 in 2003 and that he

12  secured repayment of that loan with a mortgage on the

13  Ten Rod Road property.

14      For all of those reasons, for the evidence that

15  we will submit, U.S. Bank, as Trustee is entitled to an

16  equitable assignment of the mortgage.  Thank you.

17          THE COURT:  Okay.  Thank you, Mr. Bodurtha.

18          Mr. Ennis, do you wish to give an opening

19  statement?

20          MR. ENNIS:  Yes.  Is it possible I can do it

21  from this position, your Honor, because I'm looking at

22  the screen?

23          THE COURT:  Sure.

24          MR. ENNIS:  Good morning, your Honor.  I'd like

25  to address a few of the issues in regard to this case

1  that we will believe that the evidence will show and

2  the admissions that have been filed in this case, the

3  requests for admissions which were mailed to the

4  purported plaintiff in May of 2018 which have not been

5  answered.  These are the facts which have already been

6  established as a matter of law.  And I would

7  specifically present to the Court Request for Admission

8  Number Seven which states that no entity within the

9  name of Structured Asset Securities Corporation,

10 Structured Asset Investment Loan Trust, Mortgage

11 Pass-Through Certificates, Series 2003-BC11 has ever

12 existed.  That is an established fact which is the name

13 of the plaintiff in this case which is seeking relief.

14         Request for Admission Eight, which is a fact

15 accepted as true, deemed true, pursuant to Federal Rule

16 of Civil Procedure 36, is that LaSalle Bank National

17 Association was never the trustee for Structured Asset

18 Securities Corporation, Structured Asset Investment

19 Loan Trust, Mortgage Pass-Through Certificates, Series

20 2003-BC11.  Request for Admission Forty, which is

21 deemed admitted, which is very crucial:  U.S. Bank

22 National Association was never a trustee for any entity

23 named Structured Asset Investment Loan Trust, Mortgage

24 Pass-Through Certificates, Series 2003-BC11.  And

25 Request for Admission Number Four, there is no such

1     entity named Structured Asset Investment Loan Trust,

2     Mortgage Pass-Through Certificates, Series 2003-BC11.

3          Now, as a result, your Honor, by virtue of that,

4     my brother indicated, he's the attorney for this trust,

5     it has been deemed admitted that this trust does not

6     exist.  So I would suggest that the plaintiff cannot

7     proceed under the name it's proceeding under because it

8     doesn't exist as a matter of law and fact.

9          Now, your Honor, a review of the testimony of

10    the documents which will be presented, we're not

11    disputing that my client signed the note and signed the

12    mortgage.  The question is:  What happened after July

13    16, 2003?  On July 16, 2003, the testimony will

14    demonstrate that my client had a closing at a law

15    office on Douglas Avenue in Providence around 5 o'clock

16    p.m.  At that time, he did sign the promissory note and

17    he did sign the mortgage.  However, the documents

18    presented by the plaintiff, and pursuant to their

19    answers to interrogatories, indicates that the

20    so-called allonge was signed on July 16th, 2003, by a

21    person named Mary Conway who at the time was in

22    Florida.

23         Pursuant to Rhode Island General Law 6A-3-204,

24    for an allonge to be effective -- allonge isn't used in

25    that statute, but it states that a paper affixed to the

1    note is effectively the same as an indorsement provided

2    that the signature is made on the paper affixed to the

3    note.  Now, there is no dispute and no evidence that

4    the note and allonge were affixed together on July 16,

5    2003; rather, this so-called traveling allonge was

6    signed by an employee of Option One in ink on that same

7    day.

8         Now, why is that important, your Honor?  This

9    was a rescission loan.  The loan wasn't even funded

10   until July 21st, 2003, under the Truth in Lending Act.

11   A homeowner has three business days to change their

12   mind and to cancel the loan.  The closing statement

13   provided by the -- which is one of the plaintiff's

14   exhibits, indicates that the loan was funded on July

15   21st; thus, the loan could not be negotiated or

16   transferred or sold because the promise that my client

17   made to sign the promissory note and sign the mortgage

18   was conditional upon the passage of three days.  He had

19   that absolute right to rescind.

20        The note that he signed did not get transmitted

21   to Option One on July 16, 2003; it remained in the

22   possession of the closing attorney.  As a result, the

23   note was never indorsed under Rhode Island law.  And

24   they've admitted that it was indorsed on July 16th.  If

25   it was signed before the closing, it was not effective

1    because the note was not yet a note.  A note consists

2    of a promise to pay money.  If the allonge was signed

3    before the closing, before my client signed the note,

4    it's not effective to transfer the note.  So that is a

5    problem that is there; namely, the note has never been

6    indorsed as required by Rhode Island law.

7        Also there is no testimony available as to when

8    that was affixed to the note, the so-called allonge.

9    The allonge -- Supreme Court in *Note Capital Group vs.*

10   *Perretta* indicated that allonge -- they used the

11   Black's Law Dictionary -- which indicates that an

12   allonge is a piece of paper affixed to the note for the

13   purpose of further indorsements.

14       Well, think about it.  Affixed to the note for

15   the purpose of further indorsements.  That is a future

16   event that the Supreme Court envisioned that first the

17   allonge has to be affixed.  Second, the signature

18   occurs.  In this case, your Honor, it wasn't affixed;

19   it was a separate piece of paper floating around

20   somewhere in Option One land and eventually made its

21   presence.

22       THE COURT:  Mr. Ennis, I'm a little unclear.  I

23   want to try to understand your argument.  I'm a little

24   unclear on what you're saying.

25       So is your argument that the allonge wasn't

1    affixed to the loan documents on July 16th and

2    therefore it's not valid, or is your argument that the

3    indorsement occurred before the loan was funded after

4    the three-day waiting period or is it both of those

5    things?  I'm a little unclear.

6         MR. ENNIS:  Well, I raised the TILA issue

7    because technically there's no funding at that point so

8    they can't -- there's no real note to transfer because

9    the client has an absolute right to rescind.  But in

10   terms of the fix, there is no doubt that when the

11   allonge was signed on July 16, 2003, it was not affixed

12   to the note.  So the way the Supreme Court in *Note

13   Capital Group vs. Perretta* stated, quoting Black's Law

14   dictionary, for the allonge to be effective and under

15   U.C.C. 3204, the piece of paper has to be affixed to

16   the note when the signature is put on the piece of

17   paper.  That was not the case, and there's no way they

18   can demonstrate that.

19        THE COURT:  Well, okay.  So, I mean, just so I'm

20   clear, your argument is -- are you saying that in order

21   for a signature to be valid, it literally has to be

22   stapled to the document or paper-clipped to the

23   document at the time it is signed?  I've signed a lot

24   of mortgages in my life, and things aren't all stapled

25   together at the time you sign the mortgage.

1          So, I mean, is that what you're saying?

2          MR. ENNIS:  Under the definition that the Rhode

3     Island Supreme Court took in *Note Capital Group vs.*

4     *Perretta*, and under the U.C.C., an allonge has to be

5     affixed to the note.  Now, affixed can either be

6     paper-clipped, can be stapled, but it has to be affixed

7     to the note before the signature is placed on that

8     document.

9          And the purpose of that is to prevent, some

10    cases have talked about, mischievous or in other ways

11    fraudulent conduct, where you have an allonge floating

12    around and traveling, the way the original statute

13    under the U.C.C. allowed the use of an allonge when

14    there was no additional room on the note to sign.  The

15    allonge is a substitute for a stamp on the bottom of

16    the note.

17         THE COURT:  Okay.  So I understand -- I think I

18    understand what your argument is.

19         Now, what is this business about Mary Conway

20    being in Florida?  What does that have to with

21    anything?

22         MR. ENNIS:  Well, she was an employee of Option

23    One and in the Option One Tampa office at that time,

24    and, thus, she was not in Rhode Island to get the note

25    and sign it.  Indorsed the note after my client signed

1    the note.  So it wasn't something -- they said it

2    happened on July 16th, they've admitted on July 16th.

3    We believe that testimony will show Mary Conway was not

4    in Rhode Island and did not affix her signature after

5    the note was signed and, more importantly, did not

6    affix her signature to the allonge while it was affixed

7    to the note.

8         THE COURT:  Okay.  All right.  I understand

9    that.

10        Now, what does the funding after three days have

11   to do with this?

12        MR. ENNIS:  Well, the reason for that is, your

13   Honor, the note for a negotiable instrument -- there

14   was a failure of consideration until the three days

15   went by.  There was no fund -- you know, a promissory

16   note is a promise to pay money in return for

17   consideration.  And the consideration would have been

18   the payment of the payoff from the prior loan as well

19   as funds to my client.  If this had been a purchased

20   money security instrument where my client went to the

21   closing and purchased the property on that day, the

22   note would be effective that day because the money

23   would have been transferred to the closing agent for

24   distribution to my client on July 16th.

25        However, in this case, there was no funding of

1     the loan until July 21st, 2003, when it was recorded.

2     I believe July 16th was a Wednesday.  The third

3     business day was the 19th.  No business was transacted

4     on Sunday, the 20th.  And then on the 21st the money

5     was transferred to the settlement agent to make

6     distribution of funds and to record the mortgage.

7         THE COURT:  Well, wouldn't that basically make

8     every mortgage invalid because every mortgage has a

9     waiting period because that's required by law?

10        MR. ENNIS:  Only owner-occupied single

11    family -- excuse me, owner-occupied refis with anybody

12    other than the original creditor.  It doesn't make

13    it -- it makes it effective July 21st, 2003, not that

14    it's illegal or void or invalid.  But the homeowner has

15    an absolute right to cancel that obligation for three

16    business days.

17        THE COURT:  Right, I understand that.  I mean, I

18    think what you're saying, and this is what I'm trying

19    to figure out, is you're saying that the indorsement is

20    not valid because the indorsement occurred before the

21    waiting period expired.

22        MR. ENNIS:  That's a secondary argument, yes,

23    your Honor.

24        THE COURT:  But that would, in effect, make

25    every indorsement where there's a waiting period an

1    invalid indorsement.

2         MR. ENNIS:  Well, very often, your Honor.  It

3    appears Option One is one of the few entities that has

4    dates on the allonges.  Very rarely, your Honor, do

5    allonges have dates on them.  So thus, in this case

6    they've identified the date as -- when I asked them

7    what the date was, originally they objected until

8    February 2nd, 2022; at which point, they said look at

9    the dates on the note and allonge.

10        THE COURT:  But you're not really answering my

11   question.

12        MR. ENNIS:  No, wait, your Honor.  Because most

13   of the times allonges are not dated.

14        THE COURT:  But that doesn't change the -- the

15   fact that they're not dated doesn't change the reality

16   of the date that they're signed.

17        MR. ENNIS:  Well, very often nobody knows when

18   they were signed.

19        THE COURT:  But that's not an answer to my

20   question either.  I think I understand what you're

21   saying.  You're not saying that what I'm asking you is

22   untrue.  So I think your argument is that an

23   indorsement that occurs before the three-day waiting

24   period has passed is effectively a voidable or voided

25   indorsement.  I think that's what you're saying.

1          MR. ENNIS:  Yes, your Honor, because there's

2     nothing to assign or transfer because it's not an

3     absolute promise, unconditional promise.

4          THE COURT:  All right.

5          MR. ENNIS:  Now, another problem with the

6     plaintiff's case that the evidence will point out,

7     there is absolutely no evidence that the mortgage was

8     ever transferred from Option One, anybody.  They

9     present a purported chain of title.

10         And notably absent in that chain of title is any

11    indication from them as to what Option One did with the

12    mortgage or the note.  There's absolutely no evidence

13    to that effect.  They start with evidence from Lehman

14    Brothers Bank, FSB, which purports to have entered into

15    an agreement with Lehman Brothers Holding, Inc., to

16    purchase or sell loans.  There is no loan schedule in

17    that document.  There is no reference to the

18    defendants' mortgage and note in that document.  It is

19    a gap.

20         Likewise, they then present evidence purporting

21    to be a sales agreement from Lehman Brothers Holding,

22    Inc., to Structured Asset Securities Corporation.  Once

23    again, there's no loan schedule.  There's no reference

24    to the defendants' mortgage and note.  So on

25    transaction number two, there's nothing there.

1          Now, I would note, your Honor, these are

2     the -- the plaintiff cited the case of *U.S. Bank vs.*

3     *Ibanez*, which was a Massachusetts Supreme Court case in

4     which the Massachusetts Supreme Court, faced with the

5     identical issue in this case and basically the same

6     players, the same originators, found that U.S. Bank did

7     not meet its burden, could not show the transactions

8     one by one.  Could not prove the transactions from

9     Option One to Lehman Brothers Bank, from Lehman

10     Brothers Bank to Lehman Brothers Holding and from

11     Lehman Brothers Holding to Structured Asset Securities

12     Corporation.

13          There was a gap in the chain of title.  They

14     just did not have the loan schedules.  They did not

15     have identification, assuming these documents could be

16     authenticated.

17          Now, they purport to have a trust agreement

18     which they claim contains a loan schedule.  That, by

19     the way, was provided on February 2nd, 2022, which was

20     the basis for my motion in limine after discovery was

21     long closed.  Now, the difficulty with that is that is

22     the so-called trust agreement dated August 1st, 2003,

23     but it doesn't say it's transferring the loans.  It

24     states that on the closing date of the loan, October

25     31st, 2003, a sale of loans will occur.  It's an

1    anticipatory event.  It says we're not doing anything

2    today, but on October 31st we're going to buy loans.

3         But once again, you've got a gap.  Option One,

4    we don't know what happened.  Never got to Lehman

5    Brothers Bank, never got to Lehman Holding, never got

6    to SASCO.  And they purport to have a loan schedule,

7    but we question the authenticity of that.  We don't

8    really know when that occurred.  We asked for all this

9    in discovery, and they basically objected to everything

10   saying it wasn't relevant and February 2nd when they

11   realized we better put this in.

12        Now, therefore, we believe there is a complete

13   lack of evidentiary basis to prove that either this, by

14   the way, nonexistent entry, based upon the request for

15   admissions, neither had or never had the note or the

16   mortgage.

17        Now, they're trying to prove it through my

18   client because of my client's bankruptcy schedules.

19   Well, your Honor, the bankruptcy schedules -- my

20   client, through two attorneys, identified as creditor

21   certain entities.  But the definition of creditor, your

22   Honor, is not what the plaintiff suggests.  11 U.S.C.

23   101 has the definitional sections for creditor in claim

24   pursuant to the bankruptcy court.  And creditor, under

25   11 U.S.C. 101, Section 10, means, I read, "The term

1    creditor means:  A, entity that has a claim against the

2    debtor that arose at the time of or before the order

3    for relief concerning the debtor; or B, the entity that

4    has a claim against the estate specified in Section

5    348(d), 502(f), 502(g), 502(h) or 502(i) of this title;

6    or entity that has a community claim."

7            So we then have to see what claim means in the

8    bankruptcy code.  And the claim specifically does not

9    mean what my brother suggests it means.  11 U.S.C.

10   101(5), "The term 'claims' means:  A, right to payment,

11   whether or not such right is reduced to judgment,

12   liquidated, unliquidated, fixed, contingent, matured,

13   unmatured, disputed, undisputed, legal, equitable,

14   secured or unsecured."  So there's no equation of

15   creditor with the term "holder" or "owner."  As a

16   matter of fact, in the 2015 bankruptcy, in which case

17   my client was represented by attorney Christopher

18   Lefebvre, the Chapter 7 bankruptcy in Schedule D listed

19   this claim as disputed, specifically.

20           So there's no suggestion that my client can

21   basically create ownership of a note or a mortgage by

22   virtue of a bankruptcy petition.  The 2012 petition was

23   a Chapter 13 case which ended up getting dismissed

24   without discharge and the Chapter 7 petition in 2015

25   did have a discharge.  The fact that my client, through

1    his attorney, utilized the definitional section of 11

2    U.S.C. 101, he had to do it; he had to identify

3    whatever was on his paperwork that he had.  So the

4    attorney relied on the statute, but put the so-called

5    claim in as to creditor which is what the bankruptcy

6    code requires.

7          Now, the Supreme Court in Rhode Island had

8    multitude cases relating to the nature of mortgages and

9    obligation notes.  The seminal case is *Bucci vs. Lehman*

10   *Brothers* in which the Supreme Court in Rhode Island

11   indicated that you can have a split.  *Bucci* was a

12   so-called MERS case.  MERS is the nominator for the

13   holder of the note.

14         And the Supreme Court held in that case that

15   there's nothing wrong with the split so long as the

16   mortgagee is the agent for the owner of the note.  They

17   found in a MERS case the term "nominee," which is in

18   the MERS mortgage, it's just not here, was in fact the

19   agent as nominee.  They followed a Massachusetts case

20   called *Eaton* which pretty much establishes the same

21   thing.  So in Rhode Island, as long as the entity

22   holding the mortgage is the agent for the owner of the

23   note, they are allowed to foreclose so long as there's

24   that agency relationship.

25         Rhode Island is a title state in which property

1    is deeded to the mortgagee subject to defeasance upon

2    payment of the obligation.  So the two are intertwined.

3    So somebody has to be owed the money and somebody has

4    to have the mortgage securing that obligation.

5         In this case, there's been no demonstration that

6    the mortgage has gone beyond -- they have no evidence

7    showing that the mortgage went to Lehman Brothers which

8    was the beginning entity in the so-called

9    securitization of, once again, the nonexistent trust.

10   They have been aware of this since 2018 and could have

11   amended their petition, their complaint, but they

12   didn't do so.

13        The gaps create a significant problem for them.

14   Because of that problem, I don't see how they can

15   proceed even today because they've admitted they don't

16   exist.  So I don't know how we go forward with an

17   entity that doesn't exist given their failure to seek

18   to remove the admissions despite knowledge of these

19   admissions for now almost four years.

20        THE COURT:  Okay.  Thank you, Mr. Ennis.

21        MR. ENNIS:  Thank you, your Honor.

22        THE COURT:  All right.  So I'm interpreting Mr.

23   Ennis's opening statement as basically a motion to

24   dismiss.  And I want to -- because you're raising,

25   effectively, a legal argument, this business about the

1    entity not existing and the request for admissions.

2         So Mr. Bodurtha, I'm going to ask you to respond

3    to those now before we get to the testimony.  I'm a

4    little unclear about all of this.

5         MR. BODURTHA:  Certainly, your Honor.  Your

6    Honor, there are requests for admissions that were

7    served in this case upon my predecessor counsel, and I

8    will concede to the Court that they were not timely

9    responded to.  They were ultimately responded to, but

10   predecessor counsel did not file a response or seek an

11   extension within the 30-day deadline.

12        Requests for admissions are geared towards

13   facts, what facts can be deemed admitted.  They are

14   not, however, conclusions of law.  You cannot request

15   that someone admit that they're in default or that

16   they're subject to judgment.  What I'm suggesting to

17   the Court today is that the requests for admissions

18   seek legal conclusions which can be easily overcome

19   based upon a review of the documents that are

20   admissible in evidence, based upon the testimony that

21   the Court will receive from Mr. Shakoori, from a

22   representative of U.S. Bank, N.A., as Trustee and based

23   upon the totality of evidence in making what is

24   effectively an equitable claim.

25        Much of the requests for admissions deal with

1   the assignments of mortgage and how those assignments

2   were executed and recorded and how they exist according

3   to record chain of title.  We are not pursuing any

4   relief based upon the assignments.  We are pursuing

5   relief based upon the fact that U.S. Bank, as Trustee

6   holds the promissory note; that U.S. Bank, as Trustee,

7   through its mortgage loan servicer, had possession and

8   can authenticate all of the deal documents, and that

9   Mr. Shakoori himself has filed several bankruptcy

10   petitions and entered into a loan modification

11   agreement that demonstrate the travel of this loan.

12       For that reason -- and I will concede to the

13   Court that it may be evidence or facts that the Court

14   ought to consider in reaching this decision; however, I

15   don't think that what Mr. Ennis is suggesting is

16   dispositive of this case or should dismiss it before

17   the Court hears the entirety of the evidence.

18       THE COURT:  Okay.  Get me clear on who the

19   plaintiff is and what the issue is there.  That's the

20   admission number seven.

21       So are you saying that ultimately the admission

22   was responded to and denied and that this is the

23   correct entity, or are you saying that there is an

24   error in the name of the entity that's in the complaint

25   but that hasn't been corrected.  I'm a little unclear

1    on that.

2         MR. BODURTHA:  There is no error in the entity

3    that has been identified as the plaintiff in this

4    complaint.  If anything, the admission -- and the

5    requests for admissions were responded to, but the

6    admission should be withdrawn on the proof that we are

7    about to submit to this Court the deal documents

8    demonstrating that the trust exists, the trust has

9    filings with the Securities and Exchange Commission.

10   Mr. Shakoori has filed bankruptcy proceedings under the

11   pains and penalties of perjury that identified the bank

12   that served as trustee before U.S. Bank.

13        There is really no dispute that U.S. Bank, N.A.,

14   as Trustee for this trust exists and is valid other

15   than the fact that our predecessor counsel failed to

16   timely respond to requests for admissions.

17        THE COURT:  All right.  So you're just

18   saying -- I think it's clear now.  You're just saying

19   that this was an error, there was a failure to respond,

20   but the admission can't be effectively relied upon

21   because it's not true.

22        MR. BODURTHA:  Correct.

23        THE COURT:  Okay.  All right.  I understand.

24        As to the other two admissions Mr. Ennis

25   referred to about LaSalle Bank not being the trustee

1    and U.S. Bank not being the trustee, I take it your

2    argument is basically the same there; that these were

3    admissions that were not responded to, but they are

4    contrary to the facts that you intend to demonstrate in

5    the course of the trial.

6         MR. BODURTHA:  Correct.

7         THE COURT:  All right.  Well, I'll take all of

8    that under advisement.  And you can call your first

9    witness.

10         MR. BODURTHA:  Call Mr. Shakoori, the borrower,

11   please.

12         THE CLERK:  Raise your right hand.

13         **MASOUD SHAKOORI**, PLAINTIFF'S WITNESS, SWORN

14         THE CLERK:  Please state your name and spell

15   your last name for the record.

16         THE WITNESS:  First name is Masoud, last name is

17   Shakoori-Naminy, S-h-a-k-o-o-r-i.

18         THE CLERK:  Thank you.  You may be seated.

19         THE COURT:  All right.  Good morning, Mr.

20   Shakoori.

21         THE WITNESS:  Good morning, your Honor.

22         THE COURT:  You may inquire, Mr. Bodurtha.

23         MR. BODURTHA:  Thank you, your Honor.

24         THE COURT:  Are you going to do it -- off the

25   record.

```
 1              (Off-the-record discussion)
 2              THE COURT:  Let's go back on the record.
 3                        DIRECT EXAMINATION
 4    BY MR. BODURTHA:
 5    Q.   Good morning, Mr. Shakoori.
 6    A.   Good morning, sir.
 7    Q.   Is it okay if I call you Mr. Shakoori?  I know we
 8    talked about this before.
 9    A.   Yes, not a problem.
10    Q.   I'd call you Mike, but this is a more formal
11    setting so we'll do it with Mr. Shakoori.
12    A.   Sure.
13    Q.   Where do you live?
14    A.   I live in 1541 Ten Rod Road, Exeter, Rhode Island
15    02822.
16    Q.   Mr. Shakoori, how long have you lived there?
17    A.   Since 2000, I believe, or 2001.  I'm not quite
18    sure.
19    Q.   Do you own the property you live in?
20    A.   Yes.
21    Q.   Do you recall when you purchased the property?
22    A.   When I pulled the first mortgage.  I don't know
23    the exact date.
24    Q.   Okay.  Your bankruptcy filings indicate a purchase
25    in January of 2001 for roughly $200,000.  Is that
```

1    accurate?

2    **A.**    I guess, yes.

3    **Q.**    Okay.  And in November of 2001, you obtained a

4    mortgage loan from Finance America, LLC, correct?

5    **A.**    I guess.  I don't have any documents in front of

6    me.

7    **Q.**    Okay.  Let me see if I can refresh your

8    recollection here.

9          THE COURT:  Let's go off the record for a

10    second.

11          (Off-the-record discussion)

12    **Q.**    Mr. Shakoori, what I'm showing you is a document

13    that has been marked for identification as Plaintiff's

14    Exhibit letter B.  And I just enlarged it as best I

15    can.  Can you see the words on the page?  It's going to

16    be --

17    **A.**    I can see the heading and the book number and the

18    last thing is mortgage.

19    **Q.**    All right.  Bear with me here because what we're

20    going to do is go to the last page.

21          All right.  So now, Mr. Shakoori, I am on page

22    21 and 22 of Exhibit B at the top of that page.  Is

23    that your signature?

24    **A.**    Yes.

25    **Q.**    Okay.  And then if I go through the pages that

1    precede that, if you look at the bottom, are those your

2    initials on the bottom?

3    **A.**    Yes.

4    **Q.**    Okay.  Now, I'm going to go back to the very first

5    page of the agreement, okay.  All right.  Now, this

6    agreement that has -- and let me go to the bottom.

7         Those are your initials at the bottom, MSN?

8    **A.**    Yes.

9    **Q.**    Okay.  And looking at this document, it appears

10   that it's dated November 5, 2001.  Do you see that?

11   **A.**    Yes.

12   **Q.**    Okay.  Does review of this document refresh your

13   recollection of the mortgage loan you entered into with

14   Finance America?

15   **A.**    Yes.

16   **Q.**    Okay.  I'm going to go to the next page that has

17   the actual amounts.  Do you recall how much money you

18   borrowed from Finance America?

19   **A.**    I do not, but it says it right here.

20   **Q.**    Okay.  That was my next question.  It says in the

21   actual agreement that it was $243,750.  Does that

22   refresh your recollection of the amount you borrowed?

23   **A.**    Yes.

24   **Q.**    Did you borrow this money to purchase the

25   property?

1    **A.**   Yes.

2    **Q.**   I believe you had owned the property for at least

3    ten months prior to executing this mortgage loan.  Is

4    there any reason that you can recall for the delay in

5    the purchase and the mortgage funding?

6    **A.**   I'm a little confused with your question.  I'm

7    sorry, go ahead.

8    **Q.**   Let me see if I can rephrase.

9          The question is:  This mortgage is dated

10   November of 2001, right, but the property purchase was

11   actually ten months earlier.  Based upon your

12   recollection of events, can you tell us why there was

13   that ten-month period of delay?

14   **A.**   No.

15   **Q.**   Okay.  Now, when you signed this agreement, Mr.

16   Shakoori, did you understand that you were pledging

17   1541 Ten Rod Road as security to guarantee repayment of

18   this loan?

19   **A.**   Yes.

20   **Q.**   Okay.  Moving beyond the signature date on the

21   mortgage, you made all regular monthly mortgage loan

22   payments to Finance America, correct?

23   **A.**   I'm sure, yes.

24   **Q.**   You're sure.  Okay.

25          Mr. Shakoori, you refinanced the Finance America

1    mortgage loan in July of 2003, correct?

2    **A.**    I don't -- do you have any paperwork?

3    **Q.**    You don't recall that?  Let me see if I can

4    refresh your recollection.

5            What I'm showing you is marked as Plaintiff's

6    Exhibit C.

7    **A.**    I can see that.

8    **Q.**    All right.  Now, the first page of the actual

9    exhibit is titled "Adjustable Rate Note," and it's

10   dated July 16, 2003.

11           Do you have that before you?

12   **A.**    7-16-03?  Yes.

13   **Q.**    Yes.  And why don't you take a quick look at this

14   document to see if it refreshes your recollection as to

15   this loan.

16   **A.**    Okay.

17   **Q.**    Now, having looked at this, does that refresh your

18   recollection as to the loan you obtained in 2003?

19   **A.**    Yes.

20   **Q.**    Do you see the name of the lender?

21   **A.**    Where would that be?  No.  Can you tell me the

22   number so I can see it.

23   **Q.**    If you look at paragraph number one, borrower's

24   promise to pay, do you see where it says the lender is?

25   **A.**    Roughly, yes.  Letters are very small.

1    **Q.**    Okay.  Would you agree with me that the lender

2    identified on this note is Option One Mortgage

3    Corporation, a California corporation?

4    **A.**    Yes.

5    **Q.**    Okay.  Would you agree with me that the loan was

6    in the amount of $315,400?

7    **A.**    Yes.

8    **Q.**    Okay.  Now, if I take you to page 4 of 5, is that

9    your signature?

10    **A.**    It appears to be.

11    **Q.**    Okay.  And on the bottom of each page, are those

12    your initials, MS?

13    **A.**    Yes.

14    **Q.**    Okay.  And on the first page, your initials, MS,

15    right?

16    **A.**    Yes.

17    **Q.**    Okay.  Do you recall actually signing the note,

18    Mr. Shakoori?

19    **A.**    Yes.

20    **Q.**    Okay.  When you signed the note -- I'm going to

21    move you to another page.  This is page 5 of 5 of this

22    exhibit.

23         When you signed the note, was this document

24    attached to it?  It's called allonge to note?

25    **A.**    I do not recall.

1    **Q.**    Okay.

2    **A.**    I do not recall.

3    **Q.**    Okay.  If you look at the bottom of the page, do

4    you see your initials on the bottom of the page?

5    **A.**    No.  I don't see my initials.

6    **Q.**    All right.  But your initials are on the bottom of

7    every other page of the note?

8    **A.**    The one you're showing me is missing.

9    **Q.**    This one doesn't have it because it has your

10   signature, right?

11   **A.**    Yes.

12   **Q.**    Okay.  But on the page before there, there's your

13   initials, page 2 and 3?

14   **A.**    Yes.

15   **Q.**    And on the first one, there are your initials on

16   page 1 of 3, right?

17   **A.**    Yes.

18   **Q.**    Okay.  Now, you understood, Mr. Shakoori, when you

19   signed this note, that you would be required to make

20   monthly payments, right?

21   **A.**    Yes.

22   **Q.**    And you understood that if you didn't make the

23   monthly payments that you would default on the note,

24   right?

25   **A.**    Yes.

1    **Q.**    Did you also understand that this note had an

2    adjustable rate?

3    **A.**    I'm sorry?

4    **Q.**    Did you also understand that the note had an

5    adjustable rate?

6    **A.**    I'm not sure.

7    **Q.**    Okay.  Do you know what an adjustable interest

8    rate is?

9    **A.**    I believe it changes.

10    **Q.**    Okay.  Do you know if this note had an adjustable

11    interest rate?

12    **A.**    I'm not quite sure.

13    **Q.**    Okay.  Now, if I can turn your attention to the

14    page that we're on, okay.  This is on page 2 of 5.  And

15    if you look -- I'm going to zoom in on this so you can

16    see it, okay.  If you look at paragraph 3, payments,

17    time and place of payments, do you see that?

18    **A.**    Yes.

19    **Q.**    All right.  And if you read through that, it

20    indicates that there's a first day for each month of

21    payment, correct?

22    **A.**    Yes.

23    **Q.**    As of September 1, 2003, right?

24    **A.**    Yes.

25    **Q.**    And a last date for payment of August 1, 2033.  Do

1    you see that?

2    **A.**   Yes.

3    **Q.**   And you would agree with me that we're not quite

4    at August 1 of 2033, right?

5    **A.**   Yes.

6    **Q.**   So this note still has payments that are owing and

7    due on it, correct?

8    **A.**   Yes.

9    **Q.**   All right.  And you haven't paid off the note in

10   its entirety at any time before today, have you?

11   **A.**   No.

12   **Q.**   So you haven't obtained a refinance or other funds

13   that you used to pay off this loan, right?

14   **A.**   No.

15   **Q.**   Okay.  So you would agree with me that this note

16   remains owing and due, correct?

17          MR. ENNIS:  Objection to the form, your Honor.

18   I believe that calls for a legal conclusion as to my

19   client.

20          THE COURT:  Well, you can rephrase the question

21   and --

22          MR. BODURTHA:  I'll rephrase it.

23          THE COURT:  -- ask what he understands it to be.

24          MR. BODURTHA:  I'll rephrase it.

25   **Q.**   You would agree with me, Mr. Shakoori, that you

1   still owe money on this note, correct?

2   **A.**   Yes, with explanation.

3   **Q.**   Okay.  Now, with the understanding that you have

4   been discharged of all debts in the bankruptcy court,

5   right?

6   **A.**   Yes.

7   **Q.**   Okay.  So that you're not -- is it your

8   understanding that you're not personally liable for the

9   note, right?

10  **A.**   That's what I was told by my attorney.

11  **Q.**   Okay.  All right.

12        MR. BODURTHA:  Your Honor, I have an original

13  copy of the promissory note.  May I approach and have

14  the witness look at it?

15        THE COURT:  Sure.  Show it to Mr. Ennis first.

16  **Q.**   Now, Mr. Shakoori, what I have given you is the

17  original version of the promissory note that has been

18  marked as Exhibit C.  And I'm going to -- sorry.  I'm

19  going to pull this copy back up on your screen and ask

20  you to confirm that the document you're holding in your

21  hand is the same as the copy that you just reviewed on

22  the digital screen.

23  **A.**   Could you make it larger, please.

24  **Q.**   Sure.

25  **A.**   Thank you.

1  **Q.**    Is that big enough?

2  **A.**    Yes.

3         MR. ENNIS:  Your Honor, I believe a different

4  one has been submitted.  The digital screen shows a

5  bankruptcy document --

6         THE COURT:  Well, do you want to stipulate that

7  the document introduced as Exhibit C is a true and

8  accurate copy of the original?

9         MR. ENNIS:  Well, of the note, not of the

10  allonge, your Honor.

11         THE COURT:  All right.  Mr. Bodurtha can ask his

12  questions.

13         MR. BODURTHA:  Okay.

14  **Q.**    Mr. Shakoori, let me turn your attention to the

15  last page of that document that I handed to you.

16  **A.**    Okay.

17  **Q.**    In reviewing that last page, is that the same page

18  as what you're seeing on the screen as Exhibit C?

19  **A.**    Yes, except the loan number has been crossed out.

20  **Q.**    Right.  So the loan number and servicing number

21  have been redacted.  That's a requirement in order to

22  file documents so that we don't divulge your personal

23  information in the matter -- in a public record.  But

24  beyond those redactions, is that the same document that

25  you're looking at in front of you?

1    **A.**    It appears to be, yes.

2    **Q.**    Okay.  Now, if you go to the page before on the

3    document you're holding.

4    **A.**    Okay.

5    **Q.**    That's your signature on the page, right?

6    **A.**    It appears to be, yes.

7    **Q.**    Okay.  And go to the page before.  That's your

8    initials at the bottom of the page?

9    **A.**    Yes.

10   **Q.**    And the page before that?

11   **A.**    Okay.

12   **Q.**    Those are your initials at the bottom of the page?

13   **A.**    Correct, yes.

14   **Q.**    So would you agree with me that that document is

15   the same document as what you were looking at under

16   Exhibit C?

17   **A.**    Yes.

18   **Q.**    Okay.  Do you have any reason to doubt that the

19   document you're holding is the original promissory note

20   that you signed?

21        MR. ENNIS:  Objection, your Honor.  How can he

22   establish the original nature of a document?  He can

23   ask him is that your signature, but they're trying to

24   authenticate the note through my client, including the

25   allonge.

1        THE COURT:  I understand your objection.  It's

2    overruled.  He can testify, and he has testified that

3    the documents are identical.  I don't know that he can

4    do more than that.

5        MR. BODURTHA:  My question was whether Mr.

6    Shakoori has any reason to doubt that that's the

7    original promissory note that he signed in 2003.

8        THE COURT:  All right.  So the objection is

9    noted and overruled.  You may answer that question.

10       THE WITNESS:  The last page, allonge to note, I

11   have never seen that.

12   **Q.**   Okay.

13   **A.**   This is the first time.

14   **Q.**   Okay.  So you didn't see that when you signed the

15   promissory note?

16   **A.**   Correct.

17   **Q.**   Okay.

18   **A.**   I have not.

19   **Q.**   How about the three pages that precede the

20   allonge?  Are those -- do you have any reason to doubt

21   that those are the original document pages that you

22   initialed and you signed when you obtained the loan

23   from Option One?

24   **A.**   It appears, except the original looks like it was

25   copied.

1    **Q.**    Okay.  Thank you.

2         MR. BODURTHA:  May I approach, your Honor?

3         THE COURT:  Yes.

4    **Q.**    Mr. Shakoori, in order to obtain this loan from

5    Option One, you had to sign a mortgage, correct?

6    **A.**    Yes.

7    **Q.**    Do you recall signing the mortgage?

8    **A.**    I'm not looking at --

9    **Q.**    I'm sorry.  I was going to ask you first if you

10   recalled it.  And if you don't, then I can show you the

11   mortgage to refresh your recollection.

12   **A.**    Isn't that the paper you just gave me?

13   **Q.**    I just gave you a promissory note.  I'm asking you

14   about the mortgage.

15        Do you recall signing a mortgage?

16   **A.**    I signed papers, yes.

17   **Q.**    Okay.  Let me show you this document to refresh

18   your recollection.  It's marked as Exhibit D.

19        Do you recognize this document, Mr. Shakoori?

20   **A.**    Can you enlarge it, please.

21   **Q.**    Yes.

22   **A.**    Thank you.  Okay.

23        Is this recorded?

24   **Q.**    Do you see the recording marks at the top of the

25   document, book 212, page 001?

1    **A.**    Yes.

2    **Q.**    Bear with me here.  Is that your signature, Mr.

3    Shakoori, on page 7 of the exhibit?

4    **A.**    It appears to be.

5    **Q.**    Okay.  On page 6, are those your initials at the

6    bottom of the page?

7    **A.**    Yes.

8    **Q.**    And on page 4 of 6, are those your initials at the

9    bottom of the page?

10   **A.**    Yes.

11   **Q.**    Page 3, those are your initials?

12   **A.**    Yes.

13   **Q.**    All right.  And page 1, are those your initials?

14   **A.**    Yes.

15   **Q.**    Okay.  And if I direct your attention to page 1 --

16   let me know if I need to blow this up -- do you see the

17   names on that page?

18   **A.**    Yes.

19   **Q.**    And your name is listed on there, is it not?

20   **A.**    Yes.

21   **Q.**    And also the mortgagee is listed on that page, is

22   it not?

23   **A.**    Yes.

24   **Q.**    And who is the mortgagee on the page, if you can

25   review that for us?

1    **A.**    Option One Mortgage.

2    **Q.**    Okay.  And the amount, can you find the amount on

3    the mortgage?

4    **A.**    Yes.

5    **Q.**    How much is the mortgage for?

6    **A.**    $315,400.

7    **Q.**    Okay.  Now, is that the same amount that was on

8    the note that you just reviewed?

9    **A.**    Yes.

10   **Q.**    Okay.  So do you have a recollection now that you

11   reviewed this document of signing this mortgage

12   agreement?

13   **A.**    Yes.

14   **Q.**    Do you understand the effect of signing this

15   mortgage agreement?

16   **A.**    Yes.

17   **Q.**    What is the effect of your signature on this

18   mortgage agreement?

19   **A.**    I borrowed money.

20   **Q.**    But isn't it the case that when you signed this

21   mortgage agreement, you agreed to secure payment of

22   that loan with a mortgage lien on your property; isn't

23   that the case?

24   **A.**    Correct, yes.

25   **Q.**    Okay.  And you understood that by signing this

1    mortgage agreement that if you didn't make the mortgage

2    payments, that your mortgagee, here, Option One, could

3    foreclose on that property?  You understood that,

4    right?

5    **A.**    Yes.

6    **Q.**    Can we agree, Mr. Shakoori, going forward, that

7    when I say "mortgage loan," I'm talking about this

8    Option One Mortgage loan?

9    **A.**    Yes.

10    **Q.**    Okay.  Thank you.

11         Now, Mr. Shakoori, I'm going to test your memory

12    here on this mortgage loan a little.  When you obtained

13    the proceeds from the mortgage loan, in other words,

14    you got money out of this mortgage loan with Option

15    One, do you recall where the proceeds were paid?

16    **A.**    The other mortgage.

17    **Q.**    Okay.  Namely, the Finance America mortgage was

18    paid off, right?

19    **A.**    I can't see the names.  Yes.

20    **Q.**    Okay.  Did you receive a cash payment from this

21    mortgage loan?

22    **A.**    I'm not sure, but I'm sure, yes.

23    **Q.**    What I'm showing you is Plaintiff's Exhibit E

24    titled "Settlement Statement" at the top.

25    **A.**    Yeah.

1    **Q.**    Is that your signature at the bottom?

2    **A.**    It appears to be, yes.

3    **Q.**    Okay.  Then on page 2 of the settlement statement,

4    is that your signature as well?

5    **A.**    Yes.

6    **Q.**    All right.  And then there's an addendum.  Is that

7    your signature?

8    **A.**    Yes.

9    **Q.**    And it says that you've reviewed the HUD-1

10   settlement statement, it's true and accurate, correct?

11   **A.**    Yes.

12   **Q.**    And you confirmed that you received a copy of the

13   HUD-1 by signing it?

14   **A.**    I'm sorry.  Say that again.

15   **Q.**    You confirmed that you had received a copy of the

16   HUD-1 by signing this addendum?

17   **A.**    Yes.

18   **Q.**    Okay.  Now, if I take you back to the first page

19   all the way at the bottom, right, do you see Item 303

20   on the left-hand side?  And it says, "Cash to

21   borrower."

22          Do you see that?

23   **A.**    Yes.  It's not clear, but yes.

24   **Q.**    Okay.  Does that refresh your recollection as to

25   what happened with the money that was borrowed beyond

1    what was paid on the prior mortgage lender?

2    **A.**    Yes.

3    **Q.**    So you'll agree with me that you received nearly

4    $54,000 in cash from this mortgage loan?

5    **A.**    Yes.

6    **Q.**    What did you do with the money?

7    **A.**    Put it in -- paying bills and building a house, I

8    believe.

9    **Q.**    Was that a house you were building on the property

10   or was it on a different property?

11   **A.**    On a different property.

12   **Q.**    Okay.  Do you know the address of that other

13   house?

14   **A.**    I'm not quite sure.  It could be somewhere in

15   Diamond Hill Road.

16   **Q.**    Okay.  Did you own that property?

17   **A.**    Yes.

18   **Q.**    Okay.

19   **A.**    Company did.

20   **Q.**    The company did.  Okay.

21          Now, at some point in the course of this

22   mortgage loan, the Option One mortgage loan, you

23   defaulted on the loan, correct?

24          MR. ENNIS:  Objection to the term "default,"

25   your Honor.  I believe that's a legal term.  Either

1    delinquent or don't pay, but default is a term of art.

2    It is the term about a note in the mortgage.

3            THE COURT:  Okay.  You can rephrase it.

4            MR. BODURTHA:  I'll rephrase it.

5    **Q.**   At some point in time, Mr. Shakoori, you stopped

6    making payments on the mortgage loan, correct?

7    **A.**   At my attorney's advice, the answer is yes.

8    **Q.**   Okay.  Can you tell us the first time you failed

9    to make a monthly mortgage loan payment on the Option

10   One loan.

11   **A.**   I cannot give you a date or a time, sir.

12   **Q.**   Okay.  Did you at any time enter into a

13   modification on this mortgage loan?

14   **A.**   The answer is yes, at the advice of an attorney.

15   **Q.**   Okay.  Do you know when you entered into that

16   modification agreement?

17   **A.**   The date?

18   **Q.**   Can you give me the year?

19   **A.**   I'm not sure, but my -- do I answer?

20   **Q.**   If you're not sure --

21           THE COURT:  If you're not sure, you're not sure.

22           THE WITNESS:  Okay.  I'm not sure about the time

23   or the date.

24   **Q.**   Okay.  And did you enter into that loan

25   modification in order to resolve the fact that you had

1    failed to make monthly mortgage loan payments?

2    **A.**    No.  I need to correct you.  You keep on saying

3    failed mortgage payment.  I did not fail mortgage

4    payment.

5    **Q.**    Okay.  Let me rephrase then.

6         Did you enter into the loan modification

7    agreement in order to resolve the payments that you had

8    missed on the mortgage loan?

9    **A.**    Again, I did not miss payments.  There was

10   argument between myself and the mortgage company, and I

11   hired an attorney.  And that attorney on my behalf

12   contacted Option One.  And during this conversation, I

13   had questions regarding payments; that it was not being

14   recorded on Option One's document.

15        And my attorney called Option One and said he

16   wanted to know what's going on.  And they suggested

17   modification which I did not want to sign, but my

18   attorney said as a good faith we will do this until the

19   original document and all the paperwork showing where

20   all the money I sent was going to.

21   **Q.**    Okay.  Do you remember signing the mortgage loan

22   modification agreement?

23   **A.**    Yes, with objection.

24   **Q.**    And how did you know that you were signing the

25   mortgage loan modification agreement with an objection?

1    **A.**   My attorney Charlie Wick explained and explained

2    to Option One legal department on a phone call

3    conversation that my client will sign this, send

4    monthly payment until they prove where all my payments

5    were because they did not have accounting of where all

6    the money I sent was going to.

7    **Q.**   And what your attorney said to Option One was

8    reduced to a written agreement showing that you were

9    going to make these modification payments until this

10   documentation was provided, right?

11   **A.**   Yes.  I was making -- I was to make payments such

12   time Option One provided accounting paperwork and at

13   some point they did not.

14   **Q.**   Okay.  Just to confirm, that whole agreement was

15   reduced to a writing, a modification agreement, that

16   you signed?

17   **A.**   Yes.

18   **Q.**   Okay.  Let me show you what plaintiff has marked

19   as Exhibit L.  Sorry, wrong exhibit.

20          All right.  Mr. Shakoori, I'm going to show you

21   what's been marked as Exhibit Q, all right.  Can you

22   see that?

23   **A.**   I can read the words "loan modification

24   agreement."

25   **Q.**   Can you read anything below it?

1    **A.**    No.  Very fuzzy.

2    **Q.**    Let me see if I can enlarge it for you.

3        Now can you read it?

4    **A.**    Yes.

5    **Q.**    All right.  I'm going to take you to the last page

6    of this agreement, okay.  Actually, it's the

7    second-to-last page.

8        Is that your signature, Mr. Shakoori?

9    **A.**    Yes.

10    **Q.**    Now I'm going to take you back to the first page

11    of the agreement.

12        Do you recall signing this agreement?

13    **A.**    Yes.

14    **Q.**    Is this the modification agreement you were just

15    discussing that you entered into but objected to making

16    the payments?

17    **A.**    The answer is, yes, I objected to everything.

18    **Q.**    Okay.  As you testified, where in the document

19    does it say that you're making these payments under an

20    objection?

21    **A.**    I don't know.  My attorney handled this.

22    **Q.**    Okay.  So you don't actually know for a fact if

23    those objections that you were just testifying was

24    actually reduced to a written agreement, do you?

25    **A.**    Actually, yes, it was my attorney, previous

1    attorney, wrote a letter and got a -- letter --

2    **Q.**    Okay.

3    **A.**    -- from Option One.

4    **Q.**    You just testified before that you agreed to a

5    loan modification under an objection that Option One

6    provide you with all this information as to where your

7    payments were made.

8    **A.**    Yeah.

9    **Q.**    And that that agreement was reduced to a writing,

10   right?

11   **A.**    Yes.

12   **Q.**    Is what I've shown you as Exhibit Q, is that that

13   writing?

14   **A.**    No.

15   **Q.**    Okay.  It's a separate writing?

16   **A.**    Correct.

17   **Q.**    Okay.

18   **A.**    It was a letter sent to my attorney.

19   **Q.**    So it's not included in the actual loan

20   modification agreement, is it?

21   **A.**    It's not here, no.

22   **Q.**    Why not?

23   **A.**    I have no idea.

24   **Q.**    Okay.  If I can turn your attention to page 1 of

25   this agreement.  Are those your initials at the bottom

1    of the page?

2    **A.**    Yes.

3    **Q.**    Okay.  And if I blow this up for you, do you see

4    where it says the parties -- it lists the parties to

5    the agreement, Mr. Shakoori?

6    **A.**    Where?  What number is that?

7    **Q.**    I'm at the top of the page, and it starts, "This

8    loan modification agreement made as of the first day of

9    December of 2008."

10    **A.**    I see that.

11    **Q.**    Do you see the parties on there?

12    **A.**    Yes.

13    **Q.**    One of whom is yourself, right?

14    **A.**    That's correct.

15    **Q.**    And the other one is listed as American Home

16    Mortgage Servicing, Inc., as servicer.  Do you see

17    that?

18    **A.**    I see that.

19    **Q.**    Okay.  Earlier you testified that you entered into

20    a modification agreement with Option One.  Is that the

21    agreement you're talking about here or is that a

22    different modification agreement?

23    **A.**    American Mortgage, like you just said, it was the

24    servicer on behalf of Option One.

25    **Q.**    Okay.  So your recollection, as you sit here

1    today, is that American Home Servicing, Inc., was the

2    mortgage loan servicer?

3    **A.**    For Option One, correct, that's what I was told.

4    **Q.**    Okay.  And so when you were talking earlier about

5    the agreement that you entered into with Option One, it

6    was actually an agreement that you entered into with

7    American Home Mortgage Servicing as loan servicer for

8    Option One?

9    **A.**    Correct.

10    **Q.**    Okay.  So you will agree with me that in December

11    of 2008, American Home Mortgage Servicing, Inc., was

12    your mortgage loan servicer?

13    **A.**    Yes.

14    **Q.**    And you would agree with me that this modification

15    agreement altered, modified and changed the terms of

16    the mortgage loan, the July 2003 Option One mortgage

17    loan, right?

18    **A.**    Yes, with objection, I guess if I'm saying it

19    correctly.

20    **Q.**    Okay.  And your objection is that you had asked

21    for documents or information from Option One?

22    **A.**    Correct.  And American Mortgage.

23    **Q.**    And from American Mortgage?

24    **A.**    The servicer.

25    **Q.**    And it's your testimony that those objections are

1    either not in this agreement but are in a different

2    letter that your counsel sent to either Option One or

3    American Home?

4    **A.**   Correct.

5    **Q.**   Okay.  As you sit here today, are you objecting or

6    challenging the validity of this mortgage modification

7    agreement?

8    **A.**   I need to ask my attorney.

9    **Q.**   That's a question for you.  I'll put it another

10   way.

11           You don't have any basis to object to the

12   validity of this mortgage modification agreement, do

13   you?

14   **A.**   I'm sorry.  Say it again.

15   **Q.**   You don't have any reason to object to the

16   validity of this mortgage loan modification agreement,

17   do you?

18   **A.**   I objected to this from day one.

19   **Q.**   You objected to the modification --

20   **A.**   I was never, ever behind mortgage.  The problem

21   was, as I was sending money to the mortgage company,

22   they did not have proper paperwork.  When I was getting

23   my monthly statement, the balance would never go down.

24   **Q.**   Okay.  When you signed this mortgage loan

25   modification agreement, do you have an understanding of

1    the payments that you were required to make?

2    **A.**    Yes.

3    **Q.**    Okay.  What is your understanding of the payments

4    that you were required to make under this modified

5    mortgage loan agreement?

6    **A.**    My attorney said as a good faith let's do this

7    until we find all the document, and then we will go in

8    front of a judge and sort this out.

9    **Q.**    Okay.

10   **A.**    And as a good faith by counsel's advisement, I

11   signed this paperwork.

12   **Q.**    Okay.  If I turn your attention to page 6 of this

13   agreement, it's entitled "Loan Modification Agreement,

14   Schedule A."

15         Do you see that?

16   **A.**    Yes.

17   **Q.**    All right.  Would you agree with me that the new

18   principal balance on the mortgage loan after this

19   modification was $320,760.58?

20   **A.**    That's what it says here, yes.

21   **Q.**    Okay.  And you agreed to that modified mortgage

22   amount when you signed this document, right?

23   **A.**    Again, yes, with -- what's the correct legal term?

24   Prejudice?  I did not want to sign this.

25   **Q.**    Okay.  All right.

1    **A.**    I did it as a good faith so we can go forward and
2    resolve the problem.
3    **Q.**    Okay.  Now, if I move down a little on this page,
4    sir, on page 6 where it says, "New modified payment
5    amount effective for the payments," do you see that
6    section?
7    **A.**    Yes.
8    **Q.**    And it says "interest only."  Do you see that?
9    **A.**    Yes.
10    **Q.**    And you understood at the time that you entered
11    into this modification agreement that you would be
12    making interest-only payments on this loan for a period
13    of time, correct?
14    **A.**    Correct.
15    **Q.**    All right.  And you understood that those
16    interest-only payments were $1,336.50, correct?
17    **A.**    Correct.
18    **Q.**    All right.  And you understood under the terms of
19    the modification that you were supposed to make those
20    payments through December 1, 2013, correct?
21    **A.**    Correct.  That's what it says here.
22        THE COURT:  All right.  Mr. Bodurtha, are you
23    done with this document?
24        MR. BODURTHA:  Yes, I am.
25        THE COURT:  Let's take a ten-minute recess.

1          MR. BODURTHA:  Thank you.

2          THE CLERK:  All rise.

3          (Recess taken)

4          MR. BODURTHA:  Your Honor, at this time, I'm

5     going to ask that Exhibit Q be admitted into evidence

6     based upon Mr. Shakoori's testimony.

7          THE COURT:  Okay.  Is there any objection?

8          MR. ENNIS:  No objection, your Honor.

9          THE COURT:  All right.  Q will be full.

10         (Plaintiff's Exhibit Q was admitted in full)

11    **Q.**   Okay.  So Mr. Shakoori, so I've moved; I'm over

12    here now.

13         So just wrapping up on this document, it's fair

14    to say that as of December of 2008, you understood that

15    your mortgage loan servicer was American Home Mortgage

16    Servicing, Inc., correct?

17    **A.**   Yes.

18    **Q.**   Okay.  And following execution of the modification

19    agreement, you made payments to American Home Mortgage

20    Servicing, Inc., on the modified mortgage loan,

21    correct?

22    **A.**   Yes.

23    **Q.**   And you sent those payments directly to American

24    Home Mortgage Servicing, Inc.; is that right?

25    **A.**   Actually, I gave some of it to my attorney.  He

1    sent it in.

2    **Q.**    But the payments that you sent in, to the best of

3    your recollection, those payments were sent to American

4    Home Mortgage Servicing, Inc., right?

5    **A.**    I guess, yes.

6    **Q.**    Okay.  And based upon your recollection, do you

7    know for how long you made those payments to American

8    Home Mortgage Servicing, Inc.?

9                MR. ENNIS:  Objection, your Honor.  This

10   evidence that he's been presenting has nothing to do

11   with the basis of this lawsuit, namely, to establish

12   the identity of the holder of the note and holder of

13   the mortgage.

14               THE COURT:  Well, I totally disagree with that.

15   This is an equitable claim, and this evidence I think

16   is relevant to an equitable claim.  So the objection is

17   noted and it's overruled.

18               You may proceed, sir.

19               MR. BODURTHA:  Did he answer the last question?

20               THE REPORTER:  No, counsel.

21               MR. BODURTHA:  Okay.  Would you repeat the last

22   question.

23               (Record read)

24               THE WITNESS:  No.

25   **Q.**    Is it -- I'm sorry.  Strike that.

1    Do you recall making any mortgage loan payments

2    after April of 2011?

3    **A.**   I do not recall.

4    **Q.**   Okay.  You don't recall specifically the last time

5    you made a mortgage loan payment on this loan, do you?

6    **A.**   Don't recall the date.

7    **Q.**   Okay.  Is it fair to say that the last time you

8    made the mortgage loan payment was more than ten years

9    ago?

10   **A.**   Could be.

11   **Q.**   Okay.

12   **A.**   I was told to stop making payments by my attorney

13   on this loan modification.

14   **Q.**   You haven't made a mortgage loan payment in over

15   ten years, correct?

16   **A.**   Correct.

17   **Q.**   You haven't paid any property taxes in more than

18   ten years, correct?

19   **A.**   I have paid some.

20   **Q.**   When did you make those property tax payments?

21   **A.**   I don't know the dates.

22   **Q.**   Do you have records of property tax payments?

23   **A.**   It says right in town who makes the payment.

24   **Q.**   You haven't made any property insurance payments

25   since April of 2011, have you?

1    **A.**    That's an incorrect statement.  I have been paying

2    insurance on the house.  Automatically comes out of my

3    checking account.

4    **Q.**    Okay.  Is it fair to say that you've been living

5    at Ten Rod Road for ten years without making a mortgage

6    loan payment?

7           MR. ENNIS:  Objection; asked and answered, your

8    Honor.

9           THE COURT:  Overruled.

10          THE WITNESS:  I'm sorry.  Does that mean I have

11   to answer?

12          THE COURT:  Yes.

13          THE WITNESS:  Okay.  Sorry.  What was it?

14   **Q.**    Is it fair to say that you've lived at the

15   property located at Ten Rod Road for over ten years

16   without making a monthly mortgage loan payment?

17   **A.**    The answer is yes.

18   **Q.**    And you would concede that during the entirety of

19   that time you have had a mortgage on the property

20   securing repayment of the loan that you obtained in

21   2003, correct?

22   **A.**    Answer is yes; not to the amount that you claim.

23   **Q.**    Okay.  But you're agreeing with me that you owe

24   money on a mortgage loan that you haven't paid in over

25   ten years, right?

1    **A.**    I thought I just answered that question.

2         THE COURT:  Well, you can answer it again.

3    There's no harm.

4         THE WITNESS:  So yes.

5    **Q.**    Okay.  You pursued two bankruptcy petitions

6    following 2011, right?

7    **A.**    Yes.

8    **Q.**    And each of these two bankruptcy petitions you

9    hired counsel, right?

10   **A.**    That's correct.

11   **Q.**    And Mr. Shakoori, all of the information you

12   provided to your counsel was true and accurate, right?

13   **A.**    To the best of my knowledge, yes.

14   **Q.**    To the best of your knowledge.  You gave your

15   bankruptcy counsel all of the loan account information

16   that you had in your possession so that that counsel

17   could file a bankruptcy petition, right?

18   **A.**    I gave my attorneys the notice of foreclosures.

19   **Q.**    Okay.  And there was no other information that you

20   provided to your attorneys?

21   **A.**    Some statements from other accounts.

22   **Q.**    And I'm assuming you provided your attorneys a

23   copy of the mortgage loan modification agreement we

24   were just discussing, right?

25   **A.**    Not sure.

1    **Q.**    Not sure.  Okay.

2         To the best of your knowledge, all the

3    information your counsel used to file the bankruptcy

4    petitions, that was true and accurate, right?

5    **A.**    Whatever I received from the mortgage company, I

6    gave to my attorney.

7    **Q.**    Okay.  Now, in January of 2012, you filed a

8    bankruptcy petition; is that true, sir?

9    **A.**    I'm sure.

10    **Q.**    Okay.  Let me show you what has been identified as

11    Plaintiff's Exhibit 7.  Mr. Shakoori, do you recognize

12    this document?

13    **A.**    Can you enlarge it, please.

14    **Q.**    Yes.

15    **A.**    Thank you.  Yes, that's my name.

16    **Q.**    Okay.  Now, if I turn -- sorry.  Okay.  On page 3

17    of 8 of Exhibit S, is that your signature on the page?

18    **A.**    I don't see my signature.

19    **Q.**    In the left column under "Voluntary Petition," it

20    says, "Signature of debtor, Masoud Shakoori-Naminy."

21    **A.**    Right.  I see my name typed, but I don't see a

22    signature.

23    **Q.**    Okay.  You have an understanding that at a certain

24    point in time you were able to countersign documents,

25    in other words, not using your actual signature but

1    just typing in your signature as well?

2    **A.**    I did not know that.

3    **Q.**    You didn't know that?  Do you recall ever

4    reviewing this petition for bankruptcy?

5    **A.**    I went to my attorney and he explained some stuff.

6    **Q.**    Okay.

7    **A.**    And told me to sign it so I did.

8    **Q.**    And you understood that the signature on this

9    document represented that you declared under penalty of

10    perjury that the information provided in the petition

11    was true and correct; is that the case, sir?

12    **A.**    Sure.

13    **Q.**    Okay.  Did your attorney explain that to you, that

14    you were signing documents under penalties of perjury?

15    **A.**    Yes.

16    **Q.**    And that the truth and accuracy of the information

17    you provided to the bankruptcy court was essential in

18    order to obtain bankruptcy relief.  You understood

19    that, right?

20    **A.**    Yes.

21    **Q.**    Let me show you what's been marked as Plaintiff's

22    Exhibit T.  I'm going to blow this up for you, Mr.

23    Shakoori, so you can see.  This document is titled

24    "Schedule D, Creditors Holding Secured Claims."

25            Do you recall reviewing this document?

1    **A.**    I don't remember.

2    **Q.**    Okay.  But you met with your bankruptcy counsel in

3    order to run through all of the claims that would be

4    made against you in connection with your bankruptcy,

5    right?

6    **A.**    Yes.

7    **Q.**    And you provided your attorney the information of

8    any potential claimant out there, correct?

9    **A.**    Yes.

10   **Q.**    And so your attorney was aware of creditors who

11   would make claims against you once you filed for

12   bankruptcy, right?

13   **A.**    Yes.

14   **Q.**    And then based upon that information, your

15   attorney prepared this Schedule D.  Do you recall that

16   happening?

17   **A.**    Yes.

18   **Q.**    Okay.  Do you recall signing the declaration?

19   **A.**    My name is printed.

20   **Q.**    Okay.  But you understand that at the time that

21   you signed this document, you were actually able to

22   sign it by a backslash backslash signature.  You didn't

23   actually have to put your pen to the paper, right?

24   **A.**    I actually signed this documents in his office,

25   pen and paper.

1    **Q.**   Okay.  Do you consider what I've shown you as

2    exhibit --

3    **A.**   That is my name.

4    **Q.**   That is your name on this exhibit.  And that's

5    your signature.

6         Do you treat that as your signature, Mr.

7    Shakoori?

8    **A.**   I guess.  Signature to me means I am signing.

9    **Q.**   I understand.  Do you understand that by making

10   this declaration you were stating to the Court under

11   the penalty of perjury that you read the foregoing

12   summary of schedules and that they were true and

13   correct to the best of your knowledge, information and

14   belief?

15   **A.**   Yes, yes.

16   **Q.**   And you understood that if you made a false

17   statement or concealed property, that you were subject

18   to a fine, prison or both.

19         You understood that, right?

20   **A.**   Yes.

21   **Q.**   Now, going back to the first page of this Schedule

22   D.  I want to focus your attention on the first top

23   section below creditor's name and mailing address.

24         Do you see that?

25   **A.**   Yes.

1    **Q.**    You under creditor number one, you've listed

2    American, and in parentheses, LaSalle Bank N.A., close

3    parentheses, right?

4    **A.**    I did not list it.  My attorney did.

5    **Q.**    But Mr. Shakoori, you signed this document under

6    the pains and penalties of perjury.

7    **A.**    Correct.

8    **Q.**    Okay.  And by signing this document, you were

9    saying that this is true and accurate information,

10    correct?

11    **A.**    Correct.

12    **Q.**    And you put the name American on -- you agreed to

13    the name American on there because that was American

14    Home Mortgage Servicing, Inc., your mortgage loan

15    servicer, right?

16    **A.**    Again, I received a foreclosure with names on it

17    and I gave it to my attorney.

18    **Q.**    That's not answering my question, Mr. Shakoori.

19    You put the name American on that document because you

20    knew -- let me finish my question.

21            THE COURT:  Mr. Shakoori, let him finish his

22    question and then you can answer, okay?

23            THE WITNESS:  Yes, your Honor.

24    **Q.**    You agreed to the name American under creditor

25    number one because you knew that your mortgage loan

1    servicer was American Home Mortgage Servicing, Inc.,

2    right?

3    **A.**    What day is this?  What year is this document?

4    **Q.**    This is filed in connection with your 2012

5    bankruptcy.

6    **A.**    Yes.  They were the servicer.

7    **Q.**    Okay.  And you put in parentheses LaSalle Bank

8    N.A. because you knew that LaSalle Bank N.A. was the

9    holder of your mortgage, correct?

10        MR. ENNIS:  Objection, your Honor.  That is

11    asking him a legal question about the holder of the

12    mortgage.

13        THE COURT:  Overruled.  He can answer if he

14    knows the answer to the question.

15        Go ahead.  Answer the question.

16        THE WITNESS:  Again, Sam -- I apologize, I don't

17    know your last name -- you keep on referring to the I

18    put that in parentheses.  I did not know.  I'm not an

19    attorney.  I just followed my attorney's advice.  So I

20    gave documents that they asked for, foreclosure

21    paperwork, and this is what the gentleman typed.  And

22    when I went there, he says these are the names of who

23    you owe money to and I signed the paperwork.

24    **Q.**    Okay.  So the advice of your bankruptcy counsel

25    was to list LaSalle Bank N.A. as a creditor in your

1    bankruptcy case?

2    **A.**    My attorney did that, correct.

3    **Q.**    And on his advice, you signed this Schedule D?

4    **A.**    That's correct.

5    **Q.**    Under the penalties and pains of perjury?

6    **A.**    Yes.

7    **Q.**    Okay.  Now in the next column over where it says

8    "Date Claim Was Incurred," do you see that?

9    **A.**    To the right?

10   **Q.**    Yes, to the right.

11   **A.**    Okay.

12   **Q.**    And it recites that the mortgage -- I'm sorry.  It

13   states that the claim opened in July 1, 2003.  Do you

14   see that?

15   **A.**    Yes.

16   **Q.**    And then below it says first mortgage, right?

17   **A.**    Yes.

18   **Q.**    And it also says below that primary residence of

19   debtor located at 1541 Ten Rod Road in Exeter, Rhode

20   Island, right?

21   **A.**    Correct.

22   **Q.**    This line in this Schedule D, this is identifying

23   the Option One mortgage loan, right?

24   **A.**    Okay.

25   **Q.**    It is?  That's your testimony; you have identified

1    the Option One mortgage loan in that box?

2    A.    Yes.

3    Q.    Okay.  Now, in one box over where it says "Amount

4    of Claim Without Deducting Value of Collateral," the

5    number written is $320,760, right?

6    A.    Okay.

7    Q.    You see that?

8    A.    Yes.

9    Q.    And you would agree with me that that's the amount

10   that was in the mortgage loan modification agreement

11   you signed with American Home Mortgage Servicing in

12   2008?

13   A.    Yes.

14   Q.    Okay.  So is it fair to say, Mr. Shakoori, that

15   this first level line for the creditor's name, this is

16   identifying the mortgage loan that you executed in

17   favor of Option One Mortgage?

18   A.    If you say so.

19   Q.    Well, I'm asking you.  Do you agree with me --

20   A.    I did sign this document, yes.

21   Q.    You did.  And by signing it, you agreed that this

22   was the mortgage loan that you originated with Option

23   One?

24   A.    Yes.

25   Q.    Okay.  Now, it's a little bit difficult to see,

1    but if you look in between the columns, between "Amount

2    of Claim" and "Date Claim was Incurred," do you see

3    those three headings?

4    **A.**    Which column are you referring to?

5    **Q.**    In between the column "Amount of Claim Without

6    Deducting Value of Collateral" and the column "Date

7    Claim was Incurred," there are three small narrow

8    columns.

9         You see those, right?

10   **A.**    Okay.

11   **Q.**    And one column is listed as "Contingent," another

12   one is "Unliquidated" and another is "Disputed."

13        Do you see those?

14   **A.**    Yes.

15   **Q.**    Okay.  You didn't check the box for "Disputed,"

16   did you?

17   **A.**    I don't know the law.  My attorney prepare this.

18   **Q.**    Your attorney prepared it and you signed it,

19   sir --

20   **A.**    Correct.

21   **Q.**    -- but you didn't check the box for "Disputed" on

22   the loan?

23   **A.**    Okay.

24   **Q.**    That's true, right?

25   **A.**    Yes, I don't see a check there.

1  **Q.**   Despite the fact that you previously testified

2  that you were disputing portions of this loan, right?

3  **A.**   Yes.

4  **Q.**   But as far as you were communicating to the

5  bankruptcy court on your Schedule D of creditors, you

6  were not disputing this loan?

7  **A.**   I'm sure I'll explain everything to my attorney,

8  but I signed it.

9  **Q.**   Okay.  So you weren't disputing the identification

10  of creditor number one as American and in parentheses

11  LaSalle Bank N.A.?

12       MR. ENNIS:  Your Honor, another objection.  My

13  brother knows that Bank of America took over LaSalle

14  Bank N.A. in October of 2007 and that LaSalle Bank N.A.

15  was no longer the trustee of this trust after that

16  date.  This is five years later.

17       THE COURT:  Okay.  That may all be true, but

18  that has really nothing to do with what he put on the

19  form as his recitation of what his debts were.  So that

20  may or may not be relevant, I don't think it is, but if

21  that's an objection, it's overruled.

22       MR. BODURTHA:  Is there a question pending?

23       (Record read)

24  **Q.**   Mr. Shakoori?

25  **A.**   No.

1    Q.    Thank you.  All right.  Now I'm going to turn your

2    attention to Plaintiff's Exhibit U.  Now, I'm going to

3    go to the second page of the exhibit.

4         Do you see where I'm at, Mr. Shakoori?

5    A.    At the bottom?

6    Q.    Yes.

7    A.    Uh-huh.

8    Q.    You see the writing where you declare under

9    penalty of perjury that the above indicates your

10   intention as to any property of your estate securing a

11   debt and/or personal property subject to an unexpired

12   lease, correct?

13   A.    Yes.

14   Q.    Now, I'm anticipating this, but you're going to

15   tell me that your bankruptcy counsel prepared this

16   document, right?

17   A.    Correct.

18   Q.    But you reviewed these documents with your

19   bankruptcy counsel before they were filed with the

20   court, right?

21   A.    Yes.

22   Q.    All right.  And that is your signature on that

23   page, correct?

24   A.    Yes.

25   Q.    Now, going back to the prior page, this is a

1    Chapter 7, Individual Debtor's Statement of Intention.

2    On this statement, you have listed under property

3    number one a property located at 1541 Ten Rod Road.

4         Do you see that?

5    **A.**   Yes.

6    **Q.**   And then in the box next to that, you've listed

7    creditor's name, right?

8    **A.**   The attorney did, yes.

9    **Q.**   All right.  The attorney listed the creditor's

10   name American, and in parentheses, LaSalle Bank N.A.,

11   close parentheses, right?

12   **A.**   Yes.

13   **Q.**   And that's because American Home Mortgage

14   Servicing was your servicer, correct?

15   **A.**   Yes.

16   **Q.**   And we can dispute it here for some reason, but

17   it's also because LaSalle Bank N.A. was the holder of

18   the mortgage, correct?

19        MR. ENNIS:  Objection.  That is a difference

20   because I've tried to define as indicated in the

21   bankruptcy creditor in claim.  It doesn't mean it's the

22   holder, your Honor.  And he's asking a legal question

23   relating to holding the assets.

24        THE COURT:  All right.  Well, I'll ask Mr.

25   Bodurtha to rephrase the question.

1    MR. BODURTHA:  Absolutely, your Honor.

2    Q.    And to the best of your knowledge, your bankruptcy

3    counsel listed LaSalle Bank N.A. because LaSalle was

4    one of your creditors, correct?

5    A.    I guess, correct.

6    Q.    Okay.  And the purpose of this -- do you know the

7    purpose of this statement, Mr. Shakoori?

8    A.    I have -- can you tell me who filed this

9    paperwork, which attorney?  I don't see it here.

10   Q.    Well, I can tell you, Mr. Shakoori, that I believe

11   this bankruptcy was filed by an attorney Dawn M.

12   Thurston.

13         Do you recall working with Dawn?

14   A.    Yes.

15   Q.    Okay.  And do you recall meeting with Ms. Thurston

16   in order to review and sign these documents?

17   A.    At some point, yes, and then I was referred to

18   another attorney.

19   Q.    Okay.  In the context of this individual statement

20   of intention, is everything in this statement, although

21   prepared by your lawyer, true and accurate?

22   A.    I'm assuming, yes.

23   Q.    Okay.  In the course of the 2012 bankruptcy, you

24   pursued loss mitigation with the creditor that is

25   referred to as American, open parentheses, LaSalle Bank

1    N.A., close parentheses; is that right?

2    **A.**    That's what it says here, yes.

3    **Q.**    Okay.  Because the reality is that you were in

4    default on the mortgage loan and you wanted a

5    modification, right?

6    **A.**    I was not in default of the loan.  That is an

7    incorrect statement.

8    **Q.**    Okay.

9    **A.**    We had dispute.

10    **Q.**    All right.  Well, there was a dispute over your

11    loan, but you had not made monthly loan payments and

12    you needed to modify the loan, right?

13    **A.**    Yes.

14    **Q.**    Okay.  And so you or your lawyer filed this

15    statement of intention in your bankruptcy proceedings

16    in order to initiate a loan modification negotiation,

17    right?

18    **A.**    Yes.

19    **Q.**    Do you recall the course of that loan modification

20    negotiation?

21    **A.**    Somewhat, yes.

22    **Q.**    Do you recall providing documents to your lawyer

23    so that the modification could be reviewed?

24    **A.**    Actually, my lawyer gave me documents.

25    **Q.**    Okay.  Do you recall that your lawyer was working

1    with another attorney who represented creditor number

2    one?

3    **A.**    I'm sorry?

4    **Q.**    Do you recall that your lawyer was working with a

5    lawyer who represented the creditor on this statement?

6    **A.**    My understanding was she was talking directly to

7    the mortgage company.  That's what I was told.

8    **Q.**    Mr. Shakoori, I'm going to show you what's marked

9    as Plaintiff's Exhibit V.  Now, in response to a loss

10   mitigation request, your mortgage holder provided you

11   information, right?

12         MR. ENNIS:  Objection, your Honor.  Once again,

13   use of the word "holder."

14         THE COURT:  Well, so can you just --

15         MR. BODURTHA:  I'm happy to rephrase it.

16         THE COURT:  -- somehow rephrase your question

17   and deal with that.

18   **Q.**    Mr. Shakoori, in response to your request for loss

19   mitigation, the creditor provided you with information,

20   correct?

21   **A.**    What do you mean by "information"?

22   **Q.**    Well, they entered into a negotiation with you on

23   a loan modification, correct?

24   **A.**    With my attorney, yes.

25   **Q.**    But you were involved in that loan modification

1  negotiation, right?

2  **A.**   Actually, she would just call me from time to time

3  telling me what's going on so ...

4  **Q.**   Okay.  So you gave her the authority to modify the

5  mortgage loan that you originated with Option One?

6  **A.**   I guess.

7  **Q.**   And she communicated information that she had

8  received from the creditor as part of these

9  negotiations, correct?

10 **A.**   Yes.  Her and her partner, yes.

11 **Q.**   Okay.  And did you receive any -- strike that.

12       And what can you tell me about the course of

13 those loan modification negotiations?

14 **A.**   I was contacted by the two attorneys saying that

15 they cannot find accounting, and they proposed they

16 would give me a $200,000 loan for 2 percent for 30

17 years fixed.

18 **Q.**   Okay.  And you accepted that offer?

19 **A.**   I verbally accepted that offer, and when I showed

20 up at the office, whoever made that offer rescinded,

21 took it back.

22 **Q.**   And what office did you show up at in order to

23 accept that offer?

24 **A.**   Dawn Thurston and Tom Howard attorney, Aurora Law.

25 **Q.**   To the best of your knowledge, this negotiation,

1  the $200,000 at 2 percent, was reported back to the

2  bankruptcy court, right?

3  **A.**  I have no idea.  I have no idea.  I can't answer

4  that.  I don't know.

5  **Q.**  Well, you understood that you were under a loss

6  mitigation plan with --

7  **A.**  They took the loan back, so they rescinded the

8  offer.

9  **Q.**  They rescinded the offer.

10  **A.**  After I said yes, I was supposed to sign and they

11  never send the document.

12  **Q.**  When you say "they," to whom are you referring?

13  **A.**  The mortgage company, whoever my two attorneys

14  talked to.

15  **Q.**  Do you understand that LaSalle Bank retained

16  counsel in the bankruptcy proceeding in order to

17  negotiate this loan modification?

18       MR. ENNIS:  Objection, your Honor.  My brother

19  is making a false statement that LaSalle Bank retained

20  anybody.  They did not exist in 2012.

21       THE COURT:  All right.  Well, overruled.  You

22  can clarify if you think it's necessary, but the

23  objection is overruled.

24  **Q.**  Mr. Shakoori, did a trust referred to as LaSalle

25  Bank National Association, as Trustee for Structured

1    Asset Securities Corporation, Structured Asset

2    Investment Loan Trust, Pass-Through Certificates,

3    Series 2003-BC11 retain counsel in your bankruptcy

4    proceeding in order to negotiate a loan modification?

5    **A.**   As far as I know, it was Option One and American

6    mortgage.  So all these other names I have never heard

7    of.

8    **Q.**   In the course of your bankruptcy proceeding, you

9    never saw a document or a pleading or a filing that was

10   generated by the trust that I just identified?

11         MR. ENNIS:  Once again, the same objection as I

12   raised originally, your Honor.  The current status --

13         THE COURT:  All right.  I get it.  He's

14   rephrased it, and your objection is noted.  I've

15   overruled it so proceed.

16         THE WITNESS:  I'm sorry, sir.

17   **Q.**   Mr. Shakoori, you've never received any documents

18   or information from the trust that I just identified

19   through the course of these loan modification

20   negotiations?

21   **A.**   Whatever I received I handed to my attorney.  I

22   don't know the law.  And whatever they said, I

23   followed.  It's just as plain as it gets.

24   **Q.**   So let me understand this.  You were going to sign

25   a loan modification agreement for $200,000 at 2

1    percent?

2    **A.**    That's correct.

3    **Q.**    And that required you to go to an attorney's

4    office, correct?

5    **A.**    My two attorneys were already working, yes.

6    **Q.**    Okay.  So you had to go to an office in order to

7    sign these documents?

8    **A.**    I received a phone call that this is the offer

9    they gave and I accepted.

10    **Q.**    Okay.  And before you accepted, you reviewed

11    documents at least that indicated to you what the offer

12    was, correct?

13    **A.**    No.  There was no offer.  When I went to the

14    office, like I said, they decided to take the offer

15    back.  That's the only explanation I had.

16    **Q.**    So how did you know there was an offer?  It was a

17    phone call from your attorney?

18    **A.**    Both my attorneys called, and they said they have

19    an offer; can you come to the office.  By the time I

20    went to the office, apparently someone made a decision

21    not to go through with it.

22    **Q.**    All right.  So you never reviewed or received any

23    documents in connection with this offer?

24    **A.**    Correct.

25    **Q.**    Okay.  And you never received any documents that

1    came from your mortgage lender through the course of

2    this bankruptcy proceeding?

3    **A.**    No.

4    **Q.**    And you didn't know where to send the documents

5    that you had prepared in order to negotiate the loan

6    mod?

7    **A.**    Where to send it?

8    **Q.**    Yes.

9    **A.**    Again, I received a phone call from two attorneys.

10   So when I went to the office, there was nothing for me

11   to read.  I was told they took it back.

12   **Q.**    So it's fair to say then that the $200,000

13   modification offer was never actually extended to you?

14   **A.**    Not to me, no.  My attorneys on my behalf.  To my

15   attorneys.

16   **Q.**    Okay.  Were you aware that your attorneys were

17   filing documents with the Rhode Island Bankruptcy Court

18   on the status of your loss mitigation efforts?

19   **A.**    Yes.  She said she was going to do that.

20   **Q.**    And did she discuss those filings before she filed

21   them with the court with you?

22   **A.**    Yes.

23   **Q.**    By discussing those documents, did you have an

24   understanding of with whom she was negotiating?

25   **A.**    She told me she was negotiating with Option One

1    and American Mortgage.

2    **Q.**   Would the documents that she filed with the

3    bankruptcy court, would that reflect with whom she was

4    negotiating a loan modification?

5    **A.**   I can't answer who she's -- I wasn't in her

6    office.

7    **Q.**   Mr. Shakoori, showing you what's marked as Exhibit

8    W.  This is a bankruptcy loss mitigation status report

9    that was filed by Dawn M. Vigue and Peter M. Lawton.

10        Ms. Vigue was your attorney, right?

11   **A.**   Dawn, yes.  I don't know who Peter is, yes.

12   **Q.**   But Ms. Vigue was your lawyer?

13   **A.**   Correct.  And Tom Howard.

14   **Q.**   Okay.  And in the course of these negotiations for

15   loss mitigation, those were occurring in 2012, right?

16   **A.**   I guess.

17   **Q.**   Okay.  And we had just talked about how you would

18   consult with your lawyer about the status of loss

19   mitigation negotiations, right?

20   **A.**   Yes.

21   **Q.**   And I believe you testified that you understood

22   she was filing status reports with the Court, right?

23   **A.**   Yes.

24   **Q.**   Okay.  And did she show you this particular status

25   report?

1    **A.**    I do not recall.

2    **Q.**    Okay.  So she never told you that she was

3    negotiating with this trust on a loan modification?

4    **A.**    She always referred to it as American Mortgage or

5    Option One.

6    **Q.**    So she never referred to your creditor as LaSalle

7    Bank?

8    **A.**    I don't recall.

9    **Q.**    Despite the fact that you listed --

10   **A.**    In one of the paperworks when I reviewed, I have

11   mentioned to her why isn't it saying Option One?  And

12   she says the legal name what I found in documents are

13   this.

14   **Q.**    Okay.

15   **A.**    I didn't question her.

16   **Q.**    So your attorney confirmed for you the legal name

17   in the documents that were being used to negotiate the

18   loan modification?

19   **A.**    That's what she said.

20   **Q.**    Okay.  And the loan modification negotiations

21   never resulted in a modification of your loan, right?

22   **A.**    That's correct, they didn't.

23   **Q.**    And let me ask you this, Mr. Shakoori.  You never

24   filed an objection to the mortgage or the amount you

25   owed or the validity of the mortgage holder in

1     connection with this 2012 bankruptcy petition, did you?

2     **A.**   Can you explain that.

3     **Q.**   I'm sorry if that was confusing.

4          You never filed an objection to the holder of

5     your mortgage in connection with your 2012 bankruptcy

6     petition?

7     **A.**   I was under the impression my attorney did on the

8     amount.

9     **Q.**   On the amount.

10    **A.**   All of these arguments is about the amount, yes.

11    **Q.**   So the argument isn't about who actually holds the

12    mortgage; it's about the amount?

13         MR. ENNIS:  Objection to the form of the

14    question.  Doesn't specify a particular time.  Is he

15    referring to this bankruptcy?

16         THE COURT:  I'll sustain the objection.

17    Rephrase it in terms of the time.

18         MR. BODURTHA:  Yes, your Honor.

19    **Q.**   In the 2012 bankruptcy, your objection was not to

20    the holder of the mortgage; it was to the amount owed

21    on the mortgage.

22         MR. ENNIS:  Your Honor, he's already established

23    there was no objection.  There's no adversary

24    proceeding filed in this case which is the only manner

25    in which a matter can be objected to in the bankruptcy

1    court.  He clearly did not file an adversary
2    proceeding.
3        THE COURT:  All right.  That may be true, but I
4    think this is a more general question that he's asking
5    so I'm going to overrule the objection.
6        Why don't you rephrase your question and ask it
7    again, please.
8        MR. BODURTHA:  Yes, sir.
9  **Q.**  Mr. Shakoori, to the best of your knowledge, you
10   never filed an objection in the 2012 bankruptcy
11   proceeding to the holder of your mortgage?
12  **A.**  I was under the impression my lawyer was handling
13   this, sir.
14  **Q.**  Okay, sir.  But you've never seen, and to the best
15   of your knowledge, no objection to the holder of the
16   mortgage was filed in connection with your 2012
17   bankruptcy proceeding?
18  **A.**  I have never seen paperwork, if that's what you're
19   asking me.
20  **Q.**  Okay.  How did the 2012 bankruptcy petition work
21   out?  Did you receive a discharge or dismissal?  What
22   happened to it?
23  **A.**  I don't think it was discharged.
24  **Q.**  Okay.  To the best of your knowledge, the
25   bankruptcy case was dismissed?

1    **A.**    Yes.  The other attorney couldn't come up with

2    documents from my understanding.

3    **Q.**    Can you clarify that for me.  What other attorney

4    couldn't come up with documents?

5    **A.**    When I got served with the bankruptcy, when I

6    hired these two attorneys, I explained the situation

7    and they asked for documents.

8    **Q.**    Okay.  And that was why your case was dismissed?

9    **A.**    No.  I don't know why it was dismissed.

10   **Q.**    Okay.  But you would agree with me that the 2012

11   bankruptcy petition was dismissed without a discharge?

12   **A.**    Yes.

13   **Q.**    All right.  Now, during that time, you still were

14   not making monthly mortgage loan payments, right?

15   **A.**    Correct.  We were in dispute, yes.

16   **Q.**    Okay.  And you continued to, I'll say, withhold

17   monthly mortgage loan payments until you filed another

18   bankruptcy petition, right?

19   **A.**    Yes.

20   **Q.**    All right.  Now, that bankruptcy petition, it was

21   filed in 2015; is that true?

22   **A.**    Yes.

23   **Q.**    And once again, all of the information that you

24   provided to your bankruptcy counsel was true and

25   accurate, right?

1    **A.**    Yes.

2    **Q.**    Okay.

3    **A.**    Actually, the two attorneys gave it to the third

4    attorney.

5    **Q.**    Okay.

6    **A.**    All the documents.

7    **Q.**    So your third attorney relied upon the same

8    documents and information that you gave to the two

9    attorneys before in order to file your 2015 bankruptcy?

10    **A.**    Yes.  Plus a new foreclosure notice by another

11    attorney.

12    **Q.**    Okay.  So you were filing bankruptcies every time

13    you received a foreclosure notice?

14    **A.**    I was not.  I was hiring an attorney, and I would

15    listen to their legal advice.

16    **Q.**    Okay.  I'll rephrase.

17        So whenever you were about to be foreclosed on,

18    you would hire an attorney and they would pursue relief

19    in the bankruptcy court for you?

20    **A.**    No.  I always had the attorneys.

21    **Q.**    Okay.

22    **A.**    The company were constantly changing attorneys,

23    coming after me, because the previous attorneys Option

24    One hired could not come up with all the documents I

25    asked for.

1    **Q.**    Okay.  So let me show you Exhibit AA.  Mr.

2    Shakoori, what I've marked as Exhibit AA, I'm going to

3    have you take a quick look at the second page.

4         Do you see under Exhibit B it lists the attorney

5    for the petitioner?

6    **A.**    Christopher, yes.

7    **Q.**    And that was the attorney you retained for the

8    2015 bankruptcy?

9    **A.**    Yes.

10   **Q.**    And the attorneys we referred to before had given

11   your documents and information to Christopher, right?

12   **A.**    That's correct.  That's how I actually met

13   Christopher.  They brought me to his office.

14   **Q.**    Okay.  And if I turn your attention to the

15   following page, page 4, once again, under the voluntary

16   petition, there's your name, your signature, right?

17   **A.**    Yes.

18   **Q.**    Masoud Shakoori-Naminy, signed on April 30, 2015,

19   right?

20   **A.**    That's correct, yes.

21   **Q.**    You declared under the penalty of perjury that the

22   information provided in this petition is true and

23   correct, right?

24   **A.**    Yes.

25   **Q.**    Okay.  Now, let me show you Exhibit BB.  This is

1    going to look familiar.

2        All right.  This is the Schedule D, Creditors

3    Holding Secured Claims, from your 2015 bankruptcy

4    proceeding.  Do you see that?

5    **A.**   Yes.

6    **Q.**   All right.  I'm going to turn your attention to

7    this page, page 52 of 74 in the filing, and that's your

8    declaration concerning debtor schedules.

9        Do you see that?

10    **A.**   Yes.

11    **Q.**   Once again, you provided this information under

12    penalty of perjury that all of the summary and

13    schedules were true and correct to the best of your

14    knowledge, information and belief, correct?

15    **A.**   Yes.

16    **Q.**   And you knew that by signing that, the penalty for

17    making a false statement or concealing property was a

18    fine or imprisonment or both, right?

19    **A.**   Yes.

20    **Q.**   Now, turning your attention back to the first

21    page.  Now, you see these similar columns to what we

22    looked at in your 2012 bankruptcy.

23        So let's run through them, okay?

24    **A.**   Okay.

25    **Q.**   All right.  Under creditor's name, you listed

1  Ocwen Mortgage Company, right?

2  **A.**   Yes.

3  **Q.**   Now, you listed Ocwen because Ocwen was your

4  mortgage loan servicer, right?

5  **A.**   Yes.  The attorney listed, not I.

6  **Q.**   But the attorney listed it based upon the

7  information that you provided him, right?

8  **A.**   That's correct.

9  **Q.**   And you signed this Schedule D under the penalties

10 of perjury, right?

11 **A.**   That's correct.

12 **Q.**   So you knew at the time that you signed this

13 document that Ocwen Mortgage Servicing was your

14 mortgage loan servicer, right?

15 **A.**   That's correct.

16 **Q.**   Okay.  Now, in the second column, again, you have

17 the date claim was incurred, nature of lien and

18 description of valued property.

19       Do you see that?

20 **A.**   Yes.

21 **Q.**   And you list 7-1-2003, right?

22 **A.**   Yes.

23 **Q.**   You also list first mortgage and you list the

24 property located at 1541 Ten Rod Road, right?

25 **A.**   Yes.

1    **Q.**    Okay.  Is it fair to say that the information you

2    provided to your counsel identifies this claim as the

3    Option One mortgage loan?

4    **A.**    Yes.

5    **Q.**    Okay.  Now, if I turn your attention to the amount

6    of claim, a few columns over, it reads $320,760.

7         Do you see that, sir?

8    **A.**    I see that.

9    **Q.**    And that is the same amount that you listed in

10   your 2012 petition, correct?

11   **A.**    Yes.

12   **Q.**    And it's also the same amount that you had in your

13   2008 loan modification agreement with American Home,

14   correct?

15   **A.**    Yes.

16   **Q.**    All right.  So it's fair to say that through this

17   section in your Schedule D, you have identified the

18   Option One mortgage loan, right?

19   **A.**    Yes.

20   **Q.**    And you've identified the servicer because you

21   knew the servicer was Ocwen Mortgage, right?

22   **A.**    Yes.

23   **Q.**    Now, unlike the 2012 bankruptcy, in this one, your

24   lawyer checked the box "Disputed."

25        Do you see that?

1    **A.**    Yes.

2    **Q.**    Okay.  Do you have an understanding of why that

3    "Disputed" box was checked?

4            MR. ENNIS:  Objection, your Honor.

5            THE COURT:  Overruled.  He can answer.

6            THE WITNESS:  Can you clarify your question,

7    please.

8    **Q.**    Sure.  Do you have an understanding, as you sit

9    here today, as to why your lawyer checked the box

10   "Disputed"?

11           MR. ENNIS:  Your Honor, to the extent --

12           THE COURT:  Overruled.  No more speaking.  I

13   want him to answer that question.

14           THE WITNESS:  I explained all my problems to him

15   so he put it disputed.  I'm disputing with that figure.

16   **Q.**    You're disputing the amount?

17   **A.**    All this argument is dispute -- about how much I

18   owe the mortgage company.

19   **Q.**    Okay.  So you weren't disputing who was holding

20   your mortgage loan?

21   **A.**    All my fight, as far as I know, has been Option

22   One and whoever else was handling their servicing after

23   they filed bankruptcy.

24   **Q.**    Okay.  But the question I'm asking you, I'm trying

25   to isolate what the dispute was over, you're testifying

1    that your dispute was to the amount you owed?

2    **A.**    Correct.

3    **Q.**    Okay.  Mr. Shakoori, showing you what's been

4    marked as Plaintiff's Exhibit CC.  Now, again, this is

5    similar to the 2012 bankruptcy, but we're in the 2015.

6    And I'm showing you the Individual Debtor's Statement

7    of Intention.

8         Do you see that on the screen?

9    **A.**    Yes.

10   **Q.**    All right.  On page 2, you see once again your

11   signature, right?

12   **A.**    Yes.

13   **Q.**    Your declaration under penalty of perjury; that

14   the above indicates your intention as to property?

15   **A.**    Yes, yes.

16   **Q.**    Sorry if I'm belaboring the point.

17   **A.**    No, no.

18   **Q.**    So on the first page, you identified property

19   number one.  Do you see that?

20   **A.**    Yes.

21   **Q.**    And you list the real estate located at 1541 Ten

22   Rod Road?

23   **A.**    Can you enlarge it, please.

24   **Q.**    Yes.

25   **A.**    Thank you.

1    **Q.**    Sorry.

2    **A.**    No problem.

3    **Q.**    Is that good?

4    **A.**    Sure.

5    **Q.**    That's big.  Okay.  You list the real estate

6    located at 1541 Ten Rod Road, Exeter, Rhode Island,

7    right?

8    **A.**    Correct.

9    **Q.**    And you list under creditor's name, Ocwen Mortgage

10   Company, correct?

11   **A.**    I don't see.

12   **Q.**    If you go on the left side under property number

13   one, it says creditor's name.

14   **A.**    Yes.

15   **Q.**    And the reason you listed Ocwen Mortgage Company

16   is that that was your mortgage loan servicer, right?

17   **A.**    Correct.

18   **Q.**    And you identified your interest in retaining the

19   property, correct?

20   **A.**    Correct.

21   **Q.**    And you state under "Other" that debtor will

22   retain collateral and continue to make regular

23   payments, correct?

24   **A.**    Correct.

25   **Q.**    But isn't it the case that you weren't making

1    regular payments at this time?

2    **A.**    To whom was I going to make regular payment when

3    there is a major accounting issue?

4    **Q.**    Okay.

5    **A.**    I kept sending money and my balance remained the

6    same.

7    **Q.**    Okay.

8    **A.**    So at one point my attorney says we're not going

9    to send money until they send document and we go in

10    front of a judge.

11    **Q.**    Okay.  So you wanted to make regular payments.

12    **A.**    Absolutely.

13    **Q.**    But you didn't have, according to your testimony,

14    an accounting?

15    **A.**    Correct.

16    **Q.**    So there was a dispute over the amount that you

17    had to pay?

18    **A.**    Absolutely.

19    **Q.**    All right.  Thank you.  Now, turning your

20    attention to Plaintiff's Exhibit DD.

21        Have you ever seen this document, Mr. Shakoori?

22    **A.**    I'm sure.

23    **Q.**    Okay.  You recall that in this 2015 bankruptcy you

24    ultimately received a discharge of debts.

25        Do you recall that?

1    **A.**    Correct, yes.

2    **Q.**    Did your attorneys explain to you the significance

3    of that discharge?

4    **A.**    Yes.

5    **Q.**    And what is your understanding of that discharge?

6    **A.**    That I'm not responsible for that debt.

7    **Q.**    Okay.  And did your attorneys explain to you that

8    although you're not responsible for the debts, that to

9    the extent that there are debts on property, those

10   still may be owed, right?

11   **A.**    Yes.

12   **Q.**    Okay.  So is it fair to say that you understood

13   that the mortgage remained on the Ten Rod Road

14   property, right?

15   **A.**    Yes.  But did not know how much, what the correct

16   amount is.

17   **Q.**    We have been through that, I understand.  You

18   didn't know the amount, but you understood that the

19   mortgage was going to survive the bankruptcy and remain

20   on the property, right?

21   **A.**    Yes.

22   **Q.**    And that your creditor, the mortgage holder, would

23   have the opportunity to foreclose on that property in

24   order to collect on the debt?

25   **A.**    That was never explained to me.

**Q.**    Okay.

**A.**    My understanding was it was discharged, that they could not come foreclose; however, our intention with my attorney to come to the table and establish the correct amount.

**Q.**    Okay.

**A.**    Which your client up to this day has refused to give the correct amount.

**Q.**    Okay.

**A.**    Or a correct accounting.

**Q.**    So let me ask you this, Mr. Shakoori.  Providing you with the correct accounting in your mind would resolve the entirety of this dispute?

        MR. ENNIS:  Objection.  That's a legal question, your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  Wasn't that the purpose of before we came to the Court so we could resolve?

**Q.**    I'm not answering questions.  I'm asking you the questions.

**A.**    I know that.  I clearly understand that.

        THE COURT:  Hang on a second.  Don't talk over each other, all right.  For the court reporter's sake, let him finish his question, then you answer his finish.

1          Now the last question asked, do you want to

2     restate it?

3          MR. BODURTHA:  I'll restate.  Thank you, your

4     Honor.  Apologies for that.

5     **Q.**   So as you sit here today, the source of your

6     dispute is the amount of money that you owe on the

7     mortgage?

8     **A.**   Yes.

9     **Q.**   And the dispute can be resolved by providing you

10    with an accounting of the loan, right?

11    **A.**   With a proper accounting of the note, yes.

12    **Q.**   A proper accounting of the loan?

13    **A.**   Correct.

14    **Q.**   Okay.  And there's no doubt in your mind as you

15    sit here today that you've discharged your personal

16    liability for the mortgage loan, right?

17    **A.**   That's correct.

18    **Q.**   That happened as a result of the 2015 bankruptcy?

19    **A.**   Correct.

20    **Q.**   And there's no doubt in your mind that when you

21    got that discharge order, that Ocwen Loan Servicing,

22    Ocwen Mortgage Company, was your mortgage loan

23    servicer?

24    **A.**   Yes.

25    **Q.**   Is it reasonable to assume that in the ten years

1  that you haven't made monthly mortgage loan payments

2  that the holder of your mortgage is going to try to

3  foreclose on the property?  Is that reasonable?

4  A.   No.

5  Q.   It's not?

6  A.   No.

7  Q.   So you would expect that you can continue to avoid

8  mortgage payments and not be the subject of

9  foreclosure?

10  A.   That's not what I said, no.

11  Q.   Okay.  Can you explain to me your reasoning here.

12  A.   Sure.  As a cooperation, when they give loans to

13  other people to purchase home or refinance, they're

14  obligated to show me my monthly payment; how much goes

15  for interest, how much goes towards principal and what

16  I owe.

17  Q.   Okay.

18  A.   Your client has failed since 2008, okay.  Six

19  attorneys have asked for all of this, and they have

20  failed over and over and over again.

21  Q.   Okay.  Let me ask you this, Mr. Shakoori.  Other

22  than the entities that we've discussed today -- we've

23  talked about American Home, Option One, we talked about

24  this trust, we talked about Ocwen, all right -- other

25  than those entities, has there been any other entity

1    that has written you a letter demanding collection of

2    this mortgage debt?

3    **A.**   Besides the other people?

4    **Q.**   Besides the entities we've talked about, has there

5    been any other entity that's tried to collect on this

6    debt?

7    **A.**   I receive letters, used to receive letters all the

8    time, from at least 20 attorneys.  You ask a question,

9    I'm answering you, okay.

10   **Q.**   I'm not asking you about attorneys; I'm asking you

11   about companies, entities.

12        Have there been any other entities beyond the

13   ones that we have discussed today that have attempted

14   to collect this debt, this Option One mortgage loan

15   against you?

16   **A.**   Whatever letters I received, I brought it to my

17   attorneys.

18   **Q.**   Okay.  Let me ask it to you in a different way.

19   You haven't received a collection letter or a demand

20   letter from any entity, not lawyers, any entity other

21   than the ones we've discussed today?

22   **A.**   No.

23   **Q.**   And you haven't received any foreclosure notices

24   from any entity other than the ones we've discussed

25   today?

1    **A.**    Haven't received it since you filed the last one.

2    **Q.**    Okay.  And you don't have any other facts or

3    information to show that there is an entity other than

4    the ones that we discussed today that actually owns

5    your mortgage loan, right?

6    **A.**    Explain that one more time, please.

7    **Q.**    Sure.  We've discussed several entities today.

8    We've discussed servicers, we've discussed this trust.

9        You don't know of any other entities that would

10    have the right or that have contacted you on the

11    foreclosure of this mortgage loan, right?

12    **A.**    American mortgage.

13    **Q.**    Okay.

14    **A.**    Ocwen.

15    **Q.**    Okay.

16    **A.**    And all the other attorneys, okay.

17    **Q.**    Yes.

18    **A.**    Claim.

19    **Q.**    Those are the ones you know of, to the best of

20    your knowledge?

21    **A.**    From -- yes.

22    **Q.**    And you've received nothing else from any other

23    entity concerning foreclosure of that mortgage?

24    **A.**    The only thing I received was from you with

25    different names.  I don't know if I'm making that clear

1    or not.

2    **Q.**   When you say "different names," to what are you

3    referring?

4    **A.**   Every time someone send us a letter, okay, it

5    would have an attorney's name on behalf of this person

6    claiming you owe us money, and I would bring it to my

7    attorneys.

8    **Q.**   When you're saying "different names," you're

9    talking about different attorneys that these different

10   entities had hired, right?

11   **A.**   Different attorneys and sometimes different names.

12   Like I can't remember.  There was one bank claimed I

13   owed them money.  When I called and I said show me

14   documents, I never heard back from them again.  And I

15   brought that letter to my attorney, Dawn and Howard.

16   **Q.**   But as you sit here today, you can't recall any

17   other entity other than the ones we've discussed?

18   **A.**   Correct.  That's a long time ago.

19        MR. BODURTHA:  I have no other questions subject

20   to redirect.

21        THE COURT:  Okay.  Thank you.

22        Mr. Ennis.

23                    CROSS-EXAMINATION

24   BY MR. ENNIS:

25   **Q.**   Mr. Shakoori, do you recall when the last -- what

1    was the last time you received a mortgage statement

2    from any loan servicer?

3    **A.**    I think after the first bankruptcy no one has sent

4    me anything.

5    **Q.**    So is it fair to say for the past almost ten years

6    you have not received a monthly periodic statement from

7    any loan servicer in regard to this loan?

8    **A.**    100 percent truth, yes.

9    **Q.**    Now, I understand the current servicer is PHH

10   Mortgage.

11   **A.**    I have no idea.

12   **Q.**    Have you ever received any type of statement or

13   documentation from PHH Mortgage?

14   **A.**    No.  If I have, you would have had it already.

15   **Q.**    Okay.  Have you ever received any periodic

16   statement from Ocwen Loan Servicing?

17   **A.**    No.

18         MR. ENNIS:  Okay.  Just a moment, your Honor.

19         (Brief pause)

20         MR. ENNIS:  No further questions.

21         THE COURT:  Okay.  Thank you.

22         Do you have any redirect on that?

23         MR. BODURTHA:  Just one question.

24         THE COURT:  Okay.  Go ahead.

25                   REDIRECT EXAMINATION

1    BY MR. BODURTHA:

2    **Q.**    Mr. Shakoori, despite your claim that you haven't

3    received monthly loan statements from PHH or Ocwen,

4    certainly you received information from Ocwen which you

5    used in order to file the 2015 bankruptcy, right?

6    **A.**    Whatever I received, I gave my attorney.

7    **Q.**    Okay.

8    **A.**    I can't remember the exact date.

9    **Q.**    All right.  But fair to say -- permitting one more

10    question -- fair to say that you had received

11    information from Ocwen which you provided to your

12    attorney which ended up in the bankruptcy filing,

13    right?

14    **A.**    On 2015?

15    **Q.**    Yes.

16    **A.**    That one actually I clearly remember when my

17    attorney Christopher Lefebvre, he asked me have I

18    received any documents and I said no.  He contacted and

19    they sent paperwork to him.

20            MR. BODURTHA:  Okay.  Thank you.

21            No further questions, your Honor.

22            THE COURT:  All right.  Thank you.  I have a

23    couple of questions.

24            You said in response to one of Mr. Bodurtha's

25    questions, he was showing you Exhibit CC.  That's the

1      2015 bankruptcy petition or Chapter 7, Individual

2      Debtor's Statement of Intention.  That's the one that

3      says debtor will retain collateral and continue to make

4      regular payments.  Do you remember that?

5           THE WITNESS:  Yes.

6           THE COURT:  All right.  So he asked you a

7      question about that statement.  And you said that you

8      continued to make payments and you never got credited

9      for them.  And that's when he asked you about the

10     source of the dispute is the amount.  And you agreed it

11     could be resolved by a proper accounting of the loan.

12          So I'm wondering, how many payments did you make

13     that did not -- that you did not get credit for after

14     that 2015?

15          THE WITNESS:  Your Honor, that's before 2015.

16          THE COURT:  So you were --

17          THE WITNESS:  I was making payments from 2003

18     through 2008.  They don't have any documents.  They can

19     not show all the money that I sent to them.

20          THE COURT:  Okay.  So you're saying you made

21     payments between 2003 and 2008?

22          THE WITNESS:  Yes.  I was making money and

23     sending money.

24          THE COURT:  All right.  How many payments did

25     you make?

1          THE WITNESS:  Every month I was making payment,

2     and I was sending extra, your Honor.

3          THE COURT:  You're saying you made a payment

4     every month and sent extra between 2003 and 2008?

5          THE WITNESS:  Yes.  And then after the

6     modification, which I strongly object signing it, but

7     as a good faith I listened to my attorney, I signed and

8     I sent the money.  And then at some point they send the

9     checks back to my attorney.  They never cashed it.

10    Although they made the agreement and I made the $1300

11    interest only, they sent the checks back.

12         THE COURT:  Okay.  When was that?

13         THE WITNESS:  I don't know the date, but there

14    is copy of it.  My attorney Charlie Wick has it.

15         THE COURT:  Well, just in terms of the year,

16    when was that?  I'm just trying to get straight what

17    you're saying.

18         So you're saying after the first bankruptcy

19    discharge, you said you would continue to make payments

20    in good faith and you did that?

21         THE WITNESS:  The modification which was 2011, I

22    believe.

23         THE COURT:  Okay.  So that's 2011.  So what I'm

24    asking you -- I'm just trying to get a general idea.

25    You're saying that you made payments from 2003 to 2008.

1        That's five years of payments so that's 60 payments.

2        And you say that you paid the mortgage amount plus

3        extra.  You made 60 payments of that type; is that what

4        you're saying?

5               THE WITNESS:  Correct.  Also I made payment on

6        the loan modification.

7               THE COURT:  So then you're saying -- so what

8        happened between 2008 and 2011?  Did you make any

9        payments between then?

10              THE WITNESS:  There was dispute going on and,

11       yes, I did make some payments, yes.

12              THE COURT:  So you're saying you made some

13       payments between 2008 and 2011?

14              THE WITNESS:  Yes.

15              THE COURT:  And then after 2011 you made more

16       payments?

17              THE WITNESS:  Until they re-send my checks back

18       to attorney Charlie Wick.  And then he told me do not

19       send any more payments until we go to court.

20              THE COURT:  Okay.  Now, which checks did they

21       send back?  All of them from 2003 or just the ones

22       after 2011?

23              THE WITNESS:  After the new modification as they

24       called it.

25              THE COURT:  So what happened to the -- let's

1    start with 2003.  What happened to the 60 checks that

2    you sent them between 2003 and 2008?

3              THE WITNESS:  They cashed it.

4              THE COURT:  Okay.  Those were cashed?

5              THE WITNESS:  Right.

6              THE COURT:  So you should have records of that,

7    right?

8              THE WITNESS:  I have asked them for the records.

9    I send the check.

10             THE COURT:  No, I'm asking you about your

11   records.  When you have a checking account, you write

12   the checks and then you get the checks back from the

13   bank.  There's electronic copies of them.

14             Have you provided copies of all of those checks

15   in the course of this litigation?

16             THE WITNESS:  During this, no, not this

17   litigation.  Some of them have been destroyed in the

18   flood.

19             THE COURT:  They were destroyed in a flood?

20   What flood?

21             THE WITNESS:  Yes.  We had a flood a few years

22   back.  Our basement was underwater.

23             THE COURT:  Okay.

24             THE WITNESS:  I live in high water table area.

25             THE COURT:  So you're saying the

1    copies -- usually banks keep electronic copies of

2    checks.

3              THE WITNESS:  Correct.

4              THE COURT:  Have those been produced during the

5    course of this litigation?

6              THE WITNESS:  No.

7              THE COURT:  Okay.  What about the payments from

8    2008 to 2011?  You should have checks -- first of all,

9    how many such payments did you make?

10             THE WITNESS:  Whatever my attorney said, your

11   Honor.  I don't know the numbers.

12             THE COURT:  I'm just asking you.

13             THE WITNESS:  I don't know the numbers.  I did

14   make the payments.

15             THE COURT:  Did you make one or ten?

16             THE WITNESS:  More than that.  More than that.

17   I don't know the exact number.

18             THE COURT:  Where are the checks, the canceled

19   checks, for those?

20             THE WITNESS:  I can probably get them from the

21   bank if they haven't destroyed it.

22             THE COURT:  Those haven't been produced in this

23   litigation?

24             THE WITNESS:  No, no, sir.

25             THE COURT:  All right.  Then you said you made

1    more after 2011 until they sent them back to you.  So

2    you would have copies of the checks that were sent

3    back, right?

4              THE WITNESS:  That's correct.

5              THE COURT:  Where are those checks?

6              THE WITNESS:  I can try to get them for you.

7              THE COURT:  Have you given them to your

8    attorney?

9              THE WITNESS:  My attorney has a copy of the

10   check.  Shows it was returned to attorney Charlie Wick.

11   Mr. Ennis has that copy.

12             THE COURT:  How many checks were returned?

13             THE WITNESS:  I believe three.

14             THE COURT:  And during what year were those

15   returned?

16             THE WITNESS:  Between 2011 or to '12.  I don't

17   know the exact date.  The letter -- there is a letter

18   to attorney saying the check has been returned.  There

19   is a date on that letter.

20             THE COURT:  All right.  So those are the only

21   ones that have been returned.  Apparently, you're

22   saying 60 checks were cashed between 2003 and 2008 and

23   then many checks, you don't know the exact number, were

24   sent and cashed between 2008 and 2011.

25             THE WITNESS:  Yes.

1          THE COURT:  So this mortgage would not be

2     320,000 unless all those checks were for interest only,

3     which I don't think was the agreement you had with the

4     bank.  You're saying you never got credit for these

5     checks?

6          THE WITNESS:  That's correct.  Western Union,

7     your Honor, I sent cash from --

8          THE COURT:  Say that again.

9          THE WITNESS:  I sent cash, hundred-dollar bills

10     went to Western Union at Stop & Shop in Richmond, Rhode

11     Island.  And I send it to Option One, okay.  They don't

12     have a record of it.

13          THE COURT:  When did you do that?

14          THE WITNESS:  Period of 2003 all the way to

15     2011.

16          THE COURT:  How many times did you do that?

17          THE WITNESS:  Probably eight to ten times I send

18     extra cash.

19          THE COURT:  What do you mean "extra cash"?

20          THE WITNESS:  I was sending extra money toward

21     the principal.

22          THE COURT:  You sent that to Option One?

23          THE WITNESS:  Correct.

24          THE COURT:  All right.  So you should have a

25     record of that, right?

1        THE WITNESS:  There's some kind of an account I

2    have with Western Union.

3        THE COURT:  Okay.

4        THE WITNESS:  I have a card with an account

5    number.  Every time I went there, I presented the card

6    and there's a computer record in their system.

7        THE COURT:  All right.  And has all that been

8    given to your attorney and produced in this litigation?

9        THE WITNESS:  Negative.

10       THE COURT:  And why not?

11       THE WITNESS:  Sam never asked for it.

12       THE COURT:  Well, I'm asking you if you provided

13   it to your attorney?

14       THE WITNESS:  No.

15       THE COURT:  Did you provide all this to Mr.

16   Ennis?

17       THE WITNESS:  No, no.

18       THE COURT:  Do either of you want to follow up

19   with this?

20       MR. BODURTHA:  I just have a point of

21   clarification, your Honor, because you were discussing

22   the payments that Mr. Shakoori made between 2008 and

23   2011 and how there should be a credit.  If you look at

24   Exhibit Q, which was admitted in full.

25       THE COURT:  I know.  It says interest only.

1          MR. BODURTHA:  It was interest-only payments.

2          THE COURT:  I understand.  I'm just trying to

3     understand the big picture here.

4          MR. BODURTHA:  I get it.  I was just clarifying

5     it.  I don't have any other questions.

6          MR. ENNIS:  No questions, your Honor.

7          THE COURT:  All right.  You can step down.

8          THE WITNESS:  Thank you.

9          THE COURT:  Is there any further testimony?

10         MR. BODURTHA:  Not today, your Honor.

11         THE COURT:  Okay.  Let's go off the record.

12         (Off-the-record discussion)

13         THE COURT:  Back on the record.  Mr. Bodurtha,

14    go ahead and go through the documents that you seek to

15    admit at this point without objection.

16         MR. BODURTHA:  Okay.  For those documents we

17    seek to admit as self-authenticating:  Exhibit A, the

18    December 26th, 2000, deed to Mr. Shakoori; Exhibit B,

19    the Finance America Mortgage; Exhibit D, the Option One

20    mortgage; Exhibit F, the Finance America mortgage

21    discharge.

22         Now turning to bankruptcy documents.  That's

23    Exhibit N, Exhibit O, P, Exhibit S, Exhibit T, Exhibit

24    U, Exhibit V, Exhibit W, Exhibit X, Exhibit Y, Exhibit

25    AA, Exhibit BB, Exhibit CC, and Exhibit DD.

1          THE COURT:  All right.  So those are moved as

2     self-authenticating documents.

3          Mr. Ennis, do you have any objection?

4          MR. ENNIS:  The only objection I note is my

5     initial objection about the deemed admissions which we

6     still don't have a motion to remove those admissions.

7          THE COURT:  I think those are unrelated to these

8     documents.  I'm just asking about these documents.

9          MR. ENNIS:  No.  In terms of the documents,

10    self-authentication, no problem, your Honor.

11         THE COURT:  All right.  So all of those

12    documents just listed by Mr. Bodurtha will be admitted

13    in full without objection.

14         (Plaintiffs' Exhibits A, B, D, F, N, O, P, S, T,

15         U, V, W, X, Y, AA, BB, CC, and DD were admitted

16         in full)

17         THE COURT:  All right.  Now you did refer to

18    some others, but you're saying to me that you do not

19    intend to move those documents at this time because you

20    are going to lay an additional foundation through the

21    company witness; is that correct?

22         MR. BODURTHA:  Actually, your Honor, I'd like to

23    admit -- I'm sorry, I'm reviewing this.  There are a

24    lot of documents here.

25         I'd like to admit the July 16, 2003, Option One

1    closing statement as Exhibit E.

2              MR. ENNIS:  No objection, your Honor.

3              THE COURT:  All right.  That will be full.

4              (Plaintiff's Exhibit E was admitted in full)

5              MR. BODURTHA:  That's it, your Honor.

6              THE COURT:  All right.  Let me just ask you,

7    since I asked Mr. Shakoori a number of questions about

8    payments made, is that an issue that is agreed to or is

9    that in dispute or is it just not relevant the fact

10   that he says he made, just as an example, that he made

11   every payment between 2003 and 2008 and that those

12   checks were all cashed?  Wouldn't that have reduced the

13   debt amount?  I realize that may all be water under the

14   bridge and the mortgages were refinanced and so forth,

15   but --

16             MR. BODURTHA:  So is it relevant to the claim

17   that we're pursuing?  Not necessarily.  Because what

18   we're asking for is an equitable assignment of the

19   mortgage.

20             Does it impact the extent to which there is a

21   significant outstanding debt?  Yes, it does.  And I do

22   believe, though, that the loan modification agreement

23   speaks -- is now admitted into evidence -- it speaks

24   for itself.  And it includes a breakdown of what Mr.

25   Shakoori owed.  It resolved what he owed into a new

1    loan at 320-odd-thousand dollars.  All the payments

2    that followed that were for interest only.

3         So realistically, your Honor, the unpaid

4    principal balance has remained $320,000 since the 2008

5    loan mod.

6         MR. ENNIS:  Your Honor, other than equitable

7    issues relating to availability of documents and

8    accuracy of documents, which is another issue because

9    they had several other documents they wanted to

10   introduce later because it doesn't appear there's any

11   documents in their possession from before 2000 late '7

12   or early '8.

13        THE COURT:  I don't think I understand what

14   you're saying.

15        MR. ENNIS:  I don't think it has any relevance

16   towards their litigation in this case, the amounts or

17   the payments.

18        THE COURT:  All right.  That sounds like that's

19   correct.

20        Okay.  If there's nothing further, then we'll be

21   in recess for today.  And I'll let you know what day we

22   can recommence the trial in the week of the 18th.  I

23   just have to work out a couple of other scheduling

24   things.

25        MR. ENNIS:  Thank you, your Honor.

1          MR. BODURTHA:  Thank you, your Honor.

2          THE CLERK:  All rise.

3          (Time noted; 12:50 p.m.)

1          I, Lisa Schwam, CRR-RPR-RMR, do hereby

2     certify that the foregoing transcript is a correct

3     transcript prepared to the best of my skill, knowledge

4     and ability of the proceedings in the above-entitled

5     matter.

6

7     /S/ Lisa Schwam

8     Lisa Schwam, CRR-RPR-RMR              Date:
      Federal Official Reporter            April 21, 2022
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25