UNITED STATES DISTRICT COURTH

FOR THE DISTRICT OF RHODE ISLAND


U.S. BANK N.A AS TRUSTEE

FOR THE REGISTERED HOLDERS

OF THE STRUCTURED ASSET

SECURITIES CORPORATION, STRUCTURED

ASSET INVESTMENT LOAN TRUST

MORTGAGE PASS-THROUGH

CERTIFICATES, SERIES 2003-BC11



              VS                      CA: 17-CV-394 WES


MASOUD SHAKOORI ET AL


              POST TRIAL MEMORANDUM OF DEFENDANT


     This Matter was heard by the Court on the Plaintiff's Complaint for a

Declaratory Judgment that it was the holder of the note by way of an endorsement

and for a Declaration that it be equitably assigned to the Plaintiff by an Order of

this Court.   The only witnesses who testified were Defendant and an employee of

Ocwen Financial Corporation, Howard Handville.  A review of the testimony and

the Requests for Admission, which were not responded to by the Plaintiff in a

timely manner indicates that the Plaintiff has not met its burden of proof and as a result Judgment should enter for the Defendant.

FRCP 36 sets forth the standard for Requests for Admissions:

b) EFFECT OF AN ADMISSION; WITHDRAWING OR AMENDING IT. A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding.

The following are admissions which Plaintiff did not timely respond to and to which it did not move to be allowed to withdraw before Trial or at any time.

1. On December 15, 2008 , Option One was not owed any indebtedness under the Defendant's note.

2. On December 15, 2008 Option did not own Defendant's note.

3. On December 15, 2008 Option One did not own Defendant's mortgage.

4. On December 15, 2008, La Salle Bank National Association as

Trustee for Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11("LaSalle as Trustee" did not purchase Defendant's Mortgage from any entity.

5. On December 15, 2008, La Salle Bank as Trustee did not purchase Defendant's note from any entity.

6. La Salle as Trustee did not provide any consideration to any entity on December 15, 2008.

7. No entity with the name of Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11has ever existed.

8. La Salle Bank, National Association was never the trustee for Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11.

9. The purported assignment referenced as Exhibit 5 to the complaint was not signed by Linda Green.

10. The purported witness to the purported assignment referenced as Exhibit 5 to the complaint was not signed by Tywanna Thomas.

11. The purported notarization to the purported assignment referenced as Exhibit 5 to the complaint was not signed by Bailey Kirchner.

12. Exhibit A is a genuine and authentic copy of a complaint filed by AHMSI against DocX, LLC and Lender

13. Lender Processing Services, Inc. ("LPS") was the parent company of DocX, LLC.

14. Linda Green was never an officer of AHMSI.

15. Exhibit B is a genuine and authentic copy of a Consent Order of the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Comptroller of the Currency, the Office of Thrift Supervision, Lender Processing Services, Inc.,

DocX, LLC and LPS Default Solutions, Inc., dated April 13, 2011.

16. Option One did not own Plaintiff's mortgage on July 15, 2011.

17. On March 18, 2009, an affidavit was filed in the United States Bankruptcy Court for the Eastern District of Louisiana in case number 07-11862.

18. Exhibit C is a genuine and authentic of the affidavit referenced in Request for Admission 17.

18. The original of Exhibit C was signed by Dale Sugimoto.

19. Dale Sugimoto on March 18, 2009 was the President of Sand Canyon.

20. On March 18, 2009 Sand Canyon did not own any residential real estate mortgages.

21. On July 15, 2011 Option One did not own any residential real estate mortgages.

22. On December 15, 2008 Option One did not own any residential real estate mortgages.

23. On July 15, 2011, Sand Canyon did not own any residential real estate mortgages.

24. On December 15, 2008 Sand Canyon did not own Defendant's mortgage.

25. On December 15, 2008 Sand Canyon did not own Defendant's note.

26. La Salle Bank as Trustee did not provide any consideration to Sand Canyon for Defendant's note on July 15, 2011.

27. La Salle Bank as Trustee did not provide any consideration to Sand Canyon for Defendant's mortgage on July 15, 2011.

28. La Salle Bank as Trustee never purchased Defendant's mortgage from Sand Canyon at any time.

29. La Salle Bank as Trustee never purchased Defendant's note from Sand Canyon at any time.

30. La Salle Bank as Trustee did not provide any consideration for Defendant's mortgage to Sand Canyon on July 15, 2011.

31. Exhibit 6 to the complaint was not signed by an officer of Sand Canyon.

32. Tonya Hopkins was not an officer of Sand Canyon on July 15, 2011.

33. Tonya Hopkins was an employee of AHMSI on July 15, 2011.

34. Tonya Hopkins did not sign the purported assignment dated July 15, 2011.

35. La Salle Bank National Association did not exist as an entity on February 22, 2013.

36. La Salle Bank National Association merged with Bank of America, N.A. on October 17, 2008.

37. On February 22, 2013, La Salle Bank National Association no longer existed as an entity.

38. On February 22, 2013 La Salle Bank as Trustee did not own Defendant's mortgage.

39. La Salle Bank as Trustee never granted a power of attorney to Homeward Residential, Inc., authorizing it to sign an assignment of mortgage from La Salle Bank as Trustee to U.S. Bank National Association as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 on February 22, 2013.

40. U.S. Bank National Association was never a Trustee for an entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

41. There is no such entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC1.

42. Pamela Stoddard was not an officer of Homeward Residential on February 22, 2013.

43. Pamela Stoddard was never an officer of Homeward Residential on February 22, 2013.

44. Pamela Stoddard was an employee of Security Connections, Inc. on February 22, 2013.

45. Pamela Stoddard did not sign the purported assignment dated February 22, 2013.

The purpose of these requests for Admissions was to preclude the Plaintiff

presenting fraudulent assignments to the Court which it originally sought to do in

the Original and Amended Complaint and which it sought to present in its original

list of Exhibits. However the admissions made by Plaintiff in regard to several of

these Requests bind the Plaintiff and cannot be controverted.

7. No entity with the name of Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11has ever existed.

8. La Salle Bank, National Association was never the trustee for Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11.

37. On February 22, 2013, La Salle Bank National Association no longer existed as an entity.

38. On February 22, 2013 La Salle Bank as Trustee did not own Defendant's mortgage.

39. La Salle Bank as Trustee never granted a power of attorney to Homeward Residential, Inc., authorizing it to sign an assignment of mortgage from La Salle Bank as Trustee to U.S. Bank National Association as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through

Certificates, Series 2003-BC11 on February 22, 2013.

40. U.S. Bank National Association was never a Trustee for an entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

41. There is no such entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC1.

The case law is clear that Plaintiff cannot undo these admissions, nor has it made any attempt to do so.  The case law in the First Circuit and elsewhere is clear, these admissions bind the Plaintiff.  In *Brook Village North Associates v. General Electric Company*, 686 F. 2d 66 (First Cir., 1982) the Court reversed the Trial Court for allowing a withdrawal of an admission at trial on Motion of the party bound by the admission.  The Court noted the basis for the rule, the procedure and standards for removing admissions and the different standard at trial:

Under Rule 36 in its present form (the rule was amended in 1970), if a party fails timely to answer a request for admissions, the requested items are deemed admitted. Any matter thus admitted under the Rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. And courts have not hesitated in appropriate cases to apply the sanction of Rule 36 to material facts that conclusively establish or preclude a party's claim. *See, e.g., Rainbolt v. Johnson,* 669 F.2d 767 (D.C.Cir.1981); *United States v. Kenealy,* 646 F.2d 699 (1st Cir.), *cert. denied,* 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 250 (1981).

The instant case poses the question of the discretion of a district court to permit withdrawal or amendment of an admission by default once trial has commenced. In general, the standard for being relieved of a failure to respond in a timely fashion to a request for admissions is permissive: a court may allow withdrawal or amendment of an admission "when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits." Fed.R.Civ.P. 36(b). The prejudice contemplated by the Rule is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth. Rather, it relates to the difficulty a party may face in proving its case, *e.g.,* caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions. *See Westmoreland v. Triumph* 71*71 *Motorcycle Corp.,* 71 F.R.D. 192 (D.Conn.1976).

The Rule understandably imposes a more restrictive standard, however, on the granting of a request to avoid the effect of an admission once trial had begun. Rule 36(b) specifies that the court can permit withdrawal or amendment of admissions "[s]ubject to the provisions of Rule 16 governing amendment of pre-trial order." Rule 16 authorizes the conduct and defines the contours of a conference before trial. "The chief purposes of the pre-trial conference are to define and simplify the issues, to lessen surprise at trial and the risk of judicial error, to conclude stipulations on matters of evidence, and to promote settlements." 3 J. Moore, *Moore's Federal Practice* ¶ 16.03 at 16-6 to 16-7 (2d ed. 1982) (footnote omitted). To give effect to matters resolved at conference, Rule 16 provides for the court to make an order "which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreement of counsel." The pre-trial order, once entered, controls the subsequent course of action. "No proof need be offered as to matters stipulated to in the order, since the facts admitted at the pretrial conference and contained in the pre-trial order stand as fully determined as if adjudicated at the trial." 3 J. Moore, *supra,* ¶ 16.19 at 16-40 to 16-41 (footnote omitted). The order can be modified at trial, but only "to prevent manifest injustice." Thus, Rule 16 by its terms sets a higher threshold for a trial judge to exercise his discretion to avoid the force of admissions under Rule 36 once trial has begun.

The district court in the instant case appears to have disregarded the existence of this higher threshold for opening up admissions after commencement of trial.

At no time, did Plaintiff  file a Motion to withdraw these admissions. The

Defendant raised this issue on the first day of trial as indicated by the Transcript:

And I would
specifically present to the Court Request for Admission Number Seven which states that no entity within the name of Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 has ever existed. That is an established fact which is the name of the plaintiff in this case which is seeking relief.

Request for Admission Eight, which is a fact accepted as true, deemed true, pursuant to Federal Rule of Civil Procedure 36, is that LaSalle Bank National Association was never the trustee for Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

Request for Admission Forty, which is deemed admitted, which is very crucial: U.S. BankNational Association was never a trustee for any entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

And Request for Admission Number Four, there is no such entity named Structured Asset Investment Loan Trust,Mortgage Pass-Through Certificates, Series 2003-BC11.

Now, as a result, your Honor, by virtue of that, my brother indicated, he's the attorney for this trust, it has been deemed admitted that this trust does not exist. So I would suggest that the plaintiff cannot proceed under the name it's proceeding under because it doesn't exist as a matter of law and fact.

Defendant's Requests for Admissions established that these were conclusive facts and Plaintiff could not at the last minute in trial without a Motion ask the Court to not consider these Admissions because they were not true. This defeats the purpose of the rule and is prejudicial to the Defendant who relied on the admissions. Defendant also had had filed a Motion in Limine and for Sanctions pursuant to Fed. R. Civ. Pro. 37. Plaintiff has proposed certain Trial Exhibits, which it sought to introduce into evidence which were referenced in the attached Exhibit List provided by Plaintiff. The Exhibits, which are the scope of this Motion were as follow:

July 16, 2003 $315,400 Adjustable Rate Note with Option One Mortgage Corporation ("Option One") *Exhibit C*.

October 1, 2003 Assignment and Assumption Agreement between Lehman Brothers Bank, FSB and Lehman Brothers Holdings, Inc., *Exhibit G*.

October 1, 2003 Mortgage Loan Sale and Assignment Agreement, *Exhibit H*.

October 1, 2003 Trust Agreement, *Exhibit I*.

October 1 2003 Servicing Agreement, *Exhibit J*.

October 1, 2003 Mortgage Loan Schedule, *Exhibit K*.

April 30, 2008 American Home Mortgage Servicing, Inc. ("AHMSI") Purchase Agreement, *Exhibit L*.

June 30, 2009 Notices of Resignation and Appointment of Trustee, *Exhibit M*.

Loan Payment History, *Exhibit R*.

The Court admitted these exhibits into evidence despite they inability of the purported business records witness to authenticate these records and the refusal of the Plaintiff to provide them until the eve of trial, thus further prejudicing the Defendant.  The Motions in Limine and for Sanction are incorporated into this Post Trial Memorandum and should be granted.  PHH and Plaintiff should be sanctioned for trial by ambush and for seeking to present evidence without any authentication prior to trial at discovery level and certainly at trial where the witness could not establish any evidence about original documents or most copies as will be discussed.

The travel of this case indicates the following loan servicers who mailed bills to the Defendant:

Option One Mortgage Corporation

American Home Mortgage

American Home Mortgage Servicing, Inc. which later changed its name to Homeward Residential, which utilized a servicing platform known as Black Knight MSP

Ocwen Loan Servicing, LLC, which utilized a servicing platform known as Real Servicing

PHH Mortgage which utilized a servicing platform known as  Black Knight MSP

The First Circuit set forth the standard for admission of purported business records  in U.*S. Bank Trust v. Jones*, 925 F. 3d 534 (1st Circuit, 2019). The holding in *Jones* mandates that the testimony of Howard Handville is defective because it does not verify anything about the boarding or the verification of the records of Homeward Residential (formerly American Home Mortgage Servicing, Inc., This corporation was not the original American Home Mortgage Servicing, Inc., the original servicer, which filed a Chapter  11 Bankruptcy Petition on August 6, 20007 in case number 07-11050 in the United States Bankruptcy Court for the District of Delaware, of which this case can take judicial notice.  Thus this mortgage loan has been serviced by five entities:

(1) Option One Mortgage Corporation

(2) The first American Home Mortgage Servicing, Inc. until its bankruptcy on August 6, 2007.

(3) The second American Home Mortgage Servicing, Inc. from its creation on September 6, 2007 until its name change of Homeward Residential, Inc. on May 31, 2012 as reflected in the record of the Rhode Island Secretary of State, of which the Court can take judicial notice.

(4)     Ocwen Loan Servicing, LLC from March 1, 2013 to June 1, 2019.

(5) PHH Mortgage Services from June 1, 2019.

This witness could not explain how the records of Homeward/AHMSI regarding this loan were confirmed and verified by Ocwen when servicing was transferred. He could not explain how the records of American Home Mortgage were confirmed and verified by AHMSI when servicing was transferred. He could not explain how the records of Ocwen and its RealServicing electronic system of record, were confirmed and verified when PHH took over servicing of Ocwen and transferred the records from Ocwen's servicing platform to its own servicing platform. This testimony did not address any of the hearsay issues in *Jones*, in which the Court allowed the records to be considered because the servicer employee relied on the accuracy of the mortgage history and took measures to verify the same and the servicer incorporated the previous servicer's records into its own database and place its own financial interests at stake by relying on those

12

records and that is took steps to review the previous servicer's records in a

way that assured itself of the accuracy of those records. *Jones* at p.538.  No

such testimony was presented in  this case and no reference was made to the

verification or the procedures followed to verify accuracy when the records

were purportedly integrated. The Court held:

[W]hether a third party's records . . . can be integrated into the records of the offering entity . . . for purposes of admission under the business records exception **is not an issue upon which this circuit has reached a uniform conclusion**" covering every instance. United States v. Savarese, 686 F.3d 1, 12 (1st Cir. 2012). **Rather, the admissibility of the evidence turns on the facts of each case.**

Thus, we have affirmed the admission of business records containing third-party entries without third-party testimony where the entries were **"intimately integrated"** into the business records, FTC v. Direct Marketing Concepts, Inc., 624 F.3d 1, 16 n.15 (1st Cir. 2010), or where the party that produced the business records "**relied on the [third-party] document and documents such as those[] in his business**," United States v. Doe, 960 F.2d 221, 223 (1st Cir. 1992) (internal quotation marks omitted). Conversely, in the absence of third-party evidence**, we have rejected the admission of business records containing or relying on the accuracy of third-party information integrated into the later record where, for example, the later business did not "use[] a procedure for verifying" such information, lacked a "self-interest in assuring the accuracy of the outside information,**" United States v. Vigneau, 187 F.3d 70, 77 & n.6 (1st Cir. 1999) (emphasis omitted), or sought admission of third-party statements made "by a stranger to it," Bradley, 891 F.3d at 35 (quoting Vigneau, 187 F.3d at 75 (alterations omitted)). The key question is whether the records in question are "reliable enough to be admissible." Direct Marketing Concepts, 624 F.3d at 16 n.15..

The Court reviewed the testimony of the trial witness and noted:

In answering that question, we are mindful that the "**reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation**." Fed. R. Evid. 803 advisory committee's note to 1972 proposed rules. The rule seeks "to capture these factors and to extend their impact" by applying them to a "regularly conducted activity." Id (emphasis added).

The District Court had received testimony from a loan servicer employee who had

testified that:

 **Caliber incorporated the previous servicer's records into its own database and "plac[ed] its own financial interest at stake by relying on those records," and that "Caliber's acquisition department took steps to review the previous servicer's records in a way that assured itself of the accuracy of the records**." 330 F. Supp. 3d 530, 543 (D. Me. 2018); see Trial Tr. 28:3-6, 60:17-19.

(emphasis added).

All this testimony consisted of was his  recital of the business exception to the

hearsay rule with no factual basis. Thus these records should not have been

admitted nor considered. He could not verify the accuracy of any records as per

this testimony. He could not authenticate the note and allonge. On page 98 he

indicated that his answer to interrogatory 14 was accurate indicating that the

allonge was dated July 16, 2003 and on page 99 that:

And do you have any information which indicates that the signed promissory note

was in the possession of Option One on July 16, 2003.

A. I don't

Thus there is testimony that the allonge was dated July 16, 2003, the date that the note was signed, even though the allonge was not affixed to the note on that date.

He had no idea when the note was placed in the collateral file on page  102-103:

```
1    Q.   So you have no idea what was in the collateral

2    file when you signed that answer; isn't that
     correct?

3    A.   I had an idea.

4    Q.   Well, you had not seen it; isn't that correct?

5    A.   Yes.

6    Q.   And you didn't know if the original note was in

7    that file; isn't that correct?

8    A.   I had not seen any indication that it was

     missing and my counsel had talked to  confirm its

1    whereabouts, so I'm comfortable with that answer. .

     . Q. Okay.  Now, when did this note leave the

2    possession of Option One?

3    A.   I don't know.
```

This witness could not confirm that the note and allonge were original documents and in fact in his answers to interrogatories he indicated that the allonge was dated July 16, 2003, the same date as the note.  He did not provide any information about the collateral file and the location of collateral file documents, indicating the promissory note and allonge and other documents, which would shed light on

15

when the so-called allonge was indorsed and placed in the collateral file. This is

an important issue, because pursuant to R.I.G.L.6A-3-204, an allonge is effective

only if it is affixed to the executed promissory note at the time that a name is

placed on an allonge.

As mentioned in the Motion in Limine Plaintiff refused to produce any

documents requested in Request numbers  28, 31, 32, 33, 34, 35, 36. 37, 38, 39, 40,

41, 42, 43 and 44. These Requests asked for the custodial agreement, seeking

records relating to custodial receipts by the Custodian. However Plaintiff refused

to comply any document. The documents sought in this  group of requests should

have been provided as Defendant has not been provided the custodian information

or the documents in the collateral file and when they were placed into the file with

the indices. Plaintiff should not be rewarded for its refusal to provide discovery. It

has not amended its answers to interrogatories or provided the complete

documents, which have missing exhibits, but only presented these documents on

the eve of trial. Evidence regarding the note should not be admitted without

authentication regarding the allonge, its date of creation, the date it was signed and

added to the collateral file. One document provided by Plaintiff is attached, which

twice indicates that there were two separate documents provided, a note and

allonge

The Plaintiff in its Supplemental Answer to Interrogatory 14 still refused to indicate the date that the allonge to the promissory note was actually signed. This answer suggests that the allonge was executed on July 16, 2003 when the note had not yet been signed or it was signed remotely and not affixed to the note. However the note could not be indorsed until the note existed. R.I.G.L. 6A-3-204 states that that an indorsement is one made "for the purpose of negotiating the instrument". Since the "allonge" was purportedly executed before the instrument existed there could no intent to negotiate a document which did not exist and the purported allonge was not affixed to a note executed by the Plaintiffs.

R.I.G.L. 6A-3-204 defines an indorsement as a signature on the instrument for the purpose of negotiating the instrument. This section states:

## § 6A-3-204. Indorsement.

(a) "Indorsement" means a signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of (i) negotiating the instrument, (ii) restricting payment of the instrument, or (iii) incurring indorser's liability on the instrument, but regardless of the intent of the signer, a signature and its accompanying words is an indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than indorsement. For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument.

(b) "Indorser" means a person who makes an indorsement.

(c) For the purpose of determining whether the transferee of an instrument is a holder, an indorsement that transfers a security interest in the instrument is effective as an unqualified indorsement of the instrument.

(d) If an instrument is payable to a holder under a name that is not the name of the holder, indorsement may be made by the holder in the name stated in the instrument or in the holder's name or both, but signature in both names may be required by a person paying or taking the instrument for value or collection.

A Negotiable Instrument is defined by R.I.G.L. 6A-3-104 as follows:

## § 6A-3-104. Negotiable instrument.

(a) Except as provided in subsections (c) and (d), "negotiable instrument" means an unconditional **promise** or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) Is payable on demand or at a definite time; and

(3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor. (emphasis added)

The note was in the possession of the closing attorney  not in the possession of the Defendant and could not have been signed on July 16, 2003 unless it were signed first or signed remotely contrary to the UCC. In the case of *In Re; Weisband*,  B.R. 427 B.R. 13, 15 (Bankr D. AZ, 2010)   the Bankruptcy Court held that for an endorsement by allonge the paper had to be affixed to the note when signed:

However, for the Endorsement to constitute part of the Note, it must be on "a paper affixed to the instrument." A.R.S. § 47-3204; *see also In re Nash,* 49 B.R. 254, 261

(Bankr.D.Ariz.1985). Here, the evidence did not demonstrate that the Endorsement was affixed to the Note. The Endorsement is on a separate sheet of paper; there was no evidence that it was stapled or otherwise attached to the rest of the Note

As stated previously pursuant to the definition of instrument in UCC 6A-3-104 and 2-204 an instrument contains a promise to pay money. R.I.G.L. 6A-3-103 (5) defines maker as:

(5) "Maker" means a person who signs or is identified in a note as a person undertaking to pay.

R.I.G.L. 6A-3-103 (9) defines promise as:

(9) "Promise" means a written undertaking to pay money signed by the person undertaking to pay. An acknowledgment of an obligation by the obligor is not a promise unless the obligor also undertakes to pay the obligation.

Thus only when the Defendant signed the note did it become a promise, an instrument and an undertaking to pay under the Uniform Commercial Code. When the document has been signed by the maker, only then does it become an instrument, which can be transferred by assignment (if non-negotiable) or by negotiation (if a negotiable instrument). R.I.G.L. 6A-2-204 clearly states that a writing on a separate piece of paper if affixed to the instrument when it is executed is *part of the document.*

This section of the UCC does not permit so called traveling allonges which are

executed when not affixed to the instrument. An  endorsement may be made on the

instrument itself.  If there is a separate piece of paper known as an is allonge it must

be affixed to the instrument when the signature is added, pursuant to the provisions of

R.I.G.L. 6A-3-204. A signature on separate document, not affixed to the instrument is

not effective to endorse the instrument. Plaintiff disregarded the need for  negotiation

by delivery and endorsement, which explicitly requires that the instrument be

executed prior to the endorsement or when affixed to the note, but not before or

remotely. The failure to provide this information until February 2, 2022 effectively

prejudiced the Defendant in defending this complaint. The witness did not provide

this information in his testimony and thus only the note without the allonge can be

considered by the Court.

Howard Handville testified that he only looked at copies of documents and

did not know the location of or whether there were any original documents. The

First Circuit in *Airframes Systems, Inc  L-3 Communications Corporation*  658 F.

3d (First Cir. , 2011) discussed the Best Evidence Rule:

The Best Evidence Rule requires that a party seeking to prove the "content" of a
writing must introduce the "original" or a "duplicate" of the original, unless it is
established that (1) all originals have been lost or destroyed (absent bad faith by
the proponent); (2) the original cannot be obtained; (3) the original is in the

possession of an opposing party who refuses to produce it; or (4) the writing is not closely related to a controlling issue. *See* Fed. R.Evid. 1001-1004;

A review of his testimony indicates that he had never seen any original documents and made no effort to locate these documents and had no idea where they were.  As a result this witness could not have authenticated any sales agreements, loan schedules or any Trust Agreement, because all he looked at were copies without any reference to original documents. Rule 1002 specifically requires that original documents be provided:

An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.

However he testified that he had never seen the originals of any loan schedules or trust agreements or any documents, which Plaintiff asked that this Court admit into evidence:

 On  page 108 the following testimony was elicited on cross examination:

```
1    Q.    Okay.   That assumes that this is an original

2    document, correct, a copy of an original document;

3    isn't that correct?

4    A.    Yes.

5    Q.    And you don't know that this is a copy of the
```

6      original loan schedule in this case; isn't that

7      correct?

8      **A.    I have not seen the original.    I don't know.**

9      **Q.**    In fact, you have no idea where the original loan

10     schedule is; isn't that correct?

11     **A.**    I haven't seen it so I don't know.

12     **Q.**    You've made no attempt to find that original loan

13     schedule; isn't that correct?

14     **A.**    No, I haven't.

15     **Q.**    And as a matter of fact, you recall your

16     deposition on April 7th in which you testified

17     under oath; is that correct?

18     **A.**    Yes.

19     **Q.**    You recall that deposition?    In that

20     deposition you had indicated when you've addressed

21     this document,the so-called loan schedule, you

22     indicated that it was a standalone document not

23     attached to the so-called trust agreement; isn't

24     that correct?

25     **A.**    In our business records it was a standalone

26     document.

This continued on page 109 in which he indicated no knowledge about the

original documents stating that the purported loan schedules were not attached to

22

the purported trust agreement and that he never looked at the original trust

agreement and never compared paragraph by paragraph the copy with any

original agreement. He could not provide any information aboutgloan agreement

from Lehman Brothers Bank and Brothers Holding Inc on page 110, exhibit G,

which on page 11 he indicated contained no loan schedules. He stated on page

111 that he was not aware of any loan schedules for the document referenced as

Exhibit G, an assignment and assumption agreement and that he has never seen

the original and could not compare the original with what he claimed to be a

copy. On page 112 he indicated:

**Q.**      And therefore, you cannot say that Exhibit G is anaccurate copy of the original record of any transaction between Lehman Brothers Bank and Lehman Brothers Holding; isn't that correct?

**A.**      Correct

On page 112 he indicated that he was not aware of any documents which existed

which indicate that Option One Mortgage Corporation sold the Defendant's

mortgage loan to Lehman Brothers Bank:

**Q.**      Are you aware of any documents which exist which indicate

that Option One Mortgage Corporation sold the defendants' mortgage

loan to Lehman Brothers Bank?

**A.**        No.

He testified that the purported Exhibit by which Lehman Brothers holding

purportedly transferred Defendant's loan to Structured Asset Securities

Corporation did not contain a loan schedule and that he did not verify the

accuracy of his copy because he had never seen the original document.

(p 113).

He indicated that the loan schedules did not contain the street address, city

and zip code and that there were no records of any custodian certifications

as to this loan.

        This witness did not make any effort to communicate with the

custodian, Wells Fargo in order to obtain any documents requested in

discovery. He was asked on page 121 whether PHH had a procedure to

verify the accuracy of prior servicer records and answered that there was a

procedure. However on page 121 his prior deposition testimony was that he

was not aware of any such procedure:

> • **Q.**    Okay. And do you recall your testimony
> in the deposition on April 7, 2022, on pages
> 19 and 20, in which I asked you, "Does PHH
> have a protocol to determine -- let me strike
> that. Does PHH currently have a protocol to
> confirm and verify the accuracy of all prior
> servicer documents when it loads the

```
                 documents on its electronic system of
                 record?"  And you answered, "Not to my
                 knowledge."

        •        Was that your testimony at that time?

•       A.   If that's what I'm stating in the deposition,
        that's correct.
```

He did not know of the people who may have verified the accuracy other than they were in India and did not review any documents whether there was any accuracy when the loan was boarded. (pp 121-122) and did not know when exhibits G, H I J K L and M were imaged (p 123).

He also testified that the Ocwen platform is no longer available for review and that he did not know whether any procedures were complied with to verify the accuracy of any data boarded into the Ocwen system when it took over servicing from Homeward Residential. He also testified that he did not have any first hand knowledge of the manner in which the Option One records were verified when it transferred servicing on page126.

He also testified that he was not aware of any sales agreement from Option One to any entity regarding Defendant's loan on page 127. Also contrary to the answers to interrogatories, he indicated that somehow another Option One trust had the loan without any documentation for that purported transaction.

This witness could not identify any original documents as to any copies which Plaintiff sought to place in evidence. FRE 1002 was not satisfied, nor was the standard set forth by the First Circuit in *Jones*. Thus his testimony should be disregarded and all Plaintiff's exhibits should not be considered.

THE PLAINTIFF'S ATTEMPT TO PROVE ITS CASE BY THE DEFENDANT'S BANKRUPTCY PLEADINGS FAILS AS A MATTER OF LAW

Plaintiff's post trial memorandum focused on purported testimony of Defendant about the Bankruptcy Petition that he filed listing entities as creditors. A mortgage in Rhode Island is a conveyance of land. Rhode Island is a Title State, in which the mortgage is a conveyance of land to the mortgagee. This conveyance is made pursuant to the statutory condition and with the statutory power of sale.  A review of the mortgage in this case indicates that if the loan is reformed, the mortgagor will have to also be the borrower of the obligation.  R.I.G.L. 34-11-20 defines the mortgage covenants which indicate the nature of this conveyance of land:


§ 34-11-20.  Meaning of mortgage covenants.

In any conveyance of real estate the words "with mortgage covenants" shall have the full force, meaning, and effect of the following words, and shall be applied and construed accordingly: "The mortgagor, for himself or herself and for his or her heirs, executors, and administrators, covenants with the mortgagee and his or her heirs and assigns, that he or she is lawfully seised in fee simple of the mortgaged premises; that the same are free from all incumbrances; that he or she has good right, full power, and lawful authority to sell and convey the same to the mortgagee and his or her heirs and assigns; that the mortgagee and his or her heirs and assigns shall at all times hereafter peaceably and quietly have and enjoy the mortgaged premises and that the mortgagor will, and his or her heirs, executors, and administrators shall, warrant and defend the premises to the mortgagee and his or her heirs and assigns forever against the lawful claims and demands of all persons, and that the mortgagor and his or her heirs and assigns, in case a sale shall be made under the power of sale, will, upon request, execute, acknowledge, and deliver to the purchaser or purchasers such deed or deeds confirmatory of the sale as may be required; and that insurance against loss by fire shall be kept and maintained on the buildings, if any, on the mortgaged premises in such office or offices as the mortgagee or his or her heirs, executors, administrators, or assigns shall approve, in a sum not less than the amount secured by the mortgage deed, or as otherwise provided herein, and that the policy or policies of such insurance shall be delivered

to and held by the mortgagee and assigned and transferred, or made payable in case of loss, to the mortgagee or his or her heirs, executors, administrators or assigns, as collateral security hereto, and in default thereof, that the mortgagee or his or her heirs, executors, administrators or assigns may effect such insurance in the name of the mortgagor or his or her heirs or assigns, payable in case of loss to the mortgagee or his or her heirs, executors, administrators or assigns, and that the premium or premiums paid therefor shall be a further charge upon the mortgaged premises."

A conveyance requires consideration and delivery. The testimony of the Defendant cannot establish ownership of a mortgage or note. To rely on bankruptcy documents which name a servicer and La Salle Bank as Trustee without naming the trust filed by Defendant's attorney does not constitute a binding admission, which allows Plaintiff to avoid its burden of proof.

THIS CASE IS SIMILAR TO A MASSACHUSETTS SUPREME COURT CASE

The Massachusetts Supreme Court considered almost an identical situation in *U.S. Bank National Association v. Ibanez,* 458 Mass. 637 (2011), a title clearing action brought by U.S. Bank to establish ownership of a mortgage, which had a similar ownership claim as this case, after a foreclosure. The purported chain of title in *Ibanez* was:

Rose Mortgage, Inc. (originator) ↓ Option One Mortgage Corporation (record holder) ↓ Lehman Brothers Bank, FSB ↓ Lehman Brothers Holdings Inc. (seller) ↓ Structured Asset Securities Corporation (depositor) ↓ U.S. Bank National Association, as trustee for the Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-Z

The issue before the court in Ibanez was whether the two securitization trusts could prove a chain of title for the mortgages they were attempting to foreclose on.  Absent such a chain of title, they did have standing  to foreclose. The Trusts claimed three alternative bases for chain of title:

(1) that the mortgages were transferred via the pooling and servicing agreement (PSA)--basically a contract of sale of the mortgages

(2) that the mortgages were transferred via assignments in blank.

(3) that the mortgages follow the note and transferred via the transfers of the notes.

The Supreme Judicial Court (SJC) held that arguments #2 and #3  had no validity in Massachusetts. The reasoning here was heavily derived from Massachusetts being a title theory state. The opinion was unanimous verdict (with an even sharper concurrence) by one of the most highly regarded state courts in the country.  The opinion is quite lucid and persuasive, particularly the point that if the wrong

plaintiff is named is the foreclosure notice, the homeowner hasn't received proper

notice of the foreclosure.

Regarding the first basis for the transfer, the Court held that a Pooling and

Servicing Agreement *might* suffice as a valid assignment of the mortgages, if the

PSA is executed and contains a schedule that sufficiently identifies the mortgage in

question, *and* if there is proof that the assignor in the PSA itself held the

mortgage. This last point is nothing more than the rule of *nemo dat*--you cannot

give what you don't have. It shows that there has to be a complete chain of title

going back to origination. The Rhode Island Supreme Court in *Mruk v. Mortgage*

*Electronic Registration Systems, Inc.* 82 A.3d 527 (2013) held that a mortgagor

could challenge a void assignment and defined "void" by referencing the Federal

Court's seminal cases on void assignments in a foot note:

More recently, the United States District Court of the District of Rhode
Island relied on the First Circuit's reasoning in the *Culhane* decision and concluded
that Rhode Island law also provided the same protections to mortgagors and held
that mortgagors have standing to challenge "`invalid, ineffective, or void'
assignments, such as situations where `**the assignor had nothing to assign or had**
**no authority to make an assignment to a particular assignee.**'" *Cosajay v.*
*Mortgage Electronic Registration Systems, Inc.,* ___ F.Supp.2d ___, ___, 2013 WL
5912569, at *4 (D.R.I. 2013) (quoting *Culhane v. Aurora Loan Services of*
*Nebraska,* 708 F.3d 282, 291 (1st Cir.2013)).

The purported assignments in this case were all void since Option One Mortgage

Corporation did not transfer anything to the Plaintiff by assignment or otherwise.

Any subsequent assignments were also void, since the original was void.

--

On the facts, both mortgages in *Ibanez* failed these requirements. In one case, the PSA couldn't even be located and in the other, there was a non-executed copy and the purported loan schedule, not the actual schedule,didn't sufficiently identify the loan. Moreover, there was no proof that the mortgage chain of title even got to the depositor (the assignor), without which the PSA is meaningless:.

Even if there were an executed trust agreement with the required schedule, US Bank failed to furnish any evidence that the entity assigning the mortgage – Structured Asset Securities Corporation [the depositor] — ever held the mortgage to be assigned. The last assignment of the mortgage on record was from Rose Mortgage to Option One; nothing was submitted to the judge indicating that Option One ever assigned the mortgage to anyone before the foreclosure sale.

So *Ibanez* means that to foreclosure in Massachusetts, a securitization trust needs to prove:

(1) a complete and unbroken chain of title from origination to securitization trust

(2) an executed PSA

(3) a PSA loan schedule that unambiguously indicates that association of the defaulted mortgage loan with the PSA. Just having the ZIP code or city for the loan won't suffice.

The real problem for authentication in this case is that the purported loan schedules often cannot be found (as in this case) or are not sufficiently specific. The SJC did not say that an executed PSA plus valid schedules was sufficient for a transfer; the parties did not raise and the SJC did not address the question of whether there might be additional requirements, like those imposed by the PSA itself.

The SJC did note that a "confirmatory assignment" could be valid, but it: "cannot confirm an assignment that was not validly made earlier or backdate an assignment being made for the first time. Where there is no prior valid assignment, a subsequent assignment by the mortgage holder to the note holder is not a confirmatory assignment because there is no earlier written assignment to confirm." In other words, a confirmatory assignment does notn't establish transfer unless there is a showing of an original assignment.

## US BANK HAS THE SAME PROBLEMS IN THIS CASE AS IN IBANEZ

The deficiencies found in *Ibanez* are present in this case. Without a valid assignments there can be no demonstration that Option One conveyed the mortgage, without a sales agreement of the mortgage. The documents presented by Plaintiff simply do not demonstrate any transaction. Nor do any of the purported

sales documents from Lehman Brothers Bank, FSB to Lehman Brothers Holding,

Inc. or from Lehman Brothers Holding, Inc. to Structured Asset Securities

Corporation contain any loan schedules, which identify the Defendant's loan. The

purported loan schedule has not been verified as being part of any document and

there is no information which has been provided in discovery. In fact the Plaintiff's

answers to interrogatories did not identify each owner of the mortgage or how each

obtained ownership nor identify the documents by which it was sold. The

Supplemental Answers and Response provided after discovery had closed on

February 2, 2022 were provided so late on the eve of trial that Defendant has been

Prejudiced. The First Circuit in *McCauley v. Anas*, 321 F.3d 45 (2003)  upheld a

District Court preclusion of an expert witness from testifying due to the failure to

update discovery responses. The Court noted the duty to update discovery in a

timely manner mindful of scheduling Orders:

 Once such a disclosure is made, it must be kept current. *See* Fed.R.Civ.P. 26(e)(1)

(explicating the duty to supplement discovery responses). Since an important

object of these rules is to avoid trial by ambush, the district court typically sets

temporal parameters for the production of such information. *See, e.g.,* Fed.R.Civ.P.

16(b). Such a timetable "promotes fairness both in the discovery process and at

trial." . . . When a party fails to

comply with this timetable, the district court has the authority to impose a

conditional sanction (including the authority to preclude late-disclosed expert

testimony)

*Anas* at p. 50.

      Rule 26(e) requires a party to supplement discovery. In *Anas,* the Court cited

a prior case, *Thibault v. Square D. Company*, 960 F.2d 239 , 245(1992) in

which the First Circuit held that a sanction could be imposed without a Court

Order citing the ability to sanction a violation of Rule 26(e):

While Fed.R.Civ.P. 37(b) requires that a court order must be in effect, and then
violated, as a prerequisite for the imposition of sanctions thereunder, *R.W. Int'l
Corp. v. Welch Foods, Inc., 937 F.2d 11, 15 (1st Cir.1991),* no such requirement
exists under Rule 26(e). The rule itself furnishes fair warning. Thus, when Rule
26(e) is flouted, district courts possess the power to impose sanctions without first
issuing a firm discovery deadline or an admonitory order. *See Bradley v. United
States,* 866 F.2d 120, 124 n. 6 (5th Cir.1989); *Outley v. City of New York,* 837 F.2d
587, 589 (2d Cir.1988); *Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th
Cir.1980); 8 Charles A. Wright & Arthur R. Miller, *Federal Practice and
Procedure* § 2050 (1970).

Moreover, a district court confronted with a violation of Rule 26(e) can fashion an
appropriate sanction from a wide range of options. Preclusion is one of these

options. *See* Fed.R.Civ.P. 26 advisory committee's note ("The duty [to supplement] will normally be enforced ... through sanctions imposed by the trial court, including exclusion of evidence, continuance, or other action, as the court may deem appropriate."). Clearly, then, the trial court possessed the power to preclude appellant's proffered expert testimony despite the lack of an antecedent order.

Plaintiff contended that it could not be sanctioned because there was no Court

Order which it violated. However Rule 26(e) required it to provide responses in a

timely manner, not on the eve of trial and when discovery was closed.

The proposed exhibits provided to the Defendant after discovery closed did not contain any loan schedules attached to thme  A review of these documents indicates that there is no reference that this schedule was part of the first so-called title document, the October 1, 2003 Assignment and Assumption Agreement (Exhibit G). That document does not contain an Exhibit of Loan Schedules. Instead it contains an exhibit A, which has no reference to Option One Loans or purchase agreement from Option One. This document states:

**WHEREAS, the Assignor is a party to the sale and servicing agreements identified on Exhibit A attached hereto (each, a "Sale/Servicing Agreement"), pursuant to which the Assignor has acquired certain mortgage loans (the "Initial Mortgage Loans") identified on the Mortgage Loan Schedule attached hereto as Exhibit B (the "Mortgage Loan Schedule") or pursuant to which such Initial Mortgage Loans are being serviced by various servicers;**

**WHEREAS, the Assignee has agreed on certain terms and conditions to purchase from the Assignor the Initial Mortgage Loans, together with all right and interest of the Assignor under the Sale/Servicing Agreements, to the extent relating to the Initial Mortgage Loan**s;

There is no sales agreement  and no identification of the Initial Mortgage Loans.

Exhibit A contains the following references:

21. Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of May 13, 2003 (Group No. 2003 LBB⁄001);

22. Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of June 20, 2003 (Group No. 2003 LBB⁄002);

23. Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of August 25, 2003 (Group No. 2003 LBB⁄003);

Thus none of the so-called Initial Mortgage Loans which were the purported

subject of this were post July 16, 2003 loans of Option One and Exhibit B simply

put does not exist. Exhibit A indicates that these agreements were servicing

agreements.  Exhibit B contains no loan schedule and states that there are no loan

schedules attached. Instead it states:


**Exhibit B**
**Mortgage Loan Schedule**

[To be maintained in a separate closing binder entitled "SAIL 2003-BC 11 Mortgage Loan Schedules" at McKee Nelson LLP]

This indicates that the mortgage loan schedules are not yet determined and that they are to be maintained at McKee Nelson LLP.   Thus like *Ibanez,* this document does not contain the loan schedules attached to it and there is no documentation which indicates that the Defendant's loan was contained in this Assignment and Assumption Agreement.

The next document which Plaintiff seeks to admit into evidence is a purported October 1, 2003 Mortgage Loan Sale and Assignment Agreement, *Exhibit H*. This document does not contain an Exhibit A or any schedules of loans. The copy submitted as Exhibit H with the Court's Clerk is not signed and consists of 31 pages. Most importantly there is no proof that Lehman Brothers Bank FSB ever purchased the Option One Mortgage. Thus there is no chain of title which is confirmed by any documents. Nor does this document indicate that the Defendant's mortgage was included in this sale. There were two purported Exhibits A-1 and A-2 which state:


SCHEDULE A-1

TRANSFERRED MORTGAGE LOANS
MORTGAGE LOAN SCHEDULE
(including Prepayment Charge Schedules and Prepayment Charge Summary)
To be maintained in a separate closing binder entitled "SAIL 2003-BC 11
Mortgage Loan Schedules" at McKee Nelson LLP]

SCHEDULE A-2
BANK ORIGINATED MORTGAGE LOANS
MORTGAGE LOAN SCHEDULE
(including Prepayment Charge Schedules and Prepayment Charge Summary)
[To be maintained in a separate closing binder entitled "SAIL 2003-BC11 Mortgage Loan Schedules" at McKee Nelson LLP]

As with the previous exhibit, the document indicates that the mortgage loan schedules are not yet determined and that they are to be maintained at McKee Nelson LLP.   Thus like *Ibanez*, this document does not contain the loan schedules attached to it and there is no documentation which indicates that the Defendant's loan was contained in this Assignment and Assumption Agreement. This document also references the purported loan sales which are included in loans purportedly purchased by Lehman Brothers Bank, FSB. There is a reference to loan purchase agreements, not of which reference Option One and all of which relate to loans closed or securitizations before July 16, 2003:

1.
Flow Purchase and Warranties Agreement by and between LBH and BNC Mortgage Inc. dated as of August 15, 2000;

2.
Flow Mortgage Loan Purchase and Warranties Agreement by and between LBH and Finance America, LLC dated as of June 30, 1999; and

3.
Flow Mortgage Loan Purchase and Warranties Agreement by and between LBH and People's Choice Home Loan, Inc., dated as of July 1, 2002 (Group No. 2002-Flow).

WHEREAS, Lehman Brothers Bank, FSB (the "Bank"), pursuant to the following specified mortgage loan purchase and warranties agreements (each, a

"Bank Transfer Agreement," and together with the LBH Transfer Agreements, the "Transfer Agreements"), has purchased or received from certain transferors identified below (each, a "Bank Transferor," and together with the LBH Transferors, the "Transferors") certain mortgage loans, each identified on the Mortgage Loan Schedule attached hereto as Schedule A-1 (collectively, the "Initial Bank Transferred Mortgage Loans" and, together with the Initial LBH Transferred Mortgage Loans, the "Initial Transferred Mortgage Loans"):

1.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Aames Capital Corporation dated as of April 21, 2003;

2.

Loan Purchase Agreement by and between the Bank and Alternative Financing Corporation dated as of April 17, 2003;

3.

Flow Purchase and Warranties Agreement by and between the Bank and BNC Mortgage Inc. dated as of March 1, 2002;

4.

Loan Purchase Agreement by and between the Bank and Colorado Federal Savings Bank dated as of March 18, 2002;

5.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Equifirst Corporation dated as of June 20, 2002, Series 2002-Flow;

6.

Loan Purchase Agreement by and between the Bank and Equity Financial Inc., dated as of February 19, 2002;

7.

Flow Mortgage Loan Purchase Agreement by and between the Bank and Fieldstone Mortgage Company, dated as of July 1, 2000, as amended by Amendment No. 1 dated as of July 20, 2001 and Amendment No. 2 dated as of October 31, 2002;

8.

Loan Purchase Agreement by and between the Bank and Fieldstone Mortgage Company, dated as of October 17, 2002;

9.

Loan Purchase Agreement by and between the Bank and First Mutual Corp. dated as of June 24, 2002;

10.

Loan Purchase Agreement by and between the Bank and Genysis Financial Corp. dated as of February 14, 2002;

11.

Loan Purchase Agreement by and between the Bank and Harbourton Mortgage Investment Corporation d/b/a HMIC dated as of December 21, 2001;

12.

Loan Purchase Agreement by and between the Bank and Home Loan Corporation, dated as of May 30, 2002;

13.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Novelle Financial Services, Inc., dated as of February 21, 2003;

14.

Mortgage Loan Purchase Agreement by and between the Bank and Lime Financial Services, Inc., dated as of July 21, 2003;

15.

Mortgage Loan Purchase Agreement by and between the Bank and Lime Financial Services, Inc., dated as of August 21, 2003;

16.

Mortgage Loan Purchase Agreement by and between the Bank and United Pacific Mortgage, dated as of April 4, 2002;

17.

Loan Purchase Agreement by and between the Bank and American Mortgage Express d/b/a Millennium Funding Group, dated as of July 2002;

18.

Loan Purchase Agreement by and between the Bank and MLSG Inc. dated as of June 11, 2002;

19.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Oak Street Mortgage LLC dated as of April 1, 2003;

20.

Loan Purchase Agreement by and between the Bank and Old Towne Financial, Inc. dated as of January 30, 2002;

21.

Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of May 13, 2003 (Group No. 2003 LBB/001);

22.

Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of June 20, 2003 (Group No. 2003 LBB/002);

23.

Seller's Warranties and Servicing Agreement by and between the Bank and Option One Mortgage Corporation, Option One Owner Trust 2001-1A, Option One Owner Trust 2001-1B, Option One Owner Trust 2001-2 and Option One Owner Trust 2002-3, dated as of August 25, 2003 (Group No. 2003 LBB/003);

24.

Flow Purchase and Warranties Agreement by and between the Bank and Pinnacle Direct Funding Corp. dated as of May 29, 2001 (Group No. 2001-1);

25.

Flow Loan Purchase and Warranties Agreement by and between the Bank and Residential Mortgage Assistance Enterprise, LLC dated as of May 1, 2003;

26.

Loan Purchase Agreement by and between the Bank and Sea Breeze Mortgage Services, dated as of January 30, 2003;

27.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and SIB Mortgage Corp. dated as of June 10, 2002, as amended by Amendment No. 1 dated as of November 1, 2002;

28.        Loan Purchase Agreement by and between the Bank and SIB Mortgage Corporation dated as of October 31, 2002;

29.        Loan Purchase Agreement by and between the Bank and Steward Financial dated as of June 4, 2003;

30.        Loan Purchase Agreement by and between the Bank and Stonecreek Funding Corp. dated as of July 8, 2002;

31.        Loan Purchase Agreement by and between the Bank and Superior Mortgage dated as of February 12, 2002;

32.        Seller's Warranties and Servicing Agreement by and between the Bank and Wells Fargo Home Mortgage, Inc., dated as of June 1, 2003 (2003-M05); and

33.        Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Wilmington Finance, Inc., dated as of August 22, 2002.


Once again, none of these prior purchase agreements are attached and there is no

loan schedule to this transaction. Thus this document had no reference to

Defendant's mortgage.

The third document which Plaintiff sought to admit into evidence is Exhibit

I a copy of a purported Trust Agreement, dated October 1, 2003.  However there is

no loan schedule attached to this document and more importantly this document is

not a sale of any loans but rather an agreement to transfer at the closing date,

October 31, 2003 unspecified loans, in return for mortgage backed securities,

which will be paid for by investors. The date of this document is October 1, 2003.

The closing date for any transfers of mortgage loans in return for the issuance of

the certificates is October 31, 2003.  The Preliminary Statement of this document

indicates as such:

The Depositor has acquired the Initial Mortgage Loans from the Seller, and at the Closing Date is the owner of the Initial Mortgage Loans and the other property being conveyed by it to the Trustee hereunder for inclusion in the Trust Fund.  **On the Closing Date, the Depositor will acquire the Certificates from the Trust Fund, as consideration for its transfer to the Trust Fund of the Initial Mortgage Loans, the Pre-Funding Amount and the other property constituting the Trust Fund.  The Depositor has duly authorized the execution and delivery of this Agreement to provide for the conveyance to the Trustee of the Initial Mortgage Loans, any Subsequent Mortgage Loans and the other property constituting the Trust Fund.**  All covenants and agreements made by the Seller in the Mortgage Loan Sale Agreement and by the Depositor, the Master Servicer, the Securities Administrator and the Trustee herein with respect to the Mortgage Loans and the other property constituting the Trust Fund are for the benefit of the Holders from time to time of the Certificates and, to the extent provided herein, any NIMS Insurer.  The Depositor, the Trustee, the Master Servicer, the Securities Administrator and the Credit Risk Manager are entering into this Agreement, and the Trustee is accepting the Trust Fund created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. (emphasis added).

This trust agreement does not contain any loans listed nor the Defendant's

mortgage. It only states:

**Exhibit B**
**Mortgage Loan Schedule**

[To be maintained in a separate closing binder entitled "SAIL 2003-BC 11 Mortgage Loan Schedules" at McKee Nelson LLP]

However as indicated above this document is "to be maintained" as it did not exist on October 1, 2003. Thus this document contains no reference to the Defendant's mortgage and thus does not transfer any mortgage. Furthermore this Trust Agreement speaks of a future event which had not yet occurred on October 1, 2003.   The Plaintiff responded in its belated answer to interrogatories that there were no custodial certificates.  This Trust Agreement contains  unsigned and undated Exhibits B1, B2 and B3  which provide for certification and verification that mortgages are actually delivered to the Custodian of the mortgage loan. Plaintiff refused to provide the identity of the custodian or provide the custodial agreement contained in the Trust Agreement and in fact stated that there were no custodial receipts. The Initial Certification, if signed would  have   provided and stated that the Custodian (LaSalle Bank at the time) :

 certifies that it has received the documents listed in Section 2.01(c) of the Trust Agreement for each Mortgage File pertaining to each Mortgage Loan listed on Schedule A to the Trust Agreement, subject to any exceptions noted on Schedule I hereto.

  The Interim Certification by the Custodian if signed  .would have provided and stated:

    The undersigned hereby certifies that as to each Mortgage Loan identified on the Mortgage Loan Schedule, other than any Mortgage Loan listed on Schedule I hereto, it has reviewed the documents listed in Section 2.01(c) of the Trust

Agreement and has determined that each such document appears regular on its face and appears to relate to the Mortgage Loan identified in such document.

Finally the Final Certification by the Custodian if signed  .would have provided and stated:

In accordance with Section 2.02(d) of the Trust Agreement, the undersigned, as Custodian on behalf of the Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on Schedule I hereto) it (or its custodian) has received the applicable documents listed in Section 2.01(c) of the Trust Agreement.

The undersigned hereby certifies that as to each Mortgage Loan identified in the Mortgage Loan Schedule, other than any Mortgage Loan listed on Schedule I hereto, it has reviewed the documents listed in Section 2.01(c) of the Trust Agreement and has determined that each such document appears to be complete and, based on an examination of such documents, the information set forth in items (i) through (vi) of the definition of Mortgage Loan Schedule is correct.

However the document provided does not contain such certificates or any

documents from the custodian. Thus there is no record that this occurred and that

Defendant's  mortgage loan was transferred.

This explanation of the documents which Plaintiff seeks to admit into

evidence demonstrates that Plaintiff's failure to answer interrogatories about these

documents in any manner and failure to provide  documents prior to February 2,

2022, long after discovery had closed, clearly prejudiced the Defendant. A review

of the February 2, 2022 supplemental answers indicates the belated nature of the

responses after stonewalling the process and refusing to indicate any travel of the

loan other than the void assignments. After the Court indicated that there would be

a trial Plaintiff amended its answers. However Defendant due to the closure of

discovery could not depose the witness which the Plaintiff identified nor determine

which documents he reviewed or will review or the travel of the loan.

## CONCLUSION

The Plaintiff should not be rewarded for not complying with Rule 26(e). The

failure to respond to the Request for Admissions is fatal to the Plaintiff's case. In

*Far Mann v M/V Rozita* 903 F.2d 871 (First Cir., 1990), this Court recognized that

Rule 36's deemed admissions could be removed if a party filed a motion and met

the two pronged test of the facilitation of truth and lack of prejudice.  In *Farr Man*,

the Court found that the two prong test had been met:

As to the first part of Rule 36(b)'s test, we find that permitting the withdrawal of M/V ROZITA's admissions would "facilitate the development of the case in reaching the truth," 4A J. Moore, *supra,* ¶ 36-08 at 36-79, because, as the district court noted, the most current stipulation of facts sets the damages suffered by plaintiffs at $29,268.63, rather than the amount admitted to of $285,268.63. Thus, we conclude, the first prong of Rule 36(b) is satisfied. The second hurdle is similarly easily surmounted.
*Farr Man* at p. 874

In this case, the Plaintiff has not sought to remove the admissions, which would be

prejudicial at the eve of trial. Thus this issue is not even before the Court since the

Plaintiff has not requested a withdrawal of the admission pursuant to the Rule.

In addition to the deemed admissions, Plaintiff should not be allowed to

present these documents because it after three years finally responded to

Interrogatories with objections as to each interrogatory, some of which were

clearly relevant to Defendant's defense that the assignments were void. Plaintiff

objected to virtually every interrogatory and only belatedly provided supplemental

answers which did not really answer the questions, which Defendant was entitled

to have util discovery had been closed and on the eve of trial. At no time prior to

February 2, 2022 were the interrogatories supplemented and even now the

reference to Rule 33(d) without any specific reference for each question renders

the answers non-responsive and not in line with the testimony it seeks to present at

trial. Defendant sought in number 3 to identify all documents which reference a

sale of the note or the mortgage from the origjnation of the note to the present.

Plaintiff did not provide this answer until February 2, 2022 after the closure of

discovery and then only referenced documents. However there is no document

which conveys the mortgage from Option One Mortgage Corporation. It also uses

the language "further demonstrates" thus still clinging to the void assignments of

mortgage as a basis for its claim of ownership of the mortgage. At no time has it

amended its answers and removed the assignments from its claim of ownership.

These documents including one purported loan schedule were provided after

discovery was closed and thus Plaintiff should be  precluded from seeking their

admission into evidence.

Defendant in number 6 asked for information about servicing of the mortgage

by various servicers as well as all documents by which servicing was authorized.

Defendant objected, refused to identify any the documents and now seeks to introduce a servicing agreement, *Exhibit J* and a Loan Servicing Purchasing Agreement, *Exhibit K*. It refused to identify any sale documents or servicing agreements or custodial agreements until it sought to introduce those documents after discovery closed. Plaintiff refused to answer this question and waived any objections by not responding to the interrogatories for three years. This answer is inconsistent with the complaint and the attempt of the Plaintiff to prove ownership of the mortgage by securitization.

The Plaintiff seeks to prove that the loan was included in various sales ands has objected and has only produced a copy of a pooling and servicing agreement. By not providing this information Plaintiff should be sanctioned by not being allowed to present any evidence regarding this securitization. It now seeks to present photocopies of documents which all claim to be the travel of the loan, without authentication after close of discovery, including a purported loan schedule. That violation of Rule 26(e) is particularly egregious. The internet copy of the securitization documents contained no loan schedule. However miraculously on February 2, 2022, this purported schedule appeared.  The Plaintiff was It in fact indicated that these documents were irrelevant to the case, yet seeks to present into evidence the same documents that it contended were irrelevant.

The Plaintiff refused to provide any documents which indicated sales of the note or mortgage from origination to the present other than an unauthenticated Trust Agreement copy. The Defendant had propounded Requests  7, 8, 11, 13,14, 15, 21, 29, 46, 47 and 48, all of which requested documents regarding the securitization of the mortgage loan, as indicated in this memorandum

October 1, 2003 Assignment and Assumption Agreement between Lehman Brothers Bank, FSB and Lehman Brothers Holdings, Inc., *Exhibit G*.

October 1, 2003 Mortgage Loan Sale and Assignment Agreement, *Exhibit H*.

October 1, 2003 Trust Agreement, *Exhibit I*.

October 1 2003 Servicing Agreement, *Exhibit J*.

October 1, 2003 Mortgage Loan Schedule, *Exhibit K*.

April 30, 2008 American Home Mortgage Servicing, Inc. ("AHMSI") Purchase Agreement, *Exhibit L.*

June 30, 2009 Notices of Resignation and Appointment of Trustee, *Exhibit M*.

None of these documents were produced in June, 2021 when the Plaintiff made its belated and objection filled response to the Requests for Production. The Defendant was not afforded an opportunity to review the documents and as a result the Plaintiff has thrusted on the Court, documents never mentioned in its response to discovery.  Rule 37 requires that Plaintiff not be allowed to introduce documents which it previously refused to provide, claiming that they were irrelevant to the issues of the case.

For these reasons, the Court should rule for the Defendant and deny the discovery avoiding Plaintiff the relief it seeks.

MASOUD SHAKOORI

By his attorney,

July 8, 2022

/s/ John B. Ennis

John B. Ennis, Esq. #2135

1200 Reservoir Avenue

Cranston, RI 02920

401-943-9230

jbelaw75@gmail.com

CERTIFICATION

I hereby certify that I emailed a copy of the above  Post Trial  Memorandum to the following electronically, on this  8th day of July, 2022:

 Samuel Bodurtha

Christopher Lefebvre

/s/ John B. Ennis