1

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - -X
U.S. Bank N.A., as           :  17-cv-00394-WES
Trustee for the              :
Registered Holders of the    :
Structured Asset             :
Securities Corporation,      :
Structured Asset             :  United States Courthouse
Investment Loan Trust,       :  Providence, Rhode Island
Mortgage Pass-Through        :
Certificates, Series         :
2003-BC11,                   :
         Plaintiff,          :  Monday, April 18, 2022
                             :
                             :
    vs.                      :
                             :
                             :
MASOUD SHAKOORI-NAMINY,      :
et al.,                      :
         Defendants.         :
- - - - - - - - - - - - - - -X

         TRANSCRIPT OF CIVIL CAUSE FOR A BENCH TRIAL
           BEFORE THE HONORABLE WILLIAM E. SMITH
             UNITED STATES DISTRICT COURT JUDGE

                   A P P E A R A N C E S:

 For the Plaintiff:    SAMUEL C. BODURTHA, ESQ.
                       Hinshaw & Culbertson LLP
                       56 Exchange Terrace, 5th Floor
                       Providence, RI  02903
 For the Defendants:   JOHN B. ENNIS, ESQ.
                       1200 Reservoir Avenue
                       Cranston, RI  02920




 Court Reporter:  Lisa Schwam, CRR-RPR-RMR
                  One Exchange Terrace
                  Providence, RI  02903
```

```
 1    (In open court)

 2    18 APRIL 2022

 3    (Time noted; 9:48 a.m.)

 4         THE COURT:  Good morning.  We're here for

 5    continuation in the trial of U.S. Bank vs.

 6    Shakoori-Naminy.  And you've already entered your

 7    appearances so I think we're ready to proceed.

 8         What's the order of business?

 9         MR. BODURTHA:  Your Honor, the plaintiff, U.S.

10    Bank, N.A., as Trustee calls Howard Handville,

11    corporate representative for PHH Mortgage.

12         THE COURT:  Good morning, Mr. Handville.

13         I can see you there on the screen.  Can you hear

14    me all right?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Okay.  Very good.  We're going to

17    get you sworn in by the clerk and we'll proceed with

18    your examination.

19         THE CLERK:  Please raise your right hand.

20         **HOWARD HANDVILLE**, PLAINTIFF'S WITNESS, SWORN

21         THE CLERK:  Please state your name and spell

22    your last name for the record.

23         THE WITNESS:  My name is Howard Handville,

24    H-a-n-d-v-i-l-l-e.

25         THE COURT:  All right.  Thank you.
```

1          All right.  Mr. Bodurtha, you may inquire.

2          MR. BODURTHA:  Thank you, your Honor.

3                    DIRECT EXAMINATION

4    BY MR. BODURTHA:

5    **Q.**   Good morning, Mr. Handville.  Can you hear me?

6    **A.**   Yes, I can.

7    **Q.**   Okay.  The first thing I want to do, Mr.

8    Handville, as a housekeeping measure -- you and I have

9    discussed this in preparation -- I just want to run

10   through the exhibits that we're going to be reviewing

11   today because you have access to those exhibits, but we

12   can't screen share them from this courtroom to you,

13   okay?

14   **A.**   I understand.

15   **Q.**   So for today's testimony, will you confirm that

16   prior to the hearing, I sent you an electronic version

17   of all of U.S. Bank, N.A., as Trustee's proposed

18   exhibits?

19   **A.**   Yes, I can confirm that.

20   **Q.**   And will you confirm that you have access to

21   exhibits that are premarked A through JJ for

22   identification purposes available for review and

23   testimony today?

24   **A.**   Bear with me while I double-check them.

25   **Q.**   Okay.

1    **A.**    Can you tell me which one JJ is.

2    **Q.**    Of course.  That was going to be a follow-up

3    question because this is a little bit tricky.  Exhibit

4    JJ is an Excel spreadsheet titled

5    "4325-SAIL2003-BC11-MLS."

6         Do you have that document available?

7    **A.**    I do.

8    **Q.**    Okay.  And I have provided the Court and my

9    brother with a copy of the same spreadsheet, and

10    obviously I'll let you know as we're going through

11    these when we get to each exhibit, okay?

12    **A.**    Okay.

13    **Q.**    Where do you work, Mr. Handville?

14    **A.**    I work for Ocwen Financial Corporation.

15    **Q.**    What is your position there?

16    **A.**    Senior loan analyst.

17    **Q.**    And what are the responsibilities, duties and

18    obligations of a senior loan analyst?

19    **A.**    Senior loan analysts work primarily on litigated

20    loans.  We work with our in-house counsel and our

21    outside counsel.  We do research.  We are assigned

22    loans to be the party that would be assigned for things

23    like trials or depositions or mediations.

24         We are also empowered to execute on behalf of

25    the servicing units and we are MERS certified so we can

1    execute on behalf of MERS Corporation as well.

2    **Q.**    Does your work with Ocwen Financial include

3    reviewing records and recordkeeping systems on a daily

4    basis?

5    **A.**    It does.

6    **Q.**    How long have you worked for Ocwen?

7    **A.**    Over 11 years.

8    **Q.**    Where did you work prior to Ocwen?

9    **A.**    I worked for a company called ABN AMRO Mortgage

10   Corporation.

11   **Q.**    And how long did you work there?

12   **A.**    I was with them for three years.

13   **Q.**    Can you describe to the Court Ocwen Financial's

14   business.

15   **A.**    Ocwen is the parent company of a number of

16   business units, one of which is PHH Mortgage which is a

17   mortgage loan servicer.  They also have Liberty which

18   is an origination unit for mortgage loans.  And they

19   also service reverse mortgages.

20   **Q.**    What is the relationship between Ocwen Financial

21   Corporation and Ocwen Loan Servicing?

22   **A.**    Ocwen Loan Servicing used to be owned by Ocwen

23   Financial Corporation.

24   **Q.**    Okay.  And when you say it used to be owned by

25   Ocwen Financial, what happened to Ocwen Loan Servicing,

1    to the best of your knowledge?

2    **A.**    Ocwen Loan Servicing merged with PHH Mortgage.  I

3    believe it was the third or fourth quarter of 2018.

4    And in 2019 the servicing transferred from Ocwen Loan

5    Servicing to PHH.

6    **Q.**    Okay.  So since 2019, can you tell the Court who

7    has -- what entity has provided servicing for mortgage

8    loans?

9    **A.**    Ocwen Loan Servicing did it up until June 1.

10   Effective June 1 of 2019, it transferred to PHH.

11   **Q.**    Will you describe the current relationship between

12   PHH and U.S. Bank, as Trustee, the plaintiff in this

13   case.

14   **A.**    PHH services the loan for the trust.

15   **Q.**    Okay.  And what does it mean when you say that PHH

16   is the servicer for U.S. Bank, as Trustee?

17   **A.**    As long as the loan remains active, a servicer

18   would be involved with the loan in order to administer

19   payments or provide information regarding interest

20   paid, yearend statements, escrow analysis, loans that

21   are in default.  We maintain monthly inspections to

22   ensure that property hasn't been abandoned or vacated

23   or has any kind of code violations.

24        The servicing continues through such time as

25   either the loan is paid off or it's liquidated or

1   transferred to somebody else.

2   Q.   Does PHH maintain records for loans that are owned

3   by trusts?

4   A.   Yes.

5   Q.   Does PHH maintain records for loans owned by the

6   trust that U.S. Bank services that is the plaintiff in

7   this case?

8   A.   It does.

9   Q.   Does PHH maintain records for the particular loan

10  at issue in this case owned by the trust?

11        MR. ENNIS:   Objection, your Honor; foundation.

12        THE COURT:   Well, he can answer the question.

13  You can ask him how he knows that and that will satisfy

14  the foundation.

15  Q.   You can answer the question, Mr. Handville.

16  A.   Yes.

17  Q.   How do you know that PHH maintains records for the

18  loan at issue in this litigation?

19  A.   The records that we have involve prior servicer

20  records and current servicer records which you can pull

21  up the loan on the servicing system to look at it which

22  is where the servicing action takes place.  And you can

23  also look at image records of correspondence that have

24  been received or generated.

25  Q.   Does PHH retain any records of the trust's

1    acquisition of the loan at issue in this case?

2    **A.**    Yes.

3    **Q.**    And how do you know that?

4    **A.**    I've looked at the business records that we have

5    received and have verified that the loan is part of

6    that trust.

7    **Q.**    In the 12 years or 11-plus years since you've

8    worked for Ocwen and PHH, has Ocwen acquired or merged

9    with any other companies in the business of mortgage

10   loan servicing?

11   **A.**    Yes, there were several.  Ocwen acquired and

12   merged with Litton.  I think that's back in 2010.  And

13   then Ocwen acquired servicing from One West Bank.

14   Ocwen acquired servicing for Homeward Residential which

15   was another merger.  And Ocwen was the surviving

16   corporation out of that merger.

17   **Q.**    Were you employed with Ocwen when the company

18   acquired Homeward?

19   **A.**    Yes.

20   **Q.**    Did you work as a loan analyst at that time?

21   **A.**    Yes.

22   **Q.**    Are you aware of whether Homeward had changed its

23   name prior to Ocwen's acquisition?

24   **A.**    Yes.  They used to be called American Home

25   Mortgage Servicing.  We refer to them as AHMSI,

1    A-H-M-S-I.

2    **Q.**  Are you aware whether Homeward's mortgage

3    servicing records were integrated into Ocwen's records?

4         MR. ENNIS:  Objection, your Honor.  To show

5    integration, the case of *U.S. Bank vs. Jones* requires

6    knowledge of the manner in which the records of the

7    prior servicer were verified and confirmed.  And I

8    think to do that they have to demonstrate a foundation

9    for this question.

10         THE COURT:  All right.  Well, I'll leave it to

11    Mr. Bodurtha to do that.  Go ahead.

12    **Q.**  Mr. Handville, at the time Ocwen acquired

13    Homeward, are you aware of processes and systems

14    through which Homeward records were forwarded to Ocwen

15    Loan Servicing?

16    **A.**  I am.

17    **Q.**  And how did that occur?  If you can explain this

18    to the Court.

19    **A.**  The boarding process involved several phases.  The

20    electronic phase as I call it, the first phase, is the

21    coordination of efforts between the two technology

22    groups on how they're going to transfer the

23    information, when and where they're going to transfer

24    the information and the metadata language of the data

25    that will be transferred.  The acquiring servicer then

1    has a system where they send two reports, one about a

2    month before the transfer and one the day before the

3    transfer.  The first report that's sent has all the

4    master data which is over 3500 data fields; everything

5    from the borrower's name, address, phone number,

6    socials, every little intimate bit of information

7    that's in a servicing platform.

8           They make sure that it will populate into the

9    new loan system.  The new loan system, they create new

10   loan numbers so they can import the data into the

11   system.  That report that's received 24 hours before

12   going live just picks up the differences, if any

13   payments have been made or if anything's changed

14   regarding escrow disbursements or anything like that,

15   so that we have the most up-to-date information.  They

16   run everything through a series of spreadsheets to make

17   sure that there aren't any quality control issues for

18   the data that's received and the language of the data

19   so that it's placed into the system.  So they do a data

20   mapping process.

21          When the loan is brought into the servicing

22   system, they run a test on it to make sure everything

23   works and then the loans go live.  Once the loans go

24   live, there's a series of audits that are undertaken;

25   if the loan is in default or foreclosure.  Timeline

1    foreclosure coordinators will go in and verify the due

2    dates, whether the loan has been --

3    **Q.**    Mr. Handville, can I interrupt you for one second.

4    Do you think you can just slow down a little bit?  Our

5    court reporter is having some difficulty transcribing

6    your testimony.  Thank you.

7    **A.**    I'm sorry.  I understand.

8    **Q.**    Can you start with the timeline, sir.

9    **A.**    The timeline foreclosure coordinators will verify

10   the default date.  They'll look at the notice of intent

11   or demand letters.  They will also verify the

12   foreclosure firm that's handling it and make sure that

13   they have the proper information regarding the loan in

14   foreclosure default.  Also the bankruptcy; so they'll

15   update the bankruptcy information.

16          Once the loan goes live, a series of audits take

17   place to make sure that the escrow information has been

18   imported properly.  The escrow team will verify this

19   with the city or county.  Same for the taxes.

20          The other phase is done by the investor

21   reporting group.  They have a reconciliation specialist

22   go in and verify that the loan terms that have been set

23   up in the system comport with the balance that's been

24   sent over, the due dates, if we have the right term in

25   place, if a modification has been done, how that

1    changed the terms.  So that's how they validate the

2    accuracy of the information that's been brought into

3    our servicing system.

4         Subsequent to that, like I said, the audits for

5    taxes and insurance take place.  And the servicing

6    picks up at either a stage where the loan is current

7    and they just apply payments and administer escrows or

8    it's in foreclosure or bankruptcy and those different

9    business units will service the loan accordingly.

10   **Q.**  Okay.  So how about documents?  Can you explain to

11   the Court how Ocwen received documents of loans from a

12   servicer such as Homeward that has merged into Ocwen?

13        MR. ENNIS:  Objection.  No specificity related

14   to this loan.

15        MR. BODURTHA:  I'm asking him about documents in

16   general on a servicer acquisition and merger.  I'll get

17   to the specific documents after that.

18        THE COURT:  All right.  Objection is overruled.

19   **Q.**  You can answer, Mr. Handville.

20   **A.**  Could you run the question by me again, I'm sorry.

21   **Q.**  Sure.  The question was if you could explain to

22   the Court how documents kept by a prior servicer were

23   transferred to Ocwen, for example, when Homeward merged

24   with Ocwen.

25   **A.**  The documents that Ocwen received are transmitted

1    from the prior servicer.  It's part of the data that

2    they transfer.  They send these documents over.

3    They're imaged so they're electronic data transfers.

4    They are sorted out by our imaging team and placed into

5    a database associated strictly with that one loan

6    number for each individual loan that's boarded.

7        So they'll get copies of the collateral

8    documents which are the note, mortgage, title policy,

9    closing documents, HUD-1 settlement statements.

10    They'll get servicing-related correspondence, incoming,

11    outgoing correspondence.  Sometimes we get copies

12    of -- if a matter has been in foreclosure, we'll get

13    the foreclosure pleadings and things like that.  Copies

14    of the breach letters.  Customer correspondence

15    regarding questions they may have or response letters.

16    We'll get monthly statements.  We'll just get all kinds

17    of servicing documents from the prior servicer.

18    **Q.**  And can you explain to the Court also how or

19    whether documents involving the trust's acquisition of

20    the loan are transferred over from a prior servicer;

21    for example, when Homeward merged with Ocwen, how the

22    investor acquisition documents are transferred.

23        MR. ENNIS:  Objection, your Honor.  There's no

24    demonstration for a foundation that they can

25    demonstrate the original creation of the documents of

1    this purported trust which ultimately seeks to get into

2    evidence.  He's talking generalities of documents

3    coming in through Ocwen from Homeward Residential, but

4    that's ten years after the creation of any documents.

5         THE COURT:  Well, I'm going to overrule the

6    objection and let you continue with laying the

7    foundation.

8         MR. BODURTHA:  Thank you, your Honor.

9    **Q.**   Mr. Handville, can you answer the question or do

10   you need me to rephrase that?

11   **A.**   No, I can answer the question.

12   **Q.**   Okay.

13   **A.**   Normally, you're going to get them either from the

14   prior servicer on a disk or sometimes you get a CD that

15   was generated by the law firm.  In this case, I

16   confirmed that we did receive a CD.  I believe the

17   company's name was McKee Nelson; I may have that wrong.

18   And that is where the pooling and servicing agreement

19   and the trust agreements that we've been able to

20   produce were received.

21   **Q.**   And Mr. Handville, how were you able to confirm

22   that Ocwen received a CD with the loan acquisition

23   documents?

24   **A.**   I spoke with a person at PHH named Jolene

25   Stratton.  I had some questions for her.  We were

1    searching for some other documents.  And after looking

2    through the SharePoint drive where these documents are

3    made available to staff, I reached out to her and she

4    confirmed that she had received the CD.

5          MR. ENNIS:  Objection, your Honor; motion to

6    strike.  He was asked how he did it, not what another

7    person told him.  That would be hearsay.

8          THE COURT:  Well, it is hearsay.

9          MR. BODURTHA:  I'm happy to rephrase the

10   question and have Mr. Handville answer to his

11   understanding of how the documents were received.

12         THE COURT:  Okay.  That will be fine.

13   **Q.**   Mr. Handville, do you have a present understanding

14   of how the documents particular to this loan were

15   received by Ocwen?

16         MR. ENNIS:  Your Honor, at this point I think

17   there has to be a point made that in Mr. Handville's

18   deposition on April 7th --

19         THE COURT:  You'll be able to cross-examine him

20   and if you want to use his deposition for a prior

21   inconsistent statement, you'll be able to do that.  But

22   this is not the time for that.

23         All right.  So proceed.

24         MR. BODURTHA:  Thank you, your Honor.

25   **Q.**   Do you need me to rephrase or restate the

1    question, Mr. Handville?

2    **A.**    Please.

3    **Q.**    Do you have an understanding of how the loan

4    acquisition documents were transferred to Ocwen when

5    Ocwen acquired Homeward?

6            MR. ENNIS:  Objection; lack of foundation.

7            THE COURT:  All right.  Overruled.  Just go

8    ahead.

9            THE WITNESS:  It's my understanding that Ocwen

10    received a CD with the information on it.

11    **Q.**    Okay.  And once Ocwen received that CD, are you

12    aware of how the documents were treated or what

13    happened to them in the course of moving them into

14    Ocwen's systems?

15    **A.**    The image of the documents were imported into a

16    SharePoint database which is published on the Ocwen

17    internet portal so that staff can go in and view them.

18    **Q.**    That was going to be my next question.  Who has

19    access to the SharePoint system?

20    **A.**    To my knowledge, customer service would have

21    access to it, loan analysts have access to it, the

22    legal department has access to it.  The investor

23    reporting group would have access to it.  Most of the

24    people that service loans would have access to it

25    because in that same SharePoint directory they publish

1    a document, it's called a beneficiary matrix, and that

2    spells out the investor loan numbers and has the

3    information regarding how the trust is named.  It's

4    sort of like a "foreclosed in the name of" template so

5    you can look up the loan in the servicing platform, you

6    can get the investor number.  Then you go to this

7    database, and you can look up the investor information

8    that way.

9    **Q.**    Okay.  Just to put a fine point on my question,

10   what I was trying to understand is -- and here's the

11   question.

12         Is it fair to say that the SharePoint website is

13   an intranet site held by the company within which

14   company employees can access these trust acquisition

15   documents?

16   **A.**    That is correct.

17   **Q.**    Okay.  To the best of your knowledge, the loan

18   acquisition documents that you've reviewed for this

19   trial were taken from a CD and placed into the

20   SharePoint website; is that accurate?

21         MR. ENNIS:  Objection.

22         THE COURT:  All right.  If there's an objection,

23   it's overruled.  Go ahead and answer that.

24         THE WITNESS:  That's my understanding.

25   **Q.**    And have you had the opportunity to review

1    Homeward Residential's servicing records for other

2    loans that Ocwen ended up servicing?

3    **A.**    Yes.

4    **Q.**    And for how many years have you reviewed Homeward

5    servicing records?

6    **A.**    Well, since the merger.  I'd have to go back and

7    look and see.  I don't remember the exact date of the

8    merger.

9    **Q.**    And have you had the opportunity to review

10   Homeward servicing records for mortgage loans that were

11   originated with Option One Mortgage Corporation?

12   **A.**    Yes.

13   **Q.**    So is it fair to say that this lawsuit is not the

14   first time you've reviewed Homeward servicing records?

15   **A.**    Correct.

16   **Q.**    And is it fair to say that this is not the first

17   time you've reviewed mortgage servicing records for a

18   loan that was originated with Option One?

19   **A.**    I have seen other loans that way, yes.

20   **Q.**    What is the relationship between Ocwen Financial

21   Corporation and PHH Mortgage?

22   **A.**    PHH Mortgage is a subsidiary of Ocwen Financial

23   Corporation.

24   **Q.**    Has Ocwen's business remained the same since

25   merging with PHH?

1    **A.**    As far as servicing, yes.

2    **Q.**    Okay.  And when Ocwen Loan Servicing and PHH

3    merged, was there a transfer of records between Ocwen

4    and PHH?

5    **A.**    Yes.

6    **Q.**    And can you describe what records were

7    transferred.

8    **A.**    The servicing records that Ocwen maintained and

9    all the data were transferred over to the -- from the

10   REAL Servicing mortgage platform to the MSP -- it's

11   called Black Knight LoanSphere MSP -- servicing

12   platform using the same type of boarding process I

13   described earlier.  However, it was a little bit easier

14   in this case because at the time Ocwen and PHH merged,

15   Ocwen and PHH maintained two servicing systems so they

16   could easily compare the data that was boarded under

17   the new one directly from the data that was in the

18   prior system.

19   **Q.**    And how about the documents?  Can you explain to

20   the Court how the loan documents were transferred from

21   Ocwen to PHH.

22   **A.**    Ocwen used to maintain the loan documents in an

23   image database called CIS which stands for customizable

24   imaging solutions.  Subsequent to the servicing

25   transfer to PHH, those documents were imported into the

1    new document repository database which is called iDesk.

2    The record imaging people would sort them out and index

3    them with an identification such as collateral or HUD-1

4    or closing or acquisition or, you know, very broad

5    terminology for the type of document.

6         You just go in, pull the loan number up, brings

7    up all the images.  And then you can scroll through the

8    images and click one and it will bring it up.  And you

9    can print it or save it.

10   **Q.**   Can you describe what steps you have taken to

11   review and familiarize yourself with the loan file at

12   issue in this litigation.

13   **A.**    Yes.  I looked at the business records, the

14   origination documents, the HUD-1, the closing

15   settlement statements, collateral file documents such

16   as the note, mortgage.  I reviewed correspondence.  I

17   reviewed escrow statements.  Monthly statements.

18   Payment history records.  I reviewed the foreclosure

19   complaint.  I reviewed some bankruptcy documents.  Of

20   course, counsel's petitions and pleadings as well as

21   responses to interrogatories.  And the trust documents

22   that we have as part of the exhibits.

23   **Q.**    Are all of the actions that you undertook that you

24   just explained, are those consistent with your job

25   duties as a loan analyst for PHH?

1    **A.**    They are.

2    **Q.**    And is it the normal and customary practice of PHH

3    to maintain the records you have reviewed in

4    preparation for today's testimony?

5    **A.**    Yes, they are.

6    **Q.**    Okay.  Now, I want to turn your attention, I want

7    to talk about some of these systems in greater detail.

8         So I want to start with the loan level records,

9    okay?

10    **A.**    Okay.

11    **Q.**    Are there software systems that PHH utilizes to

12    keep and maintain loan level documents for the loans

13    that Ocwen services on behalf of these trusts?

14    **A.**    Could you repeat that question.

15    **Q.**    Are there software systems that Ocwen

16    keeps -- sorry.  Strike that.

17         Are there software systems that Ocwen utilizes

18    to keep and maintain loan level documents for the loans

19    Ocwen services on behalf of trusts?

20    **A.**    Yes.  The loan level documents maintained by PHH

21    are in the iDesk application.

22    **Q.**    Okay.  Now, can you explain to the Court how you

23    go about accessing iDesk.

24    **A.**    Yes.  There's a link on my desktop, and I can

25    click that link and it will take me to the platform.  I

1      can access MSP or I can select iDesk.  Clicking on

2      iDesk brings it up, and then you just put the loan

3      number in and hit enter.  And about a minute later you

4      have a list of documents to scroll through.

5      **Q.**    Okay.  How do you know the loan number that you're

6      going to enter into iDesk?

7      **A.**    Well, I know it because I'm -- it's associated

8      with the matter that I'm working on.  The loan number

9      is also available inside the MSP servicing platform.

10     **Q.**    Okay.  We'll get to MSP in a second, but just to

11     sort of close out the discussion of iDesk, what are the

12     documents that you were able to review on iDesk for a

13     particular loan?

14     **A.**    I can view servicing-related correspondence,

15     monthly statements, escrow analysis, 1098 statements,

16     incoming and outgoing correspondence from a borrower or

17     their authorized representatives.  I can view images of

18     bankruptcy documents that have been filed.  Proof of

19     claims.  Things like that.  Discharge orders.  I can

20     review the origination documents, settlement documents,

21     closing documents.

22           Basically, the documents received from the prior

23     servicer as well as the documents that have been

24     received or generated under the current servicing

25     watch.

1    **Q.**    And do you regularly access iDesk to research and

2    review borrower documents as part of your job?

3    **A.**    Yes.  It's quite common.

4    **Q.**    And did you access iDesk in order to review loan

5    documents for this case?

6    **A.**    I did.

7    **Q.**    And can you explain to the Court what documents

8    you were able to review as a result of a search on

9    iDesk?

10   **A.**    I reviewed the origination documents, the closing,

11   the HUD-1.  I reviewed the note and mortgage.  There

12   were some underwriting documents in there.  I reviewed

13   some bankruptcy-related documents.  There was

14   modification.  There were some image payment histories,

15   correspondence to the borrower.  I think there was

16   correspondence to one of his attorneys regarding

17   escrows that had been established when payments were

18   late on taxes.  That's largely what I reviewed.

19   **Q.**    Okay.  Has Ocwen always utilized iDesk to store

20   and keep borrower's loan level documents?

21   **A.**    Once the loan transferred to PHH, that's where

22   they were retained.  Before that when Ocwen was

23   servicing them under Ocwen Loan Servicing, they were

24   retained in the CIS database.

25   **Q.**    Okay.  Can you explain -- well, strike that.

1       Do you have experience in using CIS?

2   **A.**   I did.

3   **Q.**   And did you use CIS to review and research loan

4   documents prior to the PHH merger?

5   **A.**   Yes.

6   **Q.**   And to the best of your recollection, was CIS a

7   similar software system to iDesk?

8   **A.**   Yes.

9   **Q.**   In other words, were you able to research loan

10  level documents by loan number on the CIS system?

11  **A.**   Yes.

12  **Q.**   And if you reviewed -- strike that.

13      If you enter the loan number for a particular

14  loan, you would be able to pull up the same image files

15  that you used to pull up on iDesk, correct?

16      MR. ENNIS:  Objection, your Honor; leading.

17      THE COURT:  Overruled.

18      THE WITNESS:  Correct.

19  **Q.**   And is it your testimony that -- well, strike

20  that.

21      And how long do you know did Ocwen use the CIS

22  document system?

23  **A.**   I don't know.  It was in use when I came on board

24  in 2010.

25  **Q.**   Okay.  So when Homeward merged with Ocwen, was

1    Ocwen using the CIS imaging system?

2    **A.**    Yes.

3    **Q.**    And to the best of your recollection, were the

4    Homeward loan level documents transferred into the

5    Ocwen CIS system?

6    **A.**    To my knowledge, all the business records were

7    transferred on all the loans, including the subject

8    loan.

9    **Q.**    Did you have the opportunity to review this

10    particular loan on CIS?

11    **A.**    No.

12    **Q.**    Okay.  The only place you could look for the loan

13    level documents would be on iDesk; is that true?

14    **A.**    Correct.

15    **Q.**    Okay.  Now, Mr. Handville, let me turn to another

16    aspect of the loan.

17        Does Ocwen presently maintain a site that stores

18    all of the account and loan information for a

19    particular loan and for that borrower?

20    **A.**    That information is in the servicing platform MSP.

21    **Q.**    Okay.  So I was just going to ask you that.

22        What is the name of the system that they use?

23    **A.**    Black Knight MSP.

24    **Q.**    And do you access MSP as part of your regular job

25    duties at PHH?

1    **A.**    Yes.

2    **Q.**    Can you explain to the Court how you can access

3    and search a loan on MSP.

4    **A.**    Well, to access the loan in MSP you need the loan

5    number.

6    **Q.**    Okay.

7    **A.**    So you input the loan number.  If you were going

8    to do a search, you would need the borrower's name, the

9    property address and the last four digits of the

10   social.

11   **Q.**    Is it possible to search MSP by entering the

12   borrower's first and last name?

13   **A.**    That's not enough information.  You'd need more.

14   **Q.**    So I think you testified earlier.  What are the

15   other identifiers that you need to enter in order to

16   access MSP and review an account?

17   **A.**    Well, if you didn't have the loan number and you

18   were doing a search, you would need the property

19   address and the last four digits of the borrower's

20   social security, as well as their first and last name.

21   **Q.**    Okay.  Did you search MSP for account information

22   of the borrower in this lawsuit?

23   **A.**    I had the loan number; I didn't need to do a

24   search.  But I did enter the loan number and access it

25   in MSP.

1  **Q.**   Okay.  And once you entered the loan number, what

2  information were you able to retrieve about the

3  borrower from MSP?

4  **A.**   You can pull up information such as the due date,

5  the principal balance, who the investor is, document

6  custodian, things like that.

7  **Q.**   And in this particular case, were you able to

8  identify the name of the investor by reviewing the

9  borrower's account on MSP?

10       MR. ENNIS:  Objection; foundation.  There hasn't

11  been a demonstration laid.  Investor means the trust.

12  He hasn't provided a foundation for that.  He's merely

13  reading from a record.

14       THE COURT:  Well, he's testifying about what he

15  did so overruled.  Go ahead.

16       THE WITNESS:  Yes.  In MSP I noted the investor

17  number that PHH assigns to the individual trust.  I

18  went to the beneficiary matrix and entered that number

19  so I could get the information regarding the trust and

20  the power of attorney.  And then from there I was able

21  to go into the SharePoint site using that investor

22  number to access the trust documents.

23  **Q.**   Okay.  So by reviewing the borrower's account on

24  MSP, were you able to locate an identifier or a number

25  that references U.S. Bank, as Trustee for the trust in

1    this case?

2    A.    Yes.

3    Q.    Okay.  And were you also able to identify an

4    investor number that was assigned to this particular

5    investor?

6    A.    Yes.

7    Q.    And then were you able to use the investor name

8    and the investor number in order to crosscheck other

9    systems to confirm the investor?

10   A.    I used the investor number to access the trust

11   documents.

12   Q.    Were you also able to locate the loan number that

13   PHH assigns to the borrower's loan in this case?

14   A.    Yes.

15   Q.    And were you able to review the financial status

16   of the borrower's account by access to MSP?

17   A.    Yes.

18   Q.    Did Ocwen utilize MSP prior to the PHH merger?

19   A.    No.

20   Q.    Do you know what servicing system Ocwen used prior

21   to merging with PHH?

22   A.    It was called REAL Servicing.

23   Q.    And did you review REAL Servicing as part of your

24   regular job functions as a loan analyst?

25   A.    Yes.

1    **Q.**   And generally speaking, not talking about this

2    particular loan, but were you able to review the same

3    information about borrowers' loans that you now review

4    on MSP?

5    **A.**   Yes.

6    **Q.**   In other words, when Ocwen used REAL Servicing,

7    you had access to the borrower's account information,

8    loan number and other data; is that true?

9    **A.**   Correct.

10   **Q.**   And is it your understanding that the Homeward

11   Mortgage accounts and information was transferred over

12   to Ocwen's REAL Servicing system?

13   **A.**   Correct.

14        MR. ENNIS:  Objection; foundation.

15        THE COURT:  All right.  You can ask him how he

16   knows.

17   **Q.**   Mr. Handville, do you know if Homeward's loan

18   information was boarded on to REAL Servicing?

19   **A.**   Yes, it was.

20   **Q.**   Can you describe the process through which loans

21   were boarded into REAL Servicing?

22   **A.**   Yes.  It's the same process I've described before.

23   The electronic information is transmitted ahead of

24   time.  Once the loan information is received, we get an

25   update prior to the loan going live.  Information is

1    boarded live.  They run a test to make sure the

2    information populates properly with the new loan

3    numbers.

4        Then once the loan is boarded, the

5    reconciliation specialist from the investor reporting

6    group verifies the information regarding having the

7    loan set up properly with the proper due dates,

8    principal balances.  They verify that by looking at the

9    original collateral documents, the note and mortgage,

10   to make sure the term has been set up properly, as well

11   as any other documents that would have affected that

12   such as a modification.  And that way they verify the

13   information that's come in from the prior servicer.

14       And then they go through the regular audit

15   process for taxes and insurance and if the loan is in

16   bankruptcy or foreclosure, verifying that information

17   as well.

18   **Q.**    And so Mr. Handville, in your experience, beyond

19   this loan, did you have experience in reviewing

20   Homeward loan files and loan account information once

21   the loans had been transferred to Ocwen?

22   **A.**    Yes.

23   **Q.**    And was that review that you undertook on the REAL

24   Servicing platform?

25   **A.**    Yes.

1  **Q.**   But now that Ocwen has merged with PHH, those

2  servicing information and records have been transferred

3  to MSP; is that accurate?

4  **A.**   Yes.

5  **Q.**   And while you were using REAL Servicing, is it

6  fair to say that you could locate the investor

7  information that you previously discussed in relation

8  to MSP?

9  **A.**   Yes.

10  **Q.**   And were you also able to crosscheck that investor

11  information with other servicing systems that Ocwen

12  maintained?

13  **A.**   Yes.

14  **Q.**   Did Ocwen maintain a SharePoint site before

15  merging with PHH?

16  **A.**   Yes.

17  **Q.**   And before merging with PHH, did you utilize that

18  same SharePoint site in order to locate investor loan

19  acquisition documents?

20  **A.**   Yes.

21  **Q.**   And did you review REAL Servicing on a regular

22  basis as part of your job duties at Ocwen?

23  **A.**   Yes.

24  **Q.**   And did you review Homeward Residential service

25  loans that had been transferred to Ocwen on the REAL

1    Servicing database as part of your job?

2    **A.**    Yes.

3    **Q.**    Okay.  Now, Mr. Handville, does Ocwen presently

4    utilize a software system where you can access a

5    borrower's payment history and comments or notes

6    related to the borrower's loan?

7    **A.**    Yes.

8    **Q.**    Do you know the name of that system?

9    **A.**    Outside of the servicing system itself, which has

10   screens that have that information, I can pull -- I can

11   run a report and print out a system that will

12   maintain -- it will play back all the comments and the

13   payment history.  Whatever date specifications I put in

14   the software is called Web Direct.

15   **Q.**    And Mr. Handville, do you know when Ocwen started

16   to utilize Web Direct?

17   **A.**    It was when they merged with PHH.  That's when

18   they began using it.

19   **Q.**    Do you utilize Web Direct in the regular course of

20   your job functions as a loan analyst?

21   **A.**    Yes.

22   **Q.**    Did you access Web Direct in order to review

23   payment history and comments or notes related to this

24   borrower's loan?

25   **A.**    I utilized the prior servicer history mainly,

1  although I did look at the comments and the notes after

2  the acquisition.

3  Q.   Okay.  Let's break this up into two questions.

4       What did you review in terms of prior servicing

5  history when you accessed Web Direct for the borrower's

6  loan?

7  A.   No, no, no.  I think you misunderstood.

8  Q.   Sorry.

9  A.   I looked at the payment history, the information

10  that we had imaged in CIS, and I did look at the

11  comments and notes from the time of the merger forward.

12  But most of the information I was looking at was in the

13  past, so I didn't really focus on the newer comments

14  and payment history information.

15  Q.   Okay.  Can you explain to the Court what

16  information you were able to maintain regarding the

17  borrower from Web Direct?

18  A.   It verified the principal balance and the due

19  date, escrow balance, and the fees and charges that

20  have been assessed to the loan since it boarded.

21  Q.   Okay.  And has Ocwen always used the Web Direct

22  system?

23  A.   No.  We didn't start using that until the merger

24  with PHH.

25  Q.   What system did Ocwen use prior to Web Direct?

1    **A.**    It's called MicroStrategy.

2    **Q.**    Okay.  Now, in terms of Web Direct, how do you

3    perform a search for a loan?

4    **A.**    You click on the link, opens it up.  You put in

5    the loan number.  And then you -- in Web Direct you

6    specify the date period.  So you could select one year,

7    the last year, or you could go back further or you

8    could go back to infinity and it will just pick up

9    wherever the information that it has into it.  And you

10   just ask it to print and it prints it out.

11   **Q.**    Okay.  And can you explain for the Court what

12   those printouts -- what information you're getting on

13   those printouts.

14   **A.**    Well, for payment history information you're going

15   to get the principal balance.  You're going to get a

16   heading at the top with the borrower's name and loan

17   information.  And the payment history; just shows what

18   the balances are any given time, fees and costs

19   assessed to the loan, things like that.

20        The comments will show the date of the entry and

21   the substance of the entry.  Say, if a borrower called

22   in and had a question about something, it would note

23   that in the comments.  And so on and so forth.

24   **Q.**    And Mr. Handville, were you able to pull a payment

25   history for the borrower's loan from Web Direct?

1    **A.**    I did look at a payment history from Web Direct,

2    but there weren't any payments made on it so I didn't

3    really focus on it.

4    **Q.**    Okay.  Is the Web Direct software system one that

5    you use on a regular basis as part of your job at PHH?

6    **A.**    Yes.

7    **Q.**    Do you, Mr. Handville, have a recollection of how

8    you searched for loans on MicroStrategy?

9    **A.**    MicroStrategy, you put the loan number in.  As

10    long as you have the loan number, you can just enter

11    it.

12    **Q.**    Is it fair to say, Mr. Handville, that the

13    MicroStrategy software system is similar to the Web

14    Direct system in terms of how you research loans?

15    **A.**    In terms of how you research it and functionality,

16    it's very similar.

17    **Q.**    That was going to be my follow-up.  So is it fair

18    to say that the information you obtained from

19    MicroStrategy is similar to what you now obtain on Web

20    Direct?

21         MR. ENNIS:  Objection.  There's no suggestion

22    that he has searched this loan under MicroStrategy.

23         THE COURT:  Overruled.

24         THE WITNESS:  The functionality and the

25    information is largely the same.

1    **Q.**    Okay.  Were you able to review the borrower's

2    payment history on MicroStrategy?

3    **A.**    I don't think I looked at MicroStrategy on that

4    because we had the payment history from the prior

5    servicer in printed form already.

6    **Q.**    Okay.  Do you know if payment histories from the

7    prior system were transferred over to the Web Direct

8    system?

9    **A.**    I don't know.  I don't recall.

10   **Q.**    Okay.  Are you able to search on Web Direct for

11   payment and comment histories before Ocwen merged with

12   PHH?

13   **A.**    No.  That system wasn't available to us before

14   then.

15   **Q.**    Okay.  So can you explain to the Court then how

16   you were able to review payment histories and comment

17   histories for events that occurred before the merger

18   between Ocwen and PHH?

19   **A.**    Because that information was transferred from one

20   servicing platform to the other.

21   **Q.**    Okay.

22   **A.**    So the data is resident inside the servicing

23   platform.

24   **Q.**    Okay.  And were you able to review the borrower's

25   loan on -- sorry.  Strike that.

1      THE COURT:  I'm not sure I understand the last

2    two answers because you asked him if he could search

3    Web Direct for payment and comment history before the

4    merger and he said no.

5          MR. BODURTHA:  Okay.

6          THE COURT:  But then he said the information was

7    transferred from one platform to the next which would

8    imply that it's there, so could you get that clarified.

9          MR. BODURTHA:  Yes.  Let me see if I can clarify

10   that.

11   **Q.**  Mr. Handville, can you clarify how the prior

12   payment history and prior comments from MicroStrategy

13   are accessible.

14   **A.**  The payment information in MicroStrategy

15   incorporates the information resident in the prior

16   servicing platform REAL Servicing.  The information in

17   Web Direct incorporates the data of the time of the

18   transfer from Ocwen Loan Servicing to PHH.  So if I run

19   a payment history in MicroStrategy, it's going to start

20   around the time the loan boarded onto MSP.  If I want

21   to look at the payment history before then, then I

22   would go to the MicroStrategy system to look at what

23   REAL Servicing had incorporated.

24         To clarify for the Court, I was answering that I

25   wouldn't be able to look at documents in Web Direct

1    before the merger, meaning, we did not have access to

2    that system before the merger.

3              THE COURT:  I see.  Okay.

4    **Q.**    Do you still have access to MicroStrategy?

5    **A.**    Yes.

6    **Q.**    Okay.  So if you wanted to review the payment

7    history for this loan prior to the merger, could you

8    access that payment history on MicroStrategy?

9    **A.**    Yes.

10   **Q.**    And did you access MicroStrategy to look at the

11   payment history for this borrower's loan before the

12   merger?

13   **A.**    I don't recall if I did or not.

14             MR. BODURTHA:  Okay.  Did I clarify the point,

15   your Honor?  I just want to make sure --

16             THE COURT:  Yes, I think you did.

17             MR. BODURTHA:  Okay.  Thank you.

18   **Q.**    Now, I want to go beyond the loan level and

19   borrower information with you, Mr. Handville.  Does

20   Ocwen presently have a software system where you can

21   search for documents that show the investor's

22   acquisition of the loans that Ocwen services?

23             MR. ENNIS:  Objection, your Honor.  There's no

24   servicing by Ocwen.

25             MR. BODURTHA:  Do you want me to rephrase and

1    make this clearer?

2            THE COURT:  Yes.  You can rephrase this.

3    **Q.**   Mr. Handville, does PHH presently have a software

4    system where you can search for documents that show the

5    investor's acquisition of the loan that PHH services?

6    **A.**   We have a SharePoint drive where these -- we call

7    them deal documents -- are maintained.

8    **Q.**   Did you say "deal documents," Mr. Handville?

9    **A.**   I did.

10   **Q.**   Okay.  Thank you.

11          And do you access the SharePoint site as part of

12   your regular job functions as a loan analyst?

13   **A.**   Yes.

14   **Q.**   When you access SharePoint, are you searching for

15   a particular borrower?

16   **A.**   In some cases, yes.

17   **Q.**   Okay.  How do you search -- well, strike that.

18          Can you explain to the Court what types of

19   documents are kept within the SharePoint site?

20   **A.**   Yes.  The documents that would be in the

21   SharePoint drive, what we call the deal documents,

22   would be the -- not so much loan level information as

23   trust information.  There would be trust-related

24   documents regarding the pooling and servicing agreement

25   as an example.  Other trust documents that the trustee

1    has changed or some of the services changed.  Sometimes

2    they had documents in there for changing out the

3    trustee's assignment and assumption and resignation

4    documents and things like that.  Sometimes there are

5    acquisition-related documents regarding the placement

6    of the loans into the trust.  And things like that.

7           Often, not always, but sometimes we get the

8    entire mortgage loan schedule unredacted.  And if I

9    were to be looking specifically for a given loan, that

10   would be the reference I would use to determine if it

11   was included in the list of loans for the trust.

12   Q.   Mr. Handville, when you access SharePoint, are you

13   able to initiate a document search?

14   A.   Yes.

15   Q.   How do you search for documents on the SharePoint

16   site?

17   A.   In the SharePoint site they maintain a list of

18   investor numbers for each individual trust.  The

19   investor number is also available in MSP so if I have

20   the investor number, then going into SharePoint I just

21   type the investor number, hit N and hit search and it

22   brings up the folder.  Then I click on the folder and

23   review the contents.

24   Q.   Okay.  So I think you answered my next question,

25   but let's put a fine point on this.

1    How do you determine the investor number that
2    you're going to search on SharePoint?
3    **A.**    It's in the servicing system.  It's in MSP.
4    **Q.**    Okay.  Does the investor number include -- well,
5    strike that.
6    What part of MSP includes the investor number?
7    **A.**    It's on the investor screen.
8    **Q.**    Okay.  And do you access a particular -- strike
9    that.
10    Is the screen that you're looking at associated
11    with an individual borrower's account?
12    **A.**    The screen in MSP is in their loan records, so I
13    just go to the investor screen and it would display the
14    information.  Then I would take that investor number
15    and go into SharePoint.
16    **Q.**    Okay.  So I've done this awkwardly, but just to
17    clarify this, is it your testimony that there is a
18    screen within MSP that when you enter the borrower's
19    information, you have the borrower up, that screen is
20    going to show investor information; is that true?
21    **A.**    Correct.
22    **Q.**    And did you actually search MSP for the borrower
23    in this case on the investor screen?
24    **A.**    I did locate the investor information in the MSP
25    system for this loan.

1    **Q.**    Okay.  So once you had the investor information

2    from MSP, then did you move over to the SharePoint

3    system?

4    **A.**    Yes.

5    **Q.**    Okay.  And so then when you took that information

6    from MSP and entered it into the SharePoint system,

7    were you able to locate trust -- what you called the

8    deal documents?

9    **A.**    Yes.

10   **Q.**    And did you review the deal documents that

11   establish the trust for which U.S. Bank serves as

12   trustee in this case?

13   **A.**    Yes.

14   **Q.**    And can you explain -- can you describe to the

15   Court the documents that you were able to locate on

16   SharePoint.

17         MR. ENNIS:  Objection, your Honor.  I think

18   they're talking about copies.  I think they have to

19   first establish that there are original documents and

20   these documents, the copies that he reviewed, are

21   copies of an original document.

22         THE COURT:  Well, I'm not sure that's correct,

23   but I'm going to overrule the objection and allow Mr.

24   Bodurtha to lay out the testimony and then we can argue

25   about whether it's admissible or not.

1         Go ahead.

2         MR. BODURTHA:  Can you repeat the question I

3  just asked.

4         (Record read)

5         THE WITNESS:  Yes.  A number of these are marked

6  as exhibits.  I was able to review the assignment and

7  assumption agreement, mortgage loan sale and assignment

8  agreement, the trust agreement, servicing agreement,

9  the mortgage loan schedule.  There is something marked

10  "Notice of Resignation" and "Appointment of Trustee."

11  So those are the types of documents that we're able to

12  view in the SharePoint site.

13  **Q.**  And Mr. Handville, were you able to compare the

14  documents held on the SharePoint website with the

15  documents that have been submitted as proposed exhibits

16  in this case?

17  **A.**  I have.

18  **Q.**  And when did you undertake that review?

19  **A.**  I started prior to my deposition, and I finished,

20  I think it was, Friday afternoon I went in and verified

21  them.

22  **Q.**  Okay.  And is it your normal practice to review

23  deal documents on the SharePoint website as a loan

24  analyst for PHH?

25  **A.**  Yes.

1    **Q.**   And are all of the documents that have been

2    presented or at least identified as exhibits, are those

3    true and accurate copies of the documents that are held

4    within the SharePoint website?

5    **A.**   Yes.

6    **Q.**   I want to direct -- well, strike that.

7         Is it the normal and customary practice of PHH

8    to maintain documents that you refer to as the "deal

9    documents" on the SharePoint website?

10   **A.**   It's very customary.  That's why they created the

11   SharePoint site so it could be accessed.

12   **Q.**   Do you know, Mr. Handville, when the SharePoint

13   website was created?

14   **A.**   I do not.

15   **Q.**   Has PHH, or prior to PHH Ocwen, utilized the

16   SharePoint website since you started working there?

17   **A.**   Yes, I believe they started using SharePoint

18   sometime after I worked there, after I came on board.

19   **Q.**   Is it your understanding that the deal documents

20   that were previously held by Homeward were transferred

21   into the SharePoint website?

22   **A.**   Yes.

23        MR. ENNIS:  Objection; lack of foundation.

24        THE COURT:  Well, you can ask him how he knows.

25   **Q.**   And Mr. Handville, can you explain to the Court

1    how you know that the deal documents were transferred

2    into the SharePoint website.

3    **A.**    Because I can access them.  They exist, therefore,

4    they are.

5    **Q.**    Okay.  Let me ask you about your understanding of

6    the CD that you testified about earlier.

7         Do you have an understanding of the process

8    through which the CD of documents was then transferred

9    into SharePoint?

10        MR. ENNIS:  Objection, your Honor.  On this one,

11   we have never been provided any information about this

12   CD either through the prior deposition of this witness

13   or the supplemental answers to interrogatories or the

14   supplemental production.  This is the first time we

15   have heard about the existence of this document.  And

16   that is highly prejudicial in light of the fact that

17   they waited until February 2nd to provide any documents

18   until trial to even mention the existence of this CD.

19        THE COURT:  All right.  Well, I'll let you

20   cross-examine on that and then I'll consider it, but

21   I'm going to allow the witness to answer the question.

22        So go ahead.

23        MR. BODURTHA:  Thank you, your Honor.

24   **Q.**    Can you answer the question, Mr. Handville?

25   **A.**    It was mentioned to me that we had it in a

1    conversation I had with a staff member.  That's the

2    only information I know about the CD.

3    **Q.**    Okay.  Now, I want to turn your attention to the

4    specific, what we'll call the deal documents, and we'll

5    try to go through these exhibits one by one with you.

6    I understand I can't show you my exhibits so I'm going

7    to refer to them by the letters that we assigned to

8    them for identification.

9         Are there documents on the SharePoint website

10   which reflect the deposit of the borrower's loan into

11   the 2003-BC11 trust?

12        MR. ENNIS:  Objection; foundation, your Honor.

13   That's a fundamental question they're trying to

14   establish through a witness with no foundation.

15        THE COURT:  Well, you can cross-examine on it,

16   but I think he's laid the foundation for this with all

17   of his prior testimony.

18        What exhibit are you referring to?

19        MR. BODURTHA:  I'm going to start, your Honor,

20   with Exhibit II.  It was a supplement that we submitted

21   last week, and I provided copies to your clerk.  I

22   don't know if it's made it into your folder which is

23   rather large, and my apologies for that.

24        THE COURT:  Yes, I have it.

25        MR. BODURTHA:  Thank you.

1    **Q.**   Now, let me ask you again, Mr. Handville.  Are

2    there documents on SharePoint which reflect the deposit

3    of the borrower's loan into the 2003-BC11 trust?

4    **A.**   Yes.  The pooling and servicing agreement

5    establishes who the parties are involved with the trust

6    and the requirements to place the loans in the trust

7    and the documents associated with that.

8    **Q.**   Okay.  All right.  You mentioned a pooling and

9    servicing agreement.  Can you inform the -- are you

10   referring to a particular document that we identified

11   as an exhibit in this case?

12   **A.**   I referred to that.  It's commonly referred to as

13   a pooling and servicing agreement.  In this case it's

14   referred to as the trust agreement dated 10-1-03.

15   **Q.**   Okay.  And if I can have you take a look at the

16   exhibit that's been marked for identification as II.

17   Can you take a look at that document.

18   **A.**   That's the trust agreement I was referring to.

19   **Q.**   Okay.  Did you review Exhibit II against the

20   agreement that Ocwen keeps on the SharePoint system?

21   **A.**   I did.

22   **Q.**   Is Exhibit II a true and accurate copy of the

23   trust agreement kept within Ocwen's SharePoint system?

24   **A.**   Yes.

25   **Q.**   Okay.  Now, is there another -- are you aware of

1    another version of this document that has been

2    submitted to the Court?

3    **A.**    Under I believe it's listed as Exhibit J, there is

4    a servicing agreement dated 10-1-03.

5    **Q.**    Okay.  I think I may have confused you here.  Let

6    me actually refer you, Mr. Handville, to Exhibit I if I

7    can.

8    **A.**    I have it.

9    **Q.**    All right.  Now, looking at Exhibit I, have you

10   reviewed this document?

11   **A.**    Yes.

12   **Q.**    All right.  Do you have an understanding of what

13   Exhibit I is?

14   **A.**    It's as stated, a trust agreement dated 10-1-2003

15   for this particular trust.

16   **Q.**    Okay.  Is Exhibit I the same document as Exhibit

17   II?

18   **A.**    Hang on a second.  I have to compare them.  Hang

19   on.  They appear to be titled the same.

20   **Q.**    Okay.  Can you explain to the Court -- well,

21   strike that.

22          Do you have an understanding of what the

23   differences are between the two documents?

24   **A.**    I believe Exhibit I is a -- I'm not sure I'm going

25   to say this right -- truncated version or an incomplete

1    version.  I think it was -- didn't have all the same

2    pages that Exhibit II had.  I believe that was what was

3    submitted prior to the deposition and came up during

4    the course of the deposition.  And I think you

5    indicated that you sent it because it was smaller and

6    easier to open and read, as I recall.

7    **Q.**   And if I turn your attention to the last few

8    pages, the last three pages of Exhibit I, are you

9    there?

10   **A.**   Yes.

11   **Q.**   And those pages include signatures; do they not?

12   **A.**   Exhibit I displays electronic signatures.

13   **Q.**   Okay.  And are there also notations at the bottom

14   of the page that show a website?  Do you see that on

15   Exhibit I?

16   **A.**   Yes.

17   **Q.**   In your experience as a loan analyst, have you

18   seen deal documents that were filed with the Securities

19   and Exchange Commission?

20   **A.**   I have.

21   **Q.**   Okay.  And do you know whether it is possible to

22   search for these types of deal documents on the

23   Securities and Exchange Commission's EDGAR website?

24   **A.**   It's my understanding that some of these documents

25   are searchable on their website.

1    **Q.**    Do you have an understanding of why a trust

2    agreement like this would be placed onto the EDGAR

3    website?

4    **A.**    Well, as I understand it, these trusts have to

5    register with the SEC and make available the documents.

6    **Q.**    Okay.  Do you know, Mr. Handville, if all of the

7    information contained within a trust agreement is

8    submitted to the SEC?

9    **A.**    To my knowledge, they omit the mortgage loan

10   schedule.  I mean, let me clarify that.  It's my

11   understanding that the SEC does not make available for

12   searching the mortgage loan schedules.

13   **Q.**    Okay.  And if I -- strike that.

14        Is Exhibit I, this truncated agreement, is that

15   document kept within the SharePoint website?

16   **A.**    No.  I believe it's Exhibit II that we keep in the

17   SharePoint website.

18   **Q.**    Okay.  So let's turn your attention back to

19   Exhibit II.

20        Do you have an understanding of the particular

21   transaction that this trust agreement memorializes?

22   **A.**    I'm familiar with the loans that were on the

23   mortgage loan schedule associated with this trust

24   agreement.

25   **Q.**    Okay.  Well, let me ask you this.  Do you have an

1    understanding of the transaction that occurs as a

2    result of this trust agreement?

3            MR. ENNIS:  Objection; foundation, your Honor.

4            THE COURT:  Overruled.

5            THE WITNESS:  I'm not sure I understand the

6    question.  Could you repeat it.

7    **Q.**   Do you have an understanding of the transaction

8    that occurred within this trust agreement?

9    **A.**   The transactions that I think you're referring to

10   are the placement of a certain pool of loans in the

11   trust and the trust agreement stipulates how the

12   documents are to be transferred to them.  It stipulates

13   who the parties are to the trust agreement.  It

14   stipulates who the document custodians will be.  And it

15   references the -- a lot of information regarding, you

16   know, the creation and declaration and registration and

17   a lot of distributions, allocations.  It gets very,

18   very technically involved, but it basically speaks to

19   the creation and administration of the trust.

20   **Q.**   Okay.  And based upon your review of Exhibit II,

21   do you know who the depositor is in the trust

22   agreement?

23   **A.**   Yes.  The depositor is Structured Asset Securities

24   Corporation.

25   **Q.**   Are you able to explain to the Court the role that

1    the depositor plays in the trust agreement?

2    **A.**    The depositor basically purchased the loans from,

3    I believe in this case, Lehman Brothers and then they

4    placed them into this trust.

5    **Q.**    Okay.  And do you know from review of the trust

6    agreement the entity that served as trustee?

7    **A.**    The original trustee was LaSalle Bank National

8    Association.

9    **Q.**    Does the trust agreement identify the name of the

10   trust?

11   **A.**    It does.

12   **Q.**    What is the name of the trust in this trust

13   agreement?

14   **A.**    Structured Asset Investment Loan Trust, Mortgage

15   Pass-Through Certificates, Series 2003-BC11.

16   **Q.**    And Mr. Handville, do you know approximately how

17   many loans Structured Asset Securities Corporation

18   deposited into this trust?

19        MR. ENNIS:  Objection; foundation.  No testimony

20   about Structured Asset at all.

21        THE COURT:  Overruled.

22        THE WITNESS:  In looking at the mortgage loan

23   schedule, there was over 12,665 or 4 loans.

24   **Q.**    Okay.

25   **A.**    Well in excess of 12,000 loans in this trust.

1    **Q.**    To the best of your knowledge, does the trust

2    agreement identify servicers who will serve the trust?

3    **A.**    Yeah.  At the time I believe it was Aurora.

4    Aurora Loan Services was the master servicer.

5    **Q.**    Okay.  Let me direct your attention to page 50 of

6    the trust agreement marked as Exhibit I.  Just let me

7    know when you're there.

8    **A.**    50 of II?

9    **Q.**    Yes.

10   **A.**    I'm there.

11   **Q.**    Okay.  And you've reviewed this document, right?

12   **A.**    Yes.

13   **Q.**    And is there a defined term for servicers within

14   the trust agreement?

15   **A.**    No, we just call it servicers.

16   **Q.**    And you testified earlier that you thought the

17   servicer was Aurora Loan Servicers.  Did you testify to

18   that earlier?

19   **A.**    That is the master servicer, yes.

20   **Q.**    Are there other servicers included within the

21   definition of servicer on page 50?

22   **A.**    Yes, there are several.  There's Aurora Loan

23   Services, Chase Manhattan Mortgage, Ocwen Federal Bank,

24   Option One Mortgage Corporation, Wells Fargo Home

25   Mortgage, Inc., and Wilshire Credit Corporation.

1    **Q.**    Okay.  Is it your understanding, Mr. Handville,

2    that the trust agreement will govern the relationship

3    between a servicer and the trust that owns the mortgage

4    loans?

5    **A.**    It's my understanding.

6    **Q.**    And is it your understanding from reviewing this

7    trust agreement that Option One Mortgage Corporation

8    was identified as one of the servicers to this trust?

9    **A.**    Yes.

10    **Q.**    Does Ocwen keep the trust agreement marked as

11    Exhibit II as part of its -- I'm sorry.  Strike that.

12          Does PHH keep the trust agreement marked as

13    Exhibit II in the course of its regular business of

14    servicing mortgage loans?

15    **A.**    Yes.

16    **Q.**    Do you know when PHH received this trust

17    agreement?

18    **A.**    No, I don't know specifically when.

19    **Q.**    Okay.  Do you know from whom PHH received this

20    trust agreement?

21    **A.**    We would have received this from the prior

22    servicer.

23    **Q.**    Okay.  And who was the prior servicer?

24    **A.**    Homeward Residential.

25    **Q.**    Okay.  How do you know that Ocwen would have

1    received this agreement from the prior servicer?

2    **A.**    Because that's the responsibility of the prior

3    servicer to send the deal docs on the loans that are

4    service transferred.

5    **Q.**    And to the best of your knowledge, has Ocwen

6    maintained this trust agreement in its business records

7    since merging with Homeward?

8    **A.**    We've maintained it since we received it.

9    **Q.**    Okay.  And is Exhibit II a true and accurate copy

10    of the trust agreement that Ocwen -- PHH -- maintains

11    in its business records?

12    **A.**    It is.

13    **Q.**    Okay.  Does the trust agreement marked as Exhibit

14    I define the mortgage loans that have been transferred?

15    **A.**    I'm not sure what you mean by "define" them.

16    **Q.**    Sorry.  Let me see if I can direct your attention

17    to a page.

18        Looking at page 36 of Exhibit II.  Let me know

19    when you're there, sir.

20    **A.**    I have it.

21    **Q.**    Okay.  At the bottom of the page, there's a

22    defined term mortgage loan.  Do you see that, Mr.

23    Handville?

24    **A.**    I do.

25    **Q.**    And does the defined term refer to a mortgage loan

1    schedule as amended from time to time?

2    **A.**    It does.

3    **Q.**    And is it your understanding that the mortgage

4    loan schedule provides a full and complete identity of

5    all loans owned by the trust?

6            MR. ENNIS:  Objection; foundation, your Honor.

7            THE COURT:  Overruled.

8            THE WITNESS:  It's my understanding that it

9    would contain all the loans owned by the trust.

10   **Q.**    Okay.  Mr. Handville, do you have access to the

11   mortgage loan schedule for this particular trust?

12   **A.**    Yes.

13           MR. ENNIS:  Objection, your Honor.  There's no

14   establishment that there is a mortgage loan schedule

15   for this trust based upon any evidence presented by

16   this witness.

17           THE COURT:  All right.  Well, he just asked him

18   the question.  He testified yes.  So you may continue.

19   **Q.**    Mr. Handville, how were you able to access the

20   mortgage loan schedule for this particular trust?

21   **A.**    I accessed it through the SharePoint website, the

22   SharePoint portal.

23   **Q.**    Okay.  So is it fair to say that by -- when you

24   enter the investor number, you can access both this

25   trust agreement and a mortgage loan schedule for this

1    trust agreement?

2    **A.**    Yes.

3    **Q.**    Okay.  Now, you've reviewed all of the exhibits

4    that have been identified for this trial, and I want to

5    turn your attention quickly to Exhibit K.  Let me know

6    when you're there.

7    **A.**    I have it.

8    **Q.**    Is Exhibit K a redacted version of the mortgage

9    loan schedule held within the SharePoint system?

10    **A.**    It is.

11    **Q.**    Is Exhibit K a true and accurate copy of one line

12    within the SharePoint system?

13    **A.**    It is.

14    **Q.**    Okay.  But you would agree with me that there are

15    certain redactions within Exhibit K so that it does not

16    appear to be the entirety of a mortgage loan schedule?

17    **A.**    That is correct.

18    **Q.**    And just out of curiosity, can you tell the Court

19    why the plaintiff would redact information about this

20    particular loan and other information on this

21    spreadsheet?

22    **A.**    I think the idea of redaction is to not put on

23    display information about other people's loans.

24    **Q.**    Okay.  Now, Mr. Handville, what I'm going to do

25    now is I'm going to load up what has been marked for

1    identification as Exhibit JJ, okay.  Can you get there

2    with me.

3    **A.**    I have it.

4    **Q.**    Okay.  Now, Mr. Handville, Exhibit JJ which has

5    been submitted to the Court and provided to opposing

6    counsel, includes much more information than what you

7    would look at in Exhibit K, right?

8    **A.**    Thousands and thousands of lines of information.

9    **Q.**    Okay.  What is within, to the best of your

10    knowledge, the thousands and thousands of lines in

11    Exhibit JJ?

12    **A.**    A bunch of other people's loans.

13    **Q.**    Okay.  That's a reasonable answer.  And let me

14    just ask you to confirm this before we go any further.

15        What you're looking at in Exhibit JJ, is that

16    the mortgage loan schedule that Ocwen keeps and

17    maintains on the SharePoint website?

18    **A.**    It is.

19    **Q.**    Okay.  And does Ocwen keep and maintain this

20    schedule as part of its regular and customary servicing

21    business?

22    **A.**    It does.

23    **Q.**    Do you know from whom Ocwen received this Excel

24    spreadsheet marked as Exhibit JJ?

25    **A.**    We would have received this from the prior

1    servicer.

2    **Q.**    Okay.  And do you know who the prior servicer was?

3    **A.**    Homeward Residential.

4    **Q.**    And is it your understanding that when Ocwen

5    acquired Homeward, Homeward's servicing records

6    included this mortgage loan schedule?

7                MR. ENNIS:  Objection; leading, your Honor.

8                THE COURT:  Well, I'm allowing a little bit of

9    leading so overruled.

10                THE WITNESS:  Yes.

11    **Q.**    Okay.  Now, if you look at the entirety of this

12    schedule, okay, the Excel spreadsheet, what are the

13    features within the schedule that identify the trust?

14                THE COURT:  Just before you answer that

15    question, Exhibit JJ, I just have one page that says it

16    was filed under seal.  I can't find the actual

17    document.  Do you want me to have that?

18                MR. BODURTHA:  Your Honor, I provided your clerk

19    with -- we talked about this.  This is the thumb drive.

20                THE COURT:  Okay.  Well, let me just ask you

21    this.  Do you need me to look at anything that he's

22    testifying about right now or is it just something I

23    can review later?

24                MR. BODURTHA:  Well, there's going to be a bit

25    of a magic trick -- not a magic trick.  I'm going to

1    show the Court and Mr. Handville is going to look with

2    me how we can identify the loan on the schedule.  So it

3    may be of some use for you to have the actual schedule.

4            I did at your request create a demonstrative so

5    you could just look at this, although there's more

6    information we will go through.  So it may be --

7            THE COURT:  Let's go off the record for a

8    minute.

9            (Off-the-record discussion)

10           THE COURT:  Let's take a ten-minute break.

11           (Recess taken)

12   BY MR. BODURTHA:

13   Q.   Okay.  Mr. Handville, before we took a break, we

14   were discussing the mortgage loan schedule.  Are there

15   notations on the spreadsheet that identify the trust

16   that holds the loans on the schedule?

17   A.   Can you hear me now?

18   Q.   Yes.

19   A.   Okay.  The document has a tab -- it's a

20   spreadsheet so at the bottom it has a tab that

21   identifies BC11 WF closing file 10-30-03.

22   Q.   Okay.  Mr. Handville, what is your understanding

23   of the significance of those identifiers?

24   A.   That specifies the specific trust which is

25   identified as 2003-BC11.

1    **Q.**    Okay.  Are there any other identifiers on the

2    spreadsheet for the particular trust?

3    **A.**    Bear with me one second.  On the column marked

4    "BY," it states "Buyer ID" and it says "Option One

5    2003-2."

6         Wait a second.  That's not the right one here.

7    **Q.**    Well, let me ask you this, Mr. Handville, if I

8    can.  If you turn your attention to the very top of the

9    spreadsheet, okay.  Are you there?

10    **A.**    Yes.

11    **Q.**    And where it says "4325-SAIL2003-BC11-MLS," do you

12    have an understanding of what that file number

13    signifies?

14    **A.**    The SAIL2003-BC11 is referencing this trust.

15    **Q.**    Okay.

16    **A.**    The 4325 was Ocwen's investor number when they

17    were servicing the loan so that's why it's on there.

18    **Q.**    Okay.  And what about the initials "MLS"?  What

19    does that mean to you?

20    **A.**    Mortgage loan schedule.

21    **Q.**    Okay.  Now, if -- strike that.

22         How many loans are referenced in this particular

23    mortgage loan schedule?

24    **A.**    There's 12,665 loans on this schedule.

25    **Q.**    Okay.  And Mr. Handville, are you able to search

1    for a particular loan within the schedule?

2    **A.**    Yes.

3    **Q.**    How would you go about searching for a particular

4    loan?

5    **A.**    Well, under column A, "Loan ID," for example, I

6    would right click on that.  Oh, wait a second.  I would

7    hit the column A to highlight the entire column.  Then

8    I would hit control F on my keyboard which brings up

9    the ability to find.

10    **Q.**    Okay.

11    **A.**    And then using the -- I think in this case it's

12    Exhibit I, copy of the adjustable rate note.

13    **Q.**    Okay.

14    **A.**    I would use the -- on the top right -- I think on

15    Exhibit I, the loan number and the servicing number

16    have been redacted, but you have the original with you

17    and it shows a loan number.  So I would just type in

18    that loan number 38100 --

19    **Q.**    Mr. Handville, can I stop you for one second?

20    **A.**    Sure.

21    **Q.**    Because I think you're referring to the wrong

22    exhibit, so let me see if I can direct you to Exhibit

23    C.

24    **A.**    Exhibit C.  All right.  Bear with me.

25        Yes.  Exhibit C is the redacted one.  I'm sorry.

1    **Q.**   Okay.  So if you're looking at -- well, strike

2    that.

3         Do you have an unredacted version of Exhibit C

4    available to review?

5    **A.**   I do.

6    **Q.**   Okay.  Now, what is it within Exhibit C that you

7    were able to use to identify the borrower's mortgage

8    loan on the mortgage loan schedule?

9    **A.**   On Exhibit C, the loan number on the far left at

10   the top.

11        MR. BODURTHA:  Okay.  Your Honor, what I've put

12   on the ELMO is an unredacted version of Exhibit C.

13   It's actually the original promissory note.

14        MR. ENNIS:  Objection, your Honor.  He's

15   testifying.

16        MR. BODURTHA:  I'm just explaining what I'm

17   doing for the Court.

18        THE COURT:  Right.  The objection is overruled.

19   **Q.**   Now, Mr. Handville, in looking at the unredacted

20   promissory note, what is the number that you would use

21   in order to locate the loan on the mortgage loan

22   schedule?

23   **A.**   I would use the loan number on the top left which

24   is 381006307.

25   **Q.**   Okay.  So if we were to type in that loan number

1    on the mortgage loan schedule, we should be able to

2    locate the particular loan in this case; is that

3    accurate?

4    **A.**    Yes.

5    **Q.**    And Mr. Handville, have you located that

6    particular loan -- strike that.

7        Have you located a loan based upon a search of

8    that loan number?

9    **A.**    Yes.

10   **Q.**    Can you inform the Court what the identifying

11   number is in column number 1.

12   **A.**    9771.

13       MR. BODURTHA:  Your Honor, I don't know if this

14   is of any use to you, but you asked for it so I'm

15   giving it to you.

16   **Q.**    What I'm showing the Court, Mr. Handville, is a

17   screenshot of the first few columns of 9771.  So let me

18   ask you this.

19       By entering in the loan number that is listed on

20   the borrower's promissory note, you have located a loan

21   in the mortgage loan schedule that is under column 1,

22   number 9771; is that true?

23   **A.**    Yes.

24   **Q.**    Okay.  Now, are there other identifying features

25   within the loan schedule for this particular loan?

1    **A.**    There are a number of them.  A secondary way to
2    search would be to go under column C, the SLOANID
3    column.  On Exhibit C, there is a servicing number.
4    **Q.**    Okay.
5    **A.**    And you can type in that number which is
6    1138017-7.  And it will also come up to that same line
7    9771 to identify that loan number.
8    **Q.**    Okay.  So there are two separate identifying
9    numbers on the borrower's promissory note that you can
10   use to access the borrower's loan on the mortgage loan
11   servicing schedule?
12   **A.**    Correct.
13   **Q.**    And does the mortgage loan servicing schedule also
14   include an original balance that was owed on the loan?
15   **A.**    Yes.  It shows the original loan balance was
16   $315,400 on column D.
17   **Q.**    Okay.
18   **A.**    And that comports with the amount on the
19   promissory note.
20   **Q.**    Okay.  Let me turn your attention, Mr. Handville,
21   to column BN.  Let me know when you're there.
22   **A.**    I have it.  Column BN is loan purpose category.
23   **Q.**    What is listed as the purpose of the loan?
24   **A.**    Cash-out refinance.
25   **Q.**    Okay.  So based upon that column, do you have an

1    understanding of what type of mortgage -- what was the

2    purpose of this mortgage loan?

3    **A.**    Yes.

4    **Q.**    And that purpose is?

5    **A.**    Refinancing existing loan and take cash out.

6    **Q.**    Okay.  If I turn your attention to column CA.  Let

7    me know when you're there.

8    **A.**    CA, I have it.  It's the originator column.

9    **Q.**    Okay.  Who is listed as the originator under

10    column CA?

11    **A.**    Option One.

12    **Q.**    Okay.  Now, let me turn your attention to column

13    CC.  Let me know when you're there.

14    **A.**    I have it.  That's the seller column.  Identifies

15    Lehman Brothers Bank.

16    **Q.**    Lehman Brothers is listed as the seller in column

17    CC, correct?

18    **A.**    Correct.

19    **Q.**    All right.  Let me turn your attention to column

20    CJ.  Let me know when you're there.

21    **A.**    CJ, I have it.  That's the column identified as

22    Custodian.  It lists Wells Fargo Home Mortgage.

23    **Q.**    Let me ask you this, Mr. Handville.  Is there

24    another way to determine who is the custodian for the

25    trust?

1    **A.**    The custodians are referenced within the trust

2    agreement itself.

3    **Q.**    Do you know if Wells Fargo is listed as a

4    custodian within the trust agreement?

5    **A.**    I believe they are, yes.

6    **Q.**    Okay.  Based upon your review of the mortgage loan

7    schedule, are you able to identify the borrower's loan

8    on this document?

9    **A.**    Yes.

10    **Q.**    And is it your testimony that the borrower's loan

11    is listed under 9771?

12    **A.**    Line number 9771, yes.

13    **Q.**    And based upon your review of the mortgage loan

14    schedule, is it your testimony today that the

15    borrower's loan is identified and included as a loan

16    that is deposited into the Structured Asset Investment

17    Loan Series 2003-BC11 trust?

18        MR. ENNIS:  Objection, your Honor.  He hasn't

19    established a foundation yet as to that testimony.

20        THE COURT:  Overruled.

21        THE WITNESS:  Yes.

22        MR. BODURTHA:  Your Honor, at this time I'd like

23    to admit Exhibit K which is the redacted mortgage loan

24    schedule and Exhibit JJ which is the mortgage loan

25    schedule, in full.  Exhibit J is admitted -- we're

1    asking to admit Exhibit J under seal because it

2    includes confidential borrower information for this

3    particular borrower and for all other borrowers in the

4    trust.

5        MR. ENNIS:  Your Honor, there's been no

6    establishment that this document is a copy of an

7    original document.  I would ask your Honor to defer any

8    ruling until cross-examination of this witness because

9    they have not established that this is an original

10   document.  To show that it's a copy of an original,

11   they have to establish where the original is.  And this

12   witness in his deposition testified they had no idea

13   where the original was.  And I believe to authenticate

14   this document --

15       THE COURT:  Well, there are two documents that

16   have been moved.  One is K and one is JJ.

17       MR. ENNIS:  Both of them, your Honor.  They have

18   no idea where the original documents are.

19       THE COURT:  Okay.  So how do you respond to

20   that, Mr. Bodurtha?

21       MR. BODURTHA:  Your Honor, I think our client

22   has testified to the presence of the mortgage loan

23   schedule as included in the SharePoint website.  We

24   have laid a foundation that that is where the deal

25   documents are included.  We have provided the original

1    spreadsheet that includes all of these mortgage loans

2    to the Court, to opposing counsel.  We have searched

3    through that website to show that the loan is on it.

4         This document is an original of the mortgage

5    loan schedule that is kept for this particular trust.

6    And it should be admitted as an exhibit in full under

7    seal under JJ and then redacted for further use under

8    K.

9         MR. ENNIS:  Your Honor, I might note, there is

10   no testimony that this is a copy of an original.  As a

11   matter of fact, the witness testified that the number

12   on the top is the number used by the 4325-SAIL2003-BC11

13   is an Ocwen created document which Ocwen doesn't come

14   into this until 2012, nine years after the loan closed.

15        The deposition of the witness indicated they

16   have no reference whatsoever to any records of what

17   happened from Option One until October 1st, 2003.

18   There is no showing that he had -- all he's showing is

19   he can identify this as a document that's contained in

20   the SharePoint records.

21        THE COURT:  I think that's exactly what he has

22   represented and that's what it's being introduced

23   for -- hang on -- is that it is a copy of the business

24   records that are maintained.  Their original form is in

25   the SharePoint database.  This is a copy of what's in

1    the SharePoint database.  I think that's what's been

2    represented.  The history of the documents has been set

3    forth.

4         You may have issues with the accuracy of the

5    inputs, but in terms of the foundation for what this

6    document that's contained on the thumb drive and that

7    the witness has walked through, I think he has

8    demonstrated that it is a copy of the record that

9    exists on the SharePoint database and it references the

10   subject loan that contains, you know, the information

11   the witness has testified to.

12        So I note your objection.  It's overruled.  JJ

13   will be admitted in full and K will be admitted in full

14   as well.

15        (Plaintiff's Exhibits JJ & K were admitted in

16        full)

17        THE COURT:  All right.  Proceed.

18        MR. BODURTHA:  Your Honor, I'm also asking at

19   this time that the Court admit Exhibit II in full.

20   It's the execution copy of the trust agreement.

21        MR. ENNIS:  Once again, your Honor, it's not an

22   execution copy.  It is a copy of what they have with no

23   reference whatsoever to the original document.  And

24   there's been no showing that this is actually a copy of

25   the original loan schedule in this case.  As a matter

1    of fact, he testified -- my brother presented it as an

2    Ocwen loan servicing loan schedule, not a loan schedule

3    for the original loan when it was created in 2003.

4              THE COURT:  All right.

5              MR. BODURTHA:  I'm talking about the trust

6    agreement.

7              THE COURT:  I understand what you're talking

8    about.  I think the testimony was that this again, this

9    trust agreement or so-called pooling and servicing

10   agreement, is a document that is a copy of the document

11   that exists on the SharePoint website.  And I think the

12   witness's testimony establishes that.  So I think it's

13   appropriate to admit as a business record.

14             So it will be admitted in full II.  Your

15   objection is noted.

16             (Plaintiff's Exhibit II was admitted in full)

17             MR. BODURTHA:  Thank you, your Honor.

18   **Q.**   Mr. Handville, based upon your review of the

19   transaction documents for the borrower's -- strike

20   that.

21             Based upon your review of the deal documents for

22   the borrower's loan on the SharePoint website, do you

23   have an understanding of how Structured Asset

24   Investment Corporation acquired the borrower's mortgage

25   loan?

1    **A.**    It's my understanding that they acquired it from

2    Lehman Brothers.

3    **Q.**    Okay.  Is there a document kept within the

4    SharePoint website that memorializes that transaction?

5    **A.**    Bear with me.  Let me see if I can find the right

6    exhibit.

7    **Q.**    For your reference, I believe we've identified it

8    as Exhibit H.

9    **A.**    All right.  Bear with me.

10         Exhibit H is the mortgage loan sale and

11    assignment agreement between Lehman Brothers Holdings,

12    Inc., the seller, and Structured Asset Securities

13    Corporation as purchaser.  And that's also dated

14    10-1-03.  And it references the subject trust number.

15    **Q.**    And what is the subject trust that Exhibit H

16    identifies?

17    **A.**    Structured Asset Investment Loan Trust 2003-BC11,

18    Mortgage Pass-Through Certificates, Series 2003-BC11.

19    **Q.**    And Mr. Handville, did you review this document on

20    the SharePoint website?

21    **A.**    I did.

22    **Q.**    And is this a document that you were able to

23    locate after entering the trust number that is included

24    in the borrower's loan information?

25    **A.**    I was able to enter the investor number and pulled

1    up the folder that said deal docs, and this is one of

2    the documents therein.

3    **Q.**    Is Exhibit H a copy of a document that Ocwen

4    and/or PHH keeps and maintains in the regular course of

5    its loan servicing business?

6    **A.**    Yes.

7    **Q.**    And Mr. Handville, to the best of your knowledge,

8    did PHH receive and retain this record following the

9    merger with Ocwen?

10   **A.**    Yes.

11   **Q.**    And to the best of your knowledge, did Ocwen

12   receive and retain this record following the

13   acquisition of Homeward Residential?

14   **A.**    Yes.

15   **Q.**    Okay.  The date on the mortgage loan sale and

16   assignment agreement, is that the same date as listed

17   in the trust agreement that was admitted as Exhibit II?

18   **A.**    Yes.

19   **Q.**    And Exhibit H also reflects that Lehman Brothers

20   Holding is selling mortgage loans to Structured Asset

21   Securities Corporation.  Is that a fair statement on

22   the document itself?

23   **A.**    Yes.

24   **Q.**    Do you recall the mortgage loan schedule and the

25   identification of seller on the borrower's mortgage

1    loan?

2    **A.**    Yes.  It listed Lehman Brothers as a seller.

3    **Q.**    Is this document an agreement that PHH keeps in

4    the regular and ordinary course of its business?

5    **A.**    Yes.

6         MR. BODURTHA:  Your Honor, at this time I'm

7    going to ask for Exhibit H to be admitted in full.

8         MR. ENNIS:  Your Honor, the so-called loan

9    schedule states that Lehman Brothers Bank, not Lehman

10   Brothers Holding, was the purported seller of this to

11   SASCO.  And in addition, there is no loan schedule

12   attached to this supposed sales agreement between

13   Lehman Brothers Holding and Structured Asset Securities

14   Corporation.  And as a result, there has been no

15   showing whatsoever.

16        And finally, there is no demonstration that this

17   person has any knowledge whatsoever of what the

18   original so-called sales agreement looks like because

19   he has testified in his deposition he doesn't know

20   where it is.  So as a result, your Honor, there's no

21   showing that this loan was actually included in any

22   sale from Lehman Brothers Holding to Structured Asset

23   Securities Corporation.  And on the contrary, the

24   so-called loan schedule says Lehman Brothers Bank was

25   the seller, not Lehman Brothers Holding.

1          So for these reasons, your Honor, there's no

2     foundation for this at all.

3          THE COURT:  Can you respond to this, Mr.

4     Bodurtha.

5          MR. BODURTHA:  I can explain the relationship

6     between Lehman Brothers Bank and Lehman Brothers

7     Holding to authenticate this document with Mr.

8     Handville's testimony.

9          THE COURT:  Okay.

10    **Q.**   Mr. Handville, if I can turn your attention to

11    Exhibit G marked for identification.

12    **A.**   I have it.

13    **Q.**   Is Exhibit G a document that is held within the

14    PHH SharePoint website?

15    **A.**   Yes.

16    **Q.**   And is Exhibit G one of the documents that you

17    were able to locate when you entered the trust number?

18    **A.**   Yes.

19    **Q.**   And is Exhibit G, which we have submitted to the

20    Court, a complete and accurate copy of the exhibit

21    that's -- of the document that's maintained on the

22    SharePoint website?

23    **A.**   Yes.

24    **Q.**   And have you reviewed this document?

25    **A.**   Yes.

1    **Q.**   And do you have an understanding of the

2    transaction that is memorialized by this document?

3    **A.**   Yes.

4    **Q.**   And what is that understanding?

5    **A.**   Well, this document which is also dated October 1,

6    2003, same as the trust agreements we've looked at

7    previously, is captioned an "Assignment and Assumption

8    Agreement between Lehman Brothers Bank as Assigner and

9    Lehman Brothers Holding as Assignee."

10   **Q.**   Okay.  And Mr. Handville, in your review of that

11   document, what does that mean to you in terms of

12   transfer of the loan?

13   **A.**   It stipulates that the conveyance involves the

14   assignment of all rights, title and interest in the

15   initial mortgage loans and the sales service agreement

16   to the assignor.

17   **Q.**   Okay.  So is it fair to say, based upon your

18   review of that document, that Lehman Brothers Bank

19   assigned the mortgage loans to Lehman Brothers

20   Holdings?

21   **A.**   That's how I understand it.

22   **Q.**   Okay.  And then if I turn your attention back to

23   Exhibit H, the agreement through which the loans are

24   sold to Structured Asset Securities Corporation, the

25   seller is Lehman Brothers Holdings; is that fair to

1    say?

2    **A.**    Yes.

3    **Q.**    So that in the course of this transaction, Lehman

4    Brothers Bank assigned to Lehman Brothers Holdings and

5    then Lehman Brothers Holdings sold to Structured Asset

6    Securities Corporation.  Is that accurate, based upon

7    your review of the documents?

8    **A.**    Yes.

9            THE COURT:  Okay.  All right.  Thank you.

10           So I think that the foundation is sufficient to

11   establish the documents as business records so the

12   objection is noted, it's overruled, and Exhibit H will

13   be full.

14           (Plaintiff's Exhibit H was admitted in full)

15           THE COURT:  I don't know if you've moved G, but

16   you probably would want to.

17           MR. BODURTHA:  I would like to request that

18   Exhibit G be admitted in full.

19           MR. ENNIS:  Same objection, your Honor.

20           THE COURT:  All right.  The objection is noted.

21   G will be admitted in full.

22           (Plaintiff's Exhibit G was admitted in full)

23           THE COURT:  All right

24           MR. BODURTHA:  Thank you, your Honor.

25   **Q.**    Mr. Handville, do you know whether Option One

1    Mortgage Corporation sold its servicing business?

2    **A.**    Yes.  It's my understanding Option One sold their

3    mortgage servicing business to AHMSI, American Home

4    Mortgage Servicing, Inc.

5    **Q.**    And how do you know that, Mr. Handville?

6    **A.**    Actually, I read that in a few places.  I think it

7    occurred in -- I think it started in March of '08 and

8    was completed in April of '08.  In fact, I have seen a

9    document that was executed in another, I believe,

10    litigated matter from a -- I think the president of

11    Option One who stated under oath that they sold their

12    interests.  I believe it was in April of '08.

13    **Q.**    Was the president's name Dale Sugimoto?

14    **A.**    That's correct.

15    **Q.**    Did Mr. Sugimoto file a declaration in a court

16    proceeding that indicated that Option One sold its

17    servicing business?

18    **A.**    Yes.

19    **Q.**    And so to your understanding, is it your testimony

20    today that Option One servicing business was sold to

21    AHMSI, also known as American Home Mortgage Servicing,

22    Inc.?

23    **A.**    Yes.

24    **Q.**    To the best of your recollection, you believe that

25    may have occurred at some point in April of 2008?

1    **A.**    I'm working from memory, but, yeah, that sounds

2    about right.

3    **Q.**    Okay.  And do you know whether American Home

4    Mortgage Servicing, Inc., ever changed its name?

5    **A.**    Yes.  In early 2012, they changed their name to

6    Homeward Residential, Inc.

7    **Q.**    Okay.  And how do you know that?

8    **A.**    Actually, I've seen copies of their customer

9    correspondence indicating that as of May 29, 2012, the

10   name change will be in effect.

11   **Q.**    And do you know whether that Homeward Residential

12   is the same entity that Ocwen ultimately acquired?

13   **A.**    Yes.

14   **Q.**    Okay.  So is it your testimony, based upon review

15   of records and your own personal knowledge, that Ocwen

16   acquired what was American Home Mortgage Servicing,

17   Inc., but that became Homeward prior to acquisition?

18   **A.**    Correct.

19   **Q.**    And I don't know if I missed this.  Do you know

20   when that occurred?

21   **A.**    I believe it occurred in the fourth quarter of

22   2012.

23   **Q.**    Okay.

24   **A.**    And then subsequent to that, the loan started

25   boarding in the beginning of 2013.

1    **Q.**    Okay.  All right.  Now, who was the initial

2    trustee of the trust according to the trust agreement

3    and the associated documents that we've reviewed?

4    **A.**    LaSalle was the original trustee.

5    **Q.**    Did the trustee assigned to this trust change at

6    some point in time?

7    **A.**    Yes.

8    **Q.**    Okay.

9    **A.**    LaSalle was merged with Bank of America.  So Bank

10    of America took over in their place.

11    **Q.**    Okay.

12    **A.**    And then Bank of America was changed over to the

13    current trustee.

14    **Q.**    Okay.  Let me turn your attention to Exhibit M

15    marked for identification.

16    **A.**    I have it.

17    **Q.**    Okay.  And have you reviewed Exhibit M?

18    **A.**    Yes.

19    **Q.**    Are the documents included within Exhibit M kept

20    within PHH's SharePoint website?

21    **A.**    Yes.

22    **Q.**    Okay.  And are the documents marked as Exhibit M

23    true and accurate copies of documents held within the

24    SharePoint website?

25    **A.**    Yes.

1    **Q.**    And can you explain to the Court the significance

2    of the first page of Exhibit M.

3    **A.**    This document dated July 3rd, 2009, was captioned

4    "Notice of Appointment," and it references the

5    Structured Asset Investment Loan Trust in question.

6    And basically, what it's saying is all the parties are

7    in agreement that Bank of America, successor by merger

8    to LaSalle Bank National Association, is hereby

9    resigning as trustee and certificate registrar.  And it

10   has appointed U.S. Bank, National Association to act as

11   successor trustee and successor certificate registrar.

12   **Q.**    Okay.

13   **A.**    And it provides U.S. Bank's address.

14   **Q.**    Okay.  Now, if I move you six pages within Exhibit

15   M, let me know when you're there.

16   **A.**    I'm there.

17   **Q.**    Okay.  And can you explain to the Court the

18   significance of this document.

19   **A.**    This document is the instrument of appointment and

20   acceptance of a successor trustee among all the parties

21   involved with the trust.  And it's confirmation that we

22   are accepting appointment of U.S. Bank as a successor

23   trustee to Bank of America on this loan -- on this

24   trust.

25   **Q.**    To your knowledge, Mr. Handville, U.S. Bank, as

1    Trustee has continued to act as trustee for this trust

2    to the present day; is that accurate?

3    **A.**    Correct.

4          MR. BODURTHA:  At this time, your Honor, I would

5    like to admit Exhibit M in full.

6          MR. ENNIS:  No objection, your Honor.

7          THE COURT:  All right.  M will be full.  Thank

8    you.

9          (Plaintiff's Exhibit M was admitted in full)

10         MR. BODURTHA:  Thank you.

11   **Q.**   Mr. Handville, I want to shift gears and talk

12   about the history of this borrower's loans so I'm going

13   to direct your attention to Exhibit R.  Let me know

14   when you're there.

15   **A.**   I have it.

16   **Q.**   You testified about this earlier, but I just want

17   to circle back to it.  Is it the normal and customary

18   practice of PHH to maintain loan accounting records for

19   a particular mortgage?

20   **A.**   Yes.

21   **Q.**   And does maintenance of these records include

22   transaction histories for loans?

23   **A.**   Yes.

24   **Q.**   Do those transaction histories include histories

25   created for a particular mortgage by a prior mortgage

1    loan servicer?

2    **A.**   In many cases they have imaged copies of payment

3    histories that the prior servicer has imaged.  And in

4    many cases we're able to extract the information from a

5    database.

6    **Q.**   Okay.  Just remind me where you would locate those

7    prior transaction histories.

8    **A.**   I would -- we have a database that we can pull

9    that information from.  I don't have access to it.  I

10   would ask the business unit to go in and pull the

11   information to print out in a format.

12   **Q.**   Okay.  Has the business unit in this case pulled

13   those transaction histories for you?

14           MR. ENNIS:  Objection; hearsay, your Honor.

15   He's not testifying about any of his knowledge how he

16   may have pulled up information.

17           THE COURT:  Well, the question was whether he

18   asked somebody to pull the information or not.  It's

19   not hearsay.  So overruled.

20           THE WITNESS:  I didn't ask for it, no.

21   **Q.**   Okay.  Have you been provided copies of these

22   documents at some point?

23   **A.**   Yes.

24   **Q.**   Okay.  And who provided you copies of these

25   documents?

1    **A.**    You provided them to me as exhibits.

2    **Q.**    Okay.  Let me ask you this, Mr. Handville.  Have

3    you researched the borrower's particular account

4    information on MSP?

5    **A.**    I've looked at it on MSP, and I've looked at it on

6    these printed out documents as well.

7    **Q.**    Okay.  Based upon your review of MSP, are you able

8    to determine when the borrower last made a mortgage

9    loan payment on this loan?

10   **A.**    I was able to determine that from the payment

11   histories, and it appears the last payment that was

12   applied was on April 26th of 2011.

13   **Q.**    Okay.  Can you confirm that information through a

14   review of MSP or do you have to rely upon the

15   transaction histories?

16   **A.**    I would have to rely on the transaction histories.

17   **Q.**    Okay.  Do you know if Ocwen's -- or PHH's --

18   records have transferred over transaction histories

19   from prior servicers?

20   **A.**    Yes.

21   **Q.**    Based upon your review of the transaction history

22   for the borrower's mortgage loan, do you have an

23   understanding of the current status of the borrower's

24   account?

25        MR. ENNIS:  Objection; lack of foundation.  He

1    hasn't shown he has knowledge of the accuracy of the

2    prior records.  And I think that's a criterion of *U.S.*

3    *Bank vs. Jones*.

4              THE COURT:  All right.  Overruled.

5    **Q.**   You can answer, Mr. Handville.

6    **A.**   In MSP I'm able to determine the default date, the

7    principal balance and the payment amount.

8    **Q.**   Okay.  What is the default date, according to

9    records kept in MSP?

10   **A.**   This loan is currently due for December 1, 2010,

11   mortgage payment.

12   **Q.**   Okay.  And I'm sorry; what were the other

13   categories you're able to determine by looking at MSP?

14   **A.**   I can determine the payment amount that's due.

15   **Q.**   Okay.  I'm sorry.  What is the total amount of the

16   payment that's due at present?

17   **A.**   $2,103.

18   **Q.**   Okay.  What other information can you determine?

19   **A.**   I can determine the principal balance which is

20   $320,760.58.

21   **Q.**   Okay.

22   **A.**   I can determine the total amount due which is over

23   $411,104 and change.  I can determine the escrow

24   balance.  I can determine if there's funds in suspense.

25   I can tell you what the amount of the last tax amount

1    that was paid.  Things like that.

2    Q.    What was the last tax amount paid?

3    A.    The 2021 taxes were paid in the amount of

4    $5,661.22.

5    Q.    Okay.  So Mr. Handville, is it your testimony

6    today, based upon a review of MSP, that the borrower's

7    loan is presently in default?

8    A.    Yes.

9    Q.    And it is in default based upon the borrower's

10   failure to make monthly mortgage loan payments; is that

11   accurate?

12   A.    Yes.

13   Q.    And based upon your review of the MSP records, the

14   last payment credited to the account is from 2010; is

15   that accurate?

16   A.    2011.

17   Q.    I'm sorry.  From 2011; is that accurate?

18   A.    Correct, yes.

19   Q.    Okay.  Now, turning away from the account history,

20   are you aware of documents a borrower will execute in

21   order to originate a mortgage loan?

22   A.    Yes.

23   Q.    And do the originating documents include a

24   promissory note?

25   A.    If the loan is granted, yes.

1    **Q.**    Okay.  Have you had the opportunity to review a

2    copy of the promissory note in this case?

3    **A.**    Yes, I have.

4    **Q.**    Okay.  And does that promissory note, a copy of

5    it, include the unredacted loan numbers at the top of

6    the agreement?

7    **A.**    Yes.

8    **Q.**    Okay.  Do you have an understanding of how

9    promissory notes are kept for loans once they're

10    deposited into trust?

11    **A.**    My understanding is that after the loans

12    originate, the originator holds on to the mortgage and

13    note until they have to be separated which is when they

14    send the mortgage off to be recorded, which is usually

15    right after the loan closes.  Once it comes back from

16    the county where it's recorded, they are joined

17    together and they are maintained until such time as the

18    loans are placed or sold.

19    **Q.**    Okay.  And what happens to the promissory note

20    while it is being maintained and then when it is sold?

21    **A.**    Well, shortly after closing, if not at closing,

22    the document is indorsed so that it can be placed into

23    a trust.

24    **Q.**    Okay.  And in your review of Exhibit C, does the

25    promissory note include an indorsement?

1    **A.**    The copy of the promissory note that I'm looking

2    at does include an allonge referencing the same loan

3    number and servicing ID.  It also contains the same

4    date on it.  And it makes reference to the note

5    referencing the loan number, the property address, the

6    loan amount.  And it's a blank indorsement by a Mary

7    Conway at Option One Mortgage Corporation.

8    **Q.**    So Mr. Handville, based upon your review of that

9    copy, you would agree with me that the promissory note

10   includes an indorsement by an allonge?

11        MR. ENNIS:  Objection; that's a legal question,

12   your Honor.  He can reference what he sees.  He can't

13   give an opinion as to whether or not that document

14   constitutes an indorsement.

15        MR. BODURTHA:  I'll rephrase.

16        THE COURT:  All right.  Rephrase.

17   **Q.**    Mr. Handville, in your experience, how would you

18   know that a promissory note includes an indorsement?

19   **A.**    In my experience, it could be indorsed by way of a

20   stamp, which is fairly common, usually on the signature

21   page, executed by the party that is doing the

22   assigning.  In some cases, it's to a particular entity.

23   In some cases, it's just blank.

24        In this case, this document bears a fourth page

25   which is captioned "Allonge to Note Investor," and it

1    makes reference to the subject loan.  And it says "Paid

2    to the Order of," which is blank without recourse.  And

3    it says "by" -- it says at the bottom "Option One

4    Mortgage Corporation," and it's signed by an assistant

5    secretary, a Mary Conway.

6    **Q.**   Is it your testimony, Mr. Handville, that the page

7    that you have just reviewed is the indorsement of the

8    promissory note?

9              MR. ENNIS:  Once again, your Honor, that's a

10    question for the Court to determine, not for a witness

11    to determine.

12              THE COURT:  All right.  He can testify what his

13    understanding is.  It's overruled.

14              THE WITNESS:  Yes.

15    **Q.**   Okay.  And I think you testified earlier that you

16    believe the indorsement is in blank; is that accurate?

17    **A.**   Yes.

18    **Q.**   Do you have an understanding of what it means if

19    an indorsement is made in blank?

20    **A.**   It's my understanding that it becomes a bearer

21    document made enforceable by the holder.

22    **Q.**   Do you have an understanding of the effect of a

23    bearer document?

24    **A.**   It doesn't identify a specific party, so if

25    somebody were to come into possession of the original,

1    they might be able to seek enforcement of it.

2    **Q.**    In other words, Mr. Handville, is it your

3    understanding that the entity that holds a note that's

4    been indorsed in blank has the right to enforce that

5    note?

6    **A.**    Yes.

7    **Q.**    Okay.  And let me ask you this.  In your

8    experience, have you had the opportunity to review the

9    contents of files that are kept and maintained with

10   promissory notes?

11   **A.**    Yes.

12   **Q.**    What is that file routinely called, in your

13   experience?

14   **A.**    In the industry, we refer to it as a "collateral

15   file," and it contains collateral-related documents.

16   **Q.**    Do you know why it's called a collateral file?

17   **A.**    It's just an industry standard.  It's been around

18   longer than I have in the business.  It is the file

19   that the original note, the original mortgage, and

20   other original origination or collateral-related

21   documents are maintained by the document custodian for

22   the trust.  Sometimes they have original title

23   policies.  They would have allonges or indorsements.

24   In some cases, there are Bailee Letters in there.

25   Various sorts of things like that.

1    **Q.**   In your experience, Mr. Handville, what is the

2    practice that PHH, and before at Ocwen, uses if a

3    collateral file containing the original promissory note

4    is transferred from one entity or person to another?

5    **A.**   Ocwen and/or PHH would, if it's requested by our

6    counsel for some reason, we would reach out to the

7    custodian and request it.  They would ship it to the

8    servicer.  And then the servicer would inventory it

9    into their system.  And then if they needed to ship it

10   out to counsel, they would do so via a Bailee Letter.

11   **Q.**   And Mr. Handville, in your review of -- sorry,

12   strike that.

13        Mr. Handville, have you reviewed a series of

14   Bailee Letters that are associated with this mortgage

15   loan?

16   **A.**   Yes.

17   **Q.**   And can you explain to the Court what your

18   understanding is of the transfer of the collateral file

19   through these Bailee Letters?

20   **A.**   The Bailee Letters are just -- it's a cover letter

21   that indicates it's a Bailee.  They are sending these

22   collateral documents.  And they usually outline what

23   they're sending.  And they specifically state that

24   we're sending this to you for, you know, the purposes

25   of you acknowledge acceptance and receipt.  And in many

1    cases the recipient will sign or initial at the bottom

2    the date received and send it back.

3    **Q.**   In your review of these Bailee Letters, Mr.

4    Handville, are you able to determine the last entity or

5    individual that received the original collateral file?

6          MR. ENNIS:  Objection, your Honor.  There's been

7    no showing that this is the original collateral file on

8    a loan that closed in 2003.

9          THE COURT:  All right.  You can inquire further

10   on that.  I'll overrule the objection.

11         You may answer that question.

12         THE WITNESS:  Could you repeat the question.

13   I'm sorry.

14   **Q.**   Are you able to determine from a review of the

15   Bailee Letters the last entity or individual that

16   received the original collateral file?

17         MR. ENNIS:  Once again, your Honor, same

18   objection.

19         THE COURT:  Okay.  I understand.  The objection

20   is overruled.  You may answer.

21         THE WITNESS:  Yes, the last party to receive it

22   according to the Bailee Letters that I looked at was

23   your firm.  You signed for it.

24   **Q.**   Okay.  And when?  Not that I want to make myself a

25   witness to this case, but when did I sign for that

1    Bailee Letter in the collateral file?

2    **A.**    Bear with me.  Let me pull it up.  It's Exhibit

3    KK.  May 10 of 2021.  Hang on.

4         This is a letter addressed from Korde &

5    Associates, who is the local foreclosure counsel, to

6    your attention at your firm.  And it says, "This is to

7    serve as a new Bailee Letter.  Confirm you received the

8    original collateral file."  And it says it contains the

9    following documents:  Recorded mortgage and original

10   note.

11   **Q.**    Okay.  So according to the records that you have

12   reviewed, the last person or entity that holds the

13   original collateral file with the original promissory

14   note is Hinshaw & Culbertson, counsel for U.S. Bank, as

15   Trustee.  Is that a fair statement?

16   **A.**    Yes.

17        MR. BODURTHA:  Your Honor, at this time I would

18   like to admit as an exhibit Exhibit C, which is the

19   redacted version of the promissory note.

20        MR. ENNIS:  Your Honor, I would object.  There

21   has been no showing -- they're trying to bring in a

22   series of Bailee Letters from 2013.  There's no

23   demonstration that this was the original closed

24   promissory note that was signed in July of 2003.

25   There's no chain whatsoever from 2003 until 2013.

1    There's a ten-year gap.  And they cannot demonstrate

2    through any of these whatsoever that Option One

3    transferred this to anybody, the custodian, whomever

4    the custodian was at the time, there's no indication

5    whatsoever that this is an original note.

6              THE COURT:  Well, hang on, hang on.

7              Didn't Mr. Shakoori testify that this is his

8    note?

9              MR. BODURTHA:  He did, your Honor.

10             MR. ENNIS:  He said it was his signature.  He

11   didn't state it was an original.

12             THE COURT:  I know.  I didn't ask if he stated

13   it was an original.  I think he testified that this

14   appeared to be a copy of the note that he signed,

15   right?

16             MR. ENNIS:  Yes.

17             MR. BODURTHA:  I also presented Mr. Shakoori the

18   original promissory note, and I have it available for

19   the Court to review and compare against Exhibit C if

20   your Honor would like to.

21             THE COURT:  All right.  So the only issue is

22   whether the Exhibit C is a true and accurate copy of

23   the original mortgage note in this case.

24             MR. ENNIS:  As well as the allonge, your Honor,

25   which they tried to attach with Exhibit C.

1          MR. BODURTHA:  Your Honor, I can present the

2     Court with the original note that has the allonge

3     attached to it.  My only request is that I can have it

4     back before the end of the day.

5          THE COURT:  Well, look, I haven't heard anything

6     that suggests to me that -- Mr. Ennis, if the allonge

7     is attached to the original and Mr. Bodurtha has

8     provided you with the original as well as this copy and

9     your client has indicated that this is, in fact, his

10    signature or a copy of his signature appears to be

11    accurate and he did indeed sign it, I don't have any

12    indication of anything you've said to me that suggests

13    to me that this is not a legitimate business record or

14    lacks in trustworthiness.

15         So unless you're telling me that there's

16    some -- you're making all sorts of illusions to things,

17    but if the allonge is attached to the original note, I

18    can't see what the issue is.

19         MR. ENNIS:  Your Honor, it had to have been

20    affixed to the note after my client signed the note.

21         THE COURT:  All right.  I think we talked about

22    this on the first day of trial.  Your argument really

23    had to do with whether it was stapled or no.

24         MR. ENNIS:  Whether it was stapled -- when was

25    it signed and when was it affixed to the note?

1          THE COURT:  All right.  You can make arguments

2     about that, but that doesn't go to the admissibility of

3     the document.  So Exhibit C will be admitted in full.

4          (Plaintiff's Exhibit C was admitted in full)

5          MR. BODURTHA:  Your Honor, I don't have any

6     further questions at this time subject to redirect.

7          THE COURT:  Okay.  Very good.  All right.

8          Go off the record for a minute.

9          (Off-the-record discussion)

10                    CROSS-EXAMINATION

11     BY MR. ENNIS:

12     **Q.**    Mr. Handville, can you hear me?

13     **A.**    Yes, sir.

14     **Q.**    Now, do you recall signing supplemental answers to

15     interrogatories in this case?

16     **A.**    I do remember that I did execute some.

17     **Q.**    And they were, in fact, executed on January 31st

18     of 2022; is that not correct?

19     **A.**    I believe that's correct.

20     **Q.**    I would ask you to look at -- do you have a copy

21     of those supplemental answers to interrogatories which

22     were attached to your deposition which was taken on

23     April 7th?

24     **A.**    Bear with me.  Hang on.  I'm opening up a zip file

25     to see if I can find it.  No, it's not there.

1          Bear with me.  I have to open up someplace else
2     to see if I can find it.
3          MR. BODURTHA:  Mr. Handville, it's Sam Bodurtha.
4     I'm going to email you the copy that Mr. Ennis sent to
5     me this morning.
6          THE WITNESS:  Okay.  I didn't get the email, but
7     I found the document.
8     **Q.**    Ask you to look at question number 14 in which you
9     were asked, "Please state each date that the note
10    signed by the defendant was indorsed by any person or
11    persons, along with the name, employer, job title, home
12    and business address and telephone number of each
13    indorser."
14         Do you see that question?
15    **A.**    I do.
16    **Q.**    And in your original answer -- and when you
17    answered these interrogatories, you were doing so under
18    oath; is that not correct?
19    **A.**    Yes.
20    **Q.**    And in your review of documents before you
21    answered these interrogatories; did you not?
22    **A.**    Yes.
23    **Q.**    Was this answer to interrogatories based upon your
24    records of the PHH system of record?
25    **A.**    Yes.

1    **Q.**   As well as the Ocwen Financial Corporation

2    records; isn't that correct?

3    **A.**   Yes.

4    **Q.**   And in your initial answer you stated, "U.S. Bank,

5    as Trustee objects to interrogatory on the grounds that

6    the request seeks information that is irrelevant to any

7    claims made in this case.  Without waiving the

8    foregoing objection, U.S. Bank, as Trustee refers

9    defendant to the note produced in accordance with FRCP

10    33(d)."  Is that correct?

11        That was your original answer; isn't that right?

12    **A.**   Yes.

13    **Q.**   Then you gave a supplemental answer on

14    January 31st, isn't that correct?

15    **A.**   Yes.

16    **Q.**   In which you said the face of the note produced to

17    defendant identifies and indicates all dates and

18    information applicable to the date the note was

19    indorsed and who indorsed the note.

20        That was your answer at that time; is that not

21    correct?

22    **A.**   That's what it states.

23    **Q.**   And the only dates that are contained on the note

24    are July 16th, 2003; is that not correct?

25    **A.**   That is correct.

1   **Q.**   And in the allonge, it references a July 16th,

2   2003, date twice; isn't that correct?

3   **A.**   I believe that's correct.

4   **Q.**   And one of them is for the date of the note; isn't

5   that correct?

6   **A.**   Yes.

7   **Q.**   And the other one is for the date of the allonge;

8   is that not correct?

9   **A.**   I believe that's correct.

10  **Q.**   And do you have any information which indicates

11  that the signed promissory note was in the possession

12  of Option One on July 16th, 2003?

13  **A.**   I don't.

14  **Q.**   As a matter of fact, you, in reviewing various

15  records in this matter, have absolutely been able to

16  review no documents whatsoever from Option One other

17  than this so-called closing file; isn't that correct?

18          MR. BODURTHA:  Objection; that misstates

19  testimony.

20          THE WITNESS:  I'm not sure how to answer that.

21          THE COURT:  Okay.  Why don't you rephrase the

22  question.

23  **Q.**   Well, the loan closed on July 16th, 2003; is that

24  not correct?

25  **A.**   Yes.

1    **Q.**   And this was a refinance of an owner-occupied

2    residence; isn't that correct?

3    **A.**   Yes.

4    **Q.**   And this mortgage in this case was not, in fact,

5    recorded until July 21st, 2003; is that not correct?

6    **A.**   I'll defer to you on that.  I don't have it

7    memorized.

8    **Q.**   Okay.  And when you referenced -- you're familiar

9    with refinances, are you not?

10   **A.**   I am.

11   **Q.**   And you know that when a loan is refinanced, a

12   homeowner has three business days to change their mind

13   and to cancel the transaction; isn't that correct?

14          MR. BODURTHA:  Objection; foundation.

15          THE WITNESS:  Yes.

16          THE COURT:  Well, overruled.

17   **Q.**   And you know and, in fact, this was a homeowner,

18   had that right, isn't that correct, to rescind the

19   loan, correct?

20   **A.**   Three-day right of rescission, yes.

21   **Q.**   And there was a notice of the right of rescission

22   contained in the original closing package on this loan;

23   isn't that correct?

24   **A.**   I believe there was.

25   **Q.**   So that this loan, even though it closed on July

1    16th, 2003, did not fund until the three-day period had

2    passed; is that not correct?

3    **A.**    Yes.

4    **Q.**    So that interest wasn't beginning to run on this

5    loan until July 21st, 2003; isn't that correct?

6    **A.**    I don't know.  Maybe.

7    **Q.**    Okay.  But it didn't start running from July 16th;

8    isn't that correct?

9    **A.**    I didn't look into it.  I couldn't speak to when

10    the interest began.

11    **Q.**    Okay.  Now, you were also asked in Interrogatory

12    No. 13 to please identify all documents in the

13    collateral file for the defendant's loan identifying

14    the document along with the date each document was

15    placed in a collateral file; isn't that correct?

16    **A.**    Yes.

17    **Q.**    In your original answer, you put, "U.S. Bank, as

18    Trustee objects to this interrogatory on the grounds

19    that the request seeks information that is irrelevant

20    to any claims made in this case.  Without waiving the

21    foregoing objection, U.S. Bank, as Trustee has made the

22    collateral file available to defendants' counsel for

23    review and copy at a mutually agreeable time and

24    provided a scanned copy of the original promissory note

25    to defendants' counsel by email on May 11th, 2021."

1              That was your correct answer at that

2      time -- your answer at that time; isn't that correct?

3      **A.**    That's correct.

4      **Q.**    And then, however, you gave a supplemental answer,

5      "Please see a complete copy of the collateral file

6      previously produced in accordance with FRCP 33(d)."

7              That was your supplemental answer, correct?

8      **A.**    Yes.

9      **Q.**    You did that under oath; isn't that correct?

10     **A.**    I did.

11     **Q.**    What other documents were contained in the

12     collateral file at the time -- let me rephrase that.

13             You have never reviewed the collateral file,

14     have you?

15     **A.**    I have not.

16     **Q.**    So you have no idea what was in the collateral

17     file when you signed that answer; isn't that correct?

18     **A.**    I had an idea.

19     **Q.**    Well, you had not seen it; isn't that correct?

20     **A.**    Yes.

21     **Q.**    And you didn't know if the original note was in

22     that file; isn't that correct?

23     **A.**    I had not seen any indication that it was missing

24     and my counsel had talked to to confirm its

25     whereabouts, so I'm comfortable with that answer.

1    **Q.**    Okay.  Now, when did this note leave the

2    possession of Option One?

3    **A.**    I don't know.

4    **Q.**    Okay.  And when did this note first come into the

5    possession of the custodian for the loan?

6    **A.**    July 25, 2003.

7    **Q.**    And how do you know that?

8    **A.**    Ocwen inquired and that was the information given

9    to Ocwen.

10   **Q.**    And who was the custodian at that time?

11   **A.**    Wells Fargo.

12   **Q.**    And has there ever been a receipt given to Wells

13   Fargo for the note, the original note, signed by the

14   defendant?

15   **A.**    I don't know.

16   **Q.**    In fact, there is no bailment agreement from Wells

17   Fargo regarding this note; isn't that correct?

18   **A.**    I haven't seen one.  I couldn't see.

19   **Q.**    And what is the purpose of a bailment agreement?

20   **A.**    To document the receipt of collateral documents.

21   **Q.**    And it's essential that every time a custodian

22   provides a promissory note to a third party that there

23   be a bailment agreement; isn't that correct?

24        MR. BODURTHA:  Objection, your Honor; that calls

25   for opinion.  It's not fact testimony.

1          THE COURT:  Sustained.

2          MR. ENNIS:  Okay.

3     **Q.**   Based upon your experience, have you ever seen

4     bailment agreements from custodians such as Wells

5     Fargo?

6     **A.**   I don't recall seeing bailment agreements from the

7     custodians.  I've seen bailment agreements from

8     servicers to attorneys.

9     **Q.**   Would you agree that in order for the notes to be

10    transferred from a custodian, there has to be a

11    bailment agreement?

12         MR. BODURTHA:  Objection; calls for opinion.

13         THE COURT:  I'll sustain that.  I mean, why

14    don't we -- you can make that point as a legal argument

15    if you think that that's a valid point, but I'm

16    struggling to understand what you're doing here.  Are

17    you saying that there's -- the note is in evidence now.

18         MR. ENNIS:  We're looking at the so-called

19    allonge, when it was affixed.  And he's testified and

20    he provided the answers in his interrogatories that it

21    was indorsed on July 16th, 2003.

22         THE COURT:  All right.  I'm still struggling to

23    understand what your point is.  What are you getting at

24    here?

25         MR. ENNIS:  We're trying to see, your Honor,

1    when it first made its appearance in somebody's file

2    affixed to the note.

3            THE COURT:  The allonge?

4            MR. ENNIS:  Yes.  That's a crucial issue here,

5    your Honor, because it only becomes bearer paper if

6    there's an allonge affixed to the note.  And he

7    testified that the allonge was signed on July 16th,

8    2003.

9            THE COURT:  All right.  Well, this is an

10    equitable claim and if I understand the state of the

11    evidence correctly, there was a note.  Your client has

12    admitted that he signed this note, took this loan,

13    mortgage.  There's not really any doubt about that.

14    The original exists.  You have an issue about the

15    allonge; you've articulated that.

16            Mr. Bodurtha has sketched the history of how the

17    loan went from one entity to another and ended up in

18    this portfolio.  So I think your argument comes down to

19    something about this allonge, right?

20            MR. ENNIS:  Well, combination of the allonge,

21    your Honor, as well as the loan schedule which we would

22    cross-examine him after the break regarding when that

23    was created and why there's no loan schedule on the

24    previous two transactions.  And there's no history of

25    any sale from Option One to anybody of this loan, the

1    mortgage.  Because they are trying to prove -- they

2    claim they got the note pursuant to an allonge, but

3    then they have to prove that the mortgage was actually

4    sold and that there's a chain of title for the mortgage

5    because they don't have any assignments.

6          THE COURT:  Okay.  All right.  Well, how long do

7    you think your cross is going to take?

8          MR. ENNIS:  At least an hour, your Honor.

9          THE COURT:  Okay.  Why don't we take a short

10   lunch break.  It's 1 o'clock.  Let's go off the record.

11         (Off-the-record discussion)

12         THE COURT:  All right.  We'll take a half hour.

13         THE CLERK:  All rise.

14         (Lunch recess taken)

15         THE COURT:  All right.  Mr. Ennis, you ready to

16   proceed?

17         MR. ENNIS:  Yes, your Honor.

18   Q.    Good afternoon, Mr. Handville again.

19   A.    Hello.  Can you hear me okay?

20   Q.    Yes, very well.

21         Now, when you were shown the so-called

22   unredacted loan agreement, do you recall looking at

23   that exhibit?

24   A.    Yes.

25   Q.    And on the top it specifically has some

1    identifying mark.  And it says "4325-SAIL2003-BC11-MLS

2    Excel"; is that correct?

3    **A.**    Bear with me.  Let me pull that exhibit up again.

4         Yes, I have it.

5    **Q.**    What did you define that 4325 as?

6    **A.**    That was the investor number that Ocwen had

7    assigned to this particular trust.

8    **Q.**    Okay.  And Ocwen assigned that when Ocwen took

9    over servicing; isn't that correct?

10    **A.**    Yes.

11    **Q.**    And Ocwen, that number, was not on this -- that

12    number was not assigned to the trust when the loan

13    closed in July of 2003; isn't that correct?

14    **A.**    Yes.

15    **Q.**    So I'm wondering, how is it that this document,

16    which is supposedly the loan schedule from the creation

17    of the trust, has an Ocwen number on the top of it?

18    **A.**    Well, I think that would have been when they did

19    the "save as" function and they gave it a name, they

20    just added the information there.

21    **Q.**    Well, you don't know that, do you?  You're just

22    guessing.

23    **A.**    It wouldn't have come in from the trust that way

24    so that would have been added by Ocwen since Ocwen had

25    that number assigned to this particular trust.

**Q.** Okay. That assumes that this is an original document, correct, a copy of an original document; isn't that correct?

**A.** Yes.

**Q.** And you don't know that this is a copy of the original loan schedule in this case; isn't that correct?

**A.** I have not seen the original. I don't know.

**Q.** In fact, you have no idea where the original loan schedule is; isn't that correct?

**A.** I haven't seen it so I don't know.

**Q.** You've made no attempt to find that original loan schedule; isn't that correct?

**A.** No, I haven't.

**Q.** And as a matter of fact, you recall your deposition on April 7th in which you testified under oath; is that correct?

**A.** Yes.

**Q.** You recall that deposition? In that deposition you had indicated when you've addressed this document, the so-called loan schedule, you indicated that it was a standalone document not attached to the so-called trust agreement; isn't that correct?

**A.** In our business records it was a standalone document.

1    **Q.**   So it wasn't affixed to the trust agreement,

2    correct?

3    **A.**   Correct.

4    **Q.**   And you don't know when this document, the

5    original of this document, was created; isn't that

6    right?

7    **A.**   Correct.

8    **Q.**   And you don't know who created the document; isn't

9    that correct?

10   **A.**   Yes.

11   **Q.**   And you don't know when this document came into

12   the Ocwen loan servicing records; isn't that correct?

13   **A.**   Correct.

14   **Q.**   And you don't know when the SharePoint database

15   program was created; isn't that correct?

16   **A.**   Yes.

17   **Q.**   And not only the so-called trust agreement, you

18   don't know where the original of the trust agreement

19   is, do you?

20   **A.**   No.

21   **Q.**   You have never looked at the original trust

22   agreement; isn't that correct?

23   **A.**   Yes.

24   **Q.**   And you've never compared paragraph by paragraph

25   whether the copy that you have in the SharePoint

1    records is identical to the original trust agreement;

2    isn't that correct?

3    **A.**   Yes.

4    **Q.**   And you looked at several other documents and

5    purportedly authenticated them, and one of them was the

6    so-called assignment and assumption agreement; isn't

7    that correct?

8    **A.**   Yes.

9    **Q.**   And the assignment and assumption agreement

10   purported to be a sale and transfer of loans from

11   Lehman Brothers Holding to Structured Asset Securities

12   Corporation; isn't that correct?

13          MR. BODURTHA:  Objection; misstates testimony.

14   The assignment and assumption agreement was between

15   Lehman Brothers Bank and Lehman Brothers Holding.  The

16   mortgage loan sale and assignment agreement was between

17   Lehman and Structured Asset.

18          THE COURT:  Okay.  So you can straighten that

19   out.

20   **Q.**   Well, according to what you testified earlier,

21   whom did the assignment and assumption agreement

22   transfer loans from?  Who was the assignor on those?

23   **A.**   Oh, let me look.  The assignment and assumption

24   agreement was between Lehman Brothers Bank, FSB and

25   Lehman Brothers Holding, Inc., as assignee.

1    **Q.**   And that document, what exhibit was that?

2    **A.**   G.

3    **Q.**   G.  And that document contained no loan schedule

4    whatsoever; isn't that correct?

5    **A.**   According to this, it references mortgage loan

6    schedule as Exhibit B and it says in there to be

7    maintained in a separate closing binder entitled

8    "SAIL2003-BC11" mortgage loan schedules at McKee

9    Nelson, LLP.  So yes, it is not attached as an exhibit.

10   **Q.**   And you've never received the loan schedules for

11   that particular transaction; isn't that correct?

12        MR. BODURTHA:  Objection; that misstates

13   testimony, your Honor.

14        MR. ENNIS:  I'll rephrase it.

15   **Q.**   Are you aware of any loan schedules for that

16   particular transaction that exist?

17   **A.**   I am not.

18   **Q.**   And this document, you don't know where the

19   original of this document is either, do you --

20        MR. BODURTHA:  Objection.

21   **Q.**   -- the assignment and assumption agreement; isn't

22   that correct?

23   **A.**   I have not seen the original so, no, I don't know.

24   **Q.**   So you did not compare Exhibit G, photocopy, with

25   the original of Exhibit G, paragraph by paragraph, did

1    you?

2    **A.**    I did not.

3    **Q.**    And therefore, you cannot say that Exhibit G is an

4    accurate copy of the original record of any transaction

5    between Lehman Brothers Bank and Lehman Brothers

6    Holding; isn't that correct?

7    **A.**    Correct.

8    **Q.**    And you're not aware of any documents which

9    indicate that Option One sold any loans to -- excuse

10   me.  Let me rephrase that.

11        You're not aware of the existence of any

12   mortgage loan purchase and sales agreement from Option

13   One Mortgage Corporation to Lehman Brothers Bank which

14   included the defendants' loan; isn't that correct?

15        MR. BODURTHA:  Objection to form.

16        THE WITNESS:  Am I allowed to answer?

17        THE COURT:  Just one second.  I guess I don't

18   really understand what a mortgage loan purchase and

19   sale agreement is.  Maybe you want to rephrase it.

20   **Q.**    Are you aware of any documents which exist which

21   indicate that Option One Mortgage Corporation sold the

22   defendants' mortgage loan to Lehman Brothers Bank?

23   **A.**    No.

24   **Q.**    And the exhibit which indicated that Lehman

25   Brothers Holding transferred loans to Structured Asset

1    Securities Corporation does not include a loan

2    schedule; isn't that correct?

3    **A.**    It does not.

4    **Q.**    And you did not verify paragraph by paragraph that

5    the exhibit which was introduced into evidence by the

6    plaintiff related to that document was identical to

7    whatever original document existed; isn't that correct?

8    **A.**    Which document are you asking me to --

9    **Q.**    From Lehman Brothers Holding to SASCO.

10    **A.**    I have not.  I have not seen it.

11    **Q.**    I want to direct your attention to Exhibit II.

12    I'd ask you to look at page 37 of that agreement or

13    that document.

14    **A.**    Oh, hang on a second.  I'm opening up the wrong

15    one.  What page was that again?  37?

16    **Q.**    37, yes.

17    **A.**    Is it the page that says 37 at the bottom of the

18    page?

19    **Q.**    Yes.  On the bottom of the page.

20    **A.**    Okay.  I have it.

21    **Q.**    You see where it says mortgage loan schedule.  I'd

22    ask you to look at that briefly.

23         And do you see where it says, "The schedule

24    attached hereto as Schedule A would show, identify each

25    mortgage loan as such schedule may be amended from time

1    to time to reflect the additional mortgage loans,

2    including the addition of any subsequent mortgage loans

3    to or the deletion of mortgage loans from the trust

4    fund."

5            Do you see that?

6    **A.**    Yes.

7    **Q.**    And then it says, "Such schedule shall set forth,

8    among other things, the following information with

9    respect to each mortgage loan."  Do you see that?

10   **A.**    I do.

11   **Q.**    It says in II the mortgager's name.  Is it fair to

12   say nowhere on this purported loan schedule does it

13   contain the mortgager's name?

14   **A.**    Correct.

15   **Q.**    Is it fair to say -- and then Roman numeral III

16   states, "The street address of the mortgage property

17   including the city, state and ZIP code."  Is it fair to

18   say that this purported mortgage loan schedule does not

19   contain the street address of the mortgage property

20   including the city, state and ZIP code; is that

21   correct?

22   **A.**    That is correct.

23   **Q.**    And in 5II states, "The mortgage pool in which

24   such mortgage loan is scheduled."  Is it fair to say

25   that this purported mortgage loan schedule does not

1    contain the identification of the mortgage pool in

2    which such loan is included?

3    **A.**    Well, bear with me.  I'm going to have to go look

4    at it.  Bear with me while I pull that up.

5            That information is not in any of the columns in

6    the mortgage loan schedule.

7    **Q.**    Now, are you familiar with the provision of the

8    trust agreement relating to the -- do you know what an

9    initial certification of the custodian is?

10    **A.**    I've seen them in the past.  It's a list of loans

11    that were initially submitted to the trust.

12    **Q.**    And in Exhibit II, I direct your attention to the

13    end of the page B-1-1.

14    **A.**    Which was II again?  Is that the trust agreement?

15    **Q.**    The trust agreement, yes.

16    **A.**    Okay.  What am I looking at here?

17    **Q.**    Towards the end of it, the attachments, page

18    B-1-1.  It's at the end after the numbered pages.

19    **A.**    I see it.

20    **Q.**    And is it fair to say in your records there is no

21    record of an initial certification by the custodian

22    that has received the documents listed in Section

23    2.01(c) of the trust agreement for each mortgage file

24    pertaining to each mortgage loan listed on Schedule A

25    to the trust agreement, subject to any exceptions noted

1    on Schedule I?  Do you see that?

2    **A.**    Yes.

3    **Q.**    And there is no such document in the so-called

4    business records of PHH which contains such an initial

5    certification; isn't that correct?

6    **A.**    That is correct.

7    **Q.**    Okay.  And the trust agreement provides that that

8    shall be done; isn't that correct?

9    **A.**    Yes.

10    **Q.**    Okay.  And directing your attention to the next

11    page, B-2-1, that is an interim certification along the

12    same lines; isn't that correct?

13    **A.**    Yes.

14    **Q.**    And is it fair to say there is no document

15    contained in the PHH business records which is an

16    interim certification of the custodian; that all the

17    documents required to be placed into the trust are, in

18    fact, there as indicated in that interim certification?

19    **A.**    It is true that these are not in the PHH business

20    records.

21    **Q.**    And directing your attention to the next page,

22    B-3-1, is a final certification of the custodian that

23    the custodian certifies that as to each mortgage loan

24    identified in the mortgage loan schedule, other than

25    any mortgage loan listed on Schedule I, hereto, it has

1    reviewed the documents listed in Section 2.01(c) of the

2    trust agreement, has determined that each such document

3    appears to be complete and based upon an examination of

4    such documents that information set forth in items I

5    through 5I of the definition of mortgage loan schedule

6    is correct?  It says that, doesn't it?

7    **A.**    It does.

8    **Q.**    And there is no such final certification of the

9    custodian in the PHH business records; isn't that

10   correct?

11   **A.**    Yes.

12   **Q.**    And you never bothered communicating with Wells

13   Fargo in regard to any of the documents which were

14   requested in discovery in this case; isn't that

15   correct?

16   **A.**    Correct.

17   **Q.**    Why did you not communicate with the custodian to

18   obtain these type of documents?

19          MR. BODURTHA:  Objection, your Honor.  That

20   calls for work-product communications and information

21   obtained in the investigation and litigation of this

22   matter.

23          MR. ENNIS:  He testified these are business

24   records.  We're trying to explore why he didn't explore

25   the actual business records rather than relying on a

1    cutoff date in 2012 or 2013.  Wells Fargo is supposedly

2    the custodian with all these documents.

3         THE COURT:  So Mr. Bodurtha, wouldn't there be a

4    way for him to answer that question without disclosing

5    what the content of any --

6         MR. BODURTHA:  Mr. Ennis has asked my client

7    why.

8         THE COURT:  I understand.  I'm asking you a

9    question.

10         MR. BODURTHA:  I suppose there is a way, but I

11    don't think that the appropriate question should be

12    why.  To the extent that --

13         THE COURT:  I understand that, I understand

14    that.

15         So I guess my ruling would be to sustain the

16    objection and ask you, Mr. Ennis, if you can rephrase

17    that question without incorporating into the question

18    essentially the answer to the question, the legal

19    advice given; you can ask him if he made that

20    determination on his own or was that a decision that

21    was made in consultation with legal counsel.  If it

22    turns out that it's in consultation with legal counsel,

23    then you can't go there.  But if it's a decision that

24    he made on his own, then it's something he can get into

25    it.  I think that's a fair way to approach it.

1      MR. BODURTHA:  Thank you, your Honor.

2    **Q.**    Mr. Handville, did you make the determination not

3    to contact Wells Fargo for any documents based upon

4    your own determination?

5    **A.**    Yes.

6    **Q.**    Okay.  And since it's based on your own

7    determination, why did you do that?

8    **A.**    You're asking me about the document production for

9    which?  For the interrogatories?  For the response to

10   production?  For the 30(b)(6) depo notice?  I need a

11   little clarification.

12   **Q.**    So in the 30(b)(6) deposition, you were asked

13   topics about the custodian, the contents of the

14   custodial file, the identity of the custodian and those

15   types of things; isn't that correct?

16   **A.**    Yes.

17   **Q.**    And you knew that the Ocwen records only went back

18   a particular period of time; isn't that correct?

19   **A.**    I was aware of what the records were.

20   **Q.**    Okay.  And you have no records whatsoever

21   regarding this loan, original records of this loan, at

22   any time prior to 2008; isn't that correct?  Other than

23   what you claim to be the original promissory note and

24   the so-called allonge; isn't that correct?

25        MR. BODURTHA:  Objection to form.

1          THE COURT:  Why don't you restate the question.

2     **Q.**   Is it fair to say that PHH Mortgage has no records

3     of any transactions on this loan prior to 2008?

4     **A.**   That's a pretty vague question.  I would say in

5     response to that we don't have the documents you are

6     asking for in our possession.  We don't have any of the

7     original documents which we've already discovered.  So

8     I don't have access to those documents at PHH.

9     **Q.**   Now, do you recall your deposition when you were

10    asked a certain number of questions regarding the

11    manner in which PHH verified that the information

12    provided to it by the prior servicer Ocwen was

13    accurate?  Do you recall that question, that series of

14    questions?

15    **A.**   I do, yes.

16    **Q.**   Okay.  You were asked what documents, on page

17    17 -- excuse me, page 19 of the deposition -- what

18    documents did you review to verify that the documents

19    provided to Ocwen by American Home Mortgage Servicing,

20    Inc., were accurate, and you answered nothing; is that

21    correct?

22         MR. BODURTHA:  Objection, your Honor, on

23    relevancy grounds.  The deposition transcript is not

24    relevant here.  It can only be used to impeach prior

25    inconsistent statements and credibility.

1       MR. ENNIS:  Your Honor, he testified that they

2   had a procedure to determine the accuracy.

3       THE COURT:  Right.  But Mr. Bodurtha's point is

4   it's not proper forum to just read a deposition to a

5   witness unless you're impeaching him.  So just ask him

6   the question and if his answer is inconsistent with the

7   deposition, then you can use the deposition to impeach.

8   Q.   Does PHH have a procedure whereby it verifies the

9   accuracy of documents provided to it by a prior

10  servicer?

11  A.   There is a procedure.

12  Q.   Okay.  And do you recall your testimony in the

13  deposition on April 7, 2022, on pages 19 and 20, in

14  which I asked you, "Does PHH have a protocol to

15  determine -- let me strike that.  Does PHH currently

16  have a protocol to confirm and verify the accuracy of

17  all prior servicer documents when it loads the

18  documents on its electronic system of record?"  And you

19  answered, "Not to my knowledge."

20       Was that your testimony at that time?

21  A.   If that's what I'm stating in the deposition,

22  that's correct.

23  Q.   Now, are you aware of any people who verified the

24  accuracy of prior records when PHH boarded this loan on

25  its electronic system of record?

1    **A.**    I don't know the specific people.  I have an idea

2    on the business units that were involved but not the

3    specific staff member names.

4    **Q.**    And what was the business unit that did that

5    boarding of the loan?

6    **A.**    The loan boarding is handled primarily by the STM

7    team, the servicing transaction management team.

8    **Q.**    Where are they currently located, to your

9    knowledge?

10    **A.**    They are offshore, and they had an office in New

11    Jersey.  I'm not sure if they still maintain a facility

12    there or not.

13    **Q.**    So for the most part, people who do verification

14    are people in India; isn't that correct?

15    **A.**    I believe that's correct.

16    **Q.**    Okay.  And you didn't review any documents that

17    indicated whether or not those people in India in

18    reviewing the records of prior servicers made any

19    determination as to whether or not those documents were

20    accurate; isn't that correct?

21    **A.**    I did not reach out and make a determination,

22    correct.

23    **Q.**    Is it fair to say that you have no idea when the

24    SharePoint database was created?

25    **A.**    I'm not aware.

1    **Q.**    Is it fair to say that you don't know who imaged

2    any of the documents that were put into the SharePoint

3    database regarding your testimony previously?

4    **A.**    I do not know.

5    **Q.**    And is it fair to say you don't know when any of

6    this information or images were put into that system;

7    isn't that correct?

8            MR. BODURTHA:  Objection; it's vague and

9    conclusory.

10           THE COURT:  Overruled.

11           THE WITNESS:  I do not know.

12   **Q.**    So when we were looking through Exhibits G, H, I,

13   J, K, L and M which you reviewed, which you indicated

14   were in the so-called SharePoint database, you don't

15   know when any of those documents were imaged into that

16   system; isn't that correct?

17   **A.**    I do not know.

18   **Q.**    You don't know who did them, right, who imaged

19   them?

20   **A.**    I think we've established that I don't know.

21   **Q.**    Now, PHH took over from the Ocwen REAL Servicing

22   system; is that correct?

23   **A.**    The loans were transferred from one platform to

24   the MSP platform, yes.

25   **Q.**    Is it fair to say at the current time there are

1    no -- Ocwen -- excuse me, PHH has no access whatsoever

2    to the Ocwen REAL Servicing records; is that correct?

3    **A.**    Currently, no, but at the time of the transfer,

4    yes.

5    **Q.**    And isn't it fair to say that generally

6    speaking -- let me get back into that.  Those records

7    are currently maintained by a company called

8    AltaSource; isn't that correct?

9    **A.**    What records are you referring to?

10   **Q.**    The so-called REAL Servicing records of servicing

11   of this loan are maintained by a company called

12   AltaSource; isn't that correct?

13          MR. BODURTHA:  Objection; relevancy.

14          THE COURT:  Overruled.

15          THE WITNESS:  At the time the servicing platform

16   was active, yes.

17   **Q.**    So that platform's no longer active, correct?

18   **A.**    Correct.

19   **Q.**    And you were not able to go into that platform to

20   review anything about this loan; isn't that correct?

21   **A.**    Correct.

22   **Q.**    Now, is it fair to say that you have no records

23   from the MSP program that was utilized by American Home

24   Mortgage Servicing/Homeward Residential when Ocwen took

25   over servicing at that time; isn't that correct?

1        MR. BODURTHA:  Objection; foundation.

2        THE COURT:  Yes, I'll sustain that.

3        MR. ENNIS:  Okay.

4   **Q.**   Is it fair to say that Homeward Residential/AHMSI

5   utilized MSP; is that correct?

6   **A.**   Yes.

7   **Q.**   And when the loan switched over to Ocwen, there

8   had to be verification of the accuracy of those

9   documents; isn't that correct?

10  **A.**   Which documents are you referring to?

11  **Q.**   Of the MSP documents; isn't that correct?

12  **A.**   The data was verified.  I don't know which

13  specific records you're asking be verified, but the

14  data boarding, the loan amounts, things like that.

15  **Q.**   How do you know that this particular loan

16  information was verified when this particular loan was

17  boarded on the Ocwen system?

18  **A.**   Well, I've learned that there's a process that

19  involves verification.  It's done by the investor

20  reporting group, a reconciliation specialist, who will

21  look at the documents, they look at the collateral

22  documents such as the note and mortgage or any

23  modification documents that may have changed the terms,

24  and they look at the information provided regarding the

25  ending balance on their system; make sure it matches

1   the beginning balance on our system.  I said ours.

2   Ocwen Loan Servicing.

3        And the timeline for coordinators will verify if

4   the loan is in default or foreclosure, the default date

5   and that a notice of intent or breach letter had been

6   sent and verify the names of the attorneys that are

7   handling the litigation and/or bankruptcy.

8   Q.   Well, once again, in regard to this particular

9   loan, how do you know what was done when the loan

10  switched from Homeward Residential to Ocwen?

11  A.   Based on the procedures I just described.

12  Q.   So you're making an assumption; isn't that

13  correct?

14        MR. BODURTHA:  Objection.

15        THE COURT:  Overruled.

16        THE WITNESS:  I'm making a general statement

17  based on policies, procedures.

18  Q.   But you don't know that was done in this

19  particular case of your own knowledge; isn't that

20  correct?

21  A.   Correct.

22  Q.   Thank you.  And likewise, Option One was a loan

23  servicer at one time; isn't that correct?

24  A.   Yes.

25  Q.   Is it fair to say they were the loan servicer up

1    until April of 2008; isn't that correct?

2    **A.**    Yes.

3    **Q.**    And you don't know what the manner in which

4    Homeward Residential verified the accuracy of the

5    Option One records, isn't that correct, regarding this

6    loan?

7    **A.**    I don't have any firsthand knowledge.

8    **Q.**    And you're aware of no sales agreements -- no

9    sales by Option One of this mortgage to anyone; isn't

10   that correct?

11   **A.**    I'm not aware.  I haven't seen a document.

12   **Q.**    And you're aware of no sales agreement with any

13   loan schedules from Option One to any entity; isn't

14   that correct?

15   **A.**    Correct.

16        MR. ENNIS:  Bear with me, your Honor.

17   **Q.**    Now, directing your attention to what you claim

18   was the loan schedule in that 9771 number on the

19   exhibit I think K.  Ask you to go to heading "BY" where

20   it says "Buyer ID."

21   **A.**    Bear with me.  I'm scrolling.  I have it.

22   **Q.**    And it says "Option One 2003-2."  Do you know what

23   that means?

24   **A.**    That appears to indicate the loan was placed into

25   the trust that was identified with that number 2003-2.

1    **Q.**   So that's a different trust than this current

2    trust; isn't that correct?

3    **A.**   Yes.

4    **Q.**   And that is not the plaintiff in this case; isn't

5    that correct?

6    **A.**   Correct.

7    **Q.**   And the next column says "BZ."  It says "TT67."

8        Do you know what that means?

9    **A.**   No.

10   **Q.**   Now, you would agree and you're familiar, to some

11   extent, with securitization by virtue of you being a

12   witness in a large number of cases; isn't that correct?

13   **A.**   Yes.

14   **Q.**   And are you aware in the securitization what the

15   seller is defined as?

16   **A.**   Traditionally, it's the person that sold the loan

17   to the trust or the entity.

18   **Q.**   Sold to the depositor, correct?

19   **A.**   Could be sold to the depositor, yes.

20   **Q.**   As a matter of fact, in this page -- in the trust

21   agreement, there are definitions; isn't that correct?

22   **A.**   Sure.

23   **Q.**   And the trust agreement on page 49 on the bottom

24   identifies --

25   **A.**   Do I need to pull this up?

1    **Q.**    To make it easier for you, yes.

2    **A.**    What page?

3    **Q.**    49.

4    **A.**    Exhibit I?

5    **Q.**    Exhibit II.  You see that page 49?

6    **A.**    I have it.

7    **Q.**    And it defines seller as Lehman Brothers Holding,

8    Inc., or any successor in interest, doesn't it?

9    **A.**    It does.

10    **Q.**    But the so-called loan schedule states that Lehman

11    Brothers Bank was the seller; isn't that correct?

12    **A.**    Yes.

13    **Q.**    Now, this trust agreement has a term in it called

14    a closing date.  Do you know what a closing date is?

15    **A.**    It's the date of the closing of the trust.

16    **Q.**    Okay.  And the closing of the trust is the date

17    that the loans are transferred from the depositor to

18    the trust; isn't that correct?

19    **A.**    To my knowledge, yes.

20    **Q.**    And in this case, the so-called trust agreement

21    was dated October 1st; isn't that correct?

22    **A.**    Yes.

23    **Q.**    So as a result, it anticipated that on October

24    31st certain loans would be transferred from the

25    depositor to the trust in return for certificates that

1    were given; isn't that correct?

2    **A.**    I believe that's an accurate statement.

3    **Q.**    Okay.  So is it fair to say as of October 1st,

4    2003, no loans were transferred by this document, the

5    so-called trust agreement?

6    **A.**    I'm sorry.  Could you repeat that question.

7            MR. ENNIS:  Could you repeat the question for

8    him, please.

9            (Record read)

10           THE WITNESS:  I'm not sure I understand the

11   question.

12   **Q.**    Is it fair to say that the trust agreement did not

13   transfer any loans on October 1st, 2003?

14   **A.**    I don't think that's accurate.  I think the

15   closing -- the trust agreement stipulates that they

16   have to be there in certain forms by the date.

17   **Q.**    Not on October 1st, correct?

18   **A.**    No, that's the date of the trust and they give you

19   a closing date of October 30th, somewhere in that

20   range.

21   **Q.**    Okay.  And once again, you don't know where

22   that -- what that standalone so-called loan schedule

23   was attached to, do you?

24   **A.**    I do not.

25           MR. ENNIS:  Just a few more moments, your Honor.

1          (Brief pause)

2          MR. ENNIS:  No further questions.

3          THE COURT:  All right.  Thank you.

4          Mr. Bodurtha, do you have any redirect?

5          MR. BODURTHA:  No, your Honor.

6          THE COURT:  No?  Okay.  Let me just follow up on

7     one thing that I am curious about.

8          So did you say that this loan was placed into a

9     different trust 2003-2?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  And what's that all about?

12          THE WITNESS:  Going back to the exhibit, the

13    mortgage loan schedule with the 12,600 some-odd loans

14    on it.

15          THE COURT:  Yes.

16          THE WITNESS:  Under column "BY" where it

17    identified that particular trust, going to the top of

18    that column, you'll see a series of different trusts.

19    It says "Buyer ID, People's Choice 2003-C."  Then it

20    goes down to AIMS, Aquifers, Fieldstone, et cetera, et

21    cetera.  LINE Financial.  There's a series of all these

22    different trusts.

23          What this document tells me is that these other

24    trusts were collapsed into the subject trust.  So those

25    were the owners at the time under that buyer ID of the

1    loans that were subsequently collapsed and placed into

2    this trust.  So this loan originally was in a different

3    trust and that's what that signifies.

4              THE COURT:  Okay.  So that was a predecessor

5    trust that was collapsed into the present trust.

6              THE WITNESS:  Correct.

7              THE COURT:  All right.  I think that completes

8    your testimony so unless there's anything further, we

9    can let the witness go, I think.

10             MR. BODURTHA:  Thank you, your Honor.  No

11    further questions.

12             MR. ENNIS:  Thank you.

13             THE COURT:  All right.  Thank you very much.

14             THE WITNESS:  Thank you, your Honor.  Thank you,

15    gentlemen, and ladies.

16             THE COURT:  All right.  Okay.  Mr. Bodurtha,

17    does the plaintiff rest?

18             MR. BODURTHA:  Yes, your Honor, the plaintiff

19    rests.

20             THE COURT:  All right.  Now, Mr. Ennis, what's

21    your --

22             MR. ENNIS:  Your Honor, we'd like to make a

23    motion to dismiss in judgment for the defendant because

24    the testimony of this witness was that there was no

25    proof, documentation in any way, shape or form, from

1    Option One.  He surmised that it not only went into

2    another trust, but there's no documents from them.  He

3    also was unable to verify the original of any documents

4    in this case because he just doesn't know where they

5    are.

6         THE COURT:  All right.  Well, you can argue that

7    in your posttrial briefing.  My question was really

8    directed to whether you have any evidence.

9         MR. ENNIS:  I was going -- your Honor, in view

10   of his testimony that the indorsement occurred on the

11   16th of July, I was going to bring my client back to

12   testify what time he closed that day and that the note

13   was at the attorney's office and he closed at around 4

14   or 5 o'clock in the afternoon.  And that would be my

15   basis of his testimony.  I was debating subpoenaing

16   Wells Fargo, but in view of the fact of the lack of

17   proof, I'm not going to.

18        THE COURT:  Okay.  You're not calling anyone

19   from Wells Fargo.  And you were thinking of calling

20   your client back to establish the time of day?

21        MR. ENNIS:  Well, that the loan -- we're taking

22   the position that their testimony is that the

23   indorsement occurred on July 16th.  As I said before,

24   if that's the case, there's no transfer of the note.

25   It wasn't affixed to the note at the time a signature

1    was affixed to the allonge.  We sought to get this

2    through the discovery, but there was very little

3    response as to when everything was put together.

4    That's why we were thinking about Wells Fargo.  But in

5    view of the fact of this testimony, we're not going to

6    present that testimony.

7         The only thing left is to bring my client in

8    briefly to testify that he had a closing late in the

9    day and that there was no allonge affixed to the note

10   at that time.

11        THE COURT:  Well, is this something that needs

12   testimony or could that be just -- do you disagree with

13   that?

14        MR. BODURTHA:  I have no idea how the

15   plaintiff -- the borrower is going to testify as to

16   when he signed the note.  I also don't think it's

17   relevant at all.

18        And in addition, nobody has testified or

19   produced evidence that the allonge was signed on

20   January 13th or whatever the origination date.  All we

21   did was direct the defendant to the documents for all

22   relevant dates.  Mr. Ennis has turned this into, well,

23   that's what you must have meant, but that's not what we

24   did in discovery or in testimony.  So having Mr.

25   Shakoori come back and give testimony about when he

1    thought the closing was is entirely irrelevant.

2         Mr. Ennis doesn't have any other witnesses and

3    this case, as far as we're concerned, is done.  It

4    should go to your Honor's chambers for a decision.

5         MR. ENNIS:  We are also, your Honor, going to go

6    through the documents that they presented that they did

7    not submit here in their exhibits that they claimed

8    were part of their bailment agreements that they

9    declined to present.

10        MR. BODURTHA:  That's not true, your Honor.  We

11   did not decline to present documents.  We submitted all

12   exhibits to the defendant.  We did it in a timely

13   fashion.  And there shouldn't be an opportunity for Mr.

14   Ennis just to kick this can down the road.  If he's got

15   something and he wants testimony and he wants a

16   witness, then now is his chance.  But it doesn't sound

17   like he has anything to go on.

18        MR. ENNIS:  Your Honor, in the so-called second

19   supplemental exhibits that just came in last week, the

20   so-called --

21        THE COURT:  The question is whether you have any

22   witnesses.  I'm not sure what you're getting at here.

23   If what you're saying is that Mr. Bodurtha didn't put

24   in all of the exhibits that he had for identification,

25   well, that happens all the time.  You could have

1    introduced those exhibits if you wanted to.

2         MR. ENNIS:  We'd like to present those now, your

3    Honor.

4         THE COURT:  Well, you need a witness to present

5    it through.  You should have done that when you had a

6    witness.  Unless Mr. Bodurtha wants to stipulate to

7    those exhibits, then --

8         MR. BODURTHA:  No, your Honor.  Those were just

9    for identification and for background purposes.  We

10   actually did not ask the Court to admit those

11   documents.

12        THE COURT:  All right.  So I don't see any basis

13   for that.

14        Now, as far as putting Mr. Shakoori back on, it

15   sounds like this is just further to the issue of what I

16   think is your argument that the allonge was not affixed

17   to the note at the time of its execution.  I think

18   that's your basic argument, right?

19        MR. ENNIS:  Yes.

20        THE COURT:  Okay.  So I don't think Mr. Bodurtha

21   is hotly disputing the question of whether the allonge

22   was actually affixed or not to the note.

23        Do I have that right?

24        MR. BODURTHA:  Our position is the allonge has

25   been permanently affixed to the note.

1          THE COURT:  You mean, at the time of the

2    execution.

3          MR. BODURTHA:  This is Mr. Ennis's case.  I

4    don't have any information one way or the other as to

5    when the allonge was affixed.  The evidence that we

6    presented to the Court shows that it's affixed now.

7    That's what we've attempted to demonstrate here.

8          I think Mr. Ennis is trying to create a legal

9    theory that requires the holder of a promissory note

10    that's been indorsed to tell you when it was indorsed,

11    but that's not required.

12          MR. ENNIS:  It's dated July 16th, as the witness

13    testified, your Honor.

14          THE COURT:  Well, listen, this is -- unless you

15    have Mr. Shakoori here now and you can put him on the

16    stand, I would let you do that, but I don't see him in

17    the courtroom.

18          MR. ENNIS:  No.  We'll defer on that then, your

19    Honor.  That's not a major issue in view of the fact he

20    already did testify when the closing was.

21          THE COURT:  All right.  So it seems to me that

22    the evidence is closed if there's no further witnesses.

23    Then the question is simply a matter of scheduling,

24    filing additional briefs.  So we can go off the record

25    while we talk about this.

1          (Off-the-record discussion)

2          (Time noted; 2:25 p.m.)

1            I, Lisa Schwam, CRR-RPR-RMR, do hereby

2    certify that the foregoing transcript is a correct

3    transcript prepared to the best of my skill, knowledge

4    and ability of the proceedings in the above-entitled

5    matter.

6

7    /S/ Lisa Schwam

8    Lisa Schwam, CRR-RPR-RMR          Date:
     Federal Official Reporter        May 2, 2022
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25