UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


U.S. BANK N.A AS TRUSTEE

FOR THE REGISTERED HOLDERS

OF THE STRUCTURED ASSET

SECURITIES CORPORATION, STRUCTURED

ASSET INVESTMENT LOAN TRUST

MORTGAGE PASS-THROUGH

CERTIFICATES, SERIES 2003-BC11



VS                          CA: 17-CV-394 WES


MASOUD SHAKOORI ET AL


MEMORANDUM IN SUPPORT OF MOTION FOR A NEW TRIAL AND TO ALTER AND AMEND THE JUDGMENT ENTERED BY THE COURT DUE TO MANIFEST ERROR OR LAW


This Matter was heard by the Court on the Plaintiff's Complaint for a Declaratory Judgment that it was the holder of the note by way of an endorsement  and for a Declaration that it be equitably assigned to the Plaintiff by an Order of this Court.   The only witnesses who testified were Defendant and an employee of Ocwen Financial Corporation, Howard Handville. A review of the testimony and the Requests for Admission, which were not responded to by the Plaintiff in a timely manner indicates that the Plaintiff has not met its burden of proof and as a result Judgment should not have entered for the Defendant. This Court committed certain manifest errors of law and disregarded  three opinions of the Rhode Island Supreme Court

1

regarding the manner in which a promissory note is endorsed, pursuant to the Rhode Island

Uniform Commercial Code.

The first of these manifest errors of law is the Court's analysis of R.I.G.L. 6A-3-204, which specifically states:

**§ 6A-3-204. Indorsement.**

**(a) "Indorsement" means a signature,** other than that of a signer as maker, drawer, or acceptor, **that** alone or accompanied by other words **is made on an instrument for the purpose of (i) negotiating the instrument,** (ii) restricting payment of the instrument, or (iii) incurring indorser's liability on the instrument, but regardless of the intent of the signer, a signature and its accompanying words is an indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than indorsement. **For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument**.

**(b)** "Indorser" means a person who makes an indorsement.

**(c)** For the purpose of determining whether the transferee of an instrument is a holder, an indorsement that transfers a security interest in the instrument is effective as an unqualified indorsement of the instrument.

**(d)** If an instrument is payable to a holder under a name that is not the name of the holder, indorsement may be made by the holder in the name stated in the instrument or in the holder's name or both, but signature in both names may be required by a person paying or taking the instrument for value or collection.

Thus the clear language of this statute is that for a note to be transferred to a party by the

originator of the loan, Option One Mortgage Corporation ("Option One"), the originator had to

endorse the note by signing the note, either in blank or to a specific party.  However the analysis

does not end at that point.   The statute when parsed properly, clearly states:

**"Indorsement" means a signature, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of (i) negotiating the instrument,**

The note to be endorsed by a signature on a  piece of paper other than the note itself, that paper must be affixed to the instrument when the signature is made.  The statute states:

**For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument**.

No testimony was presented by Plaintiff, which indicated that the so-called allonge of Mary Conway, dated July 16, 2003 was affixed to the note, which was also dated July 16, 2003. No testimony was presented by the Plaintiff's witness whether the allonge was affixed to the note signed by the Defendant on July 16, 2003. In fact the evidence presented was that the note was in the possession of the closing attorney on July 16, 2003 and was not transmitted to Option One on July16, 2003.   Thus it could not have been affixed to that note on that date when her signature was purportedly made.

This Court made a manifest error of law in its analysis of this transaction and the need for the paper which purports to indorse the note to be affixed to the note when the signature is made in order to transfer the note by negotiation. The Court made a manifest error of law by stating:

"The Court's independent research identifies no [Rhode Island] or [First] Circuit authority establishing the method of attachment necessary to create an effective [i]ndorsement" by allonge, Livonia Prop. Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC, 717 F. Supp. 2d 724, 734 (E.D. Mich. 2010), and identifies no authority establishing when the allonge must be attached to the note to create an effective indorsement. Regardless, even if the allonge was not physically attached to the note at or soon after execution, courts faced with similar questions have held that so long as "information on [the] allonge indicates an intent to serve as an [i]ndorsement of the . . . note," the indorsement is effective. Kohler v. U.S. Bank Nat. Ass'n, No. 11-C-0893, 2013 WL 3179557 at *5 (E.D. Wis. June 21, 2013). Where "the allonge[] presented to the Court w[as] attached to the [n]ote" and where the allonge makes unambiguous reference to the note, "given the clear intent that the [n]ote and [a]llonges were to be physically attached, the evidence is insufficient to invalidate the [i]ndorsement[]." Livonia Prop. Holdings, 717 F. Supp. 2d at 734 (applying Michigan statute identical in relevant part to R.I. Gen. Laws § 6A-3-204(a)).

Here, the allonge was attached to the original note that was presented to the Court, and the allonge references the note by listing the borrower's name, loan number, property address, loan amount, note date, and servicing number. See PXC. Therefore, the evidence presented by Plaintiff is sufficient to validate the indorsement.

However this Court ignored the three cases of Note Capital Group. Inc. v Perretta, 207 A. 3d 998, 1000 n.4 (R.I., 2019)   , In all of those cases, the Supreme Court referenced an allonge by its definition in Black's Law Dictionary:

An allonge is "[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." Note Cap. Grp., Inc. v. Perretta, 207 A.3d 998, 1000 n.4 (R.I. 2019) (quoting Black's Law Dictionary 92 (10th ed. 2014)).

The Supreme Court had made the same analysis in Pimentel v. Deutsche Bank National Trust Company, 174 A.3d 740 (R.I., 2017), stating:

[4] "An `allonge' is `[a] slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements.'" Moura, 90 A.3d at 853 n. 1 (quoting NV One, LLC v. Potomac Realty Capital, LLC, 84 A.3d 800, 803 n. 4 (R.I. 2014) and Black's Law Dictionary 88 (9th ed. 2009)).

In all of these cases the Rhode Island Supreme Court clearly defined allonge as a paper attached to a negotiable instrument for the purpose of receiving further endorsements when the original paper is filled with indorsements.   The term:

"for the purpose of receiving further endorsements" speaks of an indorsement on the allonge which has been affixed to the note in a previous time. The Plaintiff made this argument at trial

which was not considered by this Court, which instead contended that the allonge did not have to be affixed to the note in order for the indorsement to be effective.

However this contention by the Court constitutes manifest error because the Rhode Island version of the Uniform Commercial Code requires that in order for negotiation and transfer of an instrument, such as the note in this case, the indorsement must be on the note or on the paper affixed to the note. The Court disregarded the plain language of the statute referenced by the Rhode Island Supreme Court in *Perretta, Pimentel, Moura and Moura.* A Massachusetts Bankruptcy Court case, which dealt with this identical issue was *In Re Shapoval,* 441 B.R. 392 (Bk. Ma.2010). In that case, Judge Boroff held that the creditor which claimed that the Option One note had been transferred to it by indorsement on an allonge had to prove that the allonge was affixed to the note so as to make it part of the instrument when the indorsement occurred. The Court noted the distinction between the prior UCC provision, identical to the Rhode Island version, which required the allonge to be "firmly affixed to the instrument" did not change the requirement that the paper be affixed prior to the signature being made:

In 1998, the Massachusetts legislature amended Article 3 of its adopted version of the Uniform Commercial Code. *See* Mass. Gen. Laws ch. 106, § 3-101, *et seq.* Under the pre-1990 version of Article 3, § 3-202 provided that the indorsement of an instrument must be written on the instrument itself if space was available or on a paper "so firmly affixed thereto as to become a part thereof." Mass. Gen. Laws ch. 106, § 3-202(2) (1998) (repealed 1998).

The 1998 amendment redrafted the section on indorsement to read, in relevant part:

(a) "Indorsement" means a signature, other than that of a signer as maker, 394*394 drawer, or acceptor, that alone or accompanied by other words is made *on an instrument* for the purpose of (i) negotiating the instrument, (ii) restricting payment of the instrument, or (iii) incurring indorser's liability on the instrument, but regardless of the intent of the signer, a signature and its accompanying words is an indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than indorsement. *For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument.*

Mass. Gen. Laws ch. 106, § 3-204(a) (1999) (emphasis added). Official Comment 1 to § 3-204 further clarifies that "[t]he last sentence of subsection (a) is based on subsection (2) of former Section 3-202. An indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement." Accordingly, the amendment was intended to liberalize the utilization of an allonge by permitting the use of a separate sheet regardless of whether the original document has space remaining for further indorsements.

Nevertheless, it is well-settled that the 1998 amendment maintained the requirement that an allonge be affixed to the original instrument. See *Dyck-O'Neal v. Pungitore,* No. 01-P-1775, 60 Mass.App. Ct. 1109, 800 N.E.2d 727, 2003 WL 22998879, at *2, n. 6 (Mass.App.Ct. Dec.22, 2003) (applying the pre-1998 statute but suggesting, under those facts, the result would be identical under the amendments); *In re Weisband,* 427 B.R. 13, 19 (Bankr. D.Ariz.2010) (finding under an identical Arizona provision that an unattached allonge that was not included with a proof of claim and later submitted did not sufficiently prove a creditor's holder in due course status required to obtain relief from the automatic stay); *Big Builders, Inc. v. Israel,* 709 A.2d 74, 76 (D.C.1998) (finding under an identical District of Columbia provision that the language change from "firmly affix" to "affix" still requires physical attachment).

Since the Debtor's mortgage was executed on March 24, 2004, well after the adoption of the 1998 amendments, the Court simply rules today that Wells Fargo's standing to prosecute the instant Motion for Relief is dependent on whether the purported allonge which contains the indorsement on which Wells Fargo relies was affixed to the mortgage note. An evidentiary hearing is now required to make findings on that question.

The *Shapoval* opinion demonstrates that this Court committed manifest error by holding, contrary to the provisions of 3-204 that the paper on which Mary Conway's signature or stamp appeared, did not have to be affixed to the note when that signature occurred. The Massachusetts statute was identical to the Rhode Island statutes, 6A-3-204 and the prior statute 6A-3-202. This Court noted that the Rhode Island Supreme Court would look to Massachusetts law for guidance. Thus *Shapoval* analyzes the allonge as part of the instrument prior to indorsement issue which this Court disregarded and which constitutes manifest error.

The Massachusetts District Court  followed this analysis in *Boguslav v BLB Trading* 136 F. Supp, 3d 11 (D. MA., 2015) and repeated the same language as *Perretta, Pimentel,Moura, and Potomac* regarding the need for the paper to be affixed to the instrument prior to the signature to become a part of the instrument. The allonge must be part of the instrument to be

6

effective and without having been affixed prior to the signature, it is not effective to negotiate

and transfer the note.

For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument. Mass. Gen. Laws c. 106 § 3-204. None of the exceptions listed above are present, which compels the conclusion that Michael Koch's signature on a piece of paper attached to the Note is an indorsement. *See* Pl. Am. Compl. ¶ 11 ("There is attached to that Note on a separate piece of paper an undated purported assignment without recourse to BLB Trading, LLC, signed by Michael Koch, as Vice President of Fremont Investment."); Pl. Am. Compl. Ex. F. According to Mass. Gen. Laws c. 106 § 3 205, an indorsement made by the holder of the instrument, when that indorsement does not identify a person to whom it makes the instrument payable, is a blank indorsement, which may be negotiated by transfer of possession alone until specially indorsed. Mass. Gen. Laws c. 106 § 3-205(a)-(b). A holder may convert a blank indorsement that consists of only a signature into a special indorsement by writing, above the signature of the indorser, words identifying the person to whom the instrument is made payable. *Id.* Here, Plaintiff has made no allegations as to how it is not possible for Defendant to have specially indorsed the Note to itself after receiving the blankly indorsed Note, and has not made a plausible claim as to why Defendant's Note is uncollectible.

*Shapoval* was cited in the Massachusetts Bankruptcy case of *In Re Thomas,* 447 B.R. 402

(Bankr. Court, 2014) in which the Court held:

Under Mass. Gen. Laws ch. 106, the Massachusetts version of the Uniform Commercial Code (the "UCC"), for a negotiable instrument to be transferred by indorsement, the indorsement must be on the instrument itself. UCC § 3-204(a). A "paper affixed to the instrument" is considered to be part of the instrument for purposes of § 3-204(a). *Id.* To be effective, therefore, an allonge must be *affixed* to a promissory note. *See, e.g., In re Shapoval,* 441 B.R. 392, 393 (Bankr. D.Mass.2010).* If the purported allonge signed by Flagstar is not affixed to the note, then despite having possession of the note, CitiMortgage lacks the status of "holder" as defined by UCC § 1-201(20).[8] Given that CitiMortgage has produced two different copies of the note — one with and one without the purported allonge — the plaintiff argues that there is a question of fact as to whether the allonge is affixed to the note, and therefore whether CitiMortgage has a valid claim in her bankruptcy case.

This Court applied the clear and concise language of 3-204 to deny a Motion for Judgment on

the pleadings filed by the Creditor in regard to a Motion for Relief from Stay and an Adversary

proceeding. The case was subsequently settled.

There is no evidence that the allonge was affixed to the note when Mary Conroy's signature was placed on the allonge and in fact this Court erroneously held that the allonge's signature could be placed on an allonge before it was affixed to the instrument, contrary to the provisions of the Rhode Island Uniform Commercial Code and set forth in the Rhode Island cases previously cited.       The Plaintiff did not present any evidence, which established whether the "allonge" was affixed to the note when Mary Conway's signature was affixed to it, Defendant has submitted an affidavit from its attorney, in another case, Haggerty v. PHH Mortgage Corporation et al  KC 2022-402 in which Option One Mortgage Corporation had included in the closing package of the closing attorney  a Promissory Note with an allonge dated the date of the promissory note , December 30, 2004 and which had been endorsed before the promissory note was executed by the mortgagors. In fact this case was removed to Federal Court by the defendants and is currently before this Court in case number 22-cv-235 WES, of which this Court can take judicial notice.

A Third Circuit case interpreted the former statute requiring the paper to firmly affixed to the instrument prior to the signature being placed on the instrument's "allonge". *Adams v. Madison Realty and Development*, 853 F.2d 163, 166-167 (3rd Cir., 1988) noted the uniformity of Court decisions and commentary regarding the need for the paper to be affixed to the instrument for the signature on the paper(allonge) to effectively negotiate the note:

The Code defines a holder as one "who is in possession of ... an instrument ... drawn, issued or indorsed to him or to his order." U.C.C. § 1-201(20). Mere ownership or possession of a note is insufficient to qualify an individual as a "holder." The instrument must be obtained through a process the Code terms "negotiation," defined as "the transfer of an instrument in such form that the transferee becomes a holder." U.C.C. § 3-202(1). If the instrument is payable to order — as is the case with the notes here — negotiation is accomplished "by delivery with any necessary indorsement." *Id.. . .*

Fortunately, our review in this case does not demand such clairvoyance. When interpreting the attachment requirement, the courts "have been of one mind" that the lack of an indorsing signature on the instrument itself, or on a sheet "firmly affixed" to the instrument, is fatal to holdership. *See, e.g., Bailey v. Mills,* 257 Ala. 239, 58 So.2d 446, 447 (1952); *Lopez v. Puzina,* 239 Cal.App.2d 708, 49 Cal.Rptr. 122, 124-25 (1966); *Lamson,* 531 P.2d at 968; *Shepherd Mall State Bank v. Johnson,* 603 P.2d 1115, 1118 (Okla.1979); *Estrada,* 550 S.W.2d at 725; *Crossland Sav. Bank FSB v. Constant,* 737 S.W.2d 19 (Tex.Ct.App. — Corpus Christi 1987); *Crosby,* 16 Wis. at 627. As one treatise states, "[t]he unanimity of the courts in cases where the signature is separate from the instrument can be explained by a judicial perception that it is sound policy to require the indorsement to be on the instrument." R. Hillman, J. McDonnell, & S. Nickles, *Common Law and Equity Under the Uniform Commercial Code* ¶ 11.02[1][b], at 11-18 (1985).

Where the state courts, the scholarly commentators, and the unambiguous language of the statute all admit of but one result, only an overwhelming equitable ground would warrant a departure from what is unquestionably settled law. Absent such a circumstance, the Code's express goal of national uniformity must prevail. *See* U.C.C. § 1-102(2).

*Adams* cited*, Bailey v. Mills,* 257 Ala. 239, 58 So.2d 446, 447 (1952)      in which the

Alabama Supreme Court analyzed this issue under the common law and the former Negotiable

Instruments Law:


For one to be a holder in due course of an order instrument "The indorsement must be written on the instrument itself or upon a paper attached thereto." Code 1940, Title 39, § 33. A written indorsement upon another and entirely distinct instrument is not permissible and will not have the effect of passing the legal title of such a negotiable instrument so as to make the transferee a holder in due course. "It is indispensably necessary if, such instruments are to fulfill the object for which they were designed, that they should carry with them the indicia by which their ownership is to be determined; otherwise, their value as a circulating medium would be largely curtailed, if not entirely destroyed. Adding an allonge when necessary or convenient is permissible only because furthering the object of their creation, viz. free and unrestrained negotiability. This is and can be the only exception to the rule * * *." Haug v. Riley, 101 Ga. 372, 29 S.E. 44, 46, 40 L.R.A. 244

The First Circuit in Papex Intern. Brokers v. Chase Manhattan Bank, 821 F. 2d 883, 884-

885 (1st Cir., 1987) referenced the replacement of the Uniform Negotiable instruments Law with

Article 3 of the Uniform Commercial Code:

Puerto Rico is the only remaining American jurisdiction to operate under the Uniform Negotiable Instruments Law (N.I.L.).[1] Elsewhere, the N.I.L. has been replaced by article three of the Uniform Commercial Code

The Court cited two cases from other jurisdictions on which it based the decision to ignore Rhode Island law and established precedence. The Court's citation of , Livonia Prop. Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC, 717 F. Supp. 2d 724, 734 (E.D. Mich. 2010), is inapplicable due to the factual differences and the evidence presented. In Livonia, the Court reviewed an affidavit of , William Walenczyk, Senior Vice President of Aurora Bank FSB f/k/a Lehman Brothers expressly affirmed the validity of the transfer to the Trust. And David H. Smith, Senior Vice President of CWCapital, the Special Servicer for the Trust, affirmed the validity of the transfer from the Trust to Lender. There also in Livonia was an assignment of mortgage presented by the Trust. No such assignment exists in this case.

The Court also committed manifest error of law in applying the case of Kohler v. U.S. Bank Nat. Ass'n, No. 11-C-0893, 2013 WL 3179557 at *5 (E.D. Wis. June 21, 2013. This case was factually different from Kohler. In that case there was evidence from a witness for the loan servicer that:

 Deutsche Bank has a custodial contract with the trust, its role under that contract is to hold and maintain the files Corcoran testified about in court, and Deutsche Bank was holding and maintaining those two files on behalf of the trust.

No such evidence was presented here and in fact Howard Handville the purported witness for the Plaintiff could not attest to any documents from US Bank as Trustee and could not attest to any documents maintained by the custodian.

Thus this case should be disregarded as inapposite and contrary to Rhode Island law as 6A-3-204 has no reference to intent to transfer.

MANIFEST ERROR AND NO FOUNDATIONAL BASIS FOR THE PLAINTIFF'S

EVIDENCE

The Court also committed manifest error by admitting any evidence as to the note or the

alleged current owner of the note by Howard Handville. The First Circuit set forth the standard

for admission of purported business records in U.*S. Bank Trust v. Jones*, 925 F. 3d 534 (1st

Circuit, 2019). The holding in *Jones* mandates that the testimony of Howard Handville is

defective because it does not verify anything about the boarding or the verification of the records

of Homeward Residential (formerly American Home Mortgage Servicing, Inc.,    This

corporation was not the original American Home Mortgage Servicing, Inc., the original servicer,

which filed a Chapter 11 Bankruptcy Petition on August 6, 20007 in case number 07-11050 in

the United States Bankruptcy Court for the District of Delaware, of which this case can take

judicial notice. Thus this mortgage loan has been serviced by five entities:

(1) Option One Mortgage Corporation


(2) The first American Home Mortgage Servicing, Inc. until its bankruptcy on August 6, 2007.

(3) The second American Home Mortgage Servicing, Inc. from its creation on September 6,
2007 until its name change of Homeward Residential, Inc. on May 31, 2012 as reflected in the
record of the Rhode Island Secretary of State, of which the Court can take judicial notice.

(4)      Ocwen Loan Servicing, LLC from March 1, 2013 to June 1, 2019.

(5) PHH Mortgage Services from June 1, 2019.

This witness could not explain how the records of prior servicers were


confirmed and verified by Ocwen or its current incarnation PHH. He could not


explain how the records of Ocwen and its RealServicing electronic system of

record, were confirmed and verified when PHH took over servicing of Ocwen and

transferred the records from Ocwen's servicing platform to its own servicing

platform. This testimony did not address any of the hearsay issues in *Jones*, in

which the Court allowed the records to be considered because the servicer

employee relied on the accuracy of the mortgage history and took measures to

verify the same and the servicer incorporated the previous servicer's records into

its own database and place its own financial interests at stake by relying on those

records and that is took steps to review the previous servicer's records in a way

that assured itself of the accuracy of those records. *Jones* at p.538. No such

testimony was presented in this case and no reference was made to the verification

or the procedures followed to verify accuracy when the records were purportedly

integrated. The Court held:

[W]hether a third party's records . . . can be integrated into the records of the offering entity . . . for purposes of admission under the business records exception **is not an issue upon which this circuit has reached a uniform conclusion**" covering every instance. United States v. Savarese, 686 F.3d 1, 12 (1st Cir. 2012). **Rather, the admissibility of the evidence turns on the facts of each case.**

Thus, we have affirmed the admission of business records containing third-party entries without third-party testimony where the entries were **"intimately integrated"** into the business records, FTC v. Direct Marketing Concepts, Inc., 624 F.3d 1, 16 n.15 (1st Cir. 2010), or where the party that produced the business records "**relied on the [third-party] document and documents such as those[] in his business**," United States v. Doe, 960 F.2d 221, 223 (1st Cir. 1992) (internal quotation marks omitted). Conversely, in the absence of third-party evidence**, we have rejected the admission of business records containing or relying on the accuracy of third-party information integrated into the later record where, for example, the later business did not "use[] a procedure for verifying" such information, lacked a "self-interest in assuring the accuracy of the outside information,"** United States v. Vigneau, 187 F.3d 70, 77 & n.6 (1st Cir. 1999) (emphasis omitted), or sought admission of third-party statements made "by a stranger to it," Bradley, 891 F.3d at 35 (quoting Vigneau, 187 F.3d at 75 (alterations omitted)). The key question is whether the records in question are "reliable enough to be admissible." Direct Marketing Concepts, 624 F.3d at 16 n.15..

The Court reviewed the testimony of the trial witness and noted:

In answering that question, we are mindful that the "**reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation**." Fed. R. Evid. 803 advisory committee's note to 1972 proposed rules. The rule seeks "to capture these factors and to extend their impact" by applying them to a "regularly conducted activity." Id (emphasis added).

The District Court had received testimony from a loan servicer employee who had

testified that:

 **Caliber incorporated the previous servicer's records into its own database and "plac[ed] its own financial interest at stake by relying on those records," and that "Caliber's acquisition department took steps to review the previous servicer's records in a way that assured itself of the accuracy of the records**." 330 F. Supp. 3d 530, 543 (D. Me. 2018); see Trial Tr. 28:3-6, 60:17-19.

(emphasis added).

All this testimony consisted of was his  recital of the business exception to the hearsay rule with

no factual basis. Thus these records should not have been admitted nor considered. He could not

verify the accuracy of any records as per this testimony. He could not authenticate the note and

allonge. On page 98 he indicated that his answer to interrogatory 14 was accurate indicating that the allonge was dated July 16, 2003 and on page 99 that:

And do you have any information which indicates that the signed promissory note was in the possession of Option One on July 16, 2003.

A. I don't

Thus there is testimony that the allonge was dated July 16, 2003, the date that the note was signed, even though the allonge was not affixed to the note on that date.

He had no idea when the note was placed in the collateral file on page  102-103:

1      **Q.**    So you have no idea what was in the collateral

2      file when you signed that answer; isn't that correct?

3      **A.**    I had an idea.

4      **Q.**    Well, you had not seen it; isn't that correct?

5      **A.**    Yes.

6      **Q.**    And you didn't know if the original note was in

7      that file; isn't that correct?

8      **A.**    I had not seen any indication that it was missing and my counsel

had talked to  confirm its

1      whereabouts, so I'm comfortable with that answer. . . **Q.**    Okay.  Now, when did this note leave the

2      possession of Option One?

3      **A.**    I don't know.

4

This witness could not confirm that the note and allonge were original documents and in fact in his answers to interrogatories he indicated that the allonge was dated July 16, 2003, the same date as the note. He relied on his counsel, Samuel Boodurtha who is not a person with any knowledge regarding the travel of the note from origination. He did not provide any information about the collateral file and the location of collateral file documents, indicating the promissory note and allonge and other documents, which would shed light on when the so-called allonge was indorsed and placed in the collateral file. This is an important issue, because pursuant to R.I.G.L.6A-3-204, an allonge is effective only if it is affixed to the executed promissory note at the time that a name is placed on an allonge.

As stated previously pursuant to the definition of instrument in UCC 6A-3-104 and 2-204 an instrument contains a promise to pay money. R.I.G.L. 6A-3-103 (5) defines maker as:

(5) "Maker" means a person who signs or is identified in a note as a person undertaking to pay.

R.I.G.L. 6A-3-103 (9) defines promise as:

(9) "Promise" means a written undertaking to pay money signed by the person undertaking to pay. An acknowledgment of an obligation by the obligor is not a promise unless the obligor also undertakes to pay the obligation.

Thus only when the Defendant signed the note did it become a promise, an instrument and an undertaking to pay under the Uniform Commercial Code. When the document has been signed by the maker, only then does it become an instrument, which can be transferred by assignment (if non-negotiable) or by negotiation (if a negotiable instrument). R.I.G.L. 6A-2-204 clearly states that a writing on a separate piece of paper if affixed to the instrument when it is

15

executed is *part of the document.*  This section of the UCC does not permit so called traveling allonges which are executed when not affixed to the instrument. An  endorsement may be made on the instrument itself.  If there is a separate piece of paper known as an is allonge it must be affixed to the instrument when the signature is added, pursuant to the provisions of  R.I.G.L. 6A-3-204. A signature on separate document, not affixed to the instrument is not effective to endorse the instrument. Plaintiff disregarded the need for  negotiation by delivery and endorsement, which explicitly requires that the instrument be executed prior to the endorsement or when affixed to the note, but not before or remotely. The failure to provide this information until February 2, 2022 effectively prejudiced the Defendant in defending this complaint. The witness did not provide this information in his testimony and thus only the note without the allonge can be considered by the Court.

Howard Handville testified that he only looked at copies of documents and did not know the location of or whether there were any original documents. The First Circuit in *Airframes Systems, Inc  L-3 Communications Corporation*  658 F. 3d (First Cir. , 2011) discussed the Best Evidence Rule:

The Best Evidence Rule requires that a party seeking to prove the "content" of a writing must introduce the "original" or a "duplicate" of the original, unless it is established that (1) all originals have been lost or destroyed (absent bad faith by the proponent); (2) the original cannot be obtained; (3) the original is in the possession of an opposing party who refuses to produce it; or (4) the writing is not closely related to a controlling issue. *See* Fed. R.Evid. 1001-1004;

A review of his testimony indicates that he had never seen any original documents

and made no effort to locate these documents and had no idea where they were.  As

a result this witness could not have authenticated any sales agreements, loan

schedules or any Trust Agreement, because all he looked at were copies without

any reference to original documents. Rule 1002 specifically requires that original

documents be provided:

An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.

However he testified that he had never seen the originals of any loan schedules or

trust agreements or any documents, which Plaintiff asked that this Court admit into

evidence:

 On  page 108 the following testimony was elicited on cross examination:

1       **Q.**      Okay.  That assumes that this is an original

2       document, correct, a copy of an original document;

3       isn't that correct?

4       **A.**      Yes.

5       **Q.**      And you don't know that this is a copy of the

6       original loan schedule in this case; isn't that

7       correct?

8       **A.      I have not seen the original.  I don't know.**

9       **Q.**      In fact, you have no idea where the original loan

10      schedule is; isn't that correct?

11      **A.**      I haven't seen it so I don't know.

17

12    **Q.**    You've made no attempt to find that original loan

13    schedule; isn't that correct?

14    **A.**    No, I haven't.

15    **Q.**    And as a matter of fact, you recall your

16    deposition on April 7th in which you testified

17    under oath; is that correct?

18    **A.**    Yes.

19    **Q.**    You recall that deposition?  In that

20    deposition you had indicated when you've addressed

21    this document,the so-called loan schedule, you

22    indicated that it was a standalone document not

23    attached to the so-called trust agreement; isn't

24    that correct?

25    **A.**    In our business records it was a standalone

26    document.

This continued on page 109 in which he indicated no knowledge about the original documents stating that the purported loan schedules were not attached to the purported trust agreement and that he never looked at the original trust agreement and never compared paragraph by paragraph the copy with any original agreement. He could not provide any information about a loan agreement from Lehman Brothers Bank and Brothers Holding Inc on page 110, exhibit G, which on page 11 he indicated contained no loan schedules. He stated on page 111 that he was not aware of any loan schedules for the document referenced as Exhibit G, an assignment and assumption agreement and that he has never seen the original and could not compare the original with what he claimed to be a copy. On page 112 he indicated:

**Q.**        And therefore, you cannot say that Exhibit G is anaccurate copy of the original record of any transaction between Lehman Brothers Bank and Lehman Brothers Holding; isn't that correct?

**A.**        Correct

On page 112 he indicated that he was not aware of any documents which existed which indicate that Option One Mortgage Corporation sold the Defendant's mortgage loan to Lehman Brothers Bank:


**Q.**        Are you aware of any documents which exist which indicate that Option One Mortgage Corporation sold the defendants' mortgage loan to Lehman Brothers Bank?

**A.**        No.

He testified that the purported Exhibit by which Lehman Brothers holding purportedly transferred Defendant's loan to Structured Asset Securities Corporation did not contain a loan schedule and that he did not verify the accuracy of his copy because he had never seen the original document.

(p 113).

He indicated that the loan schedules did not contain the street address, city and zip code and that there were no records of any custodian certifications as to this loan.

This witness did not make any effort to communicate with the custodian, Wells Fargo in order to obtain any documents requested in discovery. He was asked on page 121 whether PHH had a procedure to verify the accuracy of prior servicer records

and answered that there was a procedure. However on page 121 his prior deposition testimony was that he was not aware of any such procedure:

- **Q.**    Okay.  And do you recall your testimony in the deposition on April 7, 2022, on pages 19 and 20, in which I asked you, "Does PHH have a protocol to determine -- let me strike that. Does PHH currently have a protocol to confirm and verify the accuracy of all prior servicer documents when it loads the documents on its electronic system of record?"  And you answered, "Not to my knowledge."

- Was that your testimony at that time?

- **A.**    If that's what I'm stating in the deposition, that's correct.

He did not know of the people who may have verified the accuracy other than they were in India and did not review any documents whether there was any accuracy when the loan was boarded. (pp 121-122) and did not know when exhibits G, H I J K L and M were imaged (p 123).

He also testified that the Ocwen platform is no longer available for review and that he did not know whether any procedures were complied with to verify the accuracy of any data boarded into the Ocwen system when it took over servicing from Homeward Residential. He also testified that he did not have any first hand knowledge of the manner in which the Option One records were verified when it transferred servicing on page126.

He also testified that he was not aware of any sales agreement from Option One to any entity regarding Defendant's loan on page 127. Also contrary to the

answers to interrogatories, he indicated that somehow another Option One trust had the loan without any documentation for that purported transaction.

This witness could not identify any original documents as to any copies which Plaintiff sought to place in evidence. FRE 1002 was not satisfied, nor was the standard set forth by the First Circuit in *Jones*. Thus his testimony should be disregarded and all Plaintiff's exhibits should not have been  considered by the Court. Admission of this evidence without any foundation was a manifest error of law and should not have been allowed. Without this evidence of the negotiation of the note, Judgment should have been granted to the Defendants or in the alternative a new trial should be granted.

## THE COURT COMMITTED MANIFEST ERROR BY NOT ACCEPTING THE DEEMED ADMISSIONS AS DISPOSITIVE AND IN THE ALTERNATIVE SHOULD ENTER JUDGMENT FOR THE DEFENDANTS

This Court committed manifest errors of law by not accepting as admitted facts the failure of the Plaintiff to respond to the Requests for Admissions. The Court held that these admissions related solely to the mortgage and not the note. However a review of these admitted facts supports Defendants' demand for Judgment and reconsideration. FRCP 36 states that:

b) EFFECT OF AN ADMISSION; WITHDRAWING OR AMENDING IT. A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission

under this rule is not an admission for any other purpose and cannot be used against the party in

any other proceeding.

The following are admissions  which Plaintiff did not timely respond to and to which it did not

move to be allowed to withdraw before Trial or at any time.

1. On December 15, 2008 , Option One was not owed any
indebtedness under the Defendant's note.

2. On December 15, 2008 Option One did not own Defendant's note.

3. On December 15, 2008 Option One did not own Defendant's
mortgage.

4. On December 15, 2008, La Salle Bank National Association as
Trustee for Structured Asset Securities Corporation Structured Asset
Investment Loan Trust Mortgage Pass-Through Certificates, Series
2003-BC11("LaSalle as Trustee" did not purchase Defendant's
Mortgage from any entity.

5. On December 15, 2008, La Salle Bank as Trustee did not purchase Defendant's note from any
entity.

6. La Salle as Trustee did not provide any consideration to any entity on December 15, 2008.

7. No entity with the name of Structured Asset Securities
Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through
Certificates, Series 2003-BC11has ever existed.

8. La Salle Bank, National Association was never the trustee for
Structured Asset Securities Corporation Structured Asset Investment Loan
Trust Mortgage Pass-Through Certificates, Series 2003-BC11.

9. The purported assignment referenced as Exhibit 5 to the
complaint was not signed by Linda Green.

10. The purported witness to the purported assignment referenced as
Exhibit 5 to the complaint was not signed by Tywanna Thomas.

11. The purported notarization to the purported assignment
referenced as Exhibit 5 to the complaint was not signed by Bailey Kirchner.

12. Exhibit A is a genuine and authentic copy of a complaint filed by

AHMSI against DocX, LLC and Lender

13. Lender Processing Services, Inc. ("LPS") was the parent company of DocX, LLC.

14. Linda Green was never an officer of AHMSI.

15. Exhibit B is a genuine and authentic copy of a Consent Order of the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Comptroller of the Currency, the Office of Thrift Supervision, Lender Processing Services, Inc., DocX, LLC and LPS Default Solutions, Inc., dated April 13, 2011.

16. Option One did not own Plaintiff's mortgage on July 15, 2011.

17. On March 18, 2009, an affidavit was filed in the United States Bankruptcy Court for the Eastern District of Louisiana in case number 07-11862.

18. Exhibit C is a genuine and authentic of the affidavit referenced in Request for Admission 17.

18. The original of Exhibit C was signed by Dale Sugimoto.

19. Dale Sugimoto on March 18, 2009 was the President of Sand Canyon.

20. On March 18, 2009 Sand Canyon did not own any residential real estate mortgages.

21. On July 15, 2011 Option One did not own any residential real estate mortgages.

22. On December 15, 2008 Option One did not own any residential real estate mortgages.

23. On July 15, 2011, Sand Canyon did not own any residential real estate mortgages.

24. On December 15, 2008 Sand Canyon did not own Defendant's mortgage.

25. On December 15, 2008 Sand Canyon did not own Defendant's note.

26. La Salle Bank as Trustee did not provide any consideration to Sand Canyon for Defendant's note on July 15, 2011.

27. La Salle Bank as Trustee did not provide any consideration to Sand Canyon for Defendant's mortgage on July 15, 2011.

28. La Salle Bank as Trustee never purchased Defendant's mortgage from Sand Canyon at any time.

29. La Salle Bank as Trustee never purchased Defendant's note from Sand Canyon at any time.

30. La Salle Bank as Trustee did not provide any consideration for Defendant's mortgage to Sand Canyon on July 15, 2011.

31. Exhibit 6 to the complaint was not signed by an officer of Sand Canyon.

32. Tonya Hopkins was not an officer of Sand Canyon on July 15, 2011.

33. Tonya Hopkins was an employee of AHMSI on July 15, 2011.

34. Tonya Hopkins did not sign the purported assignment dated July 15, 2011.

35. La Salle Bank National Association did not exist as an entity on February 22, 2013.

36. La Salle Bank National Association merged with Bank of America, N.A. on October 17, 2008.

37. On February 22, 2013, La Salle Bank National Association no longer existed as an entity.

38. On February 22, 2013 La Salle Bank as Trustee did not own Defendant's mortgage.

39. La Salle Bank as Trustee never granted a power of attorney to Homeward Residential, Inc., authorizing it to sign an assignment of mortgage from La Salle Bank as Trustee to U.S. Bank National Association as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 on February 22, 2013.

40. U.S. Bank National Association was never a Trustee for an entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

41. There is no such entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC1.

42. Pamela Stoddard was not an officer of Homeward Residential on February 22, 2013.

43. Pamela Stoddard was never an officer of Homeward Residential on February 22, 2013.

44. Pamela Stoddard was an employee of Security Connections, Inc. on February 22, 2013.

45. Pamela Stoddard did not sign the purported assignment dated February 22, 2013.

The purpose of these requests for Admissions was to preclude the Plaintiff presenting fraudulent assignments to the Court which it originally sought to do in the Original and Amended Complaint and which it sought to present in its original list of Exhibits. However the admissions made by Plaintiff in regard to several of these Requests bind the Plaintiff and cannot be controverted.

7. No entity with the name of Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11 has ever existed.

8. La Salle Bank, National Association was never the trustee for Structured Asset Securities Corporation Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2003-BC11.

37. On February 22, 2013, La Salle Bank National Association no longer existed as an entity.

38. On February 22, 2013 La Salle Bank as Trustee did not own Defendant's mortgage.

39. La Salle Bank as Trustee never granted a power of attorney to Homeward Residential, Inc., authorizing it to sign an assignment of mortgage from La Salle Bank as Trustee to U.S. Bank National Association as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 on February 22, 2013.

40. U.S. Bank National Association was never a Trustee for an entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

41. There is no such entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC1.

29. La Salle Bank as Trustee never purchased Defendant's note from Sand Canyon at any time.

Thus these admissions are fatal to Plaintiff's case, since there is a deemed fact that the Plaintiff does not exist and never existed. Thus it could not bring this action.

The case law is clear that Plaintiff cannot undo these admissions, nor has it made any attempt to do so.  The case law in the First Circuit and elsewhere is clear, these admissions bind the Plaintiff.  In *Brook Village North Associates v. General Electric Company*, 686 F. 2d 66 (First Cir., 1982) the Court reversed the Trial Court for allowing a withdrawal of an admission at trial on Motion of the party bound by the admission.  The Court noted the basis for the rule, the procedure and standards for removing admissions and the different standard at trial:

Under Rule 36 in its present form (the rule was amended in 1970), if a party fails timely to answer a request for admissions, the requested items are deemed admitted. Any matter thus admitted under the Rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. And courts have not hesitated in appropriate cases to apply the sanction of Rule 36 to material facts that conclusively establish or preclude a party's claim. *See, e.g., Rainbolt v. Johnson,* 669 F.2d 767 (D.C.Cir.1981); *United States v. Kenealy,* 646 F.2d 699 (1st Cir.), *cert. denied,* 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 250 (1981).

The instant case poses the question of the discretion of a district court to permit withdrawal or amendment of an admission by default once trial has commenced. In general, the standard for being relieved of a failure to respond in a timely fashion to a request for admissions is permissive: a court may allow withdrawal or amendment of an admission "when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits." Fed.R.Civ.P. 36(b). The prejudice contemplated by the Rule is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth. Rather, it relates to the difficulty a party may face in proving its case, *e.g.,* caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions. *See Westmoreland v. Triumph* 71*71 *Motorcycle Corp.,* 71 F.R.D. 192 (D.Conn.1976).

The Rule understandably imposes a more restrictive standard, however, on the granting of a request to avoid the effect of an admission once trial had begun. Rule 36(b) specifies that the court can permit withdrawal or amendment of admissions "[s]ubject to the provisions of Rule 16 governing amendment of pre-trial order." Rule 16 authorizes the conduct and defines the contours of a conference before trial. "The chief purposes of the pre-trial conference are to define and simplify the issues, to lessen surprise at trial and the risk of judicial error, to conclude stipulations on matters of evidence, and to promote settlements." 3 J. Moore, *Moore's Federal Practice* ¶ 16.03 at 16-6 to 16-7 (2d ed. 1982) (footnote omitted). To give effect to matters resolved at conference, Rule 16 provides for the court to make an order "which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreement of counsel." The pre-trial order, once entered, controls the subsequent course of action. "No proof need be offered as to matters stipulated to in the order, since the facts admitted at the pretrial conference and contained in the pre-trial order stand as fully determined as if adjudicated at the trial." 3 J. Moore, *supra,* ¶ 16.19 at 16-40 to 16-41 (footnote omitted). The order can be modified at trial, but only "to prevent manifest injustice." Thus, Rule 16 by its terms sets a higher threshold for a trial judge to exercise his discretion to avoid the force of admissions under Rule 36 once trial has begun.

The district court in the instant case appears to have disregarded the existence of this higher threshold for opening up admissions after commencement of trial.

At no time, did Plaintiff  file a Motion to withdraw these admissions. The Defendant raised this

issue on the first day of trial as indicated by the Transcript:

And I would specifically present to the Court Request for Admission Number Seven which states that no entity within the name of Structured Asset Securities Corporation,
Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11 has ever existed. That is an established fact which is the name
of the plaintiff in this case which is seeking relief.

Request for Admission Eight, which is a fact accepted as true, deemed true, pursuant to Federal Rule of Civil Procedure 36, is that LaSalle Bank National
Association was never the trustee for Structured Asset Securities Corporation, Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

 Request for Admission Forty, which is deemed admitted, which is very crucial: U.S. Bank National Association was never a trustee for any entity named Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2003-BC11.

And Request for Admission Number Four, there is no such entity named Structured Asset Investment Loan Trust,Mortgage Pass-Through Certificates, Series 2003-BC11.

Now, as a result, your Honor, by virtue of that, my brother indicated, he's the attorney for this trust, it has been deemed admitted that this trust does not

27

exist. So I would suggest that the plaintiff cannot proceed under the name it's proceeding under because it doesn't exist as a matter of law and fact.

Defendant's Requests for Admissions established that these were conclusive facts and Plaintiff could not at the last minute in trial without a Motion ask the Court to not consider these Admissions because they were not true. This defeats the purpose of the rule and is prejudicial to the Defendant who relied on the admissions. Thus this Court committed manifest error by considering the Plaintiff's complaint because as a matter of law and fact, it did not exist.

THE COURT COMMITTED MANIFEST ERROR BY NOT IMPOSING SANCTIONS ON PLAINTIFF FOR FAILURE TO RESPOND TO DISCOVERY AND THEN TO SEEK TO PRESENT EVIDENCE CONTRARY TO ITS RESPONSES

Defendant also had filed a Motion in Limine and for Sanctions pursuant to Fed. R. Civ. Pro. 37. Plaintiff has proposed certain Trial Exhibits, which it sought to introduce into evidence which were referenced in the attached Exhibit List provided by Plaintiff. The Exhibits, which are the scope of this Motion were as follow:

July 16, 2003 $315,400 Adjustable Rate Note with Option One Mortgage Corporation ("Option One") *Exhibit C*.

October 1, 2003 Assignment and Assumption Agreement between Lehman Brothers Bank, FSB and Lehman Brothers Holdings, Inc., *Exhibit G*.

October 1, 2003 Mortgage Loan Sale and Assignment Agreement, *Exhibit H*.

October 1, 2003 Trust Agreement, *Exhibit I*.

October 1 2003 Servicing Agreement, *Exhibit J*.

October 1, 2003 Mortgage Loan Schedule, *Exhibit K*.

April 30, 2008 American Home Mortgage Servicing, Inc. ("AHMSI") Purchase Agreement, *Exhibit L*.

June 30, 2009 Notices of Resignation and Appointment of Trustee, *Exhibit M*.

Loan Payment History, *Exhibit R*.

This  Court committed manifest error by admissing these exhibits into evidence despite they inability of the purported business records witness to authenticate these records and the refusal of the Plaintiff to provide them until the eve of trial, thus further prejudicing the Defendant.  The Motions in Limine and for Sanction  should  have been granted.  PHH and Plaintiff should be sanctioned for trial by ambush and for seeking to present evidence without any  authentication prior to trial at discovery level and certainly at trial where the witness could not establish any evidence about original documents or most copies as will be discussed. The travel of this case indicates the following loan servicers who mailed bills to the Defendant:

Option One Mortgage Corporation

American Home Mortgage

American Home Mortgage Servicing, Inc. which later changed its name to Homeward Residential, which utilized a servicing platform known as Black Knight MSP

Ocwen Loan Servicing, LLC, which utilized a servicing platform known as Real Servicing

PHH Mortgage which utilized a servicing platform known as  Black Knight MSP.  As mentioned in the Motion in Limine Plaintiff refused to produce any documents requested in Request numbers 28, 31, 32, 33, 34, 35, 36. 37, 38, 39, 40, 41, 42, 43 and 44. These Requests asked for the custodial agreement, seeking records relating to custodial receipts by the Custodian. However Plaintiff refused to provide any document. Thus unlike the cases cited by the Court there was no custodial agreement which should have been provided as Defendant has not been provided the custodian information or the documents in the collateral file and when they were placed into the file with the

indices. Plaintiff should not have been rewarded for its refusal to provide discovery. It never amended its answers to interrogatories or provided the complete documents, which have missing exhibits, but only presented these documents on the eve of trial. Evidence regarding the note should not have been admitted without authentication regarding the allonge, its date of creation, the date it was signed and added to the collateral file. One document provided by Plaintiff is attached, which twice indicates that there were two separate documents provided, a note and allonge

For these reasons the Motion for a New Trial, to Grant Judgment for the Defendant and/or to Alter and Amend the Judgment due to manifest errors of law should be granted.

MASSOUD SHAKOORI

BY HIS ATTORNEY

December 14, 2022

/s/ John B. Ennis

JOHN B. ENNIS, ESQ. #2135

1200 Reservoir Avenue

Cranston RI 02920

(401)943-9230

Jbelaw75@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that this Memorandum was electronically served on all attorneys by ECF filing on December 14, 2022.

/s/ John B. Ennis